continuing through February 28, 2001, (b) with respect to the second Applicable Margin Adjustment Date, the period commencing on December 1, 2000 and continuing through May 31, 2001, (c) with respect to the third Applicable Margin Adjustment Date, the period commencing on December 1, 2000 and continuing through August 31, 2001, and (d) with respect to the fourth and any subsequent Applicable Margin Adjustment Date, a single period consisting of the four immediately preceding consecutive fiscal quarters of the Borrower (whether or not such quarters are all within the same Fiscal Year).

"Margin Stock" means "margin stock" as such term is defined in Regulation T, U or X of the Federal Reserve Board.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, condition (financial or otherwise) or prospects of the Borrower or the Collateral; (b) a material impairment of the ability of the Borrower to perform under any Loan Document to which it is a party and to avoid any Event of Default; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Borrower of any Loan Document to which it is a party.

"Maximum Rate" shall have the meaning specified in Section 3.3.

"Maximum Revolver Amount" means Twenty Million Dollars ($20,000,000).



"Mortgage" means and includes any and all of the mortgages, deeds of trust, deeds to secure debt, assignments and other instruments executed and delivered by the Borrower to or for the benefit of the Agent by which the Agent, on behalf of the Lenders, acquires a Lien on the Real Estate or a collateral assignment of the Borrower's interest under leases of Real Estate, and all amendments, modifications and supplements thereto.

"Multi-employer Plan" means a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA which is or was at any time during the current year or the immediately preceding six (6) years contributed to by the Borrower or any ERISA Affiliate.

"Net Amount of Eligible Accounts" means, at any time, the gross amount of Eligible Accounts less sales, excise or similar taxes, and less returns, discounts, claims, credits and allowances of any nature at any time issued, owing, granted, outstanding, available or claimed.

"Notice of Borrowing" has the meaning specified in Section 2.2(b).

"Notice of Continuation/Conversion" has the meaning specified in Section 3.2(b).

"Obligations" means all present and future loans, advances, liabilities, obligations, covenants, duties, and debts owing by the Borrower to the Agent and/or any Lender, arising under or pursuant to this Agreement or any of the other Loan Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, Attorney

Costs, filing fees and any other sums chargeable to the Borrower hereunder or under any of the other Loan Documents. "Obligations" includes, without limitation, (a) all debts, liabilities, and obligations now or hereafter arising from or in connection with the Letters of Credit and (b) all debts, liabilities and obligations now or hereafter arising from or in connection with Bank Products.

"Other Taxes" means any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies which arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any other Loan Documents.

"Participant" means any Person who shall have been granted the right by any Lender to participate in the financing provided by such Lender under this Agreement, and who shall have entered into a participation agreement in form and substance satisfactory to such Lender.

"Payment Account" means each bank account established pursuant to Section 6.9, to which the proceeds of Accounts and other Collateral are deposited or credited, and which is maintained in the name of the Agent or the Borrower, as the Agent may determine, on terms acceptable to the Agent.

"PBGC" means the Pension Benefit Guaranty Corporation or any Governmental Authority succeeding to the functions thereof.

"Pending Revolving Loans" means, at any time, the aggregate principal amount of all Revolving Loans requested in any Notice(s) of Borrowing received by the Agent which have not yet been advanced.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA which the Borrower sponsors, maintains, or to which it makes, is making, or is obligated to make contributions, or in the case of a Multi-employer Plan has made contributions at any time during the immediately preceding five (5) plan years.

