such payment from the Borrower in Dollars. Each such payment shall be made by the Agent on the Business Day on which the Agent receives immediately available funds paid to such Person pursuant to the immediately preceding sentence, if received prior to 11:00 a.m. (Chicago time) on such Business Day and otherwise on the next succeeding Business Day.

(3) _Documentation_. Upon the request of any Lender, the Agent shall furnish to such Lender copies of any Letter of Credit, Credit Support for any Letter of Credit, reimbursement agreements executed in connection therewith, applications for any Letter of Credit, and such other documentation as may reasonably be requested by such Lender.

(4) _Obligations Irrevocable_. The obligations of each Lender to make payments to the Agent with respect to any Letter of Credit or with respect to their participation therein or with respect to any Credit Support for any Letter of Credit or with respect to the Revolving Loans made as a result of a drawing under a Letter of Credit and the obligations of the Borrower for whose account the Letter of Credit or Credit Support was issued to make payments to the Agent, for the account of the Lenders, shall be irrevocable, not subject to any qualification or exception whatsoever, including any of the following circumstances:

(i) any lack of validity or enforceability of this Agreement or any of the other Loan Documents;

(ii) the existence of any claim, setoff, defense or other right which the Borrower may have at any time against a beneficiary named in a Letter of Credit or any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), any Lender, the Agent, the issuer of such Letter of Credit, or any other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transactions between the Borrower or any other Person and the beneficiary named in any Letter of Credit);

(iii) any draft, certificate or any other document presented under the Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv) the surrender or impairment of any security for the performance or observance of any of the terms of any of the Loan Documents;

(v) the occurrence of any Default or Event of Default; or

(vi) the failure of the Borrower to satisfy the applicable conditions precedent set forth in ARTICLE 10.

(g) _Recovery or Avoidance of Payments_. In the event any payment by or on behalf of the Borrower received by the Agent with respect to any Letter of Credit or Credit Support provided for any Letter of Credit and distributed by the Agent to the Lenders on account of their respective participations therein is thereafter set aside, avoided or recovered from the Agent in connection with any receivership, liquidation or bankruptcy proceeding, the Lenders shall, upon demand by the Agent, pay to the Agent their respective Pro Rata Shares of such

amount set aside, avoided or recovered, together with interest at the rate required to be paid by the Agent upon the amount required to be repaid by it.

   (h) <u>Indemnification; Exoneration; Power of Attorney</u>

     (1) <u>Indemnification</u>. In addition to amounts payable as elsewhere provided in this <u>Section 2.5</u>, the Borrower hereby agrees to protect, indemnify, pay and save the Lenders and the Agent harmless from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable attorneys' fees) which any Lender or the Agent (other than the Bank in its capacity as Letter of Credit Issuer) may incur or be subject to as a consequence, direct or indirect, of the issuance of any Letter of Credit or the provision of any Credit Support or enhancement in connection therewith. The agreement in this <u>Section 2.5(h)(1)</u> shall survive payment of all Obligations. Nothing contained in this Agreement is intended to limit the Borrower's rights, if any, with respect to the Letter of Credit Issuer which arise as a result of the letter of credit application and related documents executed by and between the Borrower and the Letter of Credit Issuer.

     (2) <u>Assumption of Risk by the Borrower</u>. As among the Borrower, the Lenders, and the Agent, the Borrower assumes all risks of the acts and omissions of, or misuse of any of the Letters of Credit by, the respective beneficiaries of such Letters of Credit. In furtherance and not in limitation of the foregoing, the Lenders and the Agent shall not be responsible for: (A) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any Person in connection with the application for and issuance of and presentation of drafts with respect to any of the Letters of Credit, even if it should prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (B) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (C) the failure of the beneficiary of any Letter of Credit to comply duly with conditions required in order to draw upon such Letter of Credit; (D) errors, omissions, interruptions, or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (E) errors in interpretation of technical terms; (F) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any Letter of Credit or of the proceeds thereof; (G) the misapplication by the beneficiary of any Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (H) any consequences arising from causes beyond the control of the Lenders or the Agent, including any act or omission, whether rightful or wrongful, of any present or future <u>de jure</u> or <u>de facto</u> Governmental Authority. None of the foregoing shall affect, impair or prevent the vesting of any rights or powers of the Agent or any Lender under this <u>Section 2.5(h)</u>.

