Agent to the Lenders, a report setting forth the results of such evaluation, a proposed plan for responding to any environmental problems described therein, and an estimate of the costs thereof, and (ii) provide to the Agent and the Lenders a supplemental report of such engineer whenever the scope of the environmental problems, or the response thereto or the estimated costs thereof, shall change in any material respect.

(c) Without limiting the generality of the foregoing, the Borrower shall deliver to the Agent, within sixty (60) days following the Closing Date, the Phase I Environmental Site Assessment (together with such additional reports as the Agent shall require) revised to address, to the satisfaction of Agent, certain discrepancies noted by Agent in the Phase I Environmental Site Assessment delivered to Agent as of the Closing Date. In the event that the foregoing assessment is not revised in a manner satisfactory to Agent, the Borrower shall deliver to the Agent, at the Agent's request and at Borrower's expense, a Phase II Environmental Site Assessment (together with such additional reports as the Agent shall require) conducted by an environmental firm acceptable to Agent, for each parcel of real property covered by the Mortgage, which assessments and reports shall be satisfactory to the Agent. Borrower agrees to comply with any and all reporting requirements in connection with such Phase II Environmental Site Assessment.

9.8    Compliance with ERISA.

The Borrower shall, and shall cause each of its ERISA Affiliates to: (a) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state law; (b) cause each Plan which is qualified under Section 401(a) of the Code to maintain such qualification; (c) make all required contributions to any Plan subject to Section 412 of the Code; (d) not engage in a prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan; and (e) not engage in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

9.9    Mergers, Consolidations or Sales.

Neither the Borrower nor any of its Subsidiaries shall enter into any transaction of merger, reorganization, or consolidation, or transfer, sell, assign, lease, or otherwise dispose of all or any part of its property, or wind up, liquidate or dissolve, or agree to do any of the foregoing, except (i) for sales of Inventory in the ordinary course of its business and (ii) for sales or other dispositions of Equipment in the ordinary course of business that are obsolete or no longer useable by Borrower in its business as permitted by Section 6.11. The inclusion of proceeds in the definition of Collateral shall not be deemed to constitute the Agent's or any Lender's consent to any sale or other disposition of the Collateral except as expressly permitted herein.

9.10    Distributions; Capital Change; Restricted Investments.

Neither the Borrower nor any of its Subsidiaries shall (i) directly or indirectly declare or make, or incur any liability to make, any Distribution, except Distributions to the Borrower by its Subsidiaries, (ii) make any change in its capital structure which could have a Material Adverse Effect or (iii) make any Restricted Investment;

9.11    Transactions Affecting Collateral or Obligations.

Neither the Borrower nor any of its Subsidiaries shall enter into any transaction which would be reasonably expected to have a Material Adverse Effect.

9.12    Guaranties.

Neither the Borrower nor any of its Subsidiaries shall make, issue, or be or become liable on any Guaranty, except Guaranties of the Obligations in favor of the Agent, and except with respect to the LUK Guarantee.

9.13    Debt.

Neither the Borrower nor any of its Subsidiaries shall incur or maintain any Debt, other than: (a) the Obligations; (b) trade payables and contractual obligations to suppliers and customers arising in the ordinary course of business; (c) other Debt existing on the Closing Date and reflected in the Financial Statements attached hereto as Exhibit C; and (d) Debt described on Schedule 8.9.

9.14    Prepayment.

Neither the Borrower nor any of its Subsidiaries shall voluntarily prepay any Debt, except the Obligations in accordance with the terms of this Agreement.

9.15    Transactions with Affiliates.

Except as set forth below, neither the Borrower nor any of its Subsidiaries shall, sell, transfer, distribute, or pay any money or property, including, but not limited to, any fees or expenses of any nature (including, but not limited to, any fees or expenses for management services), to any Affiliate, or lend or advance money or property to any Affiliate, or invest in (by capital contribution or otherwise) or purchase or repurchase any stock or indebtedness, or any property, of any Affiliate, or, except with respect to the LUK Guarantee, become liable on any Guaranty of the indebtedness, dividends, or other obligations of any Affiliate. Notwithstanding the foregoing, while no Event of Default has occurred and is continuing, the Borrower and its Subsidiaries may engage in transactions with Affiliates in the ordinary course of business consistent with past practices, in amounts and upon terms fully disclosed to the Agent and the Lenders, and no less favorable to the Borrower and its Subsidiaries than would be obtained in a comparable arm's-length transaction with a third party who is not an Affiliate.

