## AMENDED AND RESTATED SUBORDINATION AGREEMENT

**THIS AMENDED AND RESTATED SUBORDINATION AGREEMENT** (this "Agreement") is entered into as of October 22, 2002, by and among Auburn Foundry, Inc., an Indiana corporation ("Borrower"), the financial institutions party to that certain Financing and Security Agreement dated April 10, 2000 described below (collectively, "Lenders"), Bank of America, National Association, as agent for the Lenders (in such capacity, "Agent"), David B. Fink, William E. Fink, John A. Fink, Janet F. Borden, Timothy S. Borden, and A.F. Europe, Inc., an Indiana corporation (collectively, "Initial Holders"), Trevor Meeks Agency Under Agreement dated 6/27/97 f/b/o Trevor Meeks, David M. Meeks, Jr. Trust u/a dated 1/3/73 f/b/o David M. Meeks, Jr., Anne Meeks Davis Trust u/a dated 7/7/73 f/b/o Anne Meeks Davis, Maile M. Urbaska Revocable Trust u/a dated 10/13/87 f/b/o Maile M. Urbaska, Katie Urbaska Revocable Trust u/a dated 2/3/98 f/b/o Katie Urbaska, John A. Urbaska Revocable Trust u/a dated 1/30/98 f/b/o John A. Urbaska, Christy Davis Trust u/a dated 1/2/94 f/b/o Christy Davis, Malia Davis Megorden Trust u/a dated 4/19/91 f/b/o Malia Davis Megorden, Sheela B. Davis Trust u/a dated 11/26/73 f/b/o Sheela B. Davis (collectively, "New Holders"), and William E. Fink, as agent for the Initial Holders and the New Holders ("Subordinated Agent").

## RECITALS

A. Borrower, Lenders and Agent are parties to that certain Financing and Security Agreement dated as of April 10, 2000 (as the same may be amended, supplemented or otherwise modified from time to time, the "Senior Loan Agreement"), pursuant to which Lenders have extended loans to Borrower.

B. Borrower is indebted to Initial Holder William E. Fink in the amount of $887,470.88 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $88,747.09 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "William Fink Notes").

C. Borrower is indebted to Initial Holder David B. Fink in the amount of $887,740.88 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith (the "David Fink Note").

D. Borrower is indebted to Initial Holder Janet F. Borden in the amount of $850,028.48 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $85,002.84 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "Janet Borden Notes").

E. Borrower is indebted to Initial Holder Timothy S. Borden in the amount of $37,442.52 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $3,744.25 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "Timothy Borden Notes").

F. Borrower is indebted to Initial Holder John A. Fink in the amount of $887,470.88 pursuant to that certain Amended and Restated Subordinated Promissory Note dated

of even date herewith and $88,747.09 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "John Fink Notes").

      G.      Borrower is indebted to Initial Holder A.F. Europe, Inc. in the amount of $1,000,000 pursuant to that certain Senior Subordinated Note dated December 13, 2001 (the "AFE Note").

      H.      Borrower is indebted to New Holder Trevor Meeks Agency Under Agreement dated 6/27/97 f/b/o Trevor Meeks in the amount of $43,885.52 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $3,289.15 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "Trevor Meeks Agency Notes").

      I.      Borrower is indebted to New Holder David M. Meeks, Jr. Trust u/a dated 1/3/73 f/b/o David M. Meeks, Jr. in the amount of $58,097.72 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $4,357.33 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "David Meeks, Jr. Trust Notes").

      J.      Borrower is indebted to New Holder Anne Meeks Davis Trust u/a dated 7/7/73 f/b/o Anne Meeks Davis in the amount of $58,097.72 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $4,357.33 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "Anne Davis Trust Notes").

      K.      Borrower is indebted to New Holder Maile M. Urbaska Revocable Trust u/a dated 10/13/87 f/b/o Maile M. Urbaska in the amount of $58,379.76 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $4,378.48 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "Maile Urbaska Notes").

      L.      Borrower is indebted to New Holder Katie Urbaska Revocable Trust u/a dated 2/3/98 f/b/o Katie Urbaska in the amount of $43,885.52 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $3,289.15 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "Katie Urbaska Trust Notes").

      M.      Borrower is indebted to New Holder John A. Urbaska Revocable Trust u/a dated 1/30/98 f/b/o John A. Urbaska in the amount of $43,885.52 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $3,289.15 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "John Urbaska Trust Notes").

