# THIRD FORBEARANCE AND FOURTH AMENDMENT AGREEMENT

This THIRD FORBEARANCE AND FOURTH AMENDMENT AGREEMENT (this "Agreement") is entered into as of this ___ day of December, 2002, by and among Auburn Foundry, Inc. (the "Borrower"), Bank of America, National Association, as Agent (in such capacity, the "Agent"), and as a Lender under the Credit Agreement (as hereinafter defined), and GMAC Business Credit, LLC, as Co-Agent (in such capacity, the "Co-Agent"), and as a Lender under the Credit Agreement. Unless otherwise specified herein, capitalized terms used in this Agreement shall have the meanings ascribed to them in the Credit Agreement.

## RECITALS

WHEREAS, the Borrower, the Agent, the Co-Agent and the Lenders are parties to that certain Financing and Security Agreement dated as of April 10, 2000 (as amended, the "Credit Agreement");

WHEREAS, the Events of Default listed on Exhibit A hereto (the "Existing Defaults") have occurred and are continuing under the Credit Agreement;

WHEREAS, the Borrower has requested that the Agent, the Co-Agent and the Lenders forbear from exercising their rights against the Borrower under the Credit Agreement and the other Loan Documents on account of the Existing Defaults upon the terms and conditions set forth herein; and

WHEREAS, the Agent, the Co-Agent and the Lenders have agreed to forbear and to continue to advance funds on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual execution hereof and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**SECTION 1.** **Definitions.**

As used herein, the following terms shall have the meanings set forth below:

"Deferred Principal Amount" means $927,738.92, the sum of the principal payment due on Term Loan Notes A on December 1, 2002 in the aggregate amount of $282,051.28 plus the principal payment due on Term Loan Notes A on January 1, 2003 in the aggregate amount of $282,051.28 plus the principal payment due on Term Loan Notes B on December 1, 2002 in the aggregate amount of $181,818.18 plus the principal payment due on Term Loan Notes B on January 1, 2003 in the aggregate amount of $181,818.18.

"Effective Date" means the date on which all of the conditions precedent to the effectiveness of this Agreement set forth in Section 15 hereof shall have been met to the satisfaction of the Agent.

1

CH\565635.4

"Forbearance Default" means (a) the occurrence of any breach of any representation, warranty, covenant or agreement by the Borrower under this Agreement, or (b) the occurrence of any Event of Default other than the Existing Defaults.

"Forbearance Period" means the period of time from the Effective Date until the occurrence of a Termination Event.

"Overadvance Amount" means zero; except during the time periods as noted below.

| Time Period | Overadvance Amount |
| --- | --- |
| January 3, 2002 to February 20, 2003 | $800,000 |
| February 21, 2003 to February 27, 2003 | $400,000 |

**SECTION 2.    Confirmation of Obligations and Existing Defaults.**

(a)    The Borrower acknowledges and agrees that as of the end of the day on December 2, 2002, the aggregate amount of the principal balance of the outstanding Obligations under the Credit Agreement included the following principal amounts:

| | |
| --- | --- |
| Revolving Loans | $15,024,990.67 |
| Term Loan A | $14,666,666.72 |
| Term Loan B | $727,272.78 |
| Letters of Credit Liability | $1,021,096.00 |
| Total outstanding principal amount of Obligations | $31,440,026.17 |

The foregoing amounts do not include all of the interest, fees and expenses to which the Agent, Co-Agent and the Lenders are entitled. The Obligations listed above are outstanding, and Borrower acknowledges and agrees that it has no right of offset, defense, or counterclaim with respect to such Obligations.

(b)    This Agreement constitutes notice by the Agent, Co-Agent and the Lenders to the Borrower pursuant to the terms of the Credit Agreement of the occurrence of the Existing Defaults set forth on Exhibit A hereto. The Borrower acknowledges and agrees that such Existing Defaults have occurred and are continuing and the Borrower anticipates that such Existing Defaults will continue through the Forbearance Period.

2

CH\565635.4

**SECTION 3.** <u>**Forbearance Period; Acceleration of Obligations.**</u>

(a) All rights and remedies of the Agent, Co-Agent and the Lenders in connection with the Existing Defaults are reserved, but, except as otherwise specifically provided herein, the Agent, Co-Agent and the Lenders agree to forbear from exercising their rights and remedies against the Borrower that arise solely as a result thereof until the earliest to occur of: (i) April 10, 2003, or (ii) the occurrence of any Forbearance Default (each of (i) and (ii), a "Termination Event"); <u>provided</u>, <u>however</u>, that the Obligations shall at all times bear interest at the Default Rate and the Borrower shall not be permitted to convert any Prime Rate Loans to LIBOR Rate Loans.

