## FOURTH FORBEARANCE AND FIFTH AMENDMENT AGREEMENT

This FOURTH FORBEARANCE AND FIFTH AMENDMENT AGREEMENT (this "Agreement") is entered into as of this 26th day of June, 2003, by and among Auburn Foundry, Inc. (the "Borrower"), Bank of America, National Association, as Agent (in such capacity, the "Agent"), and as a Lender under the Credit Agreement (as hereinafter defined), and GMAC Business Credit, LLC, as Co-Agent (in such capacity, the "Co-Agent"), and as a Lender under the Credit Agreement.  Unless otherwise specified herein, capitalized terms used in this Agreement shall have the meanings ascribed to them in the Credit Agreement.

### RECITALS

WHEREAS, the Borrower, the Agent, the Co-Agent and the Lenders are parties to that certain Financing and Security Agreement dated as of April 10, 2000 (as amended, the "Credit Agreement");

WHEREAS, the Events of Default listed on Exhibit A hereto (the "Existing Defaults") have occurred and are continuing under the Credit Agreement;

WHEREAS, the Borrower has requested that the Agent, the Co-Agent and the Lenders forbear from exercising their rights against the Borrower under the Credit Agreement and the other Loan Documents on account of the Existing Defaults upon the terms and conditions set forth herein; and

WHEREAS, the Agent, the Co-Agent and the Lenders have agreed to forbear and to continue to advance funds on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual execution hereof and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**SECTION 1.**     **Definitions.**

As used herein, the following terms shall have the meanings set forth below:

"Equity Appreciation Rights Agreement" means that certain Equity Appreciation Rights Agreement, dated as of the date hereof, by and among Agent, Co-Agent and Borrower.

"Effective Date" means the date on which all of the conditions precedent to the effectiveness of this Agreement set forth in Section 15 hereof shall have been met to the satisfaction of the Agent.

"Forbearance Default" means (a) the occurrence of any breach of any representation, warranty, covenant or agreement by the Borrower under this Agreement, or (b) the occurrence of any Event of Default other than the Existing Defaults.

"Forbearance Period" means the period of time from the Effective Date until the occurrence of a Termination Event.

1

"Subordination Agreement" means that certain Subordination Agreement, dated as of June 26, 2003, by and among Agent, Co-Agent, Borrower and Subordinated Lender.

"Third Forbearance Fee" means the $200,000 fee payable to the Agent for the benefit of Lenders in exchange for the Agent and the lenders entering into the Third Forbearance and Fourth Amendment Agreement, dated as of December 20, 2002, which fee was fully earned and nonrefundable as of that date, but shall be payable in accordance with Section 4 hereof.

"75% Equity Appreciation Rights Buy-Out" means the repurchase by Borrower of seventy-five percent (75%) of the amount of any equity appreciation payment required to be paid to Lenders pursuant to the terms of the Equity Appreciation Rights Agreement.

**SECTION 2.    Confirmation of Obligations and Existing Defaults.**

(a)    The Borrower acknowledges and agrees that as of the end of the day on June 25, 2003, the aggregate amount of the principal balance of the outstanding Obligations under the Credit Agreement included the following principal amounts:

| | |
|---|---|
| Revolving Loans | $13,799,745.77 |
| Term Loans A | $12,610,722.74 |
| Term Loans B | $ 0 |
| Letters of Credit Liability | $1,021,000 |
| Total outstanding principal amount of Obligations | $27,431,468.51 |

The foregoing amounts do not include all of the interest, fees and expenses to which the Agent, Co-Agent and the Lenders are entitled.  The Obligations listed above are outstanding, and Borrower acknowledges and agrees that it has no right of offset, defense, or counterclaim with respect to such Obligations.

(b)    This Agreement constitutes notice by the Agent, Co-Agent and the Lenders to the Borrower pursuant to the terms of the Credit Agreement of the occurrence of the Existing Defaults set forth on Exhibit A hereto.  The Borrower acknowledges and agrees that such Existing Defaults have occurred and are continuing and the Borrower anticipates that such Existing Defaults will continue through the Forbearance Period.

