# FIFTH FORBEARANCE AND SIXTH AMENDMENT AGREEMENT

This FIFTH FORBEARANCE AND SIXTH AMENDMENT AGREEMENT (this "Agreement") is entered into as of this 2nd day of January, 2004, by and among Auburn Foundry, Inc. (the "Borrower"), Bank of America, National Association, as Agent (in such capacity, the "Agent"), and as a Lender under the Credit Agreement (as hereinafter defined), and GMAC Commercial Finance, LLC (successor-in-interest to GMAC Business Credit, LLC), as Co-Agent (in such capacity, the "Co-Agent"), and as a Lender under the Credit Agreement, and the other financial institutions signatory to the Credit Agreement from time to time as Lenders (collectively, the "Lenders"). Unless otherwise specified herein, capitalized terms used in this Agreement shall have the meanings ascribed to them in the Credit Agreement.

## RECITALS

WHEREAS, the Borrower, the Agent, the Co-Agent and the Lenders are parties to that certain Financing and Security Agreement, dated as of April 10, 2000 (as amended, restated or otherwise modified, the "Credit Agreement");

WHEREAS, since the execution of the Credit Agreement, the Borrower, the Agent, the Co-Agent and the Lenders have entered into a number of forbearance and amendment agreements, the latest being that certain Fourth Forbearance and Fifth Amendment Agreement, dated as of June 26, 2003 (the "Fourth Forbearance");

WHEREAS, the Events of Default listed on <u>Exhibit A</u> hereto have occurred and are continuing under the Credit Agreement and the Fourth Forbearance, as applicable (collectively, the "Existing Defaults");

WHEREAS, the Borrower has requested that the Agent, the Co-Agent and the Lenders continue to forbear from exercising their respective rights and remedies against the Borrower under the Credit Agreement, the Fourth Forbearance and the other Loan Documents on account of the Existing Defaults upon the terms and conditions set forth herein; and

WHEREAS, the Agent, the Co-Agent and the Lenders have agreed to continue to forbear and advance funds on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual execution hereof and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

**SECTION 1.  Definitions.**

As used herein, the following terms shall have the meanings set forth below:

"<u>Effective Date</u>" means the date on which all of the conditions precedent to the effectiveness of this Agreement set forth in Section 18 hereof shall have been met to the satisfaction of the Agent.

"Equity Appreciation Rights Agreement" means that certain Equity Appreciation Rights Agreement, dated as of June 26, 2003, by and among the Agent, the Co-Agent and the Borrower.

"Forbearance Default" means (a) the occurrence of any breach of any representation, warranty, covenant or agreement by the Borrower under this Agreement, (b) the occurrence of any Event of Default other than the Existing Defaults, or (c) the termination of McDonald (as hereinafter defined) by the Borrower without the prior written consent of the Agent.

"Forbearance Period" means the period of time from the Effective Date until the occurrence of a Termination Event.

"Fourth Forbearance" means that certain Fourth Forbearance And Fifth Amendment Agreement, dated as of June 26, 2003, by and among the parties to this Agreement.

"Overadvance Amount" means zero, except the amounts during the corresponding time periods noted below:

| TIME PERIOD | OVERADVANCE AMOUNT |
| --- | --- |
| Effective Date through January 6, 2004 | $653,000 |
| January 7, 2004 through January 13, 2004 | $377,000 |
| January 14, 2004 through January 20, 2004 | $725,000 |
| January 21, 2004 through January 27, 2004 | $880,000 |
| January 28, 2004 through February 3, 2004 | $1,117,000 |
| February 4, 2004 through February 10, 2004 | $562,000 |
| February 11, 2004 through February 17, 2004 | $661,000 |
| February 18, 2004 through February 24, 2004 | $777,000 |
| February 25, 2004 through March 1, 2004 | $889,000 |

"Third Forbearance Fee" means the $200,000 fee payable to the Agent for the benefit of the Lenders in exchange for the Agent, Co-Agent and the Lenders entering into the Third Forbearance and Fourth Amendment Agreement, dated as of December 20, 2002, which fee was fully earned and nonrefundable as of that date. The Borrower paid $50,000 of the Third Forbearance Fee on September 30, 2003 in accordance with the Fourth Forbearance. The remaining $150,000 of the Third Forbearance Fee shall be payable in accordance with Section 5 hereof.

