IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Auburn Foundry, Inc., | ) | Case No. 04-10427 |
| | ) | |
| Debtor. | ) | |

**OBJECTION OF BANK OF AMERICA, NATIONAL ASSOCIATION
TO DEBTOR'S EMERGENCY MOTION TO OBTAIN FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364 AND (II)
<u>SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C)</u>**

Bank of America, National Association ("BofA"), as agent for the pre-petition secured lenders (the "Senior Lenders"), parties in interest in the chapter 11 case (the "Chapter 11 Case") of the above-captioned debtor and debtor-in-possession (the "Debtor"), by and through its undersigned counsel, pursuant to section 1104(a) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), hereby objects (the "Objection") to the Emergency Motion for Order (I) Authorizing Debtor to Obtain Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364 and (II) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(C) (the "DIP Motion"). In opposition to the DIP Motion, the Lenders represent as follows:

**INTRODUCTION**

1.  On February 8, 2004 (the "Petition Date"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code.

2.  Since that time, the Debtor has continued in possession of its property and has operated and managed its business, as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). On February 12, 2004, the

CH\667326.3

United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee") in this case.  No trustee or examiner have been appointed in this Chapter 11 Case.

## PROCEDURAL BACKGROUND

4. On February 9, 2004, Auburn filed the DIP Motion. After a preliminary hearing on the DIP Motion (the "Preliminary Hearing"), on February 9, 2004, the Bankruptcy Court entered an Interim Order (I) Authorizing Debtor to Obtain Financing Pursuant to 11 U.S.C. §§ 105, 361, and 364 and (II) Scheduling Preliminary and Final Hearing Pursuant to Bankruptcy Rule 4001(C) (the "Interim Order") and set the DIP Motion for a final hearing on February 27, 2004 (the "Final Hearing").

## SUMMARY OF DEBTOR'S PRE-PETITION FINANCING

5. Prior to the Petition Date, the Senior Lenders established a loan facility (the "Pre-Petition Credit Facility") with Auburn, as borrower.  The Senior Lenders and Auburn (the "Borrower"), are party to that certain financing and security agreement, dated as of April 10, 2000 (as amended, supplemented or otherwise modified prior to the commencement of this chapter 11 case, the "Pre-Petition Credit Agreement") and all collateral and ancillary documents executed in connection therewith (the "Pre-Petition Loan Documents").  A true and correct copy of the Pre-Petition Credit Agreement is attached as Exhibit A to the Objection of Bank of America, N.A., to Debtor's Emergency Motion Seeking a Preliminary Order Authorizing the Use of Cash Collateral.  See Docket No. 27.  On the Petition Date, approximately $23,622,422.98 in principal amount was outstanding under the Pre-Petition Credit Facility (plus interest, fees, charges, costs and other expenses).

6. The Debtor is indebted to certain shareholders, affiliates and board members of the Debtor, including, without limitation, Timothy and Janet Borden and David, William and

John Fink (the "Subordinated Lenders"), in the approximate amount of $8,000,000 (the "Subordinated Debt"), that is allegedly secured and is subordinate to the claims and liens of the Senior Lenders.[1]  Upon information and belief, members of the DIP Lender include shareholders and affiliates of the DIP Lender.

## ARGUMENT

7. The Debtor seeks authorization to obtain a post-petition line of credit financing (the "DIP Facility") up to a maximum principal amount of $2 million from AFI Lending Group, LLC, an Indiana limited liability company (the "DIP Lender" or "AFI") on onerous terms that improperly benefit the DIP Lender at the expense of every other constituency in this Chapter 11 Case.[2]

8. While final approval of the proposed DIP Facility remains within the Court's "informed discretion," the Court must balance the interests of the Debtor, secured creditors and unsecured creditors. That balance requires the Debtor to demonstrate that the proposed financing

