IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| AUBURN FOUNDRY, INC. | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | BK Case No. 04-10427 |

### *DISCLOSURE STATEMENT TO ACCOMPANY*
### *PLAN OF REORGANIZATION DATED JULY 12, 2004*

**BAKER & DANIELS**
John R Burns (#3016-02)
Stephen A. Claffey (#3233-98)
Mark A. Werling (#20426-02)
111 East Wayne Street, Suite 800
Fort Wayne, Indiana 46802
Telephone:  (260) 424-8000
Facsimile:  (260) 460-1700

ATTORNEYS FOR THE DEBTOR,
AUBURN FOUNDRY, INC.

## <u>IMPORTANT NOTICE</u>

This Disclosure Statement has been submitted by Auburn Foundry, Inc. (the "Debtor" or "AFI") in connection with a Plan of Reorganization dated July 12, 2004.

This Disclosure Statement and its related documents are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes to accept the Plan. No representations have been authorized by the Bankruptcy Court concerning the Debtor, its business operations or the value of its assets, except as explicitly set forth in this Disclosure Statement.

Please refer to the Plan (or, where indicated, certain motions filed with the Bankruptcy Court) for definitions of the capitalized terms used in this Disclosure Statement.

The Debtor reserves the right to file an amended Plan and Disclosure Statement from time to time. The Debtor urges you to read this Disclosure Statement carefully for a discussion of voting instructions, recovery information, classification of claims, the history of the Debtor and the Reorganization Case, the Debtor's businesses, properties and results of operations, historical and projected financial results and a summary and analysis of the Plan.

11 U.S.C. § 1125(b) PROHIBITS SOLICITATION OF AN ACCEPTANCE OR REJECTION OF A PLAN OF REORGANIZATION UNLESS A COPY OF THE PLAN OF REORGANIZATION OR A SUMMARY THEREOF IS ACCOMPANIED OR PRECEDED BY A COPY OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT, AND, THEREFORE, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED AS, AN AUTHORIZED SOLICITATION PURSUANT TO 11 U.S.C. § 1125 AND RULE 3017 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  NO SUCH SOLICITATION WILL BE MADE EXCEPT AS AUTHORIZED PURSUANT TO SUCH LAW AND RULES.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE STATEMENTS OR INFORMATION CONTAINED HEREIN.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| AUBURN FOUNDRY, INC. | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | BK Case No. 04-10427 |

I.      **OVERVIEW OF THE DISCLOSURE STATEMENT**[1]

**INTRODUCTION**

On February 8, 2004 (the "Petition Date"), Auburn Foundry, Inc. (the "Debtor"), filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Capitalized terms not otherwise defined herein will have the same meanings as are ascribed to such terms in the Plan.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit A)
- The Debtor's Projected Financial Information (Exhibit B)
- The Debtor's Liquidation Analysis (Exhibit C)

Any interested party desiring further information should contact:

BAKER & DANIELS
111 E. Wayne Street, Suite 800
Fort Wayne, Indiana 46802
Telephone: 260-424-8000
Facsimile:  260-460-1700
Attn:  John R Burns, III
Email:  john.burns@bakerd.com
Attn:  Mark A. Werling
Email:  mark.werling@bakerd.com

II.      **SUMMARY AND OVERVIEW OF THE PLAN**

The following table briefly summarizes the classifications and treatment of Claims and Equity Interests under the Plan.  Estimated Amounts are based, in part, on the Debtor's Schedules and, in part, on the Debtor's subsequent estimates of such Claims.  These

---

[1]      Capitalized terms used and not defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.

estimates are subject to further revision by the Debtor at any time subsequent to the filing of the Disclosure Statement.

| Class | Designation | Estimated Amount | Estimated Recovery |
|-------|-------------|------------------|--------------------|
| Class 1 | Priority Tax Claims | $ 1,462,937.00 | 100% |
| Class 2 | Priority Non-Tax Claims | $    127,317.32 | 100% |
| Class 3 | Allowed Secured Claims | $26,622,422.98 | 100% |
| Class 4 | Miscellaneous Secured Claims | $    169,623.16 | 100% |
| Class 5 | General Unsecured Claims | $20,130,552.00 | 15% |
| Class 6 | IDEM Claims | $ 5,000,000.00 | 15% |
| Class 7 | Common Stock Interests | N/A | N/A |

## III.    GENERAL INFORMATION

### A.    Overview of Chapter 11

Chapter 11 is the primary business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business and affairs for itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to distributions of the value of a debtor's assets.

The commencement of a chapter 11 case creates a bankruptcy estate that is comprised of all of the legal and equitable interests of a debtor as of the commencement date of the chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and affairs and remain in possession of its property as a "debtor-in-possession".

The consummation of a plan of reorganization is the fundamental objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for restructuring a debtor's business and satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of a plan, and substitutes the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. The Debtor is submitting this

Disclosure Statement to holders of claims against and equity interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

**B.     Description and History of Business**

1.     <u>The Debtor</u>

AFI is one of the largest independent gray and ductile iron foundry operations in North America.  AFI supplies over 160,000 tons of cast iron and ductile parts annually to large original equipment manufacturers ("OEMs") in the automotive, RV, heavy truck, air compressor and home appliance markets.  With revenue of over $120 million in 2002, AFI ranked number two in sales compared to its nearest geographic competitors.  The Fink family has controlled AFI since the Company's founding in 1911, with four family members currently controlling 80% of the Debtor's stock.

AFI manufactures in two facilities within two miles of each other in Auburn, Indiana, with a combined production capacity of over 160,000 tons.  The Debtor's parts weigh less than 50 pounds per unit.  Typical products include brake, transmission and air conditioning components for consumer product companies.  AFI's quality and delivery performance have fostered many long-term customer relationships.  In 2002, approximately 69% of the Debtor's revenue was generated from customers served for more than 10 years.

Historically a gray iron-only operation, AFI has entered the growing ductile iron market.  While similar in appearance and production methodology, ductile iron is a more profitable, higher demand product than gray iron because of its greater tensile strength and elongation attributes.  These strength and elongation attributes result from mixing magnesium into the primary ferrous alloy to produce a microscopic spherical graphite shape in the iron matrix.

The changes that occurred in 2003 were the initial steps in a two-year process of returning the company to acceptable profitability levels.  For the prior five years, the Debtor suffered continuing losses, which reached a climax in 2003 with a loss expected to exceed $14 million.

The initial change was the determination that the Debtor needed to offer ductile iron as part of their product mix.  AFI had been equipped such that for little capital investment, less than $250,000, its plants would be able to produce ductile products.  Ductile products, due to their position in the market place and the control standards necessary for production, carry an average 30% higher selling price.