"Permitted Liens" means:

(a) Liens for taxes not delinquent or statutory Liens for taxes in an amount not to exceed $100,000 provided that the payment of such taxes which are due and payable is being contested in good faith and by appropriate proceedings diligently pursued and as to which adequate financial reserves have been established on Borrower's books and records and a stay of enforcement of any such Lien is in effect;

(b) the Agent's Liens;

(c) Liens consisting of deposits made in the ordinary course of business in connection with, or to secure payment of, obligations under worker's compensation, unemployment insurance, social security and other similar laws, or to secure the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure indemnity, performance or other similar bonds for the performance of bids, tenders or contracts

(other than for the repayment of borrowed money) or to secure statutory obligations (other than liens arising under ERISA or Environmental Liens) or surety or appeal bonds, or to secure indemnity, performance or other similar bonds;

(d)     statutory liens of landlords, carriers, warehousemen, mechanics, materialmen and other similar liens imposed by law, which are incurred in the ordinary course of business for sums not more than thirty (30) days delinquent or which are being contested in good faith by appropriate proceedings and for which reserves shall have been set aside on the Borrower's books, all as determined by the Agent in the exercise of its discretion, provided that if any such Lien arises from the nonpayment of such claims or demand when due, such claims or demands do not exceed $100,000 in the aggregate;

(e)     Liens constituting of encumbrances in the nature of reservations, exceptions, encroachments, easements, rights of way, covenants running with the land, and other similar title exceptions or encumbrances affecting any Real Estate as more fully described in Schedule B of the ALTA loan policy of title insurance delivered to and accepted by the Agent in accordance with Section 10.1(p) hereof; provided that they do not in the aggregate materially detract from the value of the Real Estate or materially interfere with its use in the ordinary conduct of the Borrower's business; and

(f)     Liens arising from judgments and attachments in connection with court proceedings provided that the attachment or enforcement of such Liens would not result in an Event of Default hereunder and such Liens are being contested in good faith by appropriate proceedings, adequate reserves have been set aside and no material Property is subject to a material risk of loss or forfeiture and the claims in respect of such Liens are fully covered by insurance (subject to ordinary and customary deductibles) and a stay of execution pending appeal or proceeding for review is in effect.

"Permitted Rentals" has the meaning specified in Section 9.25.

"Person" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, Governmental Authority, or any other entity.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) which the Borrower sponsors or maintains or to which the Borrower makes, is making, or is obligated to make contributions and includes any Pension Plan.

"Prime Rate" means, for any day, the rate of interest in effect for such day as publicly announced from time to time by the Bank in Charlotte, North Carolina as its "prime rate" (the "prime rate" being a rate set by the Bank based upon various factors including the Bank's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate). Any change in the prime rate announced by the Bank shall take effect at the opening of business on the day specified in the public announcement of such change. Each Interest Rate based upon the Prime Rate shall be adjusted simultaneously with any change in the Prime Rate.

"Prime Rate Loans" means, collectively, the Prime Rate Revolving Loans and the Prime Rate Term Loans.

"Prime Rate Revolving Loan" means a Revolving Loan during any period in which it bears interest based on the Prime Rate.

"Prime Rate Term Loan" means any portion of a Term Loan during any period in which such portion bears interest based on the Prime Rate.

"Prime Rate Term Loan A" means any portion of a Term Loan A during any period in which such portion bears interest based on the Prime Rate.

"Prime Rate Term Loan B" means any portion of a Term Loan B during any period in which such portion bears interest based on the Prime Rate.

"Pro Rata Share" means, with respect to a Lender, a fraction (expressed as a percentage), the numerator of which is the amount of such Lender's Commitment and the denominator of which is the sum of the amounts of all of the Lenders' Commitments, or if no Commitments are outstanding, a fraction (expressed as a percentage), the numerator of which is the amount of Obligations owed to such Lender and the denominator of which is the aggregate amount of the Obligations owed to the Lenders, in each case giving effect to a Lender's participation in Swing-Line Loans and Agent Advances.

"Proprietary Rights" means all of the Borrower's now owned and hereafter arising or acquired: licenses, franchises, permits, patents, patent rights, copyrights, works which are the subject matter of copyrights, trademarks, service marks, trade names, trade styles, patent, trademark and service mark applications, and all licenses and rights related to any of the foregoing, including, without limitation, those patents, trademarks, service marks, trade names and copyrights set forth on Schedule 8.13 hereto, and all other rights under any of the foregoing, all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing, and all rights to sue for past, present and future infringement of any of the foregoing.