     (3) <u>Exoneration</u>. In furtherance and extension, and not in limitation, of the specific provisions set forth above, any action taken or omitted by the Agent or any Lender under or in connection with any of the Letters of Credit or any related certificates, if taken or omitted in good faith, shall not put the Agent or any Lender under any resulting liability to the Borrower or relieve the Borrower of any of its obligations hereunder to any such Person. Nothing contained in this Agreement is intended to limit the Borrower's rights, if any, with respect to the

Letter of Credit Issuer which arise as a result of the letter of credit application and related documents executed by and between the Borrower and the Letter of Credit Issuer.

(4) <u>Indemnification by Lenders</u>. The Lenders agree to indemnify the Letter of Credit Issuer (to the extent not reimbursed by the Borrower and without limiting the obligations of the Borrower hereunder) ratably in accordance with their respective Pro Rata Shares, for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees) or disbursements of any kind and nature whatsoever that may be imposed on, incurred by or asserted against the Letter of Credit Issuer in any way relating to or arising out of any Letter of Credit or the transactions contemplated thereby or any action taken or omitted by the Letter of Credit Issuer under any Letter of Credit or any Loan Document in connection therewith; <u>provided</u> that no Lender shall be liable for any of the foregoing to the extent it arises from the gross negligence or willful misconduct of the Person to be indemnified. Without limitation of the foregoing, each Lender agrees to reimburse the Letter of Credit Issuer promptly upon demand for its Pro Rata Share of any costs or expenses payable by the Borrower to the Letter of Credit Issuer, to the extent that the Letter of Credit Issuer is not promptly reimbursed for such costs and expenses by the Borrower. The agreement contained in this Section shall survive payment in full of all Obligations.

(5) <u>Power of Attorney</u>. In connection with all Inventory financed by Letters of Credit, the Borrower hereby appoints the Agent, or the Agent's designee, as its attorney, with full power and authority: (a) to sign and/or endorse the Borrower's name upon any warehouse or other receipts; (b) to sign the Borrower's name on bills of lading and other negotiable and non-negotiable documents; (c) to clear Inventory through customs in the Agent's or the Borrower's name, and to sign and deliver to customs officials powers of attorney in the Borrower's name for such purpose; (d) to complete in the Borrower's or the Agent's name, any order, sale, or transaction, obtain the necessary documents in connection therewith, and collect the proceeds thereof; and (e) to do such other acts and things as are necessary in order to enable the Agent to obtain possession or control of the Inventory and to obtain payment of the Obligations. Neither the Agent nor its designee, as the Borrower's attorney, will be liable for any acts or omissions, nor for any error of judgment or mistakes of fact or law. This power, being coupled with an interest, is irrevocable until all Obligations have been paid and satisfied.

(6) <u>Account Party</u>. The Borrower hereby authorizes and directs any Letter of Credit Issuer to name the Borrower as the "Account Party" therein and to deliver to the Agent all instruments, documents and other writings and property received by the Letter of Credit Issuer pursuant to the Letter of Credit, and to accept and rely upon the Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit or the application therefor.

(7) <u>Control of Inventory</u>. In connection with all Inventory financed by Letters of Credit, the Borrower will, at the Agent's request, instruct all suppliers, carriers, forwarders, customs brokers, warehouses or others receiving or holding cash, checks, Inventory, documents or instruments in which the Agent holds a security interest to deliver them to the Agent and/or subject to the Agent's order, and if they shall come into the Borrower's possession, to deliver them, upon request, to the Agent in their original form. The Borrower shall also, at the

Agent's request, designate the Agent as the consignee on all bills of lading and other negotiable and non-negotiable documents.

(i) <u>Supporting Letter of Credit; Cash Collateral</u>. If, notwithstanding the provisions of <u>Section 2.5</u> and <u>Section 12.1</u>, any Letter of Credit or Credit Support is outstanding upon the termination of this Agreement, then upon such termination the Borrower shall deposit with the Agent, for the ratable benefit of the Agent and the Lenders, with respect to each Letter of Credit or Credit Support then outstanding, as the Majority Lenders, in their discretion shall specify, either (A) a standby letter of credit (a "Supporting Letter of Credit") in form and substance satisfactory to the Agent, issued by an issuer satisfactory to the Agent in an amount equal to the greatest amount for which such Letter of Credit or such Credit Support may be drawn plus any fees and expenses associated with such Letter of Credit or such Credit Support, under which Supporting Letter of Credit the Agent is entitled to draw amounts necessary to reimburse the Agent and the Lenders for payments to be made by the Agent and the Lenders under such Letter of Credit or Credit Support and any fees and expenses associated with such Letter of Credit or Credit Support, or (B) cash in amounts necessary to reimburse the Agent and the Lenders for payments made by the Agent or the Lenders under such Letter of Credit or such Credit Support and any fees and expenses associated with such Letter of Credit. Such Supporting Letter of Credit or deposit of cash shall be held by the Agent, for the ratable benefit of the Agent and the Lenders, as security for, and to provide for the payment of, the aggregate undrawn amount of such Letters of Credit or such Credit Support remaining outstanding.