9.16    Investment Banking and Finder's Fees.

Neither the Borrower nor any of its Subsidiaries shall pay or agree to pay, or reimburse any other party with respect to, any investment banking or similar or related fee, underwriter's fee, finder's fee, or broker's fee to any Person in connection with this Agreement. The Borrower shall defend and indemnify the Agent and the Lenders against and hold them harmless from all claims of any Person that the Borrower is obligated to pay for any such fees, and all costs and expenses (including without limitation, attorneys' fees) incurred by the Agent and/or any Lender in connection therewith.

9.17  Business Conducted.

The Borrower shall not and shall not permit any of its Subsidiaries to, engage directly or indirectly, in any line of business other than the businesses in which the Borrower is engaged on the Closing Date.

9.18  Liens.

Neither the Borrower nor any of its Subsidiaries shall create, incur, assume, or permit to exist any Lien on any property now owned or hereafter acquired by any of them, except Permitted Liens.

9.19  Sale and Leaseback Transactions.

Neither the Borrower nor any of its Subsidiaries shall, directly or indirectly, enter into any arrangement with any Person providing for the Borrower or such Subsidiary to lease or rent property that the Borrower or such Subsidiary has sold or will sell or otherwise transfer to such Person.

9.20  New Subsidiaries.

The Borrower shall not, directly or indirectly, organize, create, acquire or permit to exist any Subsidiary other than those listed on Schedule 8.5.

9.21  Fiscal Year.

The Borrower shall not change its Fiscal Year.

9.22  Capital Expenditures.

Neither the Borrower nor any of its Subsidiaries shall make or incur any Capital Expenditure if, after giving effect thereto, the aggregate amount of all Capital Expenditures by the Borrower and its Subsidiaries on a consolidated basis would exceed (a) Three Million Dollars ($3,000,000) during the Fiscal Year ending November 30, 2000 or (b) Four Million Dollars ($4,000,000) during any Fiscal Year ending thereafter.

9.23  Funded Debt to EBITDA.

The Borrower and its Subsidiaries will maintain on a consolidated basis, tested as of the last day of each of the Borrower's fiscal quarters, a ratio of (i) Funded Debt, measured as of the last day of the Borrower's fiscal quarter, to (ii) EBITDA, for the Testing Period applicable to such date, of not greater than the ratio set forth in the chart below for the period ending as of the date set forth therein. Provided however, (i) for the Testing Period of March 1, 2000 through May 31, 2000, EBITDA shall be equal to actual EBITDA for the period multiplied by four (4), (ii) for the Testing Period of March 1, 2000 through August 31, 2000, EBITDA shall be equal to EBITDA for the period multiplied by two (2), and (iii) for the Testing Period of March 1, 2000 through November 30, 2000, EBITDA shall be equal to actual EBITDA for the period multiplied by one point three four (1.34).

| Period Ended | Ratio |
| --- | --- |
| May 31, 2000 | 3.25 to 1.00 |
| August 31, 2000 | 3.12 to 1.00 |
| November 30, 2000 and thereafter | 3.00 to 1.00 |

9.24  Fixed Charge Coverage Ratio.

The Borrower and its Subsidiaries will maintain on a consolidated basis, tested as of the last day of each of the Borrower's fiscal quarters, for the Testing Period applicable to such date, a Fixed Charge Coverage Ratio of not less than 1.00 to 1.00.

9.25  Operating Lease Obligations.

Neither the Borrower nor any of its Subsidiaries shall enter into, or suffer to exist, any lease of real or personal property as lessee or sublessee (other than a Capital Lease), if, after giving effect thereto, the aggregate amount of Rentals (as hereinafter defined) payable by the Borrower and its Subsidiaries on a consolidated basis in any Fiscal Year in respect of such lease and all other such leases would exceed $500,000 (such amount being referred to herein as "Permitted Rentals"). The term "Rentals" means all payments due from the lessee or sublessee under a lease, including, without limitation, basic rent, percentage rent, property taxes, utility or maintenance costs, and insurance premiums.