      N.      Borrower is indebted to New Holder Christy Davis Trust u/a dated 1/2/94 f/b/o Christy Davis in the amount of $43,885.52 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $3,289.15 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "Christy Davis Trust Notes").

FWIMAN1 258567v1

O. Borrower is indebted to New Holder Malia Davis Megorden Trust u/a dated 4/19/91 f/b/o Malia Davis Megorden in the amount of $43,885.52 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and $3,289.15 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "Malia Megorden Trust Notes").

P. Borrower is indebted to New Holder Sheela B. Davis Trust u/a dated 11/26/73 f/b/o Sheela B. Davis in the amount of $56,264.56 pursuant to that certain Amended and Restated Subordinated Promissory Note dated of even date herewith and in the amount of $4,219.84 pursuant to that certain Amended and Restated Senior Subordinated Note dated of even date herewith (collectively, the "Sheela Davis Trust Notes").

Q. The issuance of the William Fink Notes, the David Fink Note, the Janet Borden Notes, the Timothy Borden Notes, the John Fink Notes, the AFE Note, the Trevor Meeks Agency Notes, the Davis Meeks, Jr. Trust Notes, the Anne Davis Trust Notes, the Maile Urbaska Trust Notes, the Katie Urbaska Trust Notes, the John Urbaska Trust Notes, the Christy Davis Trust Notes, the Malia Megorden Trust Notes and the Sheela Davis Trust Notes (collectively, the "Subordinated Notes"), the incurring by the Borrower of the indebtedness evidenced thereby and the granting by the Borrower of any liens or security interests to or for the benefit of any of the Initial Holders, the New Holders or Subordinated Agent are all prohibited by the Senior Loan Agreement. As a condition precedent to the Lenders' consent to the foregoing (the "Required Consent"), the Lenders required the execution and delivery of this Agreement by the Initial Holders, the New Holders, the Subordinated Agent and Borrower.

R. This Amended and Restated Subordination Agreement amends and restates the Subordination Agreement dated December 13, 2001, among Lenders, Agent, the Initial Holders, the Subordinated Agent and the Borrower.

**NOW, THEREFORE**, to induce Lenders to provide the Required Consent, and for other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the parties hereto agree as follows:

1. **Definitions**. The following terms shall have the following meanings in this Agreement:

"**Collection Action**" shall mean (a) to demand, sue for, take or receive from or on behalf of any Obligor (including, without limitation, by set-off, counterclaim or in any other manner) the whole or any part of any moneys which may now or hereafter be owing by such Obligor with respect to the Subordinated Debt, (b) to initiate or participate with others in any suit, action or proceeding against any Obligor, to (i) enforce payment of or to collect the whole or any part of the Subordinated Debt or (ii) commence enforcement of any of the rights and remedies under the Subordinated Debt Documents or applicable law with respect to the Subordinated Debt or the Subordinated Debt Documents, (c) to foreclose or attempt to foreclose any Subordinated Liens (as hereinafter defined) or (d) to accelerate any Subordinated Debt.

FWIMAN1 258567v1

"**Obligor**" shall mean Borrower and each other entity which is a direct obligor or a guarantor with respect to the Senior Debt or the Subordinated Debt.

"**Proceeding**" shall mean any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, dissolution or other winding up of any Obligor.

"**Senior Creditors**" shall mean the Lenders under the Senior Loan Agreement, all successors, assigns and participants thereof, and any other lender from time to time holding Senior Debt.

"**Senior Debt**" shall mean all loans, advances, debts, liabilities and obligations for payment of monetary amounts (whether or not such amounts are liquidated or determinable) owing by any Obligor to any Senior Creditor, of any kind or nature, present or future, arising under the Senior Debt Documents. Senior Debt includes all principal, interest, fees, expenses, attorneys' fees and any other sum chargeable to Borrower or any other Obligor under the Senior Debt Documents. Senior Debt also includes (a) all complete or partial renewals, refundings or refinancings of the Senior Debt, (b) all amendments, modifications, renewals or extensions of any of the foregoing and (c) all interest accruing on the principal of Senior Debt after the commencement of a Proceeding, without regard to whether or not such interest accrues in any such Proceeding or is allowed as a claim in any such Proceeding.