(b) Borrower agrees and acknowledges that no action taken by Agent, Co-Agent or any Lenders prior to the date hereof shall: (i) create any obligation to make any further advances or to continue to defer enforcement action after a Termination Event, (ii) constitute a waiver or modification of any term or condition of the Credit Agreement or any other Loan Document or (iii) constitute a waiver of any Event of Default, any unsatisfied condition precedent or otherwise prejudice any rights or remedies which the Agent, Co-Agent or any Lender now has or may have in the future under the Credit Agreement, the other Loan Documents, applicable law or otherwise, including, without limitation, all rights and remedies in connection with the Existing Defaults after a Termination Event. Nothing contained herein shall in any way be deemed to limit or prevent the Agent, Co-Agent and the Lenders from, upon the occurrence of a Termination Event, accelerating the Obligations, commencing any action or actions to collect the Obligations, foreclosing or otherwise realizing on the Collateral, or taking any other enforcement action against the Borrower to the extent permitted under the Loan Documents or under applicable law. Without limiting the generality of the foregoing, subject only to the agreement of the Agent, Co-Agent and each Lender to forbear during the Forbearance Period, the Agent, Co-Agent and each Lender expressly reserve all rights and remedies which they now have or may have in the future under the Credit Agreement, the other Loan Documents, applicable law or otherwise, including, without limitation, all rights and remedies in connection with the Existing Defaults after the occurrence of a Termination Event.

**SECTION 4.** <u>**Overadvance.**</u> Subject to the other limitations on the amount that may be borrowed set forth in the Credit Agreement (as amended hereby), during the Forbearance Period the definition of "Borrowing Base" shall be deemed amended to include the Overadvance Amount.

**SECTION 5.    Rescheduled Principal Payments.** The Borrower acknowledges and agrees that the principal payments due on Term Loan Notes A on December 1, 2002 and January 1, 2003 in the aggregate amount of $282,051.28 each and the principal payments due on Term Loan Notes B on December 1, 2002 and January 1, 2003 in the aggregate amount of $181,818.18 each are hereby rescheduled to be due and payable upon the earlier of the dates set forth on Exhibit B hereto or the occurrence of a Forbearance Default. All other scheduled principal payments, interest payments, fees and other payments shall be due and payable as and when provided in the Credit Agreement and the other Loan Documents.

**SECTION 6.    Covenants.** The Borrower hereby covenants and agrees as follows:

(a)    within ten (10) business days after the end of each month, Borrower shall deliver to Agent a certificate of an officer of the Borrower comparing Borrower's actual EBITDA for such month with the minimum required EBITDA for such month set forth on Exhibit C hereto. The actual EBITDA for each month shall exceed the minimum required EBITDA for such month set forth on Exhibit C hereto; and

(b)    in exchange for the accommodations provided by Agent and Lenders herein, Borrower agrees it is liable to Agent for the benefit of Lenders for a $200,000 forbearance fee, which is fully earned and nonrefundable as of the date hereof, but which is payable on April 10, 2003.

**SECTION 7.    Release.** The Borrower hereby releases, waives and agrees not to allege or otherwise pursue any defenses, counterclaims, claims, causes of action, setoffs or other rights they may have as of the date hereof against the Agent, Co-Agent or any Lender, including, without limitation, the right, if any, to contest (a) any Event of Default which could be declared by the Agent, Co-Agent or any Lender on the date hereof or any time hereafter, (b) any provision of the Credit Agreement, this Agreement or any other Loan Document, and/or (c) the conduct of the Agent, Co-Agent or any Lender in administering the financing arrangements among the Borrower, the Agent, Co-Agent and/or the Lenders.

**SECTION 8.    Representations And Warranties Of Borrower.**

The Borrower represents, warrants and agrees that:

(a)    the execution, delivery and performance by such Borrower of this Agreement and all documents and instruments delivered in connection herewith have been duly authorized and this Agreement and all documents and instruments delivered in connection herewith are legal, valid and binding obligations of such Borrower, enforceable against such Borrower in accordance with their respective terms;

(b)    except for the Existing Defaults, each of the representations and warranties contained in the Credit Agreement is true and correct in all material respects on and as of the date hereof as if made on the date hereof, except to the extent that such representations and warranties expressly relate to an earlier date; and

(c)    neither the execution, delivery and performance of this Agreement or any documents and instruments delivered in connection herewith nor the consummation of the

4

CH\565635.4

transactions contemplated hereby does or shall contravene, result in a breach of, or violate (i) any provision of the Borrower's articles of incorporation, bylaws or other organizational or governing documents, (ii) any law or regulation, or any order or decree of any court or government instrumentality known to the Borrower, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which the Borrower or any of its subsidiaries is a party or by which the Borrower or any of its subsidiaries or any of their property is bound.

**SECTION 9.** **Amendment to Credit Agreement.** Section 1.1 of the Credit Agreement is hereby amended by deleting the "Minimum Availability Reserve" definition and replacing it with the following:

> "Minimum Availability Reserve" means $0 from and after the Effective Date

**SECTION 10.** **Reference To And Effect Upon The Credit Agreement.**

(a) Except as specifically modified herein, the Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

(b) The execution, delivery and effectiveness of this Agreement and all documents and instruments delivered in connection herewith shall not operate as a waiver of any right, power or remedy of the Agent, Co-Agent or any Lender under the Credit Agreement or any other Loan Document, nor constitute a waiver of any provision of the Credit Agreement or any other Loan Document, except as specifically set forth herein. Upon the effectiveness of this Agreement, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of similar import shall mean and be a reference to the Credit Agreement as modified hereby.