**SECTION 3.    Forbearance Period; Acceleration of Obligations.**

(a)    All rights and remedies of the Agent, Co-Agent and the Lenders in connection with the Existing Defaults are reserved, but, except as otherwise specifically provided herein, the Agent, Co-Agent and the Lenders agree to forbear from exercising their rights and remedies against the Borrower that arise solely as a result of the Existing Defaults until the earliest to

2

occur of: (i) June 30, 2004, or (ii) the occurrence of any Forbearance Default (each of (i) and (ii), a "Termination Event"); provided, however, that the Obligations shall at all times bear interest at the Default Rate and the Borrower shall not be permitted to convert any Prime Rate Loans to LIBOR Rate Loans.

     (b)    Borrower agrees and acknowledges that no action taken by Agent, Co-Agent or any Lenders prior to the date hereof shall: (i) create any obligation to make any further advances or to continue to defer enforcement action after a Termination Event, (ii) constitute a waiver or modification of any term or condition of the Credit Agreement or any other Loan Document or (iii) constitute a waiver of any Event of Default, any unsatisfied condition precedent or otherwise prejudice any rights or remedies which the Agent, Co-Agent or any Lender now has or may have in the future under the Credit Agreement, the other Loan Documents, applicable law or otherwise, including, without limitation, all rights and remedies in connection with the Existing Defaults after a Termination Event. Nothing contained herein shall in any way be deemed to limit or prevent the Agent, Co-Agent and the Lenders from, upon the occurrence of a Termination Event, accelerating the Obligations, commencing any action or actions to collect the Obligations, foreclosing or otherwise realizing on the Collateral, or taking any other enforcement action against the Borrower to the extent permitted under the Loan Documents or under applicable law. Without limiting the generality of the foregoing, subject only to the agreement of the Agent, Co-Agent and each Lender to forbear during the Forbearance Period, the Agent, Co-Agent and each Lender expressly reserve all rights and remedies which they now have or may have in the future under the Credit Agreement, the other Loan Documents, applicable law or otherwise, including, without limitation, all rights and remedies in connection with the Existing Defaults after the occurrence of a Termination Event.

**SECTION 4.**    **Rescheduled Forbearance Fee and Principal Payments.** The Borrower acknowledges and agrees that payment of the Third Forbearance Fee is rescheduled such that $50,000 shall be due and payable on each of September 30, 2003, October 31, 2003, November 30, 2003 and December 31, 2003. The Borrower further acknowledges and agrees that so long as a 75% Equity Appreciation Rights Buy-Out has not occurred, the principal payments due on Term Loan Notes A are hereby rescheduled to be in the amounts set forth on Exhibit B hereto and shall be due and payable upon the earlier of the occurrence of a Forbearance Default or the deferred dates set forth on Exhibit B hereto; provided, however, that after the occurrence of a 75% Equity Appreciation Rights Buy-Out, in addition to the Partial Buy-Out Fee as defined in and required to be paid under the Equity Appreciation Rights Agreement, the principal payments due on Term Loan Notes A shall be rescheduled to be in the amount of $463,869.46 for each month from and after the occurrence of a 75% Equity Appreciation Rights Buy-Out and shall be due and payable upon the earlier of the occurrence of a Forbearance Default or on the first day of each month from and after the occurrence of a 75% Equity Appreciation Rights Buy-Out through and including June 1, 2004. In either event, the remaining principal balance of Term Loan Notes A shall be due and payable on the earlier of a Forbearance Default or June 30, 2004.