2

SECTION 2.  **Confirmation of Obligations and Existing Defaults.**

(a) The Borrower acknowledges and agrees that as of the end of the day on December 31, 2003, the aggregate amount of the principal balance of the outstanding Obligations under the Credit Agreement included the following principal amounts:

| | |
|---|---|
| Revolving Loans | $11,286,613.92 |
| Term Loans A | $12,410,722.74 |
| Term Loans B | $ 0 |
| Total outstanding principal amount of Obligations | $24,297,831.43 |
| Deferred Interest and Forbearance Fees | $594,343.38 |

The foregoing amounts do not include all of the interest, fees and expenses to which the Agent, Co-Agent and the Lenders are entitled. The Obligations listed above are outstanding, and the Borrower acknowledges and agrees that it has no right of offset, defense, or counterclaim with respect to such Obligations.

(b) This Agreement constitutes notice by the Agent, Co-Agent and the Lenders to the Borrower pursuant to the terms of the Credit Agreement of the occurrence of the Existing Defaults set forth on Exhibit A hereto. The Borrower acknowledges and agrees that such Existing Defaults have occurred and are continuing and the Borrower anticipates that such Existing Defaults will continue through the Forbearance Period.

SECTION 3.  **Forbearance Period; Acceleration of Obligations.**

(a) All rights and remedies of the Agent, Co-Agent and the Lenders in connection with the Existing Defaults are reserved, but, except as otherwise specifically provided herein, the Agent, Co-Agent and the Lenders agree to forbear from exercising their respective rights and remedies against the Borrower that arise solely as a result of the Existing Defaults until the earliest to occur of: (i) March 1, 2004, or (ii) the occurrence of any Forbearance Default (each of (i) and (ii), a "Termination Event"); provided, however, that the Obligations shall at all times bear interest at the Default Rate and the Borrower shall not be permitted to convert any Prime Rate Loans to LIBOR Rate Loans.

(b) The Borrower agrees and acknowledges that no action taken by the Agent, Co-Agent or any Lender prior to the date hereof shall: (i) create any obligation to make any further advances or to continue to defer enforcement action after a Termination Event, (ii) constitute a waiver or modification of any term or condition of the Credit Agreement or any other Loan Document, (iii) constitute a course of dealing or other basis for altering any Obligations of the Borrower or any obligor under the Credit Agreement or any other Loan Document, and (iv) constitute a waiver of any Event of Default, any unsatisfied condition precedent or otherwise

3

prejudice any rights or remedies which the Agent, Co-Agent or any Lender now has or may have in the future under the Credit Agreement, the Fourth Forbearance, the other Loan Documents, applicable law or otherwise, including, without limitation, all rights and remedies in connection with the Existing Defaults after a Termination Event. Nothing contained herein shall in any way be deemed to limit or prevent the Agent, Co-Agent and the Lenders from, upon the occurrence of a Termination Event, accelerating the Obligations, commencing any action or actions to collect the Obligations, foreclosing or otherwise realizing on the Collateral, or taking any other enforcement action against the Borrower to the extent permitted under the Loan Documents or under applicable law. Without limiting the generality of the foregoing, subject only to the agreement of the Agent, Co-Agent and each Lender to forbear during the Forbearance Period, the Agent, Co-Agent and each Lender expressly reserve all rights and remedies which they now have or may have in the future under the Credit Agreement, the Fourth Forbearance, the other Loan Documents, applicable law or otherwise, including, without limitation, all rights and remedies in connection with the Existing Defaults after the occurrence of a Termination Event.

**SECTION 4.** **Overadvance**. Subject to the other limitations on the amounts that may be borrowed set forth in the Credit Agreement (as amended hereby), during the Forbearance Period the definition of "Borrowing Base" shall be deemed amended to include the Overadvance Amount.

**SECTION 5.** **Rescheduled Forbearance Fee and Payments of Principal and Interest**. The Borrower acknowledges and agrees that the remaining $150,000 of the Third Forbearance Fee and the full amount of the Fifth Forbearance Fee (as hereinafter defined) shall be due and payable on March 1, 2004. The Borrower further acknowledges and agrees that all principal and interest payments due on Term Loan Notes A and all interest payments due on the Revolving Loans for the months of October, 2003, November, 2003, December, 2003, January, 2004 and February, 2004, are hereby rescheduled to be due and payable upon the earlier of the occurrence of a Forbearance Default or March 1, 2004. Except as provided in this Section 5, the payment of interest due on the Revolving Loans and Term Loan Notes A shall be made in accordance with the Credit Agreement and payment of principal due on the Term Loan Notes A shall be made in accordance with Section 4 of the Fourth Forbearance.