---

[1] The Lenders and the Debtor are party to the following subordination agreements: (i) that certain Subordination Agreement entered into as of December 13, 2001, by and among Auburn, the financial institutions party to that certain Financing and Security Agreement dated April 10, 2000, BofA, as agent for the Lenders (as defined therein), David B. Fink, William E. Fink, John A. Fink, Janet F. Borden, Timothy S. Borden, A.F. Europe, Inc. and William E. Fink, as agent for the Initial Holders (as defined therein); (ii) that certain Amended and Restated Subordination Agreement entered into as of October 22, 2002, by and among Auburn, the financial institutions party to that certain Financing and Security Agreement dated April 10, 2000, BofA as agent for the Lenders (as defined therein), the Initial Holders (as defined therein), the New Holders (as defined therein) and William E. Fink as agent for the Initial Holders and the New Holders; (iii) that certain Subordination Agreement entered as of December 20, 2002, by and among Auburn, the financial institutions party to that certain Financing and Security Agreement dated April 10, 2000, BofA, as agent for the Lenders (as defined therein), David B. Fink, William E. Fink, John A. Fink, Janet F. Borden and Timothy S. Borden, and William E. Fink (the "December 20 Holders"), as agent for the December 20 Holders; and (iv) the Subordination Agreement entered into as of June 26, 2003, by and among Auburn, BofA, as agent for itself and the financial institutions party to that certain financing and security agreement dated April 10, 2000, GMAC Business Credit, LLC, as co-agent and Eleventh Street Capital, LLC (collectively, the "Subordination Agreements").

[2] The note attached to the DIP Motion as Exhibit A describes the terms of the Post-Petition Facility more fully (the "Note").

comports with basic notions of fairness and equity and will ultimately inure to the benefit of the Debtor's estate.  See, In re Aqua Associates, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); In re Ames Departments Stores, Inc., 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990).  This the Debtor cannot do.

9. A debtor, for the sake of obtaining debtor-in-possession financing cannot abrogate its fiduciary duties to its chapter 11 estate.  See Ames Department Stores, 115 B.R. at 38.  The Debtor and the DIP Lender cannot undo the level playing field contemplated by the Bankruptcy Code.  As the Court in Ames Department Stores observed:

> Acknowledging that Congress, in Chapter 11, delicately balanced the hope of debtors to reorganize and the expectations of creditors for payment, the courts have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case; prejudiced, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors; or leverage the Chapter 11 process by preventing motions by parties-in-interest from being decided on their merits.

Ames Department Stores, 115 B.R. at 37; see also, In re Tenney Village Co., Inc., 104 B.R. 562, 568 (Bankr. D.N.H. 1989).

10. In keeping with the fundamental principles enunciated above, the Senior Lenders submit that the DIP Facility proposed by the DIP Motion is, at best, an attempt by the DIP Lender to take advantage of a captive borrower by charging exorbitant fees for a short-term, risk free loan and obtain undue "discretionary control" over the Debtor.  The DIP Lender also seeks to use this leverage to possibly prime the Senior Lenders' pre and post-petition liens and restrict the unsecured creditors' ability to recover avoidance actions.

CH\667326.3

A.  **The Debtor Has Not Met Its Burden Under Section 364(c) of Demonstrating That It Was Unable to Obtain Financing on Less Onerous Terms.**

11.  To have the proposed DIP Facility approved, the Debtor must establish, *inter alia,* that it was unable to obtain credit on an unsecured or administrative priority basis.  See 11 U.S.C. § 364(c); In re U.S. Lines, Inc., 79 B.R. 542, 548 (Bankr. S.D.N.Y. 1987).  Moreover, the Debtor has the burden of establishing that it "made the requisite exhaustive efforts to obtain credit in accordance with § 364(b)."  In re Crouse Group, Inc., 71 B.R. 544, 550 (Bankr. E.D. Pa.), aff'd, 75 B.R. 553 (E.D. Pa. 1987).

12.  The DIP Motion is bereft of any meaningful description of the Debtor's efforts to obtain financing from sources other than the DIP Lenders or on less onerous terms and conditions and, as a result, fails to demonstrate that the Debtor made the requisite exhaustive effort to obtain such financing.