The Debtor then began marketing its ductile capability to new and existing customers.  An excellent opportunity was developed, and AFI was favored with a contract from a very large Tier II automotive supplier.  In order to meet the needs of this supplier, AFI had to be certified as a ductile producer by one of the automotive companies.  In late summer, Chrysler Automotive did an inspection, and AFI was certified.   Industry standards would indicate that it is highly unusual for a company to be certified so quickly and on first inspection.  In addition, the Debtor asked for and was certified under ISO 9000 standards for ductile production.

The second change to occur in 2003 consisted of taking the cupola melt system off line and moving to strictly electric melt capability.  The major driver for this decision was the capital outlay that would be necessary for meeting environmental requirements associated with cupola melting.

After consistently delivering annual EBITDA in excess of $10.0 million during most of the 1990s, the combination of increased global competition, a labor strike, and a weak economy negatively affected operating performance prior to the Chapter 11 filing.  Volumes and pricing became weak, scrap costs increased dramatically by virtue of foreign demand, and foreign competition was fierce.  Many foundries failed, and are failing, in this extremely challenging environment.

The introduction of ductile iron to AFI's automotive customers will now open new product segments with both traditional and new customers.  Typical OEM ductile components include brake calipers, steering knuckles, crankshafts, anchor housings, brackets, differential carriers and a multitude of components not suitable for gray iron.  Hard-to-penetrate automotive companies have begun soliciting quotes from AFI for new ductile business opportunities – which should yield profitable new gray iron opportunities as well.

<u>Properties</u>

AFI benefits from having modern, flexible production facilities.  It is ideally structured to produce both gray and ductile iron.

**Plant #1**

Plant #1 was designed with two distinct production areas, resulting in AFI virtually being a three-facility operation.  As a result, the Debtor enjoys the ability to produce ductile iron and penetrate that marketplace while still maintaining sufficient capacity to meet its customers' gray iron needs. This production flexibility allows AFI to improve continuously the profitability of its product mix while at all times satisfying the needs of its important long-term customer relationships.

**Plant #2**

Built in 1995, Plant #2 is one of the newest, most efficient, low-cost foundries in the nation.  Built at a cost of $60 million, it houses the state-of-the-art casting equipment and automated systems.  Plant #2 generates product recovery yields (measure of how many good pounds are produced for a given amount of input material) nearly 15% higher than the industry. In management's opinion, the plant's efficiency, from a labor standpoint, is unmatched in the industry.  For example, while Plant #1 required 10.0 manhours to produce one ton of good product, Plant #2 requires only 4.0 manhours.

AFI also owns real property identified as Wetlands and the Landfills, neither of which are part of Plant 1 or Plant 2.  Legal descriptions for each will accompany the Plan Supplement.  The Wetlands and the Landfills will be retained by the Reorganized Debtor under

the Plan.  Plants 1 and 2, together with Residential Real Estate, will be sold to New AFI under the Plan.

2.    Current Executive Officers:

Michael L. Polich
Dennis Maude
David K. Weber
Thomas Woehlke

3.    Officers, Directors, and Shareholders

The Debtor's officers and directors, and each stockholder who owns or holds more than 5% of the voting securities, as listed in the Statement of Financial Affairs, is as follows:

| Name and Address | Title | Nature and Percentage of Stock Ownership |
|---|---|---|
| David D. Hunter | Director | |
| Michael L. Polich | Vice President-Marketing | |
| Dennis Maude | Chief Financial Officer | |
| David K. Weber | Vice President - Technology | |
| Tom Woehlke | President | |
| William E. Fink | Director | 20.3% of Stock |
| David B. Fink | Director | 20.3% of Stock |
| John A. Fink | Director | 20.3% of Stock |
| Janet F. Borden | Stockholder | 17.7% of Stock |
| Tim Borden | Director | |

Tim and Janet Borden are husband and wife.

## IV.    PREPETITION SECURED DEBT

The Debtor's assets are secured by liens and mortgages in favor of the Senior Lenders, Bank of America, National Association, and GMAC Commercial Finance, LLC, successor by merger to GMAC Business Credit, LLC.  The Senior Lenders will have Allowed Secured Claims of approximately $23,622,422.  The Debtor's assets are also secured by liens and mortgages in favor of certain Subordinated Lenders, of which $3,000,000 is treated as an Allowed Secured Claim under the Plan.  The claims of the Subordinated Lenders' have an aggregate value of approximately $8,300,000, the unsecured balance of which is treated as a General Unsecured Claim.  Miscellaneous Secured Claims consist principally, if not exclusively, of certain financing leases scheduled as Secured Claims on the Debtor's Schedules and identified separately as such in the Plan Supplement.

## V.    SUMMARY OF VOTING PROCESS

### A.    Who May Vote to Accept or Reject the Plan.

Generally, holders of allowed claims or equity interests that are "impaired" under a plan are permitted to vote on the plan. A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor; an equity interest represents an ownership stake in a debtor. In order to vote, a creditor must first have an allowed claim. Votes on the Plan will only be solicited from those Holders of Allowed Claims whose Claims are impaired and which will receive property or rights under the Plan. As explained more fully below, to be entitled to vote, a Claim must be both "Allowed" and "Impaired."

### B.    Summary of Voting Requirements.

In order for the Plan to be confirmed, the Plan must be accepted by at least one noninsider, impaired Class of Claims. A class of claims is deemed to have accepted a plan when allowed votes representing at least two-thirds (2/3) in amount and a majority in number of the claims of the class actually voting cast votes in favor of a plan. A class of equity interests has accepted a plan when votes representing at least two-thirds (2/3) in amount of the outstanding equity interests of the class actually voting cast votes in favor of a plan. The Debtor is soliciting votes from holders of Allowed Claims in the following Classes which are impaired under the Plan:

| Class | Description |
|-------|-------------|
| Class 3 | Secured Claims |
| Class 4 | Miscellaneous Secured Claims |
| Class 5 | General Unsecured Claims |
| Class 6 | IDEM Claims |

The Debtor will have the right to supplement this Disclosure Statement as to additional impaired Classes, if any.

**A VOTE FOR ACCEPTANCE OF THE DEBTOR'S PLAN BY THOSE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT.  THE DEBTOR ASSERTS THAT THE TREATMENT OF CREDITORS UNDER THE DEBTOR'S PLAN IS THE BEST ALTERNATIVE FOR CREDITORS AND THE DEBTOR RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE DEBTOR'S PLAN.**

## VI.    SIGNIFICANT EVENTS DURING THE REORGANIZATION CASE

### A.    First Day Orders

On or shortly after the Petition Date, the Debtor filed numerous motions and applications requesting expedited orders that were generally routine in nature, but necessary to

allow the Debtor to operate in the normal course during its transition into chapter 11.  The First Day Orders may be categorized as follows:

       1.       <u>Extension of Time to File Schedules</u>

The Debtor filed a Motion to extend the deadline to file its Schedules and Statement of Financial Affairs on February 23, 2004 due to the substantial size, scope and complexity of the Debtor's operations and the extent of material required to be compiled to complete the schedules and statements. The Court extended the time to March 12, 2004 and the Debtor proceeded to file its Schedules and Statement of Financial Affairs.