"Real Estate" means all of the Borrower's now or hereafter owned or leased estates in real property, including, without limitation, all fees, leaseholds and future interests, together with all of the Borrower's now or hereafter owned or leased interests in the improvements thereon, the fixtures attached thereto and the easements appurtenant thereto.

"Release" means a release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration of a Contaminant into the indoor or outdoor environment or into or out of any Real Estate or other property, including the movement of Contaminants through or in the air, soil, surface water, groundwater or Real Estate or other property.

"Rentals" has the meaning specified in Section 9.25.

{KAC1124.DOC;10}                                22

"Reportable Event" means, any of the events set forth in Section 4043(b) of ERISA or the regulations thereunder, other than any such event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the PBGC.

"Required Lenders" means at any time Lenders whose Pro Rata Shares aggregate more than 51% as such percentage is determined under the definition of Pro Rata Share set forth herein, provided, however, at any date of determination in which only two (2) Lenders are party to this Agreement, Required Lenders shall mean Lenders whose Pro Rata Shares aggregate more than $66^{2/3}$% as such percentage is determined under the definition of Pro Rata Share set forth herein.

"Requirement of Law" means, as to any Person, any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon the Person or any of its property or to which the Person or any of its property is subject.

"Responsible Officer" means the chief executive officer or the president of the Borrower, or any other officer having substantially the same authority and responsibility; or, with respect to compliance with financial covenants and the preparation of the Borrowing Base Certificate, the chief financial officer or the treasurer of the Borrower, or any other officer having substantially the same authority and responsibility.

"Restricted Investment" means, as to the Borrower, any acquisition of property by the Borrower in exchange for cash or other property, whether in the form of an acquisition of stock, debt, or other indebtedness or obligation, or the purchase or acquisition of any other property, or a loan, advance, capital contribution, or subscription, except the following: (a) acquisitions of Equipment to be used in the business of the Borrower so long as the acquisition costs thereof constitute Capital Expenditures permitted hereunder; (b) acquisitions of Inventory in the ordinary course of business of the Borrower; (c) acquisitions of current assets acquired in the ordinary course of business of the Borrower; (d) direct obligations of the United States of America, or any agency thereof, or obligations guaranteed by the United States of America, provided that such obligations mature within one year from the date of acquisition thereof; (e) acquisitions of certificates of deposit maturing within one year from the date of acquisition, bankers' acceptances, Eurodollar bank deposits, or overnight bank deposits, in each case issued by, created by, or with a bank or trust company organized under the laws of the United States of America or any state thereof having capital and surplus aggregating at least $100,000,000; (f) acquisitions of commercial paper given a rating of "A2" or better by Standard & Poor's Corporation or "P2" or better by Moody's Investors Service, Inc. and maturing not more than 90 days from the date of creation thereof; and (g) Hedge Agreements.

"Revolving Loans" has the meaning specified in Section 2.2 and includes each Agent Advance and Swing-Line Loan.

"Settlement" and "Settlement Date" have the meanings specified in Section 2.2(j)(1).

"Solvent" means when used with respect to any Person that at the time of determination:

(i) the assets of such Person, at a fair valuation, are in excess of the total amount of its debts (including, without limitation, contingent liabilities); and

(ii) the present fair saleable value of its assets is greater than its probable liability on its existing debts as such debts become absolute and matured; and

(iii) it is then able and expects to be able to pay its debts (including, without limitation, contingent debts and other commitments) as they mature; and

(iv) it has capital sufficient to carry on its business as conducted and as proposed to be conducted.

For purposes of determining whether a Person is Solvent, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Stated Termination Date" means April 10, 2003.