2.6 <u>Bank Products</u>.

The Borrower may request and the Bank may, in its sole and absolute discretion, arrange for the Borrower to obtain from the Bank or the Bank's Affiliates, Bank Products although the Borrower is not required to do so. To the extent Bank Products are provided by an Affiliate of the Bank, the Borrower agrees to indemnify and hold the Bank and the Lenders harmless from any and all costs and obligations now or hereafter incurred by the Bank or any of the Lenders which arise from the indemnity given by the Bank to its Affiliates related to such Bank Products; provided, however, nothing contained herein is intended to limit the Borrower's rights, with respect to the Bank or its Affiliates, if any, which arise as a result of the execution of documents by and between the Borrower and the Bank which relate to Bank Products. The agreement contained in this Section shall survive termination of this Agreement. The Borrower acknowledges and agrees that the obtaining of Bank Products from the Bank or the Bank's Affiliates (a) is in the sole and absolute discretion of the Bank or the Bank's Affiliates, and (b) is subject to all rules and regulations of the Bank or the Bank's Affiliates.

ARTICLE 3

<u>INTEREST AND FEES</u>

3.1 <u>Interest</u>.

(a) <u>Interest Rates</u>. All outstanding Obligations shall bear interest on the unpaid principal amount thereof (including, to the extent permitted by law, on interest thereon not paid when due) from the date made until paid in full in cash at a rate determined by reference

to the Prime Rate or the LIBOR Rate and Sections 3.1(a)(i), (ii), (iii) or (iv), as applicable, but not to exceed the Maximum Rate described in Section 3.3. Subject to the provisions of Section 3.2, any of the Loans may be converted into, or continued as, Prime Rate Loans or LIBOR Rate Loans in the manner provided in Section 3.2. If at any time Loans are outstanding with respect to which notice has not been delivered to the Agent in accordance with the terms of this Agreement specifying the basis for determining the interest rate applicable thereto, then those Loans shall be Prime Rate Loans and shall bear interest at a rate determined by reference to the Prime Rate until notice to the contrary has been given to the Agent in accordance with this Agreement and such notice has become effective. Except as otherwise provided herein, the outstanding Obligations shall bear interest as follows:

(i) For all Prime Rate Term Loans at a fluctuating per annum rate equal to the Prime Rate plus the Applicable Margin;

(ii) For all Prime Rate Revolving Loans and other Obligations (other than Prime Rate Term Loans and LIBOR Rate Loans) at a fluctuating per annum rate equal to the Prime Rate plus the Applicable Margin;

(iii) For all LIBOR Term Loans at a per annum rate equal to the LIBOR Rate plus the Applicable Margin; and

(iv) For all LIBOR Revolving Loans at a per annum rate equal to the LIBOR Rate plus the Applicable Margin.

Each change in the Prime Rate shall be reflected in the interest rate described in clauses (i) and (ii) above as of the effective date of such change. All interest charges shall be computed on the basis of a year of 360 days and actual days elapsed (which results in more interest being paid than if computed on the basis of a 365-day year). Interest accrued on all Prime Rate Loans will be payable in arrears on the first day of each month hereafter and on the Termination Date. Interest accrued on all LIBOR Rate Loans will be payable on each LIBOR Interest Payment Date.

(b) Default Rate. If any Default or Event of Default occurs and is continuing and the Agent or the Majority Lenders in their discretion so elect, then, while any such Default or Event of Default is continuing, all of the Obligations shall bear interest at the Default Rate applicable thereto.