9.26  Use of Proceeds.

[handwritten annotation: proceeds of the loans on the loans to]

The ~~Borrower~~ shall not, and shall not suffer or permit any Subsidiary to, use any portion of the Loan proceeds, directly or indirectly, (i) to purchase or carry Margin Stock, (ii) to repay or otherwise refinance indebtedness of the Borrower or others incurred to purchase or carry Margin Stock, (iii) to extend credit for the purpose of purchasing or carrying any Margin Stock, or (iv) to acquire any security in any transaction that is subject to Section 13 or 14 of the Exchange Act.

9.27  Further Assurances.

The Borrower shall execute and deliver, or cause to be executed and delivered, to the Agent and/or the Lenders such documents and agreements, and shall take or cause to be taken such actions, as the Agent or any Lender may, from time to time, request to carry out the terms and conditions of this Agreement and the other Loan Documents.

## ARTICLE 10

## CONDITIONS OF LENDING

10.1    Conditions Precedent to Making of Loans on the Closing Date.

The obligation of the Lenders to make the initial Revolving Loans on the Closing Date and to make the Term Loans, and the obligation of the Agent to cause the Letter of Credit Issuer to issue any Letter of Credit on the Closing Date, are subject to the following conditions precedent having been satisfied in a manner satisfactory to the Agent and each Lender:

(a)    This Agreement and the other Loan Documents shall have been executed by each party thereto and the Borrower shall have performed and complied with all covenants, agreements and conditions contained herein and the other Loan Documents which are required to be performed or complied with by the Borrower before or on such Closing Date.

(b)    Upon making the Revolving Loans on the Closing Date (including such Revolving Loans made to finance the Closing Fee or otherwise pursuant to Section 4.7 as reimbursement for fees, costs and expenses then payable under this Agreement) and with all its obligations current, the Borrower would have Availability in an amount no less than Three Million Dollars ($3,000,000).

(c)    All representations and warranties made hereunder and in the other Loan Documents shall be true and correct as if made on such date.

(d)    No Default or Event of Default shall exist on the Closing Date, or would exist after giving effect to the Loans to be made, the Letters of Credit to be issued and the Credit Support to be in place on such date.

(e)    The Agent and the Lenders shall have received (i) such opinions of counsel for the Borrower and its Subsidiaries as the Agent or any Lender shall request, each such opinion to be in a form, scope, and substance satisfactory to the Agent, the Lenders, and their respective counsel, and (ii) all other Closing Documents as set forth on Exhibit D attached hereto.

(f)    The Agent shall have received title policies, in form and substance acceptable to Agent, with respect to the Mortgage.

(g)    The Agent shall have received:

(i)    acknowledgment copies of proper financing statements, duly filed on or before the Closing Date under the UCC of all jurisdictions that the Agent may deem necessary or desirable in order to perfect the Agent's Lien; and

(ii)    duly executed UCC-3 Termination Statements, mortgage releases and such other instruments, in form and substance satisfactory to the Agent, as shall be necessary to terminate and satisfy all Liens on the Property of the Borrower and its Subsidiaries except Permitted Liens.

      (iii) estoppel/payoff letters from Bank One (formerly NBD Bank, N.A.), National City Bank (formerly Fort Wayne National Bank), and holders of Family Shareholder Loans.

      (iv) copies of notes evidencing Family Shareholder Loans marked "paid in full" and the date of such payment.

  (h) The Borrower shall have paid all fees and expenses of the Agent and the Attorney Costs incurred in connection with any of the Loan Documents and the transactions contemplated thereby to the extent invoiced.

  (i) The Agent shall have received evidence, in form, scope, and substance, reasonably satisfactory to the Agent, of all insurance coverage as required by this Agreement, including, but not limited to, an insurance certificate in accordance with the provisions of Section 9.5 of this Agreement.