"**Senior Debt Documents**" shall mean the Senior Loan Agreement and all other agreements, documents and instruments now or hereafter evidencing, securing or otherwise pertaining to all or any portion of the Senior Debt, including any amendment, modification, restatement, extension or renewal of the Senior Loan Agreement and successive refinancings or refundings of the Senior Loan Agreement evidenced thereby.

"**Senior Default**" shall mean any nonpayment of the "Obligations" described in the Senior Loan Agreement upon demand by Agent or its successors, any "Event of Default" described in the Senior Loan Agreement, or any condition or event that, after notice or lapse of time or both, would constitute such an Event of Default if that condition or event were not cured or removed within any applicable grace or cure period set forth therein.

"**Senior Default Notice**" shall mean a written notice from any Senior Creditor to Subordinated Agent, with a copy to Borrower, pursuant to which Subordinated Agent is notified of the occurrence of a Senior Default.

"**Subordinated Creditors**" shall mean Initial Holders, New Holders and all subsequent holders of the Subordinated Debt.

-4-

"**Subordinated Debt**" shall mean all of the obligations of Borrower evidenced by the Subordinated Notes, all other amounts now or hereafter owed by any Obligor to any Subordinated Creditor under the Subordinated Notes or any other Subordinated Debt Documents, and all other obligations of any Obligor to any Subordinated Creditor now or hereafter arising in respect of the Subordinated Debt Documents.

"**Subordinated Debt Documents**" shall mean the Subordinated Notes and all other documents and instruments securing or otherwise pertaining to the Subordinated Notes, as the same may be amended, modified, renewed or extended.

"**Subordinated Notes**" shall mean, collectively, the initial Subordinated Notes as defined in the recitals and all Subordinated Notes issued in exchange or substitution for the initial Subordinated Notes or evidencing indebtedness originally evidenced by the initial Subordinated Notes.

"**Subordinated Default**" shall mean a default in the payment of the Subordinated Debt or the performance of any term, covenant, agreement or condition contained in the Subordinated Debt Documents or any other occurrence permitting any Subordinated Creditor to accelerate the payment of all or any portion of the Subordinated Debt.

"**Subordinated Default Notice**" shall mean written notice from a Subordinated Creditor to Agent, with a copy to Borrower, pursuant to which Agent is notified of the occurrence of a Subordinated Default, which notice incorporates a reasonably detailed description of such Subordinated Default.

2. **Subordination**.

2.1 **Subordination of Subordinated Debt to Senior Debt**. Borrower and each Subordinated Creditor agrees that the payment of any and all of the Subordinated Debt shall be subordinate and subject, in right of payment, to the prior payment in full in cash of the Senior Debt, and that each holder of Senior Debt, whether now outstanding or hereafter created, incurred, assumed or guaranteed, shall be deemed to have acquired, maintained or advanced such Senior Debt in reliance upon the provisions contained in this Agreement.

2.2 **Proceedings**. In the event of any Proceeding involving any Obligor, (a) all Senior Debt first shall be paid in full in cash before any payment of or with respect to Subordinated Debt shall be made; (b) any payment or distribution, whether in cash, property or securities which, but for the terms hereof, otherwise would be payable or deliverable in respect of the Subordinated Debt, shall be paid or delivered directly to Agent or its successors (to be held and/or applied in accordance with the terms of the Senior Debt Documents) until all Senior Debt is paid in full in cash, and each Subordinated Creditor irrevocably authorizes, empowers and directs all receivers, trustees, debtors in possession, liquidators, custodians, conservators and others having authority in the premises to effect all such payments and distributions, and each Subordinated Creditor also irrevocably authorizes, empowers and directs Agent or its successors