**SECTION 11.** **Costs And Expenses.** The Borrower agrees to reimburse the Agent, Co-Agent and the Lenders for all reasonable fees, costs and expenses, including the fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with the negotiation, documentation and enforcement of this Agreement and all documents executed in connection herewith or otherwise contemplated hereby.

**SECTION 12.** **Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AS OPPOSED TO CONFLICTS OF LAWS PROVISIONS) OF THE STATE OF ILLINOIS.

**SECTION 13.** **Entire Agreement.** This Agreement contains the entire understanding of the parties hereto with regard to the subject matter contained herein. This Agreement supersedes all prior or contemporaneous negotiations, promises, covenants, agreements and representations of every nature whatsoever with respect to the matters referred to in this Agreement, all of which have become merged and finally integrated into this Agreement. Each of the parties hereto understands that in the event of any subsequent litigation, controversy or dispute concerning any of the terms, conditions or provisions of this Agreement, no party shall be entitled to offer or introduce into evidence any oral promises or oral agreements between the parties relating to the subject matter of this Agreement not included or referred to herein and not reflected by a writing not included or referred to herein.

CH\565635.4

**SECTION 14.**  **Counterparts; Facsimile.**  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Facsimile signatures shall be deemed originals for all purposes and shall be valid and binding on the parties.

**SECTION 15.**  **Recitals Incorporated.**  The Recitals are hereby incorporated herein by reference.

**SECTION 16.**  **Effectiveness.**  This Agreement shall become effective only upon the satisfaction of all of the following conditions precedent on the date hereof or on such other date as is set forth below:

(a)  _Agreement._  Executed signature pages for this Agreement signed by the Agent, Co-Agent, the Lenders parties hereto, and Borrower shall have been delivered to the Agent.

(b)  _Representations._  The representations and warranties contained herein shall be true and correct in all respects.

(c)  _Subordination Agreement._  Borrower shall have entered into a Subordination Agreement with William E. Fink, John A. Fink, Janet F. Borden, Timothy S. Borden, David B. Fink and A.F. Europe, Inc. in form and substance satisfactory to the Agent, and Borrower shall have provided evidence acceptable to the Agent that William E. Fink, John A. Fink, Janet F. Borden and Timothy S. Borden have contributed $465,000 to the Borrower (in addition to the funds previously contributed).

**SECTION 17.**  **Jury Trial Waiver.**  THE BORROWER, THE LENDERS, THE AGENT AND THE CO-AGENT EACH WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AGENT-RELATED PERSON, PARTICIPANT, ASSIGNEE, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. THE BORROWER, THE LENDERS, THE AGENT AND THE CO-AGENT EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY ARE WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

IN WITNESS WHEREOF, the parties hereto hereupon set their hands as of the date first written above.

**AUBURN FOUNDRY, INC.,**
as Borrower

By: _Thomas D Walsh_

Title: _Vice President & CFO_


**BANK OF AMERICA, NATIONAL ASSOCIATION,**
as Agent and as a Lender

By: _Don Glau_

Title: _Vice President_


**GMAC BUSINESS CREDIT, LLC,**
as Co-Agent and as a Lender

By: _[signature]_

Title: _VICE PRESIDENT_

CH\565635.4

7

# Exhibit A

## Existing Defaults

1. Breach of the financial covenants in Section 9.23 on or prior to July 31, 2002.

2. Breach of the financial covenants in Section 9.24 on or prior to July 31, 2002.

3. Breach of Section 7.2(a) resulting from the failure to timely deliver the audited financial statements for the Fiscal Year ended November 30, 2000.

CH\565635.4

## Exhibit B

### Deferred Principal Amount Payment Schedule

|                   | Term A       | Term B       | Total        |
|-------------------|--------------|--------------|--------------|
| February 28, 2003 | $60,804.02   | $39,195.98   | $100,000.00  |
| March 7, 2003     | $60,804.02   | $39,195.98   | $100,000.00  |
| March 14, 2003    | $60,804.02   | $39,195.98   | $100,000.00  |
| March 21, 2003    | $60,804.02   | $39,195.98   | $100,000.00  |
| March 28, 2003    | $60,804.02   | $39,195.98   | $100,000.00  |
| April 4, 2003     | $60,804.02   | $39,195.98   | $100,000.00  |
| April 10, 2003    | $199,277.88  | $128,461.04  | $327,738.92  |
|                   |              |              |              |

CH\565635.4

## Exhibit C

## Minimum Required EBITDA

| Month | Minimum Required EBITDA |
|---|---|
| January 2003 | $817,000 |
| February 2003 | $944,000 |
| March 2003 | $1,107,000 |
| April 2003 and each month thereafter | $1,063,000 |
| | |

CH\565635.4