**SECTION 5.**    **Covenants.** Borrower hereby covenants and agrees as follows:

     (a)    Within fifteen (15) calendar days after the end of each month, Borrower shall deliver to Agent a certificate of an officer of the Borrower comparing (in accordance with GAAP as reflected by Borrower's internal financial statements, which may be subject to change upon

CH\613254.7

completion of audited financial statements) Borrower's actual EBITDA for the period ending on the last day of such month with the minimum required EBITDA for such period set forth on Exhibit C hereto. The actual EBITDA for each period set forth on Exhibit C hereto shall exceed the minimum required EBITDA set forth on Exhibit C for such period; and

(b)    On or before July 7, 2003, Borrower shall request and receive from Subordinated Lender an advance of good funds in the amount of $1,500,000 (in excess of the $500,000 advance to Borrower that is a condition precedent to the effectiveness hereof) pursuant to the terms of the Subordinated Credit Facility.

**SECTION 6.    Release.** The Borrower hereby releases, waives and agrees not to allege or otherwise pursue any defenses, counterclaims, claims, causes of action, setoffs or other rights the Borrower may have as of the date hereof against the Agent, Co-Agent or any Lender, including, without limitation, the right, if any, to contest (a) any Event of Default which could be declared by the Agent, Co-Agent or any Lender on the date hereof or any time hereafter, (b) any provision of the Credit Agreement, this Agreement or any other Loan Document, and/or (c) the conduct of the Agent, Co-Agent or any Lender in administering the financing arrangements among the Borrower, the Agent, Co-Agent and/or the Lenders.

**SECTION 7.    Representations And Warranties Of Borrower.**

The Borrower represents, warrants and agrees that:

(a)    the execution, delivery and performance by the Borrower of this Agreement and all documents and instruments delivered in connection herewith have been duly authorized and this Agreement and all documents and instruments delivered in connection herewith are legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms;

(b)    except for the Existing Defaults, each of the representations and warranties contained in the Credit Agreement is true and correct in all material respects on and as of the date hereof as if made on the date hereof, except to the extent that such representations and warranties expressly relate to an earlier date; and

(c)    neither the execution, delivery and performance of this Agreement or any documents and instruments delivered in connection herewith nor the consummation of the transactions contemplated hereby does or shall contravene, result in a breach of, or violate (i) any provision of the Borrower's articles of incorporation, bylaws or other organizational or governing documents, (ii) any law or regulation, or any order or decree of any court or government instrumentality known to the Borrower, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which the Borrower or any of its subsidiaries is a party or by which the Borrower or any of its subsidiaries or any of their property is bound.

**SECTION 8.    Amendments to Credit Agreement.** The Credit Agreement is hereby amended as follows:

(a)    Section 1.1 of the Credit Agreement is hereby further amended by deleting "and" at the end of subsection (e) of the definition of "Permitted Liens," deleting the period at the end

4

CH\613254.7

of subsection (f) of such definition and replacing it with "; and", and adding as a new subsection (g) to the definition of "Permitted Liens" the following:

> (g)    liens securing the repayment of the Subordinated Obligations to Subordinated Lender, but only to the extent that such liens are subordinated to Agent's Liens, regardless of the date, manner or order in which such liens were granted or perfected.

(b)    Section 1.1 of the Credit Agreement is hereby further amended by deleting the definition of "Stated Termination Date" in its entirety and replacing it with the following:

> "Stated Termination Date" means June 30, 2004.

(c)    Section 1.1 of the Credit Agreement is hereby further amended by adding the following new definitions in alphabetical order:

> "Fourth Forbearance" means the Fourth Forbearance and Fifth Amendment Agreement, dated as of June 26, 2003, among Borrower, Agent, Co-Agent and Lenders, as amended.

> "Subordinated Credit Facility" means that certain Credit Facility and Security Agreement, dated as of June 26, 2003, by and between Borrower and Subordinated Lender.

> "Subordinated Lender" means Eleventh Street Capital, LLC.

> "Subordinated Loan Documents" means the Subordinated Credit Facility, the notes issued in connection therewith and any other agreements, instruments, and documents, heretofore, now or hereafter evidencing, securing, guaranteeing or otherwise relating to the Subordinated Obligations, the collateral securing the repayment thereof, or any other aspect of the transactions contemplated by the Subordinated Credit Facility.