**SECTION 6.** **Covenants**. The Borrower hereby covenants and agrees as follows:

(a) Within fifteen (15) calendar days after the end of each of December, 2003 and January, 2004, the Borrower shall deliver to Agent a certificate of an officer of the Borrower comparing (in accordance with GAAP as reflected by the Borrower's internal financial statements, which may be subject to change upon completion of audited financial statements) the Borrower's actual EBITDA with a minimum required EBITDA for each such month. During the Forbearance Period, in lieu of the financial covenants set forth in Sections 9.23 and 9.24 of the Credit Agreement and Section 5(a) of the Fourth Forbearance (which shall not be measured during the Forbearance Period), the Borrower's actual EBITDA for December, 2003 shall exceed a minimum required EBITDA for such month of negative $360,000 and the Borrower's actual EBITDA for January, 2004 shall exceed a minimum required EBITDA for such month of $437,000.

CH\656083.1

(b) The aggregate amount of all Accounts with respect to which more than ninety (90) days have elapsed since the date of the original invoice therefor shall at no time exceed the aggregate amount of such past due Accounts outstanding as set forth in the Borrower's accounts receivable aging report as of December 31, 2003.

(c) The Borrower shall continue to submit to Agent a weekly budget setting forth Availability in such detail as requested by Agent.

(d) From and after the Effective Date, the Borrower shall continue to retain McDonald Investments, Inc., d/b/a KeyBanc Capital Markets ("McDonald"), as its investment banker and financial advisor in connection with the marketing and sale of its assets and/or business, in one or more transactions, as a going-concern or otherwise, in order to maximize the value of such assets.

(e) On or before January 2, 2004, the Borrower shall, or shall cause McDonald to, deliver to Agent and those Persons identified as potential buyers of all or any portion of the Borrower's assets and/or business as of the Effective Date (each a "Potential Buyer," and collectively, the "Potential Buyers") a set of initial marketing materials, a written solicitation of interest and a form confidentiality agreement.

(f) On or before January 16, 2004, the Borrower shall: (i) enter into a confidentiality agreement in the form previously provided to Agent with one or more Potential Buyers; and (ii) deliver an offering memorandum concerning the sale of the Borrower's assets and/or business in the form previously provided to Agent to each such Potential Buyer.

(g) On or before January 30, 2004, the Borrower shall, or shall cause McDonald to, conduct one or more site visits with Potential Buyers that have executed an acceptable confidentiality agreement.

(h) On or before February 27, 2004, the Borrower shall, or shall cause McDonald to, obtain letters of intent from one or more Potential Buyers concerning the purchase of the Borrower's assets and/or business.

(i) The Borrower shall, or shall cause McDonald to, deliver to Agent legible copies of any and all written offers, expressions of interest or other communications concerning any potential sale of all or any portion of the Borrower's assets and/or business promptly upon the receipt thereof by the Borrower and/or McDonald.

(j) In exchange for the accommodations provided by the Agent, Co-Agent and the Lenders herein, the Borrower agrees it is liable to Agent (for the benefit of the Lenders) for a $100,000 forbearance fee, which is fully earned and nonrefundable as of the date hereof, but which shall be due and payable on March 1, 2004 (the "Fifth Forbearance Fee").

(k) During the Forbearance Period, the Borrower shall not make any payments to Subordinated Lender on account of the Subordinated Obligations.

SECTION 7.  **Release.**  The Borrower hereby releases, waives and agrees not to allege or otherwise pursue any defenses, counterclaims, claims, causes of action, setoffs or other rights the Borrower may have as of the date hereof against the Agent, Co-Agent or any Lender, including, without limitation, the right, if any, to contest (a) any Event of Default which could be declared by the Agent, Co-Agent or any Lender on the date hereof or any time hereafter, (b) any provision of the Credit Agreement, this Agreement or any other Loan Document, and/or (c) the conduct of the Agent, Co-Agent or any Lender in administering the financing arrangements among the Borrower, the Agent, Co-Agent and/or the Lenders.