13.  The Debtor asserts in a conclusory fashion that it "sought to obtain the necessary financing facility from the Senior Lenders" and that the "Debtor was unable to obtain (i) adequate unsecured credit allowable under §§ 503(b)(1) or 364(c)(1) of the Bankruptcy Code as an administrative expense or (ii) secured credit allowable under §§ 364(c)(2) or (c)(3) on terms more favorable than those described herein."  See Motion at ¶ 17.  The DIP Motion and statements made by the Debtor's counsel at the Preliminary DIP Hearing are completely devoid of any description of the Debtor's efforts to find alternative financing.  In fact, the DIP Motion does not name even a single institution other than the Senior Lenders which the Debtor approached in an effort to obtain better borrowing terms.  The requirements of §364(c) are well established.  The Debtor should not have filed the DIP Motion without a detailed account of which financial institutions it approached and the terms of any alternative post-petition financing

offered. Absent this information, the Court must assume the Debtor has not met its burden to conduct an exhaustive search for financing.

B.   **The Debtor Has Not Met Its Burden Of Establishing that the DIP Facility Is In the Best Interest of the Estate.**

14.   In order for the DIP Facility to be approved, the Debtor must also demonstrate that the terms of the financing are fair, reasonable and adequate under the circumstances. See Crouse, 71 B.R. at 549.

(i)  *The Proposed Fees, Interest and Other Charges Included in the DIP Facility Are Excessive.*

15.   The DIP Facility is styled as a $2 million line of credit, however, advances which would cause the unpaid principal balance of the DIP Facility to exceed $800,000 or which are requested after the principal balance of the DIP Facility exceeds $800,000 are at the sole discretion of the DIP Lender. In fact, no evidence has been provided that the DIP Lender has $2 million to lend, or even $800,000 for that matter. Moreover, the discretionary nature of the DIP Facility gives the DIP Lender, some of the members of which appear to be board members, affiliates or shareholders of the Debtor, increased leverage over the Debtor at times when the Debtor is particularly vulnerable. The DIP Facility, by its terms, terminates on the earlier of September 1, 2004 or the date which is 30 days after the effective date of the Debtor's plan of reorganization or upon the occurrence of an event of default set forth in the Note. The Debtor has indicated to the Court that it intends to have a plan of reorganization on file in the next three weeks. In exchange for potentially only a 90 day loan of $800,000, the DIP Lender seeks approval of a $40,000 fee (the "Commitment Fee") and payment of its attorneys' fees and reimbursable expenses not to exceed $50,000, in the aggregate, for origination and administration of the DIP Facility (the "DIP Lender's Attorneys' Fees"). These fees constitute a

charge in excess of 11% of the $800,000 committed loan.  Additionally, the DIP Lender seeks to receive interest charged at a prime plus three percent (3%) per annum rate, which is higher than the Senior Lenders' default rate.

16.     The fees and charges requested under the DIP Facility are excessive, especially when considering that the loan was inadequately shopped and is virtually risk free.

(ii) *The Debtor Has Not Negotiated the DIP Facility at Arms' Length*

17.     The DIP Motion also refers in passing to "arms' length" negotiations with the DIP Lender.  See DIP Motion at ¶ 24.  It is, of course, impossible for the Debtor to credibly assert that the negotiation with the DIP Lender was arm's length given the Debtor's financial situation, the overreaching terms which the DIP Lender ultimately negotiated and the fact that, on information and belief, certain of the members of the DIP Lender are board members, or affiliates or shareholders of the Debtor.  The Debtor states that it "understands that certain members of the DIP Lender are among the Subordinated Lenders."  See DIP Motion at ¶ 12.  The Senior Lenders find it difficult to believe and troubling that the Debtor cannot state with certainty who the members of the DIP Lender are and whether or not they are board members, affiliates or shareholders of the Debtor.  Without full disclosure regarding the members of the DIP Lender, the Senior Lenders, this Court and all other constituents in this Chapter 11 Case cannot conclude that the DIP Facility is the product of good faith, arms' length negotiations.