       2.       <u>Cash Management System</u>

The Debtor requested the authority to operate its cash management system substantially in the same manner in which it was handled prepetition. The Debtor utilizes cash management procedures in the ordinary course of its businesses designed to permit the efficient collection, investment and application of funds. Such procedures incorporate various lockbox accounts, concentration accounts, payroll accounts, and accounts payable through a system that is fully described in the motion. The Court approved the Debtor's existing cash management systems and use of existing bank accounts and business forms.

       3.       <u>Prepetition Obligations</u>

The Debtor filed a motion requesting the authority or discretion to pay certain prepetition wage obligations.  The Court authorized the Debtor to pay prepetition compensation, prepetition business expenses, deductions, withholdings and benefits that accrued but remained unpaid as of the Petition Date, to or for the benefit of employees, independent contractors, up to the statutory maximums provided in sections 507(a)(3) and 507(a)(4) of the Bankruptcy Code.

       4.       <u>Workers' Compensation Program</u>

AFI self-insures its workers' compensation obligations in accordance with Indiana law.  The Bankruptcy Court authorized AFI to continue its workers' compensation program, and pay all costs associated therewith.

       5.       <u>Use of Cash Collateral and Debtor-in-Possession Financing</u>

On the Petition Date, the Debtor filed a Motion for Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection. With the consent of the Senior Lenders, the Debtor obtained Court approval to utilize cash collateral on an interim basis, in accordance with a budget.  In consideration of the consent by the Senior Lenders to the Debtor's use of cash collateral, the Debtor granted the Senior Lenders adequate protection, including, but not limited to, replacement liens in after-acquired property.

B.    **The Official Committee of Unsecured Creditors**

On or about February 12, 2004, the U.S. Trustee filed its Notice of Appointment of Creditors' Committee and appointed five (5) members to serve on a single Creditors' Committee and to represent the interests of all general unsecured creditors of the Debtor.  The U.S. Trustee filed an amended Notice on February 19, 2004.

C.    **Professionals of the Debtor**

The Debtor obtained Court authority to retain Baker & Daniels as its bankruptcy counsel.  The Debtor also obtained authority to employ Mellon Consultants as actuarial consultants.  The Debtor will also file for authority to retain Ernst & Young as its accounting consultants.

D.    **Compliance with Bankruptcy Code, Bankruptcy Rules, Local Court Rules and U.S. Trustee Deadlines**

On March 13, 2004, the Debtor filed its Statement of Financial Affairs, Schedules of Assets and Liabilities, and lists of Equity Security Holders, each as amended from time to time.  On March 19, 2004, the U.S. Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code.  To the best of the Debtor's knowledge, information and belief, the Debtor has complied with all other applicable requirements of the Bankruptcy Code and Bankruptcy Rules, as well as local Bankruptcy Court rules and deadlines of the Office of the U.S. Trustee.

E.    **Discussions with Lenders, Committees and Unions**

Throughout its case, the Debtor has conducted numerous meetings and conversations with all major constituencies including, without limitation, the Senior Lenders, the Creditors' Committee, and the Union.  The Debtor has kept these parties informed of the status of the development of the Plan. The Debtor has attempted to forge a general consensus among these groups as to the resolution of this case, while seeking to obtain a result that maximizes the value of the Debtor's estate, for the benefit of all parties-in-interest. Under the current circumstances, the Debtor believes that the Plan maximizes the value of the Debtor's estate.

Most recently, the Debtor held additional discussions with the Union regarding consensual modifications to the Collective Bargaining Agreement and the Pension Plans.  The Debtor hopes to achieve cost savings of approximately $1,100,000.  The Debtor prefers to obtain the Union's consent to such modifications, but reserves the right to seek Court approval pursuant to section 1113 of the Bankruptcy Code.  The Debtor's proposed modifications include, but are not limited to, a freeze (but not termination) of the Pension Plans, to be replaced with a defined contribution plan; changes to retiree medical and medical insurance benefits; limiting personal days available per quarter; and reducing scheduled increases to hourly wages.  The Plan provides for an assumption of the Pension Plans, subsequent to such modifications, and payment of all unpaid contributions thereto (whether arising pre- or post-petition) over a six year payment period.  It also provides for the assumption, as modified, of the Collective Bargaining

Agreement, with full payment of Accrued Vacation Pay and Accrued Personal Day Pay over a four month period.

      **F.**      **Final Orders Permitting Use of Cash Collateral, Senior DIP Financing, and Junior DIP Financing**

      On May 12 and 13, 2004, the Court entered Final Orders regarding use of cash collateral, Senior DIP Financing, and Junior DIP Financing. Taken together, these orders grant the Debtor permission to use cash collateral through and including August 31, 2003. They also provide the Debtor with sufficient DIP financing to fund its operations, consistent with its budget, during the Plan confirmation process.

## VII.    PLAN OF REORGANIZATION

      THE FOLLOWING DISCUSSION OF THE PLAN CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN ITSELF. YOU SHOULD READ THE PLAN BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. CHANGES MAY BE MADE TO THE PLAN. ANY SUCH CHANGES MADE TO THE PLAN WILL BE DESCRIBED AT THE PLAN CONFIRMATION HEARING.

      Within 7 days prior to the Confirmation Hearing, the Debtor shall file the supplement to the Plan (the "Plan Supplement").

      As contemplated in the Solicitation, Classes 3, 4, 5, and 6 are entitled to vote pursuant to the Plan.

      **A.**      **Unclassified Allowed Claims and Their Treatment**

      1.      Administrative Expense Claims.

      Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees, in writing, to a less favorable treatment or has been paid by the Debtor prior to the Effective Date, and except as specifically set forth in the Plan to the contrary, each holder of an Allowed Administrative Expense Claim shall receive, in full and complete settlement, discharge and satisfaction of its Allowed Administrative Expense Claim, which Claims shall be assumed on the Effective Date by New AFI, Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, the date New AFI's vendors are entitled to payment pursuant to agreed-upon trade terms, or as soon thereafter as is practicable. Purchase Orders from post-petition vendors shall establish agreed-upon trade terms for purposes of the Plan.

      Upon the assumption of the Pension Plans, as first modified and restructured under the Plan, Allowed Claims for Underfunded Pension Liabilities shall be entitled to full payment, as cure payments under § 365 of the Code, on an administrative basis. The Debtor will provide adequate assurance of such payment by committing to pay the holders of such Allowed Claims,

in full, through equal quarterly Cash payments in an aggregate amount equal to such Allowed Claims, together with interest at a fixed annual rate equal to 6.5%. The first of such payments shall be made on April 1, 2005, and shall continue quarterly thereafter, and the final payment shall be made on the sixth anniversary of the initial payment. This treatment will apply to all Claims for Underfunded Pension Liabilities, regardless of whether they are otherwise entitled to payment on a priority basis under § 507 of the Code.