"Subsidiary" of a Person means any corporation, association, partnership, limited liability company, joint venture or other business entity of which more than fifty percent (50%) of the voting stock or other equity interests (in the case of Persons other than corporations), is owned or controlled directly or indirectly by the Person, or one or more of the Subsidiaries of the Person, or a combination thereof. Unless the context otherwise clearly requires, references herein to a "Subsidiary" refer to a Subsidiary of the Borrower.

"Swing-Line Sublimit" means an amount equal to the lesser of (a) $3,000,000 or (b) the Commitment of the Bank. The Swing-Line Sublimit is part of, and not in addition to the Commitment of the Bank.

"Swing-Line Loan" and "Swing-Line Loans" have the meanings specified in Section 2.2(h).

"Swap Reserve" means any and all reserves which the Lender from time to time establishes, in its sole discretion, with respect to Swap Transactions.

"Swap Transactions" means any interest rate swap transaction, forward rate transaction, treasury lock transaction, interest rate cap, floor or collar transaction, any similar transaction, any option to enter into any of the foregoing, or any combination of any of the foregoing.

"Tax Distributions" means, if the Borrower is an S Corporation or elects to be taxed as an S Corporation pursuant to Subchapter S of the Code, dividends declared and paid by the Borrower to its shareholders, in the amount determined pursuant to the next sentence, at such times as the shareholders are required to make payments to the taxing authorities, whether as

estimates or otherwise, but only so long as the aggregate amount of all such dividends for the entire period during which the S Corporation election is in effect does not exceed the amount of the federal, state and local income taxes (including estimated taxes) paid or payable by the shareholders as a group (as determined on the basis of the assumption set forth in the next sentence) because of any items of income, gain, loss, deduction or credit of the Borrower which are imputed to the shareholders because of the Borrower's S Corporation status (or would be imputed if the date which is the last day of the month preceding the date any regular quarterly estimated tax payment is due for a calendar year taxpayer were the last day of the Borrower's taxable year). In the event the amount of dividends paid to any individual shareholder pursuant to this definition exceeds the limitations set forth herein, Borrower shall use reasonable efforts to obtain such excess from such shareholder.

Subject to the limitation set forth above, the amount of the dividend payable to any shareholder on any relevant date shall be calculated on the assumption that, with respect to any items of income, gain, loss, deduction or credit of the Borrower which are imputed to the shareholders because of the Borrower's S Corporation status, each of the shareholders is subject to the highest aggregate marginal income tax rate (taking account of federal, state and local income taxes, and the deductibility of state and local income taxes for federal income tax purposes) which could be applicable to any one of the shareholders for the relevant taxable period.

"Taxes" means any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding, in the case of each Lender and the Agent, such taxes (including income taxes or franchise taxes) as are imposed on or measured by the Agent's or each Lender's net income in any jurisdiction (whether federal, state or local and including any political subdivision thereof) under the laws of which such Lender or the Agent, as the case may be, is organized or maintains a lending office.

"Term Loan" means any of Term Loan A or Term Loan B and "Term Loans" means the collective reference to Term Loan A and Term Loan B.

"Term Loan A" and "Term Loans A" have the meanings specified in Section 2.3(a).

"Term Loan Note A" and "Term Loan Notes A" have the meanings specified in Section 2.3(c).

"Term Loan B" and "Term Loans B" have the meanings specified in Section 2.4(a).

"Term Loan B Mandatory Prepayment" and "Term Loan B Mandatory Prepayments" have the meanings specified in Section 4.5

"Term Loan Note B" and "Term Loan Notes B" have the meanings specified in Section 2.4(c).

"Term Loan Note" means a Term Loan Note A or a Term Loan Note B, and "Term Loan Notes" means the collective reference to all Term Loan Notes A and Term Loan Notes B.

"Termination Date" means the earliest to occur of (i) the Stated Termination Date, (ii) the date the Total Facility is terminated either by the Borrower pursuant to Section 4.2 or by the Majority Lenders pursuant to Section 11.2, and (iii) the date this Agreement is otherwise terminated for any reason whatsoever pursuant to the terms of this Agreement.