3.2 Conversion and Continuation Elections.

(a) The Borrower may, upon irrevocable written notice to the Agent in accordance with Section 3.2(b):

(i) elect, as of any Business Day, in the case of Prime Rate Loans to convert any such Loans (or any part thereof in an amount not less than $2,000,000, or that is in an integral multiple of $500,000 in excess thereof) into LIBOR Rate Loans; or

(ii) elect, as of the last day of the applicable Interest Period, to continue any LIBOR Rate Loans having Interest Periods expiring on such day (or any part

thereof in an amount not less than $2,000,000, or that is in an integral multiple of $500,000 in excess thereof);

provided, that if at any time the aggregate amount of LIBOR Rate Loans in respect of any Borrowing is reduced, by payment, prepayment, or conversion of part thereof to be less than $1,000,000, such LIBOR Rate Loans shall automatically convert into Prime Rate Loans, and on and after such date the right of the Borrower to continue such Loans as, and convert such Loans into, LIBOR Rate Loans, as the case may be, shall terminate, and provided further that if the notice shall fail to specify the duration of the Interest Period, such Interest Period shall be one month.

(b) The Borrower shall deliver a notice of continuation/conversion ("Notice of Continuation/Conversion") to be received by the Agent not later than 11:00 a.m. (Chicago time) at least three (3) Business Days in advance of the Continuation/Conversion Date, if the Loans are to be converted into or continued as LIBOR Rate Loans and specifying:

(i) the proposed Continuation/Conversion Date;

(ii) the aggregate amount of Loans to be converted or renewed;

(iii) the type of Loans resulting from the proposed conversion or continuation; and

(iv) the duration of the requested Interest Period; provided, however, the Borrower may not select an Interest Period with respect to any portion of the Term Loans which extends beyond an installment payment date for the Term Loans unless, after giving effect to such election, the portion of the Term Loans not subject to Interest Periods ending after such installment payment date is equal to or greater than the principal due on such installment payment date.

(c) If, upon the expiration of any Interest Period applicable to LIBOR Rate Loans, the Borrower has failed to select timely a new Interest Period to be applicable to LIBOR Rate Loans or if any Default or Event of Default then exists, the Borrower shall be deemed to have elected to convert such LIBOR Rate Loans into Prime Rate Loans effective as of the expiration date of such Interest Period.

(d) The Agent will promptly notify each Lender of its receipt of a Notice of Continuation/Conversion. All conversions and continuations shall be made ratably according to the respective outstanding principal amounts of the Loans with respect to which the notice was given held by each Lender.

(e) During the existence of a Default or Event of Default, the Borrower may not elect to have a Loan converted into or continued as a LIBOR Rate Loan.

(f) After giving effect to any conversion or continuation of Loans, there may not be more than eight (8) different LIBOR Rate Loans in effect hereunder.

3.3    Maximum Interest Rate.

In no event shall any Interest Rate provided for hereunder exceed the maximum rate legally chargeable by any Lender under applicable law for loans of the type provided for hereunder (the "Maximum Rate"). If, in any month, any Interest Rate, absent such limitation, would have exceeded the Maximum Rate, then the Interest Rate for that month shall be the Maximum Rate, and, if in future months, that Interest Rate would otherwise be less than the Maximum Rate, then that Interest Rate shall remain at the Maximum Rate until such time as the amount of interest paid hereunder equals the amount of interest which would have been paid if the same had not been limited by the Maximum Rate. In the event that, upon payment in full of the Obligations, the total amount of interest paid or accrued under the terms of this Agreement is less than the total amount of interest which would, but for this Section 3.3, have been paid or accrued if the Interest Rates otherwise set forth in this Agreement had at all times been in effect, then the Borrower shall, to the extent permitted by applicable law, pay the Agent, for the account of the Lenders, an amount equal to the excess of (a) the lesser of (i) the amount of interest which would have been charged if the Maximum Rate had, at all times, been in effect or (ii) the amount of interest which would have accrued had the Interest Rates otherwise set forth in this Agreement, at all times, been in effect over (b) the amount of interest actually paid or accrued under this Agreement. In the event that a court of competent jurisdiction determines that the Agent and/or any Lender has received interest and other charges hereunder in excess of the Maximum Rate, such excess shall be deemed received on account of, and shall automatically be applied to reduce, the Obligations other than interest, in the inverse order of maturity, and if there are no Obligations outstanding, the Agent and/or such Lender shall refund to the Borrower such excess.

3.4    Closing Fee.

The Borrower agrees to pay the Agent a closing fee (the "Closing Fee") as set forth in that certain fee letter dated as of the date of this Agreement.