  (j) The Agent and the Lenders shall have had an opportunity, if they so choose, to examine the books of account and other records and files of the Borrower and to make copies thereof, and to conduct a pre-closing audit which shall include, without limitation, verification of Inventory, Accounts, and the Borrowing Base, and the results of such examination and audit shall have been satisfactory to the Agent and the Lenders in all respects.

  (k) All proceedings taken in connection with the execution of this Agreement, the Term Loan Notes, all other Loan Documents and all documents and papers relating thereto shall be satisfactory in form, scope, and substance to the Agent and the Lenders.

  (l) The Agent shall have received a landlord's waiver from each landlord of each and every business premise leased by the Borrower and on which any of the Collateral is or may hereafter be located, which landlords' waivers must be substantially in the form attached hereto as Exhibit H-1 and otherwise acceptable to the Agent and its counsel.

  (m) The Agent shall have received an agreement acknowledging the Liens of the Agent, for the benefit of the Lenders and the Agent, from each bailee, warehouseman, consignee or similar third party which has possession of any of the Collateral, which agreements must be substantially in the form attached hereto as Exhibit H-2 and otherwise acceptable to the Agent and its counsel.

  (n) The Agent shall have completed a field examination of the Borrower's business, operations and income, the results of which field examination shall be in all respects acceptable to the Agent in its sole and absolute discretion and may include reference discussions with key customers and vendors. The Agent shall have received an appraisal of the Borrower's machinery and equipment conducted by Collateral Evaluation Associates, and an appraisal for each parcel of real property owned by the Borrower conducted by appraisers satisfactory to the Agent, which appraisals shall each be in such form and content as may be required by the Agent.

  (o) The Agent shall have received a Phase I Environmental Site Assessment (together with such additional reports as the Agent shall require), conducted by an environmental

firm acceptable to Agent, for each parcel of real property covered by the Mortgage, which assessments and reports shall be satisfactory to the Agent.

(p) The Agent shall have received a title policy in ALTA form and otherwise satisfactory to the Agent, for each parcel of real property covered by the Mortgage.

(q) The Agent shall have received a survey for each parcel of real property covered by the Mortgage, performed by a Registered Surveyor, certified to the Agent, and complying with the minimum detail requirements for land title surveys as adopted by the American Land Title Association and Congress on Surveying and Mapping.

The acceptance by the Borrower of any Loans made or Letters of Credit issued on the Closing Date shall be deemed to be a representation and warranty made by the Borrower to the effect that all of the conditions precedent to the making of such Loans or the issuance of such Letters of Credit have been satisfied, with the same effect as delivery to the Agent and the Lenders of a certificate signed by a Responsible Officer of the Borrower, dated the Closing Date, to such effect.

Execution and delivery to the Agent by a Lender of a counterpart of this Agreement shall be deemed confirmation by such Lender that (i) all conditions precedent in this Section 10.1 have been fulfilled to the satisfaction of such Lender, (ii) the decision of such Lender to execute and deliver to the Agent an executed counterpart of this Agreement was made by such Lender independently and without reliance on the Agent or any other Lender as to the satisfaction of any condition precedent set forth in this Section 10.1, and (iii) all documents sent to such Lender for approval consent, or satisfaction were acceptable to such Lender..

10.2   Conditions Precedent to Each Loan.

The obligation of the Lenders to make each Loan, including the initial Revolving Loans on the Closing Date and the Term Loans, and the obligation of the Agent to cause the Letter of Credit Issuer to issue any Letter of Credit or to provide Credit Support shall be subject to the further conditions precedent that on and as of the date of any such extension of credit:

(a) the following statements shall be true, and the acceptance by the Borrower of any extension of credit shall be deemed to be a statement to the effect set forth in clauses (i) and (ii), with the same effect as the delivery to the Agent and the Lenders of a certificate signed by a Responsible Officer, dated the date of such extension of credit, stating that:

(i) The representations and warranties contained in this Agreement and the other Loan Documents are correct in all respects on and as of the date of such extension of credit as though made on and as of such date, other than any such representation or warranty which relates to a specified prior date and except to the extent the Agent and the Lenders have been notified by the Borrower that any representation or warranty is not correct and the Majority Lenders have explicitly waived in writing compliance with such representation or warranty; and

(ii) No event has occurred and is continuing, or would result from such extension of credit, which constitutes a Default or an Event of Default; and

(b) The amount of the Borrowing Base shall be sufficient to make such Revolving Loans or issue such Letters of Credit without exceeding the Availability, <u>provided, however</u>, that the foregoing conditions precedent are not conditions to each Lender participating in or reimbursing the Bank or the Agent for such Lenders' Pro Rata Share of any Swing-Line Loan or Agent Advance made in accordance with the provisions of <u>Sections 2.2(h), 2.2(i), 2.2(j)</u>.