FWIMAN1 258567v1

to demand, sue for, collect and receive every such payment or distribution; (c) each Subordinated Creditor agrees to execute and deliver to Agent or its successors all such further reasonable instruments confirming the irrevocable authorizations referred to in the foregoing clause (b) as Agent may reasonably request at any time; (d) each Subordinated Creditor agrees not to initiate or prosecute or encourage any other entity to initiate or prosecute any claim, objection, action or proceeding (or vote any claim in a Proceeding which would have the effect of) challenging or objecting to the enforceability of the Senior Debt, any liens or security interests securing the Senior Debt, any claim or adequate protection rights granted or allowed by a bankruptcy court in favor of the Senior Creditors, the terms of any proposed orders authorizing the use of cash collateral to which the holders of a majority in principal amount of the Senior Debt consent, or the terms of any proposed debtor-in-possession financing to be provided by any Senior Creditor or otherwise supported by the holders of a majority in principal amount of the Senior Debt in such Proceeding, including, without limitation, any claim or objection based on lack of adequate protection with respect to the Subordinated Debt; and (e) each Subordinated Creditor agrees to execute, verify, deliver and file any proofs of claim in respect of the Subordinated Debt requested by Agent or its successors in connection with any such Proceeding and irrevocably authorizes, empowers and appoints Agent or its successors as such Subordinated Creditor's agent and attorney-in-fact to execute, verify, deliver and file such proofs of claim if such Subordinated Creditor fails to do so prior to 15 days before the expiration of the time to file any such proof of claim. In the event that Agent or any such successor votes any claim in accordance with the authority granted hereby, no Subordinated Creditor shall be entitled to change or withdraw such vote. The Senior Debt shall continue to be treated as Senior Debt and the provisions of this Agreement shall continue to govern the relative rights and priorities of Senior Creditors and Subordinated Creditors even if all or part of the Senior Debt or the security interests securing the Senior Debt are subordinated, set aside, avoided or disallowed in connection with any such Proceeding and this Agreement shall be reinstated if at any time any payment of any of the Senior Debt is rescinded or must otherwise be returned by any holder of Senior Debt or any representative of such holder.

2.3    **Restriction on Payments**. Notwithstanding any provision of any Subordinated Debt Document to the contrary, no Obligor may make, and no Subordinated Creditor may receive, accept or retain any payment of principal, interest or any other amount with respect to the Subordinated Debt until the Senior Debt is paid in full in cash and the Senior Debt Documents are terminated; provided, however, that:

(a)    scheduled monthly payments of interest which are or have become due and payable on or after the date hereof (each, an "Interest Payment" and, collectively, the "Interest Payments") may be made, under and pursuant to the terms of the Subordinated Notes, provided that the following conditions shall have been satisfied: (i) all principal payments due and payable under the Senior Loan Agreement prior to the date of any Interest Payment shall have either (A) been paid in full in cash when due or, (B) if the payment of such principal payments was deferred by written agreement of the Lenders, shall have been paid in full in cash prior to the date of such Interest Payment; (ii) all "Aggregate Revolver Outstandings" (as defined in the Senior Loan Agreement) shall have been paid in full in cash to the extent they exceed the "Borrowing Base" (as defined in the Senior Loan Agreement) and any agreement by Lenders to temporarily increase the Borrowing Base (i.e., provide an "overadvance") shall have been terminated in writing; (iii) the Borrower shall have "Availability" (as defined in the Senior Loan

-6-

Agreement) in excess of $500,000, after giving effect to the Interest Payment; and (iv) no Senior Defaults shall have occurred and be continuing; and

(b) Scheduled payments of principal (each, a "Principal Payment" and, collectively, the "Principal Payments") may be made, provided that an officer of the Borrower certifies in writing that, after giving effect to any Principal Payment, the Borrower will be in compliance with the following conditions: (i) the "Fixed Charge Coverage Ratio" (as defined in the Senior Loan Agreement) shall be (A) not less than 1.25 to 1.00 for the 12-month period ended on the last day of the most recently ended fiscal quarter and for the 12-month period ended on the last day of each of the two subsequent fiscal quarters (based on reasonable projections for such subsequent quarters), and (B) not less than 1.25 to 1.00 for the 6-month period ended on the last day of the most recently ended fiscal quarter; (ii) Average Weekly Availability (defined as the average amount of Availability, as defined in the Senior Loan Agreement, determined at the end of each weekly period during the preceding period of six (6) months) shall be not less than $2,000,000; and (iii) no Senior Defaults shall have occurred and be continuing.

2.4 **Restriction on Action by Subordinated Creditors**.

(a) Until the Senior Debt is paid in full in cash, neither any Subordinated Creditor nor Subordinated Agent shall, without the prior written consent of holders of two-thirds or more in principal amount of the Senior Debt, take any Collection Action with respect to the Subordinated Debt, except that Subordinated Creditors may demand payment of the Subordinated Debt after a demand for payment of the Senior Debt has been made.