> "Subordinated Obligations" means all present and future loans, advances, liabilities, obligations, covenants, duties and debts owing by Borrower to Subordinated Lender, arising under or pursuant to the Subordinated Credit Facility or any of the other Subordinated Loan Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, and including, all principal, interest, charges, expenses, fees (including attorney fees), filing fees and any other sums chargeable to Borrower under the Subordinated Credit Facility or under any of the other Subordinated Loan Documents. The Subordinated Obligations are subordinate and subject, in right of payment, to the prior repayment in full in cash of the Obligations.

(d)    Section 6.6 of the Credit Agreement is hereby amended by adding as a new subsection 6.6(d) the following:

5

CH\613254.7

(d)    Notwithstanding anything herein to the contrary, the information subject to Section 6.6 hereof shall not include, and the Agent and each Lender may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Agent or such Lender relating to such tax treatment and tax structure; provided that with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transactions as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to the tax treatment or tax structure of the Loans, Letters of Credit and transactions contemplated hereby.  In addition, the Agent may disclose to any agency or organization that assigns standard identification numbers to loan facilities such basic information describing the facilities provided hereunder as is necessary to assign unique identifiers (and, if requested, supply a copy of this Agreement), it being understood that the Person to whom such disclosure is made will be informed of the confidential nature of such information and instructed to make available to the public only such information as such person normally makes available in the course of its business of assigning identification numbers.

(e)    Section 7.3 of the Credit Agreement is hereby amended by deleting "or" from the end of subsection (n), adding "or" after the semi-colon at the end of subsection (o), and adding as a new subsection (p) the following:

(p)    Promptly after Borrower has notified Agent of any intention by Borrower to treat the Loans, Letters of Credit and/or any transaction related thereto, as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4), Borrower shall provide Agent a duly completed copy of IRS Form 8886 or any successor form.

(f)    Section 8.9 of the Credit Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

8.9    Debt.

After giving effect to the making of the Term Loans and the Revolving Loans to be made on the Closing Date, the Borrower and its Subsidiaries have no Debt, except (a) the Obligations, (b) the Subordinated Obligations, (c) Debt described on Schedule 8.9, (d) trade payables and other contractual obligations arising in the ordinary course of business, and (e) other Debt existing on the Closing Date and reflected in the Financial Statements attached hereto as Exhibit C.

(g)    Section 8.31 is hereby added to the Credit Agreement as a new Section following the end of Section 8.30:

8.31    Tax Shelter Regulations.  Borrower does not intend to treat the Loans, Letters of Credit and/or any transaction related thereto, as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4).  In the event that Borrower determines to take any action inconsistent with such intention, it will promptly notify Agent thereof.  If Borrower so notifies Agent,

6

CH\613254.7

Borrower acknowledges that one or more of the Lenders may treat its Loans and/or its interest in Agent Advances and/or Letters of Credit as part of a transaction that is subject to Treasury Regulation Section 301.6112-1, and such Lender or Lenders, as applicable, will maintain the lists and other records required by such Treasury Regulation.

(h)    Section 9.10 of the Credit Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

9.10    Distributions; Capital Change; Restricted Investments; Transactions List.

(a)    Neither Borrower nor any of its Subsidiaries shall (i) directly or indirectly declare or make, or incur any liability to make, any Distribution, except Distributions to Borrower by its Subsidiaries, (ii) make any change in its capital structure which could have a Material Adverse Effect or (iii) make any Restricted Investment.

(b)    Within fifteen (15) calendar days after the end of each month, Borrower will deliver to Agent a certified list containing a detailed description of each and every Distribution, distribution of capital stock (or any options or warrants for or other rights with respect to such capital stock), Tax Distribution, redemption or other acquisition of capital stock of Borrower (or options or warrants for such capital stock), salary, management fee or other payment made by Borrower or any Subsidiary to any equity holder of Borrower or any Affiliate during such month. Such list will include, without limitation, the name of the recipient of each such transfer, the date and amount of each such transfer, the reasons for each such transfer, and any documentation created in connection with each such transfer.