SECTION 8.  **Representations And Warranties Of Borrower.**  The Borrower represents, warrants and agrees that:

(a) the execution, delivery and performance by the Borrower of this Agreement and all documents and instruments delivered in connection herewith have been duly authorized and this Agreement and all documents and instruments delivered in connection herewith are legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms;

(b) except for the Existing Defaults, each of the representations and warranties contained in the Credit Agreement and this Agreement are true and correct in all material respects on and as of the date hereof as if made on the date hereof, except to the extent that such representations and warranties expressly relate to an earlier date; and

(c) neither the execution, delivery and performance of this Agreement or any documents and instruments delivered in connection herewith nor the consummation of the transactions contemplated hereby does or shall contravene, result in a breach of, or violate (i) any provision of the Borrower's articles of incorporation, bylaws or other organizational or governing documents, (ii) any law or regulation, or any order or decree of any court or government instrumentality known to the Borrower, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which the Borrower or any of its subsidiaries is a party or by which the Borrower or any of its subsidiaries or any of their property is bound.

SECTION 9.  **Retention of Crisis Manager Upon Forbearance Default.**  Upon the occurrence of a Forbearance Default, the Agent may, at its sole discretion and without being deemed to have made an election of remedies or otherwise to have waived or limited any of Agent's other rights under the Credit Agreement, this Agreement or any other Loan Document, require the Borrower to engage a crisis manager reasonably acceptable to Agent for the purpose of consulting with Borrower regarding the management of its operations.

SECTION 10.  **Amendments To Credit Agreement.**

(a) Section 1.1 of the Credit Agreement is hereby amended by deleting the definition of "Maximum Revolver Amount" in its entirety and replacing it with the following:

"Maximum Revolver Amount" means sixteen million dollars ($16,000,000).

(b) Section 11.1 of the Credit Agreement is hereby amended by deleting "or" from the end of subsection 11.1(s) thereof, deleting the period at the end of subsection (t) thereof and replacing it with "; and", and adding as a new subsection (u) the following:

(u) Either Dennis Maude, the Borrower's Assistant Treasurer, or Thomas Woehlke, the Borrower's President of U.S. Operations (or both), are not employed as officers of the Borrower for any period of time due to resignation, retirement, termination, incapacitation, death or otherwise.

SECTION 11. **Amendment To Equity Appreciation Rights Agreement.**

(a) Section 1.1 of the Equity Appreciation Rights Agreement is hereby amended by deleting the definition of "Put Period" in its entirety and replacing it with the following:

**Put Period**: Any time on or after the earliest date on which at least one of the following occurs: (i) the consummation of a Sale; or (ii) the occurrence of a Forbearance Default, as such term is defined in that certain Fifth Forbearance and Sixth Amendment Agreement, dated as of January 2, 2004, by and among Borrower, Agent and Co-Agent.

SECTION 12. **Reference To And Effect Upon The Credit Agreement.**

(a) Except as specifically modified herein, the Credit Agreement and the other Loan Documents, including, without limitation, Section 8.24 of the Credit Agreement requiring all proceeds of the Loans to be used solely for working capital purposes, shall remain in full force and effect and are hereby ratified and confirmed.

(b) The execution, delivery and effectiveness of this Agreement and all documents and instruments delivered in connection herewith shall not operate as a waiver of any right, power or remedy of the Agent, Co-Agent or any Lender under the Credit Agreement or any other Loan Document, nor constitute a waiver of any provision of the Credit Agreement or any other Loan Document, except as specifically set forth herein. Upon the effectiveness of this Agreement, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of similar import shall mean and be a reference to the Credit Agreement as modified hereby.

SECTION 13. **Costs And Expenses.** The Borrower agrees to reimburse the Agent, Co-Agent and the Lenders for all reasonable fees, costs and expenses, including the fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with the negotiation, documentation and enforcement of this Agreement and all documents executed in connection herewith or otherwise contemplated hereby.

SECTION 14. **Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AS OPPOSED TO CONFLICTS OF LAWS PROVISIONS) OF THE STATE OF ILLINOIS.

SECTION 15. **Entire Agreement.** This Agreement contains the entire understanding of the parties hereto with regard to the subject matter contained herein. This Agreement supersedes all prior or contemporaneous negotiations, promises, covenants, agreements and representations of

CH\656083.1

every nature whatsoever with respect to the matters referred to in this Agreement, all of which have become merged and finally integrated into this Agreement. Each of the parties hereto understands that in the event of any subsequent litigation, controversy or dispute concerning any of the terms, conditions or provisions of this Agreement, no party shall be entitled to offer or introduce into evidence any oral promises or oral agreements between the parties relating to the subject matter of this Agreement not included or referred to herein and not reflected by a writing not included or referred to herein.

**SECTION 16.** <u>**Counterparts; Facsimile.**</u> This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Facsimile signatures shall be deemed originals for all purposes and shall be valid and binding on the parties.