(iii) *The DIP Motion Fails to Provide a Budget*

18.     The DIP Motion fails to provide a budget which would shed meaningful light on the cost of the Debtor's operations and the need for the DIP Facility.  The budget attached to the DIP Motion ran only three weeks.  The DIP Motion assumes that the Debtor will continue as a going concern and that the DIP Facility is "necessary for the survival of the Debtor's business

and to protect its opportunity to reorganize….." See DIP Motion at ¶ 13.  However, given the Debtor's historical lack of a workable business plan, the Senior Lenders cannot evaluate whether or not the DIP Facility is practical, feasible or a sound business decision without a budget that runs through the September 1, 2004 maturity date.

C. **The Proposed Order Does Not Make Clear That the DIP Facility, Commitment Fee and DIP Lender's Attorneys' Fees Are Subordinate to the Senior Lenders' Liens.**

19. The proposed order approving the DIP Motion does not make clear that the DIP Obligations (defined in the DIP Motion as principal and interest on the Note, the Commitment Fee, and the DIP Lender's Attorneys' Fees) are subject to the Senior Lenders' pre and post-petition secured claims and liens.  In fact, it appears that the Debtor intends to use the Senior Lenders' cash collateral to pay fees, interest and principal payments under the DIP Facility.  If the DIP Facility is truly subordinate to the pre-petition and post-petition claims and liens of the Senior Lenders, none of these amounts should be paid until the pre-petition and post-petition claims of the Senior Lenders are paid in full.  The Senior Lenders object to any attempt, either intentional or otherwise, to prime their liens or subordinate their claims and request that any final order approving the DIP Motion be clarified to reflect that the Senior Lenders' pre and post-petition liens and claims are superior to any of the DIP Lenders' liens and claims.

D. **No Liens Should Be Granted On Avoidance Action Actions.**

20. The Senior Lenders object to any claim or lien being granted to the DIP Lender under section 364 of the Bankruptcy Code absent an appropriate carve-out of all avoidance actions arising under chapter 5 of the Bankruptcy Code.  Given the potentially significant preference and fraudulent conveyance recoveries which may exist, including against the Subordinated Lenders, some of whom are also members of the DIP Lender, and the

Congressional intent to preserve avoidance action recoveries for the benefit of all creditors, the Court should mandate such a carve-out from all claims and liens granted under any final DIP Financing Order.

E.     Improper and Insufficient Notice to Parties in Interest has been given under Local Bankruptcy Rule B-2002-2.  The motion is a motion for authority to obtain credit within the meaning of L.B.R. B-2002-2(a)(3), requiring 15 days notice pursuant to L.B.R. B-2002-2(b)(1)(C).  The notice to creditors and parties-in-interest must be in a form substantially similar to Local Bankruptcy Form 3a or 3b, specifically stating in part, the date by which the objections to the motion are to be filed, where objections should be filed, and upon whom copies should be served along with other necessary information.  It appears that no such notice has been given to the parties in interest, and thus the motion is not properly before this Court.

## NOTICE AND PROPOSED ORDER

21.     Notice of this Objection has been provided via electronic filing or first class mail to (i) the Office of the United States Trustee for the Northern District of Indiana, (ii) counsel to the Debtor and counsel to the Subordinated Lenders, and (iii) the Debtor's twenty (20) largest creditors.

**WHEREFORE**, for the foregoing reasons, the Lenders request that the Court deny the DIP Motion and (ii) grant such other relief as this Court finds just and appropriate under the circumstances.

February 20, 2004                                        Respectfully submitted,


                                          /s/ Grant F. Shipley  
                                         Grant Shipley  
                                         SHIPLEY & ASSOCIATES

CH\667326.3

233 West Baker Street
Fort Wayne, Indiana 46802
(260) 422-2700

and

Josef S. Athanas
Caroline A. Reckler
LATHAM & WATKINS, LLP
233 South Wacker Drive
Sears Tower, Suite 5800
Chicago, Illinois 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

Attorneys of Bank of America, N.A.