Upon the assumption of the Collective Bargaining Agreement, as first modified and restructured under the Plan, Allowed Claims for Accrued Vacation Pay and Accrued Personal Day Pay shall be entitled to full payment, as cure payments under § 365 of the Code, on an administrative basis. The Debtor will provide adequate assurance of such payment by committing to pay the holders of such Allowed Claims, in full, through four (4) monthly Cash payments commencing the fifteenth (15th) day of the first full month after the Effective Date in an aggregate amount equal to such Allowed Claims. This treatment will apply to all Claims for Accrued Vacation Pay and Accrued Personal Day Pay, regardless of whether they are otherwise entitled to payment on a priority basis under § 507 of the Code. In the event that Debtor does not reach an agreement with its union to modify the Collective Bargaining Agreement and to assume it as modified, then Debtor shall pay, in Cash, on the fifteenth (15th) day of the first full month after the Effective Date, so much of the Accrued Vacation Pay and Accrued Personal Day Pay as is entitled to payment as a Priority Claim. In such event, any remaining balance of Accrued Vacation Pay and Accrued Personal Day Pay shall be paid as a General Unsecured Claim.

The Debtor estimates that the Administrative Expense Claims assumed by New AFI under the Plan, other than claims for Underfunded Pension Liabilities, Accrued Vacation Pay, and Accrued Personal Day Pay will be approximately $500,000. The Debtor estimates that approximately $1,500,000 of post-petition employee obligations will be assumed and paid by New AFI. The Debtor also estimates, pursuant to its assumption of the modified Pension Plans and Collective Bargaining Agreement, that its cure payments under § 365 of the Code will be approximately $2,297,000 for Underfunded Pension Liabilities, $988,227 for Accrued Vacation Pay, and $109,096 for Accrued Personal Day Pay. Underfunded Pension Liabilities will be paid in quarterly installments over a six year period, pursuant to a concurrent freeze of the Pension Plans. Accrued Vacation Pay and Accrued Personal Day Pay will be paid in four monthly installments.

2.    Professional Fee Claims.

All Persons acting as professionals for the Debtor seeking an award by the Bankruptcy Court of a Professional Fee Claim, after the application of retainers and carve-out payments, if any, or of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code: (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within forty five (45) days after the Confirmation Date; and (b) if granted, such an award by the Bankruptcy Court, shall, unless first paid in full by the Debtor, be assumed by New AFI and paid in full in such amounts as are allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Professional Fee Claim

becomes an Allowed Professional Fee Claim, or as soon thereafter as practicable, (ii) upon such other terms as may be mutually agreed upon between such holder of the Allowed Professional Fee Claim and the Debtor, or, on and after the Effective Date, New AFI, or (iii) in accordance with any administrative procedures order entered by the Bankruptcy Court. All Professional Fee Claims for services rendered by professionals for the Debtor in connection with the Bankruptcy Case and the Plan after the Confirmation Date shall be assumed and paid by New AFI upon receipt of an invoice therefor, or on such other terms and conditions as New AFI may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order. New AFI shall accede to the rights of the Debtor in and to any retainer paid by the Debtor to its Professionals.

       3.      <u>Senior DIP Lender's Claims.</u>

Unless otherwise agreed by the Senior DIP Lender, in writing, the Debtor's obligations under or evidenced by the Senior DIP Financing, will be paid in full on the Effective Date.

       4.      <u>Junior DIP Lender's Claims.</u>

Unless otherwise agreed by the Junior DIP Lender, in writing, the Debtor's obligations under or evidenced by the Junior DIP Financing will be paid in full on the Effective Date.

       5.      <u>U.S. Trustee.</u>

Pursuant to 28 U.S.C. §1930(a)(6), a reorganized debtor is obligated to continue paying statutory quarterly fees to the U.S. Trustee post-confirmation of a plan of reorganization until the case is closed, dismissed or converted. New AFI will continue to be responsible for making such statutory quarterly payments and submitting appropriate financial reports to the U.S. Trustee until the Bankruptcy Case is closed.

**B.**      **Classification and Treatment of Allowed Claims and Interests**

A summary of the classification and treatment of Allowed Claims and Allowed Interests under the Plan is set forth below.

       1.      <u>Class 1: Priority Tax Claims</u>

<u>Distributions</u>: Except to the extent that a holder of an Allowed Class 1 Claim has been paid by the Debtor prior to the Effective Date or agrees, in writing, to a different treatment, each holder of an Allowed Class 1 Claim as of the Record Date shall receive, as payment in full, at the sole option of New AFI, (a) Cash in an amount equal to such Allowed Class 1 Claim on the later of the Effective Date and the date such Claim becomes an Allowed Class 1 Claim, or as soon thereafter as is practicable, (b) equal quarterly Cash payments in an aggregate amount equal to such Allowed Class 1 Claim, together with interest at a fixed annual rate equal to 6.5% through the sixth anniversary date of the Effective Date, or (c) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Class 1

Claim deferred cash payments having a value, as of the Effective Date, equal to such Allowed Class 1 Claim.

The Debtor estimates that its Priority Tax Claims, including $24,563 in Pension Excise Tax Claims, are approximately $1,462,937.

**Class 1 is unimpaired under the Plan.  Each holder of an Allowed Class 1 Claim is conclusively presumed to have accepted the Plan and, consequently, is not entitled to vote to accept or reject the Plan.**

        2.       <u>Priority Non-Tax Claims</u>.

<u>Distributions:</u>  Except to the extent that a holder of an Allowed Class 2 Claim has been paid by the Debtor prior to the Effective Date or agrees, in writing, to a different treatment, each holder of an Allowed Class 2 Claim as of the Record Date shall receive, as payment in full, Cash in an amount equal to such Allowed Class 2 Claim on the later of the Effective Date and the date such claim becomes an Allowed Class 2 Claim, or as soon thereafter as practicable, or such other treatment that will not impair the holder of such Allowed Class 2 Claim in accordance with Section 1124 of the Bankruptcy Code.

The Debtor estimates that its Priority Non-Tax Claims are approximately $127,317, excluding Petition-date payroll obligations which have since been satisfied, together with Accrued Vacation Pay, and Accrued Personal Day Pay, each of which is payable as an administrative expense upon the assumption of the Collective Bargaining Agreement, as modified.