"Testing Period" means (a) with respect to any date of determination occurring as of the Borrower's May 31, 2000 fiscal quarter end, the period commencing on March 1, 2000 and continuing through May 31, 2000, (b) with respect to any date of determination occurring as of the Borrower's August 31, 2000 fiscal quarter end, the period commencing on March 1, 2000 and continuing through August 31, 2000, (c) with respect to any date of determination occurring as of the Borrower's November 30, 2000 Fiscal Year end, the period commencing on March 1, 2000 and continuing through November 30, 2000, and (d) from and after November 30, 2000, with respect to any date of determination, a single period consisting of the four consecutive fiscal quarters of the Borrower then last ended (whether or not such quarters are all within the same Fiscal Year).

"Total Facility" has the meaning specified in Section 2.1.

"UCC" means the Uniform Commercial Code (or any successor statute), as in effect from time to time, of the State of Illinois or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests.

"Unfunded Pension Liability" means the excess of a Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"Unused Letter of Credit Subfacility" means an amount equal to (a) One Million Five Hundred Thousand Dollars ($1,500,000), minus (b) the sum of (i) the aggregate undrawn face amount of all outstanding Letters of Credit plus (ii) the aggregate unpaid reimbursement obligations with respect to all Letters of Credit.

"Unused Line Fee" has the meaning specified in Section 3.5.

1.2     Accounting Terms.

Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed, unless otherwise specifically provided herein, in accordance with GAAP as consistently applied and using the same method for inventory valuation as used in the preparation of the Financial Statements.

1.3     Interpretive Provisions.

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)     The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement; and Subsection, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(i)     The term "documents" includes

(ii)    any and all instruments, documents, agreements, certificates, indentures, notices and other writings, however evidenced.

(iii)   The term "including" is not limiting and means "including without limitation."

(iv)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including."

(c)     Unless otherwise expressly provided herein, (i) references to agreements (including this Agreement) and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation are to be construed as including all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting the statute or regulation.

(d)     The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(e)     This Agreement and other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters. All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms.

(f)     This Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to the Agent, the Borrower and the other parties, and are the products of all parties. Accordingly, they shall not be construed against the Lenders or the Agent merely because of the Agent's or Lenders' involvement in their preparation.

ARTICLE 2

LOANS AND LETTERS OF CREDIT

2.1    Total Facility.

Subject to all of the terms and conditions of this Agreement, the Lenders severally agree to make available a total credit facility of up to Forty-Eight Million Dollars ($48,000,000) (the "Total Facility") for the Borrower's use from time to time during the term of this Agreement. The Total Facility shall be comprised of: (a) a revolving line of credit consisting of Revolving Loans and Letters of Credit up to the Borrowing Base, as described in Sections 2.2 and 2.5; (b) the Term Loan A, as described in Section 2.3 and (c) the Term Loan B, as described in Section 2.4.

2.2    Revolving Loans

(a)    Amounts. Subject to the satisfaction of the conditions precedent set forth in ARTICLE 10, each Lender severally, but not jointly, agrees, upon the Borrower's request from time to time on any Business Day during the period from the Closing Date to the Termination Date, to make revolving loans (the "Revolving Loans") to the Borrower in amounts not to exceed (except for the Bank with respect to Swing-Line Loans and except for the Agent with respect to Agent Advances) such Lender's Pro Rata Share of the Borrowing Base. The Lenders, however, in their unanimous discretion, may elect to make Revolving Loans or issue or arrange to have issued Letters of Credit in excess of the Availability on one or more occasions, but if they do so, neither the Agent nor the Lenders shall be deemed thereby to have changed the limits of the Borrowing Base or to be obligated to exceed such limits on any other occasion. If the Aggregate Revolver Outstandings exceed the Borrowing Base, the Lenders may refuse to make or otherwise restrict the making of Revolving Loans as the Lenders determine until such excess has been eliminated, subject to the Agent's authority, in its sole discretion, to make Agent Advances pursuant to the terms of Section 2.2(i).