3.5    Unused Line Fee.

Until the Loans have been paid in full and this Agreement terminated, the Borrower agrees to pay, on the first day of each month and on the Termination Date, to the Agent, for the account of the Lenders, in accordance with their respective Pro Rata Shares, an unused line fee (the "Unused Line Fee") equal to three eighths of one percent (0.375%) per annum times the amount by which the Maximum Revolver Amount exceeded the sum of the average daily outstanding amount of Revolving Loans and the average daily undrawn face amount of outstanding Letters of Credit, during the immediately preceding month or shorter period if calculated on the Termination Date. The Unused Line Fee shall be computed on the basis of a 360-day year for the actual number of days elapsed. All payments received by the Agent shall be deemed to be credited to the Borrower's Loan Account immediately upon receipt for purposes of calculating the Unused Line Fee pursuant to this Section 3.5.

3.6     Letter of Credit Fee.

(a)     The Borrower agrees to pay to the Agent, for the account of the Lenders, in accordance with their respective Pro Rata Shares, for each Letter of Credit, a fee (the "Letter of Credit Fee") equal to one and one-half percent (1.50%) per annum of the undrawn face amount of each Letter of Credit, plus all out-of-pocket costs, fees and expenses incurred by the Agent in connection with the application for, processing of, issuance of, or amendment to any Letter of Credit. The Letter of Credit Fee shall be payable monthly in arrears on the first day of each month following any month in which a Letter of Credit was issued and/or in which a Letter of Credit remains outstanding and on the Termination Date. The Letter of Credit Fee shall be computed on the basis of a 360-day year for the actual number of days elapsed.

(b)     In addition to the Letter of Credit Fees, with respect to each Letter of Credit, the Borrower shall pay to the Agent, for the account of the issuer of any Letter of Credit, an issuance fee of one-half of one percent (0.50%) per annum of the stated amount of such Letter of Credit (the "Letter of Credit Fronting Fee" and, collectively, the "Letter of Credit Fronting Fees"), together with such fees and other charges as are charged by the Agent for letters of credit issued by it, including, without limitation, its standard fees for issuing, administering, amending, renewing, paying and canceling letters of credit and all other fees associated with issuing or servicing letters of credit, as and when assessed. The Letter of Credit Fronting Fee shall be payable monthly in arrears on the first day of each month following any month in which a Letter of Credit was issued and/or in which a Letter of Credit remains outstanding. The Letter of Credit Fronting Fee shall be computed on the basis of a 360-day year for the actual number of days elapsed.

3.7     Collateral Management Fee.

The Borrower agrees to pay to the Agent, for its sole account and benefit, an annual Collateral Management Fee (the "Collateral Management Fee") of Twenty Five Thousand Dollars ($25,000), payable in arrears in quarterly installments of $6,250, on the first day of January, April, July and October of each year commencing July 1, 2000 and continuing until and including the Stated Termination Date. Upon payment, this fee shall be fully earned and non-refundable. If this Agreement is terminated at any time prior to the Stated Termination Date the Borrower shall pay to the Agent the pro-rata portion of the Collateral Management Fee earned by the Agent for the period of time until and including the date of such termination. The Collateral Management Fee shall be financed as a Revolving Loan.

ARTICLE 4

PAYMENTS AND PREPAYMENTS

4.1     Revolving Loans.

The Borrower shall repay the outstanding principal balance of the Revolving Loans, plus all accrued but unpaid interest thereon, on the Termination Date. The Borrower may prepay Revolving Loans at any time, and reborrow subject to the terms of this Agreement; provided, however, that with respect to any LIBOR Revolving Loans prepaid by the Borrower prior to the expiration date of the Interest Period applicable thereto, the Borrower shall pay to the

Agent for account of the Lenders the amounts described in Section 5.4. In addition, and without limiting the generality of the foregoing, upon demand the Borrower shall pay to the Agent, for account of the Lenders, the amount, without duplication, by which the Aggregate Revolver Outstandings exceeds the Borrowing Base.