## ARTICLE 11

### DEFAULT; REMEDIES

11.1 <u>Events of Default</u>.

It shall constitute an event of default ("Event of Default") if any one or more of the following shall occur for any reason:

(a) any failure by the Borrower to pay the principal of or interest or premium on any of the Obligations or any fee or other amount owing hereunder when due, whether upon demand or otherwise;

(b) any representation or warranty made or deemed made by the Borrower in this Agreement or by the Borrower or any of its Subsidiaries in any of the other Loan Documents, any Financial Statement, or any certificate furnished by the Borrower or any of its Subsidiaries at any time to the Agent or any Lender shall prove to be untrue in any respect as of the date on which made, deemed made, or furnished;

(c) any default shall occur in the observance or performance of any of the covenants and agreements contained in this Agreement, any other Loan Documents, or any other agreement entered into at any time to which the Borrower or any Subsidiary and the Agent or any Lender are party (including in respect of any Bank Products), or if any such agreement or document shall terminate (other than in accordance with its terms or the terms hereof or with the written consent of the Agent and the Majority Lenders) or become void or unenforceable, without the written consent of the Agent and the Majority Lenders;

(d) default shall occur with respect to any Debt For Borrowed Money (other than the Obligations) of the Borrower or any of its Subsidiaries in an outstanding principal amount which exceeds $10,000, or under any agreement or instrument under or pursuant to which any such Debt For Borrowed Money may have been issued, created, assumed, or guaranteed by the Borrower or any of its Subsidiaries, and such default shall continue for more than the period of grace, if any, therein specified, if the effect thereof (with or without the giving of notice or further lapse of time or both) is to accelerate, or to permit the holders of any such Debt For Borrowed Money to accelerate, the maturity of any such Debt For Borrowed Money; or any such Debt For Borrowed Money shall be declared due and payable or be required to be prepaid (other than by a regularly scheduled required prepayment) prior to the stated maturity thereof;

(e) the Borrower or any of its Subsidiaries shall (i) file a voluntary petition in bankruptcy or file a voluntary petition or an answer or otherwise commence any action or proceeding seeking reorganization, arrangement or readjustment of its debts or for any other

relief under the federal Bankruptcy Code, as amended, or under any other bankruptcy or insolvency act or law, state or federal, now or hereafter existing, or consent to, approve of, or acquiesce in, any such petition, action or proceeding; (ii) apply for or acquiesce in the appointment of a receiver, assignee, liquidator, sequestrator, custodian, monitor, trustee or similar officer for it or for all or any part of its property; (iii) make an assignment for the benefit of creditors; or (iv) be unable generally to pay its debts as they become due;

(f) an involuntary petition or proposal shall be filed or an action or proceeding otherwise commenced seeking reorganization, arrangement, consolidation or readjustment of the debts of the Borrower or any of its Subsidiaries or for any other relief under the federal Bankruptcy Code, as amended, or under any other bankruptcy or insolvency act or law, state or federal, now or hereafter existing;

(g) a receiver, assignee, liquidator, sequestrator, custodian, monitor, trustee or similar officer for the Borrower or any of its Subsidiaries or for all or any part of its property shall be appointed or a warrant of attachment, execution or similar process shall be issued against any part of the property of the Borrower or any of its Subsidiaries;

(h) the Borrower or any of its Subsidiaries shall file a certificate of dissolution under applicable state law or shall be liquidated, dissolved or wound-up or shall commence or have commenced against it any action or proceeding for dissolution, winding-up or liquidation, or shall take any corporate action in furtherance thereof;