(b) Until the Senior Debt is paid in full cash, no Subordinated Creditor shall, without the prior written consent of holders of two-thirds or more in principal amount of the Senior Debt, agree to any amendment, modification or supplement to any of the Subordinated Debt Documents, the effect of which is to (i) increase the principal amount of the Subordinated Debt or rate of interest on any of the Subordinated Debt, (ii) change the maturity date or other dates upon which payments of principal or interest with respect to the Subordinated Debt are due to any earlier date or dates, (iii) change or add any event of default with respect to the Subordinated Debt, (iv) change the redemption or prepayment provisions of the Subordinated Debt, or (v) alter the subordination provisions with respect to the Subordinated Debt, including, without limitation, subordinating the Subordinated Debt to any other debt.

2.5 **Incorrect Payments**. If any payment or distribution on account of the Subordinated Debt not permitted to be made by any Obligor or received by any Subordinated Creditor under this Agreement is received by any Subordinated Creditor before all Senior Debt is paid in full in cash, such payment or distribution shall not be commingled with any assets of such Subordinated Creditor, shall be held in trust by such Subordinated Creditor for the benefit of the Senior Creditors and shall be promptly paid over to Agent or its successors for application (in accordance with the Senior Debt Documents) to the payment of the Senior Debt then remaining unpaid, until all of the Senior Debt is paid in full in cash.

2.6 **Sale, Transfer, etc.** No Subordinated Creditor shall sell, assign, pledge, dispose of or otherwise transfer all or any portion of the Subordinated Debt unless (a) prior written notice of such action is given to Agent or its successors, (b) prior to the consummation of

-7-

any such action, the transferee thereof shall execute and deliver to Agent or its successors an agreement substantially identical to this Agreement, providing for the continued subordination and forbearance of such Subordinated Debt to the Senior Debt as provided herein and for the continued effectiveness of all of the rights of Senior Creditors arising under this Agreement, and (c) following such sale, assignment, pledge, disposition or other transfer, there shall be no more than fifteen (15) Subordinated Creditors. Notwithstanding the failure to execute or deliver any such agreement, the subordination effected hereby shall survive any sale, assignment, pledge, disposition or other transfer of all or any portion of the Subordinated Debt, and the terms of this Agreement shall be binding upon the successors and assigns of each Subordinated Creditor, as provided in Section 12 below.

2.7    **Legends**. Until the Senior Debt is paid in full in cash, the Subordinated Notes at all times shall contain in a conspicuous manner the following legend:

THE OBLIGATIONS OF THE COMPANY UNDER THIS NOTE ARE SUBORDINATED TO THE PAYMENT OF CERTAIN SENIOR DEBT IN THE MANNER SET FORTH IN THE SUBORDINATION AGREEMENT, DATED AS OF THE DATE HEREOF, AMONG BANK OF AMERICA, NATIONAL ASSOCIATION, FOR ITSELF AND AS AGENT, GMAC BUSINESS CREDIT, LLC., THE HOLDERS OF THE NOTES FROM TIME TO TIME AND THE COMPANY, AND EACH HOLDER OF THIS NOTE, BY ITS ACCEPTANCE HEREOF, SHALL BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

3. **Modifications to Senior Debt**. Senior Creditors may at any time and from time to time without the consent of or notice to Subordinated Creditors, without incurring liability to Subordinated Creditors and without impairing or releasing the obligations of Subordinated Creditors under this Agreement, increase the amount of the Senior Debt, change the manner or place of payment or extend the time of payment of or renew or alter any Senior Debt, or amend in any manner any agreement, note, guaranty or other instrument evidencing or securing or otherwise relating the any Senior Debt.

4. **Continued Effectiveness of this Agreement**. The terms of this Agreement, the subordination effected hereby, and the rights and obligations of Subordinated Creditors, Agent or Senior Creditors arising hereunder, shall not be affected, modified or impaired in any manner by: (a) any amendment or modification of or supplement to the Senior Debt Documents or the Subordinated Debt Documents; (b) the validity or enforceability of any of such documents; (c) the enforcement (or lack of enforcement) or release of security interests securing payment of the Senior Debt; or (d) any exercise or non-exercise of any right, power or remedy under or in respect of the Senior Debt or the Subordinated Debt or any of the instruments or documents referred to in clause (a) above. Subordinated Creditors acknowledge that the provisions of this Agreement are intended to be enforceable at all times, whether before the commencement of, after the commencement of, in connection with or premised on the occurrence of a Proceeding.

5. **Representations and Warranties**. Initial Holders and New Holders hereby represent and warrant to Senior Creditors that they are the current and sole owners and holders of the Subordinated Notes and Subordinated Debt as of the date hereof.

FWIMAN1 258567v1