(i)    Section 9.15 of the Credit Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

9.15    Transactions With Affiliates.

(a)    Except as expressly permitted in this Section 9.15, neither Borrower nor any of its Subsidiaries shall sell, transfer, distribute, or pay any money or property, including, but not limited to, any fees or expenses of any nature (including, but not limited to, any fees or expenses for management services), to any Affiliate, or lend or advance money or property to any Affiliate, or invest in (by capital contribution or otherwise) or purchase or repurchase any stock or indebtedness, or any property, of any Affiliate, or, except with respect to the LUK Guarantee, become liable on any Guaranty of the indebtedness, dividends, or other obligations of any Affiliate.  Notwithstanding the foregoing, while no Event of Default has occurred and is continuing, Borrower and its Subsidiaries may engage in transactions with Affiliates in the ordinary course of business consistent with past practices, in amounts and upon terms fully disclosed to Agent and the Lenders, and no less favorable to the Borrower and its Subsidiaries than would be obtained in a comparable arm's length transaction with a third party who is not an

7

Affiliate; provided that all payment obligations owed to Borrower by any Affiliate are required to be and are satisfied by such Affiliate within one hundred and fifty (150) days of such Affiliate incurring such obligations.

(b)     Borrower shall not pay or reimburse any fee, expense or other obligation, monetary or otherwise, that is incurred by any Person in connection with the business of any Affiliate, including, without limitation, any and all travel expenses incurred by any director or officer of an Affiliate while conducting business on behalf of such Affiliate.

(c)     Within fifteen (15) calendar days after the end of each month, Borrower will deliver to Agent a certified list containing a detailed description of each and every transaction between Borrower and any Affiliate that occurred during such month, including, but not limited to, any fees, expenses, or other payments of any nature paid to an Affiliate (including, but not limited to, any fees and expenses for management services), any lending or other advancing of money or property to any Affiliate, any investment in (by capital contribution or otherwise) or purchase or repurchase of any stock or indebtedness of any Affiliate, any Distributions or Tax Distributions to any Affiliate, any other transfer of property to any Affiliate, or liability on any Guaranty of the indebtedness, dividends or other obligations of any Affiliate.  Such list will include, without limitation, the name of the Affiliate that received each such transfer, the date and amount of each such transfer, the reasons for each such transfer, and any documentation created in connection with each such transfer.

(j)     Section 9.17 of the Credit Agreement is hereby amended by deleting such Section in its entirety and replacing it with the following:

9.17    Business Conducted.

Borrower shall not and shall not permit any of its Subsidiaries to, engage directly or indirectly, in any line of business other than the businesses in which Borrower is engaged on the Closing Date, except that Borrower's business may include the molding of gray iron, ductile iron and other ferrous castings.

(k)     Section 11.1(a) of the Credit Agreement is hereby amended by deleting such subsection in its entirety and replacing it with the following:

any Borrower default in the payment of principal, interest or premium on the Obligations or any fee or other amount owing with respect to the Obligations when due, whether upon demand or otherwise, and such default is not remedied or waiver within three (3) calendar days after receipt by Borrower of notice from Agent or Majority Lenders of such default;

(l)     Section 11.1(c) of the Credit Agreement is hereby amended by deleting such Section in its entirety and replacing it with the following:

8

CH\613254.7

(c)    any default shall occur in the observance or performance of any of the covenants or agreements contained in this Agreement (other than those defaults specifically referenced in this Section 11.1), any other Loan Documents, or any other agreement entered into at any time to which the Borrower or any Subsidiary and the Agent or any Lender are party (including in respect of any Bank Products), or if such agreement or document shall terminate (other than in accordance with its terms or the terms hereof or with the written consent of the Agent and the Majority Lenders) or become void or unenforceable, without the written consent of the Agent and the Majority Lenders; provided, however, that any default in the occurrence or performance of the covenants set forth in Sections 9.1 (Taxes and Other Obligations), 9.3 (Compliance With Law and Agreements:  Maintenance of Licenses), 9.4 (Maintenance of Property), 9.7 (Environmental Laws), 9.8 (Compliance With ERISA), 9.17 (Business Conducted), 9.21 (Fiscal Year), 9.22 through 9.24 (Financial Covenants) or 9.27 (Further Assurances) hereof shall constitute an Event of Default if and only if such default is not remedied or waived within fifteen (15) calendar days after receipt by Borrower of notice from Agent or Majority Lenders of such default;