**SECTION 17.** <u>**Recitals Incorporated.**</u> The Recitals are hereby incorporated herein by reference.

**SECTION 18.** <u>**Effectiveness.**</u> This Agreement shall become effective only upon the satisfaction of all of the following conditions precedent on the date hereof or on such other date as is set forth below:

    (a)    <u>Agreement</u>. Executed signature pages for this Agreement signed by the Agent, Co-Agent, the Lenders parties hereto, and the Borrower shall have been delivered to the Agent;

    (b)    <u>Representations</u>. The representations and warranties contained herein shall be true and correct in all respects; and

    (c)    <u>Related Transactions</u>. All proceedings taken in connection with the transactions contemplated by this Agreement and all agreements, documents, instruments, materials and other legal matters incident hereto shall be satisfactory to Agent.

**SECTION 19.** <u>**Jury Trial Waiver.**</u> THE BORROWER, THE LENDERS, THE AGENT AND THE CO-AGENT EACH WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY, IN ANY ACTION, PROCEEDING OR OTHER LITIGATION OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY AGENT-RELATED PERSON, PARTICIPANT, ASSIGNEE, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE. THE BORROWER, THE LENDERS, THE AGENT AND THE CO-AGENT EACH AGREE THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED BY A COURT WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY ARE WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING WHICH SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR ANY PROVISION HEREOF OR THEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RESTATEMENTS,

RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

IN WITNESS WHEREOF, the parties hereto hereupon set their hands as of the date first written above.

AUBURN FOUNDRY, INC.,
as Borrower

By: *David D. Hunter*

Title: PRESIDENT & CEO

BANK OF AMERICA, NATIONAL ASSOCIATION,
as Agent and as a Lender

By: _____

Title: _____

GMAC COMMERCIAL FINANCE, LLC,
as Co-Agent and as a Lender

By: _____

Title: _____

[Fifth Forbearance Signature Page]

IN WITNESS WHEREOF, the parties hereto hereupon set their hands as of the date first written above.

**AUBURN FOUNDRY, INC.,**
as Borrower

By: _____

Title: _____

**BANK OF AMERICA, NATIONAL ASSOCIATION,**
as Agent and as a Lender

By: *Dan Gelace*

Title: *Vice President*

**GMAC COMMERCIAL FINANCE, LLC,**
as Co-Agent and as a Lender

By: _____

Title: _____

[Fifth Forbearance Signature Page]

CH\G56083.1

** TOTAL PAGE.02 **

IN WITNESS WHEREOF, the parties hereto hereupon set their hands as of the date first written above.

**AUBURN FOUNDRY, INC.**,
as Borrower

By: _____

Title: _____

**BANK OF AMERICA, NATIONAL ASSOCIATION,**
as Agent and as a Lender

By: _____

Title: _____

**GMAC COMMERCIAL FINANCE, LLC,**
as Co-Agent and as a Lender

By: _____*[signature]*_____

Title:   Senior Vice President

[Fifth Forbearance Signature Page]

CH\656083.1

## Exhibit A

### Existing Defaults

1. Breach of the financial covenants in Section 9.23 of the Credit Agreement on or prior to January 1, 2004.

2. Breach of the financial covenants in Section 9.24 of the Credit Agreement on or prior to January 1, 2004.

3. Breach of Section 7.2(a) of the Credit Agreement resulting from the Borrower's failure to timely deliver the audited financial statements for the Fiscal Year ended November 30, 2000.

4. Breach of Section 9.15(a) of the Credit Agreement by the Borrower continuing to engage in transactions with Affiliates in the ordinary course of business after the occurrence of and during the continuation of Events of Default (all such transactions complied with the requirements of Section 9.15(a) had there been no Events of Default).

5. Breach of the EBITDA financial covenant in Section 5(a) of the Fourth Forbearance for all periods ending on or before January 1, 2004.

6. Breach resulting from the Borrower's failure to remain Solvent as required by Section 8.8 of the Credit Agreement.

7. Breach resulting from the Borrower's failure to pay real and personal property taxes due and payable prior to March 1, 2004, as required by Sections 8.22 and 9.1 of the Credit Agreement and certain other provisions of the Credit Agreement and other Loan Documents.

8. The occurrence of the following "Events of Default," as such term is defined in the Subordinated Credit Facility and which occurrences would constitute an Event of Default under Section 11.1(r) of the Credit Agreement: (i) failure to pay when due interest on the Subordinated Obligations; and (ii) the occurrence of the Existing Defaults and the existence of the Existing Defaults under the Credit Agreement and other Loan Documents.

CH\656083.1