**Class 2 is unimpaired under the Plan.  Each holder of an Allowed Class 2 Claim is conclusively presumed to have accepted the Plan and, consequently, is not entitled to vote to accept or reject the Plan.**

        3.       <u>Class 3:  Allowed Secured Claims</u>

<u>Distribution:</u>  Except to the extent that a holder of an Allowed Class 3 Claim has been paid by the Debtor prior to the Effective Date or agrees, in writing, to a different treatment, each holder of an Allowed Class 3 Claim as of the Record Date shall receive payment in full of its Allowed Class 3 Claim in accordance with the terms set forth in Article VII of the Plan.

Allowed Secured Claims include $23,622,422 in Senior Lender debt and $3,000,000 of Subordinated Debt.  Such Allowed Claims are paid in full under the Plan, pursuant to the provisions of Article VII.  Subordinated Debt not allowed as a Secured Claim is treated as a General Unsecured Claim.

<u>Retention of Liens:</u>  Each holder of an Allowed Class 3 Claim shall retain the Liens (or replacement Liens) securing its Allowed Class 3 Claim as of the Effective Date until full and final payment of such Allowed Class 3 Claim is made as provided herein, and upon such

full and final payment, such Liens shall be deemed null and void, and shall be unenforceable for all purposes (all without further act or action).

**Class 3 is impaired under the Plan. Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.**

4.    <u>Miscellaneous Secured Claims</u>.

<u>Distributions</u>:  Except to the extent that a holder of a Miscellaneous Secured Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Miscellaneous Secured Claim as of the Record Date shall receive payment in full of its Allowed Class 4 Claim in accordance with the term set forth in Article VII of the Plan.

The Debtor estimates that its Miscellaneous Secured Claims are approximately $169,623.

<u>Retention of Liens</u>:  Each holder of an Allowed Class 4 Claim shall retain the Liens securing its Allowed Class 4 Claim as of the Effective Date until full and final payment of such Allowed Class 4 Claim is made as provided herein, and upon such full and final payment, such liens shall be unenforceable for all purposes (all without further act or action).

**Class 4 is impaired under the Plan. Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.**

5.    <u>Class 5:  General Unsecured Claims</u>

<u>Distributions</u>:  Except to the extent that a holder of a General Unsecured Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed General Unsecured Claim as of the Record Date, other than General Unsecured Claims otherwise treated in accordance with the Plan, shall receive payment, in full and complete settlement, discharge and satisfaction of such Allowed Class 5 Claims, in accordance with the terms set forth in Article VII of the Plan.  If any non-cash assets retained by the Reorganized Debtor are liquidated at any time subsequent to the Effective Date, all Net Proceeds therefrom shall be distributed pro rata to holders of Allowed Class 5 General Unsecured Claims and Allowed Class 6 IDEM Claims as soon as practicable after any such sale.

The Debtor's Schedules list General Unsecured Claims having an aggregate value of $14,830,552.  In addition, approximately $5,300,000 of Subordinated Lender claims are treated as General Unsecured Claims.  The Plan provides that holders of such Claims shall receive a distribution equal to approximately 15% of their Allowed Claims.

**Class 5 is impaired under the Plan. Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.**

6.       Class 6:  IDEM Claims.

Distributions:  Except to the extent that IDEM, as the holder of an IDEM Claim, has been paid post-petition or agrees to a different treatment, IDEM shall receive payment, in full and complete settlement, discharge and satisfaction of such Allowed Class 6 Claims, in accordance with the terms set forth in Article VII of the Plan.  Any such post-petition payments shall be credited against payments due under the Plan.  If any non-cash assets retained by the Reorganized Debtor are liquidated at any time subsequent to the Effective Date, all Net Proceeds therefrom shall be distributed pro rata to holders of Allowed Class 5 General Unsecured Claims and Allowed Class 6 IDEM Claims as soon as practicable after any such sale.

The Debtor estimates that IDEM Claims scheduled as contingent will become Allowed Claims of approximately $5,000,000.  Such Claims, like General Unsecured Claims, are entitled to distributions of approximately 15% under the Plan.

**Class 6 is impaired under the Plan.  Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan.**

7.       Class 7:  Common Stock Interests

Distributions.  This Class shall retain its Common Stock and all rights therein subject to the provisions of the Plan, but shall not receive or retain any property or distributions under the Plan on account of such Equity Interests.

The net proceeds of any non-cash assets retained by the Reorganized Debtor shall be distributed to unsecured creditors, including IDEM, pursuant to the Plan.  Consequently, the Common Stock will have no market value.

**Holders of Allowed Class 7 Interests are deemed to reject the Plan. Consequently, holders of Allowed Class 7 Interests are not entitled to vote to accept or reject the Plan.**

**C.       Conditions to Confirmation of the Plan**

Confirmation of the Plan is subject to a number of conditions, including, but not limited to, approval of the Plan by the Bankruptcy Court pursuant to Bankruptcy Code Section 1129. In particular, confirmation of the Plan is conditioned in part upon:

1.       Conditions to Confirmation.

(a)       The Bankruptcy Court shall have entered a Final Order approving this Disclosure Statement with respect to the Plan;

(b)       The Confirmation Order shall have been entered.

2.    <u>Conditions to Effectiveness of the Plan</u>.  The following are conditions precedent to the occurrence of the Effective Date, and will remain in effect on the Effective Date, unless (except as otherwise provided) waived by the Debtor:

(a)    <u>Confirmation Order.</u> The Confirmation Order shall have been entered by the Bankruptcy Court, more than ten (10) days shall have elapsed since the Confirmation Date, no stay of the Confirmation Order shall be in effect and the Confirmation Order shall not have been reversed, modified or vacated.

(b)    <u>Substitution of Parties.</u>  The Reorganized Debtor shall be substituted for the Debtor in all adversary proceedings and contested matters pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere.

**D.    General Provisions**

1.    <u>Retention of Jurisdiction.</u>

Notwithstanding confirmation of this Plan, the Bankruptcy Court will retain jurisdiction for the following purposes:

(a)    <u>In General</u>.  The Bankruptcy Court will retain jurisdiction to determine the allowance and payment of any Claim(s) upon any objection(s) thereto (or other appropriate proceedings) by the Debtor or any other party-in interest entitled to proceed in that manner as well as all other matters related to distributions under the Plan. As part of such retained jurisdiction, the Bankruptcy Court will continue to determine the allowance of Administrative Claims and any request(s) for payment(s) thereof. Additionally, the Bankruptcy Court will retain jurisdiction to determine the allowance, legality and payment of all Claims asserted by the Internal Revenue Service pursuant to Section 505 of the Bankruptcy Code or otherwise and in order to resolve any issues regarding United States Trustee quarterly fees.

(b)    <u>Sale Hearings.</u> The Bankruptcy Court will retain jurisdiction to hear and determine all matters in connection with the sale of the Properties.

(c)    <u>Plan Disputes and Enforcement.</u> The Bankruptcy Court will retain jurisdiction to determine any dispute(s) which may arise regarding the interpretation of any provision of the Plan and to enforce any provisions of this Plan and any and all documents relating to the Plan.