(b)    Procedure for Borrowing. (1) Each Borrowing shall be made upon the Borrower's irrevocable written notice delivered to the Agent in the form of a notice of borrowing ("Notice of Borrowing") together with a Borrowing Base Certificate reflecting sufficient Availability, which must be received by the Agent prior to 11:00 a.m. (Chicago time) (i) three Business Days prior to the requested Funding Date, in the case of LIBOR Rate Loans and (ii) no later than 11:00 a.m. on the requested Funding Date, in the case of Prime Rate Loans, specifying:

(A)    the amount of the Borrowing, which in the case of a LIBOR Rate Loan may not be less than $2,000,000 or any integral multiple of $500,000 in excess thereof;

(B)    the requested Funding Date, which shall be a Business Day;

(C)    whether the Revolving Loans requested are to be Prime Rate Revolving Loans or LIBOR Revolving Loans (and if not specified, it shall be deemed a request for a Prime Rate Revolving Loan); and

(D) the duration of the Interest Period if the requested Revolving Loans are to be LIBOR Revolving Loans. If the Notice of Borrowing fails to specify the duration of the Interest Period for any Borrowing comprised of LIBOR Rate Loans, such Interest Period shall be one month;

provided, however, that with respect to (i) the Borrowing to be made on the Closing Date and (ii) the Borrowings made during the period commencing on the Closing Date and ending on the date in which the Bank makes an assignment of any part its Commitment to another Lender, which such period for purposes of this Section 2.2(b) shall not extend beyond July 15, 2000, such Borrowings will consist of Prime Rate Revolving Loans only.

(2) With respect to any request for Prime Rate Revolving Loans, in lieu of delivering the above-described Notice of Borrowing the Borrower may give the Agent telephonic notice of such request by the required time, with such telephonic notice to be confirmed in writing within 24 hours of the giving of such notice but the Agent at all times shall be entitled to rely on such telephonic notice in making such Revolving Loans, regardless of whether any such confirmation is received by Agent.

(3) The Borrower shall have no right to request a LIBOR Rate Loan while a Default or Event of Default has occurred and is continuing.

(c) Reliance upon Authority. The Borrower shall deliver to the Agent, prior to the Closing Date, a writing setting forth the account of the Borrower to which the Agent is authorized to transfer the proceeds of the Revolving Loans requested pursuant to this Section 2.2, which account shall be reasonably satisfactory to the Agent. The Agent shall be entitled to rely conclusively on any person's request for Revolving Loans on behalf of the Borrower, the proceeds of which are to be transferred to the account specified by the Borrower pursuant to the immediately preceding sentence, until the Agent receives written notice from the Borrower that the proceeds of the Revolving Loans are to be sent to a different account. The Agent shall have no duty to verify the identity of any individual representing himself or herself as a person authorized by the Borrower to make such requests on its behalf.

(d) No Liability. The Agent shall not incur any liability to the Borrower as a result of acting upon any notice referred to in Sections 2.2(b) and 2.2(c), which notice the Agent believes in good faith to have been given by an officer or other person duly authorized by the Borrower to request Revolving Loans on its behalf or for otherwise acting in good faith under this Section 2.2, and the crediting of Revolving Loans to the Borrower's deposit account, as the Borrower shall direct, shall conclusively establish the obligation of the Borrower to repay such Revolving Loans as provided herein.

(e) Notice Irrevocable. Any Notice of Borrowing (or telephonic notice in lieu thereof) made pursuant to Section 2.2(b) shall be irrevocable and the Borrower shall be bound to borrow the funds requested therein in accordance therewith.

(f) Agent's Election. Promptly after receipt of a Notice of Borrowing (or telephonic notice in lieu thereof) pursuant to Section 2.2(b), the Agent shall elect, in its discretion, (i) to have the terms of Section 2.2(g) apply to such requested Borrowing, or (ii) to

{KAC1124.DOC;10}                                29