4.2  Termination of Facility.

The Borrower may terminate this Agreement upon at least ninety (90) Business Days' notice to the Agent and the Lenders, and upon (a) the payment in full of all outstanding Revolving Loans, together with accrued interest thereon, and the cancellation of all outstanding Letters of Credit, (b) the prepayment in full of the Term Loans, together with accrued and unpaid interest thereon, (c) the payment of the early termination fee set forth in the next sentence, (d) the payment in full in cash of all other Obligations together with accrued and unpaid interest thereon, and (e) with respect to any LIBOR Rate Loans prepaid in connection with such termination prior to the expiration date of the Interest Period applicable thereto, the payment of the amounts described in Section 5.4. If this Agreement is terminated at any time prior to the Stated Termination Date, whether pursuant to this Section or pursuant to Section 11.2, the Borrower shall pay to the Agent, for the account of the Lenders, an early termination fee determined in accordance with the following table:

| Period during which early termination occurs | Early Termination Fee |
| --- | --- |
| On or prior to the first Anniversary Date | 3.00% of the average Loans and Letters of Credit outstanding during the 180 days (or lesser period if within 180 days of the Closing Date) prior to the date of termination. |
| After the first Anniversary Date but on or prior to the second Anniversary Date | 1.00% of the average Loans and Letters of Credit outstanding during the 180 days prior to the date of termination. |
| After the second Anniversary Date but on or prior to the Stated Termination Date | 0.50% of the average Loans and Letters of Credit outstanding during the 180 days prior to the date of termination. |

; provided, however, that in the event this Agreement is terminated after the first Anniversary Date in connection with a refinancing hereof by a credit facility provided by any unit or division of the Agent, no early termination fee shall be charged.

4.3  Repayment of the Term Loans.

The Borrower agrees to repay the principal of the Term Loans to the Agent, for the account of the Lenders, in accordance with the terms of Sections 2.3 and 2.4 hereof.

{KAC1124.DOC;10}                                47

4.4     Voluntary Prepayments of the Term Loans.

The Borrower may prepay the principal of the Term Loans in whole or in part, at any time and from time to time upon (a) at least five (5) Business Days' prior written notice to the Agent and the Lenders, and (b) payment of, with respect to any LIBOR Term Loans to be prepaid prior to the expiration date of the Interest Period applicable thereto, the amounts described in Section 5.4. All voluntary prepayments of the principal of the Term Loans shall be accompanied by the payment of all accrued but unpaid interest on the Term Loans to the date of prepayment. Any voluntary prepayment under this Section 4.4 of less than all of the outstanding principal of the Term Loans shall be applied to the installments of principal of the Term Loans in the inverse order of maturity, provided, however, that all such prepayments shall be applied first to the satisfaction of the Term Loan B until Term Loan B is paid in full, and thereafter, to the satisfaction of Term Loan A. Amounts prepaid in respect of the Term Loans pursuant to this Section 4.4 may not be reborrowed.

4.5     Mandatory Prepayments of the Term Loans.

(a)     The Borrower shall prepay the entire unpaid principal balance of the Term Loans, and all accrued but unpaid interest thereon, upon the termination of this Agreement for any reason.

(b)     The Borrower shall make mandatory prepayments (each a "Term Loan B Mandatory Prepayment" and collectively, the "Term Loan B Mandatory Prepayments") of the Term Loan B to the Agent for the Lenders in accordance with their respective Pro Rata Shares annually beginning for the Borrower's Fiscal Year ending November 30, 2000, in an amount equal to fifty percent (50%) of the Borrower's Excess Cash Flow for such Fiscal Year, which shall be payable (with respect to each such fiscal year) on March 1 of each year (or, if earlier, ten (10) days after the date on which Borrower delivers the financial statements required to be delivered under Section 7.2(a)) immediately following the annual period of determination; provided that the Term Loan B Mandatory Prepayment shall be applied to the Term Loan B in inverse order of maturity.

(c)     Any prepayment under this Section 4.5 of less than all of the outstanding principal amount of the Term Loans shall be applied, based upon the Pro Rata Shares of the Lenders, to the installments of principal of the applicable Term Loans in the inverse order of maturity. Amounts prepaid in respect of the Term Loans pursuant to this Section 4.5 may not be reborrowed. In connection with any such prepayment, if any LIBOR Term Loans are prepaid prior to the expiration date of the Interest Period applicable thereto, the Borrower shall pay to the Lenders the amounts described in Section 5.4.

4.6     Payments by the Borrower.

(a)     All payments to be made by the Borrower shall be made without set-off, recoupment or counterclaim. Except as otherwise expressly provided herein, all payments by the Borrower shall be made to the Agent for the account of the Lenders at an account designated by the Agent, and shall be made in Dollars and in immediately available funds, no later than 11:00 a.m. (Chicago time) on the date specified herein. Any payment received by the Agent later than

{KAC1124.DOC;10}                               48