(i) all or any material part of the property of the Borrower or any of its Subsidiaries shall be nationalized, expropriated or condemned, seized or otherwise appropriated, or custody or control of such property or of the Borrower or such Subsidiary shall be assumed by any Governmental Authority or any court of competent jurisdiction at the instance of any Governmental Authority, except where contested in good faith by proper proceedings diligently pursued where a stay of enforcement is in effect;

(j) any Guaranty of the Obligations shall be terminated, revoked or declared void or invalid;

(k) one or more judgments, orders, decrees or arbitration awards is entered against the Borrower or any of its Subsidiaries involving in the aggregate liability (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage) as to any single or related or unrelated series of transactions, incidents or conditions, of $200,000 or more, and the same shall remain unsatisfied, unvacated and unstayed pending appeal for a period of 5 days after the entry thereof;;

(l) any loss, theft, damage or destruction of any item or items of Collateral or other property of the Borrower or any Subsidiary occurs which could reasonably be expected to cause a Material Adverse Effect and is not adequately covered by insurance;

(m) there occurs a Material Adverse Effect;

(n) there is filed against the Borrower or any of its Subsidiaries any action, suit or proceeding under any federal or state racketeering statute (including the Racketeer

Influenced and Corrupt Organization Act of 1970), which action, suit or proceeding (i) is not dismissed within one hundred twenty (120) days, and (ii) could reasonably be expected to result in the confiscation or forfeiture of any material portion of the Collateral;

(o) for any reason other than the failure of the Agent to take any action available to it to maintain perfection of the Agent's Liens, pursuant to the Loan Documents, any Loan Document ceases to be in full force and effect or any Lien with respect to any material portion of the Collateral intended to be secured thereby ceases to be, or is not, valid, perfected and prior to all other Liens (other than Permitted Liens) or is terminated, revoked or declared void;

(p) an ERISA Event shall occur with respect to a Pension Plan or Multi-employer Plan which has resulted or could reasonably be expected to result in liability of the Borrower under Title IV of ERISA to the Pension Plan, Multi-employer Plan or the PBGC in an aggregate amount in excess of $10,000; (ii) the aggregate amount of Unfunded Pension Liability among all Pension Plans at any time exceeds $10,000; or (iii) the Borrower or any ERISA Affiliate shall fail to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multi-employer Plan in an aggregate amount in excess of $10,000; or

(q) there occurs a Change of Control.

11.2 Remedies.

(a) If a Default or an Event of Default exists, the Agent may, in its discretion, and shall, at the direction of the Majority Lenders, do one or more of the following at any time or times and in any order, without notice to or demand on the Borrower: (i) reduce the Maximum Revolver Amount, or the advance rates against Eligible Accounts and/or Eligible Inventory used in computing the Borrowing Base, or reduce one or more of the other elements used in computing the Borrowing Base; (ii) restrict the amount of or refuse to make Revolving Loans; and (iii) restrict or refuse to provide Letters of Credit or Credit Support. If an Event of Default exists, the Agent shall, at the direction of the Majority Lenders, do one or more of the following, in addition to the actions described in the preceding sentence, at any time or times and in any order, without notice to or demand on the Borrower: (A) terminate the Commitments and this Agreement; (B) declare any or all Obligations to be immediately due and payable; provided, however, that upon the occurrence of any Event of Default described in Sections 11.1(e), 11.1(f), 11.1(g), or 11.1(h), the Commitments shall automatically and immediately expire and all Obligations shall automatically become immediately due and payable without notice or demand of any kind; and (C) pursue its other rights and remedies under the Loan Documents and applicable law.

(b) If an Event of Default has occurred and is continuing: (i) the Agent shall have for the benefit of the Lenders, in addition to all other rights of the Agent and the Lenders, the rights and remedies of a secured party under the UCC; (ii) the Agent may, at any time, take possession of the Collateral and keep it on the Borrower's premises, at no cost to the Agent or any Lender, or remove any part of it to such other place or places as the Agent may desire, or the Borrower shall, upon the Agent's demand, at the Borrower's cost, assemble the Collateral and

{KAC1124.DOC;10}                                89