(m)    Section 11.1 of the Credit Agreement is hereby amended by deleting "or" from the end of subsection 11.1(p) and adding as new subsections 11.1(r) and (s) the following:

(r)    any "Event of Default" described in the Subordinated Credit Facility or any other Subordinated Loan Document;

(s)    any amendment, restatement or other modification of the Subordinated Credit Facility or any other Subordinated Loan Document without prior written consent of Agent; or

(t)    any failure by an Affiliate to satisfy all payment obligations owed to Borrower or any of its Subsidiaries arising from transactions entered into in accordance with Section 9.15 hereof within one hundred and fifty (150) days of such Affiliate incurring such obligations.

(n)    Schedule 8.9 to the Credit Agreement is hereby amended by deleting such Schedule in its entirety and replacing it with a new Schedule 8.9 attached as Exhibit D hereto.

**SECTION 9.    Reference To And Effect Upon The Credit Agreement.**

(a)    Except as specifically modified herein, the Credit Agreement and the other Loan Documents shall remain in full force and effect and are hereby ratified and confirmed.

(b)    The execution, delivery and effectiveness of this Agreement and all documents and instruments delivered in connection herewith shall not operate as a waiver of any right, power or remedy of the Agent, Co-Agent or any Lender under the Credit Agreement or any other Loan Document, nor constitute a waiver of any provision of the Credit Agreement or any other Loan Document, except as specifically set forth herein.  Upon the effectiveness of this Agreement, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof",

9

CH\613254.7

"herein" or words of similar import shall mean and be a reference to the Credit Agreement as modified hereby.

**SECTION 10.   Costs And Expenses.**  The Borrower agrees to reimburse the Agent, Co-Agent and the Lenders for all reasonable fees, costs and expenses, including the fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with the negotiation, documentation and enforcement of this Agreement and all documents executed in connection herewith or otherwise contemplated hereby.

**SECTION 11.   Governing Law.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AS OPPOSED TO CONFLICTS OF LAWS PROVISIONS) OF THE STATE OF ILLINOIS.**

**SECTION 12.   Entire Agreement.**  This Agreement contains the entire understanding of the parties hereto with regard to the subject matter contained herein.  This Agreement supersedes all prior or contemporaneous negotiations, promises, covenants, agreements and representations of every nature whatsoever with respect to the matters referred to in this Agreement, all of which have become merged and finally integrated into this Agreement.  Each of the parties hereto understands that in the event of any subsequent litigation, controversy or dispute concerning any of the terms, conditions or provisions of this Agreement, no party shall be entitled to offer or introduce into evidence any oral promises or oral agreements between the parties relating to the subject matter of this Agreement not included or referred to herein and not reflected by a writing not included or referred to herein.

**SECTION 13.   Counterparts; Facsimile.**  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Facsimile signatures shall be deemed originals for all purposes and shall be valid and binding on the parties.

**SECTION 14.   Recitals Incorporated.**  The Recitals are hereby incorporated herein by reference.

**SECTION 15.   Effectiveness.**  This Agreement shall become effective only upon the satisfaction of all of the following conditions precedent on the date hereof or on such other date as is set forth below:

(a)     Agreement.  Executed signature pages for this Agreement signed by the Agent, Co-Agent, the Lenders parties hereto, and Borrower shall have been delivered to the Agent;

(b)     Representations.  The representations and warranties contained herein shall be true and correct in all respects;

(c)     Equity Appreciation Rights Agreement.  Borrower shall have entered into an Equity Appreciation Rights Agreement with Agent, Co-Agent and the Lenders in form and substance satisfactory to Agent;

10

CH\613254.7