(d)    <u>Further Orders.</u> The Bankruptcy Court will retain jurisdiction to facilitate the performance of the Plan by entering any further necessary or appropriate order(s) regarding enforcement of the Plan and any provisions thereof. In addition, the Bankruptcy Court will retain jurisdiction to facilitate or implement the discharge of any Claim, or any portion thereof, pursuant to the Plan.

(e)    <u>Other Actions.</u>  Except as otherwise specifically provided in the Plan, the Bankruptcy Court will retain jurisdiction to adjudicate all Causes of Action. This provision will not restrict the rights of the Reorganized Debtor to proceed in any other court of

competent jurisdiction; and it will not be construed to require the Reorganized Debtor to proceed in any other such court if the court also has proper jurisdiction.

(f)    <u>Final Decree.</u> The Bankruptcy Court will retain jurisdiction to enter an appropriate final decree in the Chapter 11 Cases.

(g)    <u>Appeals.</u> In the event of an appeal of the Confirmation Order or any other type of review or challenge to the Confirmation Order, and provided that no stay of the effectiveness of the Confirmation Order has been entered, the Bankruptcy Court will retain jurisdiction to implement and enforce the Confirmation Order and this Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding the Plan or the performance thereof as may be necessary or appropriate to effectuate the reorganization.

(h)    <u>Executory Contracts.</u> The Bankruptcy Court will retain jurisdiction to determine any and all matters regarding Executory Contracts, including, but not limited to, assumptions or rejections thereof, and any and all Claims arising from such Executory Contracts, including, but not limited to, rejection damages claims.

2.    <u>General Provisions.</u>

(a)    <u>Additional Assurances.</u>  The Reorganized Debtor will execute such other and further documents as are necessary to implement any of the provisions of the Plan.

(b)    <u>Extension of Payment Dates.</u> If any payment date falls due on a day other than a Business Day, then such payment date will be extended to the next Business Day.

(c)    <u>Interest on Claims.</u> Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

(d)    <u>Exculpation and Limitation of Liability.</u> Neither the Reorganized Debtor nor any of its respective present or former members, officers, directors, employees, advisors, attorneys, or Administrative Agents, shall have or incur any liability to any Holder of a Claim or an Equity Interest, or any other party in interest, or any of their respective Administrative Agents, employees, representatives, financial advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for their willful misconduct or gross negligence, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

(e)    <u>Captions.</u> Section captions used in the Plan are for convenience only, and will not affect the construction of the Plan.

(f)      <u>Disclosure Statement.</u> Holders of Claims and Equity Interests and all other interested parties are referred to this Disclosure Statement, which accompanies the Plan in conjunction with the solicitation of acceptances of the Plan.

(g)      <u>Successors and Assigns.</u> The rights and obligations of any Holder of a Claim or Equity Interest referred to in the Plan will be binding upon, and will inure to the benefit of, the successors, assigns, heirs, devisees, executors, and personal representatives of such Holder.

(h)      <u>Governing Law.</u>  Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable to the Debtor the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Indiana, without giving effect to the principles of conflicts of law thereof.

(i)      <u>Revocation</u>.  If the Plan is revoked or withdrawn prior to Confirmation, if Confirmation does not occur, if the Effective Date does not occur in accordance with the Plan or if the Reorganized Debtor does not make the required payments on, or as soon as reasonably practical after the Effective Date (unless waived by the recipient thereof), then the Plan (and the previously entered Confirmation Order) shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any other Person.

(j)      <u>Reservation of Rights</u>.  The filing of the Plan, any statement or provision contained therein or in this Disclosure Statement or the taking of any action by the Debtor with respect to the Plan is not an admission or a waiver of any rights prior to the Effective Date, except as specifically set forth in the Plan with respect to the period of time prior to the Effective Date.

(k)      <u>Fractional Dollars</u>. Notwithstanding any other provision of the Plan, no payments of or on account of fractions of dollars will be made to any Holder of an Allowed Claim. When any payment of or on account of a fraction of a dollar to any Holder of a Claim would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest whole number (up or down).  The Debtor shall not be required to make any distribution or issue any check that would be in an amount less than five dollars ($5.00) on account of any Claim.

(l)      <u>Unclaimed Property</u>.  Any Property held for distribution in accordance with the Plan by the Debtor which is unclaimed or undistributed on the first anniversary of the Effective Date (except to the extent it is a Disputed Claim or Disputed Interest) shall be distributed in accordance with the Plan.

(m)      <u>Payment Option</u>.  At the option of the Debtor except as otherwise required or provided in the Plan or by any applicable agreement, any Cash payment to be made pursuant to the Plan may be made by check on a United States Bank mailed by first class mail or by wire transfer.

(n)    <u>Amendments</u>.  The authority of the Debtor and any other party to an agreement or instrument to agree to modifications, supplements or amendments thereto shall be as provided in such agreement or instrument, but may not be inconsistent with the Plan.

(o)    <u>Post-Confirmation Reportings.</u> Until the entry of the Final Decree, the Debtor shall comply with the post-confirmation reporting requirements. Additionally, the Debtor shall file post-confirmation monthly operating reports.

## VIII.  <u>FINANCIAL PROJECTIONS</u>

The Debtor's financial projections are attached as an Exhibit hereto.

## IX.  <u>SELECTED HISTORICAL FINANCIAL INFORMATION</u>

Attached to the Amended Disclosure Statement shall be a copy of the audited financial statements for the prepetition Debtor for the years ending December 31, 2001 and 2002 and the Debtor's prepared statements for the year ending December 31, 2003. The historical financial data for years 2001, 2002, and 2003 has been derived from, and should be read in conjunction with, the audited consolidated financial statements of the Debtor.

The summary historical consolidated financial information is not necessarily indicative of the future results of operations of the Reorganized Debtor.

## X.  <u>CERTAIN FEDERAL INCOME TAX CONSIDERATIONS</u>

Under the Internal Revenue Code of 1986, as amended (the "Tax Code"), there are certain federal income tax consequences associated with the Plan. The following is only a summary discussion of certain significant consequences. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only. This summary is based upon laws, regulations, rulings and decisions now in effect and upon proposed regulations of the Internal Revenue Service ("Service"), all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision.  Under present law, there is substantial uncertainty surrounding many of the tax consequences discussed below. Uncertainty is created, in part, by the changes made by the Bankruptcy Tax Act of 1980, the Tax Reform Act of 1984, the Tax Reform Act of 1986, the Revenue Reconciliation Act of 1990, and the Taxpayer Relief Act of 1997, certain provisions of which call for the promulgation of regulations ("Regulations") by the United States Department of the Treasury ("Treasury Department") which have not yet been promulgated or have not yet become final. As a result, many alternative tax consequences are possible. In addition, there are differences in the nature of the claims of Creditors, their methods of tax accounting and prior actions taken by Creditors with respect to their Claims. Further, this summary does not discuss all aspects of federal taxation that may be relevant to a particular Creditor affected by special considerations not discussed below. For example, certain types of Creditors (including nor-resident aliens, foreign corporations, broker-dealers, financial institutions, life insurance companies and tax exempt organizations) may be subject to special rules not discussed below. In addition to the federal income tax

consequences discussed below, the transactions contemplated herein may have significant state, local and foreign tax consequences which are not discussed herein. Neither a ruling from the Service nor an opinion of counsel has been requested with respect to the federal income tax consequences of the Plan.

> ACCORDINGLY, CREDITORS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THEIR CLAIMS. THE DEBTOR AND ITS COUNSEL ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY CREDITOR NOR IS THE DEBTOR OR ITS COUNSEL RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

## XI.    ALTERNATIVES TO THE PLAN

The Debtor believes that the Plan maximizes the value of its Estate and provides creditors the greatest possible value and return that can be realized on their Allowed Claims. The Debtor recommends that you vote to accept the Plan. The Plan, however, can be confirmed even if it is not accepted by every impaired class of Allowed Claims or Allowed Interests, so long as the Plan meets the "cram-down" standards set forth in section 1129(b) of the Bankruptcy Code.

### A.    Other Plans of Reorganization

In the event the Plan is not confirmed, alternatives to confirmation of the Plan include the submission of an alternative plan or plans of reorganization by AFI or by another party-in-interest, the sale of AFI's assets or the liquidation of AFI. The Debtor believes that the confirmation of any plan of reorganization proposed by another party-in-interest would involve costly and time-consuming procedures, including, *inter alia,* the possibility of protracted and costly litigation.

### B.    Liquidation Under Chapter 7 of the Bankruptcy Code

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if AFI were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of the Debtor's assets in the context of a chapter 7 case. Such amount is reduced by the amount of any claims secured by the Debtor's assets. Unpaid chapter 11 administrative expenses, and the costs and expenses of the liquidation and additional administrative expenses that will result from the termination of the Debtor's businesses and the use of chapter 7 for the purposes of liquidation must also be paid. Any remaining net cash would be allocated to creditors and

shareholders of the Debtor in strict priority in accordance with section 726 of the Bankruptcy Code.

In connection with the Disclosure Statement, AFI prepared a liquidation analysis ("Liquidation Analysis"). Section 1129(a)(7) of the Bankruptcy Code requires that, as to each holder of an impaired claim or interest, such claim or interest (i) has accepted the plan of reorganization ("POR"); or (ii) will receive or retain under the POR, on account of such claim or interest, property of a value as of the Effective Date of the POR that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

This Liquidation Analysis indicates the value that may be obtained by a chapter 7 trustee for the benefit of Classes of Claims and Interests upon the disposition of assets of the Debtor's bankruptcy estate pursuant to a chapter 7 liquidation as an alternative to the operation of a going concern business and payments in accordance with the POR. Accordingly, the values of assets discussed in this Liquidation Analysis may differ from values referenced in the Plan.

This Liquidation Analysis is based upon significant estimates and assumptions that, although developed in AFI's reasoned business judgment, are, by their nature, subject to economic and competitive contingencies and uncertainties that are largely beyond the control of AFI. The Liquidation Analysis is also AFI's best determination of the manner in which assets of its bankruptcy estate are most appropriately liquidated, and a chapter 7 trustee may not make the same liquidation determinations, and accordingly, such determinations are subject to change. Thus, there can be no guaranty or assurance that the values reflected in this Liquidation Analysis would be realized if AFI were, in fact, to undergo a chapter 7 liquidation.

The following is a list of key uncertainties that exist with respect to the Liquidation Analysis, and key assumptions made in conjunction therewith:

1. This Liquidation Analysis assumes that AFI's assets would not be shut down immediately, but instead would be shut down in a safe and reasonable manner, although it is not contemplated that the chapter 7 trustee would undertake limited operations for the purpose of utilizing raw materials or completing work-in-process.

2. During the liquidation period, corporate operations would cease with almost all positions phased out as soon as practicable. Certain limited corporate personnel, such as certain of those in the financial and management information systems areas, would be retained by the chapter 7 trustee for the liquidation period in order to support the completion of an orderly liquidation.

3. Following corporate winddown and likely disposition of leases and certain related property, plant and equipment of AFI, it is assumed that the chapter

7 trustee would liquidate all remaining miscellaneous assets in an orderly manner.

4.    The winddown costs during the liquidation period are good faith best estimates by AFI, and any deviation from this timeframe could materially affect winddown costs, claims proceeds from the liquidation of assets, and ultimately, the recovery to creditors.

5.    There is a general risk in any liquidation of unanticipated events that could have a substantial impact on both projected receipts of proceeds from assets and disbursements to creditors. These events include, but are not limited to, changes in steel pricing and raw materials costs, changes in general economic conditions and changes in the market value of AFI's primary assets.

6.    Other than as specifically addressed in this Liquidation Analysis, the issues of potential recoveries from Avoidance Actions and a bankruptcy claims reconciliation have not been addressed.

7.    The book values of assets for this Liquidation Analysis are estimated book values as of December 31, 2003. Accounts receivable are assumed to be collected on a best efforts basis, utilizing finished inventory in the possession of AFI relating to account debtors as leverage to collect accounts receivable. Finished goods will be sold and shipped to customers as soon as possible, and remaining inventory will be secured in a manner to prevent damage, and liquidated in an organized and timely manner. All sales of inventory are on an "as-is-where-is" basis, and accordingly, the amount of scrap inventory could increase.

8.    Property, plant and equipment includes the manufacturing assets of AFI, including all real property associated therewith.

9.    Costs associated with liquidation represent costs and expenses relating to asset preservation, idling expenses, environmental expenses, payroll and other various corporate functions during the winddown and liquidation period and chapter 7 professional fees incurred, including but not limited to those associated with the appointment of a chapter 7 trustee.

Estimate of Costs. The Debtor's costs of liquidation would include any obligations and unpaid expenses incurred by the Debtor during the Reorganization Case and the liquidation process, such as trade obligations, income taxes on gains resulting from the sale of assets, compensation for attorneys, financial advisors, accountants and other professionals and costs and expenses of members of any statutory committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code. Furthermore, additional claims would arise by reason of the breach or rejection of obligations incurred and

executory contracts or unexpired leases entered into by the Debtor both prior to and during the pendency of the Reorganization Case. It is possible that a conversion to a chapter 7 case could result in wind-down expenses being greater or less than the estimated amount. Such expenses are dependent, in substantial part, on the length of time of liquidation.

        <u>Unencumbered Assets.</u> The Senior Lenders have first priority liens on substantially all of the Debtor's assets, except for the value of the Debtor's interests in Avoidance Actions, if any.

        <u>Distribution of Net Proceeds Under Absolute Priority Rule.</u> Under the absolute priority rule, no junior creditor can receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. Unpaid and chapter 11 administrative expense claims would be paid before any distribution to prepetition priority and unsecured creditors.

        After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including the limited unencumbered assets of the Debtor, the Debtor has determined that confirmation of the Plan will provide each holder of an Allowed Claim or Allowed Interest with a recovery that is not less than it would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

        The Debtor also believes that the value of any distributions from the liquidation proceeds to each class of Allowed Claims in a chapter 7 case would be the same or significantly less than the value of distributions under the Plan. In this regard, it is also possible that the distribution of proceeds of liquidation could be delayed for an extended period after the completion of such liquidation in order to resolve claims and prepare for distributions. In the event that litigation were necessary to resolve claims asserted in the chapter 7 cases, the delay could be further prolonged and administrative expenses further increased.

        The liquidation analysis is an estimate of proceeds that may be generated as a result of hypothetical liquidations of the Debtor. Underlying the liquidation analysis are a number of assumptions and estimates that are inherently subject to significant economic, competitive and operational uncertainties and contingencies beyond the control of the Debtor or a chapter 7 trustee. Additionally, various liquidation decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtor's assets will result in an accurate estimate of the proceeds that would be realized were the Debtor to undergo actual liquidation. The actual amount of claims against the chapter 7 Estate could vary significantly from the Debtor's estimates depending upon the claims asserted during the pendency of the chapter 7 case. This analysis does not include liabilities that may result from litigation, certain new tax assessments or other potential claims, and does not include the value of potential recoveries from avoidance actions.

## XII.   CONFIRMATION REQUIREMENTS

### A.   The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing before a plan of reorganization may be confirmed. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the claim or number and type of shares of equity security interests held by the objector. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and certain other parties when and as set forth in the attached notice of confirmation hearing.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. At the hearing on the confirmation of the Plan, the Bankruptcy Court will confirm the Plan only if the requirements of the Bankruptcy Code, particularly those set forth in section 1129 of the Bankruptcy Code, have been satisfied.

### B.   Acceptances Necessary to Confirm the Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the requisite amount and number of Allowed Claims and Allowed Interests in each impaired class. Under the Bankruptcy Code, a class of creditors or equity security holders is impaired if its legal, equitable or contractual rights are altered by a proposed plan of reorganization. If a class is not impaired, each creditor or equity security holder in such unimpaired class is conclusively presumed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 1 and 5 are not entitled to vote on the Plan. Classes 2, 3, and 4 are impaired under the Plan and holders of Allowed Claims or Allowed Interests in such classes are entitled to vote for or against the Plan by completing and returning ballots mailed to them with this Disclosure Statement in the manner set forth in the ballots.

An impaired class of creditors and each holder of a claim in such class will be deemed to have accepted the Plan if the holders of at least two-thirds in amount and more than one-half of those in number of the Allowed Claims in such impaired class for which complete and timely ballots have been received have voted for acceptance of the Plan. An impaired class of equity securities and each holder of an interest in such class will be deemed to have accepted a plan if the plan has been accepted by at least two-thirds in amount of the interests in such class who actually vote on the Plan.

### C.   Best Interests of Creditors

To satisfy one of the requirements for confirmation of the Plan, the Debtor must establish and the Bankruptcy Court must find that, with respect to each class of Allowed Claims and Allowed Interests under the Plan, each holder of the Allowed Claim or Allowed Interests in that class either has accepted the Plan or will receive or retain under the Plan on account of such

Allowed Claim or Allowed Interest property of a value that is at least the amount that such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. The Section above regarding the liquidation analysis contains the Debtor's analysis of the likely results of chapter 7 liquidation of the Debtor. The Bankruptcy Court must compare the value of the distributions that would be made to each class in chapter 7 liquidation cases to the values of distributions to each class under the Plan to determine if the Plan is in the best interest of each class of Allowed Claims and Allowed Interest. THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF ALL ALLOWED CLAIMS AND PROVIDES VALUE TO ALL OF THEM IN EXCESS OF THE AMOUNTS OR IN THE SAME AMOUNTS THAT THEY WOULD RECEIVE IN CHAPTER 7 CASES OF THE DEBTOR.

### D.    Feasibility

As a condition to confirmation of the plan, the Bankruptcy Code requires the Bankruptcy Court to determine that confirmation is not likely to be followed by liquidation of the Reorganized Debtor or the need for further financial reorganization of the Reorganized Debtor. For purposes of determining whether the Plan meets this "feasibility" standard, the Debtor has analyzed the projected ability of the Reorganized Debtor to meet its obligations under the Plan and of the Reorganized Debtor to continue its operations. As part of this analysis, AFI prepared Financial Projections of its financial performance. The Financial Projections shall be attached to the Amended Disclosure Statement.

The Debtor believes that the results set forth in the Financial Projections are reasonable and attainable.  The Debtor has consistently operated within the confines of its cash use budgets since the outset of the Chapter 11 case, and consistently met or exceeded its projections for sales, operations, and earnings.  The Financial Projections for New AFI, which is assuming certain debts under the Plan, demonstrate an ability to continue such achievements subsequent to Plan confirmation.

Substantial effort has been made to ensure that the Financial Projections and assumptions on which they are based are reasonable. The Debtor cautions, however, that no representations can be made by the Debtor with respect to the accuracy of the Financial Projections or the Reorganized Debtor's ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are subject to major uncertainties. Some assumptions inevitably will not materialize and unanticipated events may affect the actual financial results. Therefore, the actual results achieved will vary from the projected results and the variations may be material. THE DEBTOR, HOWEVER, BELIEVES THAT THE PLAN IS FEASIBLE AND THE DEBTOR URGES THE HOLDERS OF ALL ALLOWED CLAIMS VOTING ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

### E.    Confirmation of the Plan

In the event the Bankruptcy Court determines that all of the requirements for the confirmation of the Plan are satisfied, the Bankruptcy Court will issue the Confirmation Order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

## XIII.   CERTAIN RISK FACTORS TO BE CONSIDERED

       HOLDERS OF IMPAIRED CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THOSE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

BAKER & DANIELS

By:  /s/ John R Burns
      John R Burns (#3016-02)
      Stephen A. Claffey (#3233-98)
      Mark A. Werling (#20426-02)
      111 East Wayne Street, Suite 800
      Fort Wayne, Indiana 46802
      Telephone:  (260) 424-8000
      Facsimile:  (260) 460-1700

ATTORNEYS FOR THE DEBTOR,
AUBURN FOUNDRY, INC.

**EXHIBIT A**

"PLAN OF REORGANIZATION"

# EXHIBIT B

"PROJECTED FINANCIAL INFORMATION"

**EXHIBIT C**

"LIQUIDATION ANALYSIS"