## Exhibit A

Agreement

## AGREEMENT FOR LONG-TERM CASH USE AND
## SENIOR DEBTOR-IN-POSSESSION FINANCING

This AGREEMENT FOR LONG-TERM CASH USE AND SENIOR DEBTOR-IN-POSSESSION FINANCING (this "Agreement") is entered into this 19th day of April 2004 by and among AUBURN FOUNDRY, INC., an Indiana corporation and debtor and debtor-in-possession (the "Debtor"), BANK OF AMERICA, NATIONAL ASSOCIATION ("BofA"), GMAC COMMERCIAL FINANCE, LLC, successor by merger to GMAC Business Credit LLC (collectively, the "Lenders"), and AFI LENDING GROUP, LLC ("AFI Lending"). Capitalized terms used herein and not otherwise defined have the meanings set forth in the Pre-Petition Credit Agreement (as defined below).

### RECITALS

WHEREAS, the Debtor is a debtor and debtor-in-possession in a case pending under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code");

WHEREAS, the Debtor and the Lenders have filed a Joint Motion Pursuant to Rule 4001(b) to Approve Agreement Concerning Use of Cash Collateral (the "Cash Collateral Motion") seeking (a) authorization from the United States Bankruptcy Court for the Northern District of Indiana (the "Court") to use the Lenders' cash collateral within the meaning of §363(a) of the Bankruptcy Code (the "Cash Collateral"), upon the terms and subject to the conditions set forth herein, (b) a preliminary hearing (the "Preliminary Hearing") on the Cash Collateral Motion to consider entry of an interim order approving the Cash Collateral Motion in the form attached hereto as Exhibit A (the "Interim Cash Collateral Order"), and (c) a final hearing the (the "Final Hearing") on the Cash Collateral Motion to consider entry of a final order approving the Cash Collateral Motion substantially in the form of the Interim Cash Collateral Order (the "Final Cash Collateral Order");

WHEREAS, the Debtor and the Lenders have filed a Joint Motion Pursuant to Rule 4001(c) to Approve Agreement Concerning Senior DIP Financing (the "DIP Motion") seeking (a) authorization from the Court to obtain post-petition financing (the "Post-Petition Financing"), up to an aggregate principal amount of $2,100,000 plus accrued interest on the aggregate principal amount, secured by liens on all of the Debtor's assets pursuant to § 364(c) of the Bankruptcy Code, upon the terms and subject to the conditions set forth herein, (b) a preliminary hearing (the "Preliminary Hearing") on the DIP Motion to consider entry of an interim order approving the DIP Motion in the form attached hereto as Exhibit B (the "Interim DIP Order"), and (c) a final hearing (the (the "Final Hearing") on the DIP Motion to consider entry of a final order approving the DIP Motion substantially in the form of the Interim DIP Order (the "Final DIP Order");

WHEREAS, the Debtor, AFI Lending and the Lenders desire to agree to the Debtor's use of Cash Collateral and to the Post-Petition Financing on the terms and conditions set forth herein, subject to the entry by the Court of the Interim Cash Collateral Order and Interim DIP Order and, after the Final Hearing, the Final Cash Collateral Order and the Final DIP Order;

FWIMAN1 332977v1

WHEREAS, on the last banking day prior to the Filing Date (as defined below), approximately $618,000 of proceeds of Pre-Petition Collateral (as defined below) was swept from an account at BofA in the name of the Debtor but under the control of BofA and applied to the Pre-Petition Indebtedness (as defined below) on February 9, 2004;

WHEREAS, the Debtor has disputed whether the approximately $618,000 described above was properly applied to the Pre-Petition Indebtedness and argued that the principal balance of the Pre-Petition Indebtedness on the Filing Date was larger than represented by the Lenders;

WHEREAS, the Debtor, AFI Lending and the Lenders desire to agree to resolve the dispute by agreeing to the principal balances of the Pre-Petition Indebtedness and the Pre-Petition Revolver Indebtedness (as defined below) set forth below and transferring $309,000 to the Debtor's disbursement account; and

WHEREAS, AFI Lending, the Lenders and the Debtor desire that AFI Lending agree to continue to provide the Subordinated DIP (as defined below) to the Debtor in the amounts and subject to the limited subordination provisions set forth herein;

NOW, THEREFORE, in consideration for the mutual agreements and covenants set forth herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Chapter 11 Case. On February 8, 2004 (the "Filing Date"), the Debtor filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is continuing in possession of its property, and operating and managing its business, as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

2.    Pre-Petition Credit Agreement. The Lenders, as the lenders, and Auburn Foundry, Inc. (the "Borrower" or "Auburn"), as borrower, are party to that certain Credit Agreement, dated as of April 10, 2000 (as amended, supplemented or otherwise modified prior to the commencement of this Chapter 11 Case, the "Pre-Petition Credit Agreement") and all collateral and ancillary documents executed in connection therewith (the "Pre-Petition Loan Documents"). A true and correct copy of the Pre-Petition Credit Agreement and the amendments thereto have been previously included in the record in this Chapter 11 Case.

3.    Pre-Petition Indebtedness. As of the Filing Date, the Debtor was liable to the Lenders in the aggregate principal amount of approximately $23,312,638.40 in respect of loans made by the Lenders to the Debtor pursuant to the Pre-Petition Credit Agreement (plus attorneys' fees, costs and interest accrued and unpaid thereon, to the extent allowed) (the "Pre-Petition Indebtedness"). The Pre-Petition Indebtedness includes $10,901,915.66 of Revolving Loans (including undrawn Letters of Credit) and $12,410,722.74 of Term Loans. The Pre-Petition Indebtedness consisting of Revolving Loans (including all undrawn Letters of Credit) plus attorneys' fees, costs and interest accrued and unpaid thereon, to the extent allowed, is referred to herein as the "Pre-Petition Revolver Indebtedness."

4.    <u>Pre-Petition Collateral</u>. Without prejudice to the rights of any party, by reason of the Pre-Petition Loan Documents, the Lenders assert that the Pre-Petition Indebtedness is secured by enforceable liens and security interests granted by the Debtor to the Lenders, upon and in substantially all of the Debtor's tangible and intangible assets and property, including, but not limited to, all of the Debtor's real property and all of the Debtor's other assets and property in which a security interest can be obtained under the Uniform Commercial Code (including the setoff rights described below, the "<u>Pre-Petition Collateral</u>"), including without limitation, equipment, inventory, accounts receivable, instruments, chattel paper, general intangibles, contracts, documents of title, and all other tangible and intangible personal property and the proceeds and products thereof.

5.    <u>Authorization</u>. Subject to Court approval, the Debtor is expressly authorized and empowered to (i) borrow money, use Cash Collateral, and perform its obligations pursuant to the provisions of this Agreement and (ii) enter into such agreements, instruments and documents (collectively, if any, the "<u>DIP Loan Documents</u>") as may be necessary or required to evidence its obligations to the Lenders, to consummate the terms and provisions of this Agreement, the Interim Cash Collateral Order (or, if entered, the Final Cash Collateral Order) and the Interim DIP Order (or, if entered, the Final DIP Order) and to evidence perfection of the liens and security interests to be given to the Lenders pursuant hereto and thereto; <u>provided</u> that such DIP Loan Documents are consistent with this Agreement. All post-petition loans and all other indebtedness and obligations (including undrawn Letters of Credit) incurred on or after the Filing Date by the Debtor to the Lenders pursuant to this Agreement and the DIP Loan Documents (including principal, accrued and unpaid interest, and costs and expenses, to the extent allowed) are referred to herein as the "<u>DIP Indebtedness</u>," and, together with the Pre-Petition Indebtedness, as the "<u>Indebtedness</u>."

6.    <u>Borrowing; Use of Cash Collateral</u>. Subject to the terms and conditions of this Agreement and the DIP Loan Documents, (a) the Lenders hereby consent to the Debtor's limited use of the Lenders' Cash Collateral and (b) the Lenders will make post-petition loans to the Debtor, in each of (a) and (b) above not to exceed in the aggregate, together with the outstanding principal amount of all Pre-Petition Revolver Indebtedness and DIP Indebtedness, the lesser of (i) the $13,000,000 or (ii) the difference between (A) the sum of (1) 90% of Eligible Accounts from Account Debtors who have entered into accommodation agreements with the Debtor in form and substance substantially similar to <u>Exhibit C</u> hereto, (2) 85% of Eligible Accounts from Account Debtors who have <u>not</u> entered into accommodation agreements with the Debtor in form and substance substantially similar to <u>Exhibit C</u> hereto, (3) 75% of Eligible Inventory made for customers who have entered into accommodation agreements in form and substance substantially similar to <u>Exhibit C</u> hereto, (4) 60% of Eligible Inventory made for customers who have <u>not</u> entered into accommodation agreements in form and substance substantially similar to <u>Exhibit C</u> hereto, and (5) an overadvance of $1,325,000 and (B) the Reserves (as defined below) (the "<u>Borrowing Base</u>"). On or prior to noon, Central Time, each Business Day, the Debtor shall provide the Lenders a Borrowing Base Certificate certifying the outstanding principal balance of the Pre-Petition Revolver Indebtedness and DIP Indebtedness and the Borrowing Base as of the close of business on the preceding day. Notwithstanding the foregoing, if the Lenders in their sole discretion advance funds or other extensions of credit in excess of these limitations (or any other limitations in the DIP Loan Documents), such advances (and any other indebtedness in excess of such amount) shall constitute DIP Indebtedness entitled

to the benefits of the DIP Loan Documents, this Agreement and the Interim DIP Order (or, if entered, the Final DIP Order). Each day during any week, reserves (the "Reserves") shall be calculated as a reduction to the Borrowing Base for any unpaid fees and expenses (of Debtor Professionals (as defined below) or Committee Professionals (as defined below) ("Professional Fees") in the Approved Budget for all prior weeks and for any unpaid casualty insurance expenses (the "Insurance Expenses") in the Approved Budget for all prior weeks; provided, however, that subsequent payments of any Professional Fees or Insurance Expenses shall immediately reduce the Reserves by the amount paid.

7.    Interest, Fees, Costs and Expenses. The DIP Indebtedness shall bear interest at prime plus two and a half (2 ½) percent. Interest shall accrue, but not be payable except as set forth below. There shall be no provision for LIBOR-Rate Loans under the Post-Petition Financing. All fees relating to Letters of Credit payable under the Pre-Petition Credit Agreement shall be applicable to the Post-Petition Financing, but shall not be payable except as set forth below. All reasonable out-of-pocket expenses of the Lenders shall accrue, but shall not be payable except as set forth below, including reasonable attorneys' and paralegals' fees, actual and reasonable costs and expenses incurred in connection with the DIP Indebtedness to the extent provided in the Pre-Petition Credit Agreement. Notwithstanding the foregoing, interest, fees, costs and expenses in connection with the DIP Indebtedness shall not be payable until the Termination Date. With respect to interest, fees, costs and expenses in connection with the Pre-Petition Indebtedness, all rights provided to the Lenders under section 506(b) of the Bankruptcy Code are preserved for a later determination by the Court.

8.    Termination of Post-Petition Credit. The Lenders' willingness to make loans hereunder and the Lenders' consent to the Debtor's use of Cash Collateral shall immediately and automatically terminate (except as the Lenders may otherwise agree in writing in their sole discretion), and all DIP Indebtedness shall be immediately due and payable in cash (except as the Lenders may otherwise agree in writing in their sole discretion) upon the earliest to occur of the following (the "Termination Date"):

(i)    August 31, 2004;

(ii)    the date of final indefeasible payment and satisfaction in full in cash of the Indebtedness;

(iii)    the effective date of any confirmed plan of reorganization in this Chapter 11 Case;

(iv)    the consummation of the sale or other disposition of all or substantially all of the assets of the Debtor;

(v)    the occurrence of any violation by the Debtor of this Agreement (including, but not limited to, the Debtor's violation of the covenants set forth in paragraphs 17 and 18 of this Agreement);

(vi)    the dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code;

FWIMAN1 332977v1

4

(vii)    a trustee or an examiner with enlarged powers (beyond those set forth in §§ 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business of the Debtor is appointed in this Chapter 11 Case without the prior written consent of the Lenders (which consent may be withheld in their sole discretion), or the Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of the Lenders (which consent may be withheld in their sole discretion);

(viii)    the Interim Cash Collateral Order (or, if entered, the Final Cash Collateral Order), the Interim DIP Order (or, if entered, the Final DIP Order) or this Agreement is not in full force and effect, or is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the Lenders (which consent may be withheld in their sole discretion);

(ix)    this Court or any other court enters an order or judgment in this Chapter 11 Case modifying, limiting, subordinating or avoiding the priority of any Indebtedness or the perfection, priority or validity of the Lenders' pre-petition or post-petition liens on any DIP Collateral (provided, however, that if the Lenders' pre-petition liens on $100,000 or less in the aggregate of Pre-Petition Collateral are held to be invalid or subordinate, it shall not constitute a Termination Date hereunder);

(x)    the Debtor files any application for approval or allowance of, any administrative expense claim in the Chapter 11 Case, having priority over, or being pari passu with, the superadministrative priority of the Indebtedness in any amount except as to the Carve-Out (as defined below), or any order(s) is entered approving or allowing, any administrative expense claim(s) in the Chapter 11 Case, having any priority over, or being pari passu with, the superadministrative priority of the Indebtedness in excess of $100,000 in the aggregate; or

(xi)    the sum of the outstanding principal amounts of the DIP Indebtedness and the Pre-Petition Revolver Indebtedness exceeds the lesser of (a) the $13,000,000 and (b) the Borrowing Base.

9.    Security for Indebtedness.  The Lenders are hereby granted as security for the repayment of all amounts of the Lenders' Cash Collateral used by the Debtor and for the DIP Indebtedness, pursuant to §§ 363, 364(c)(2) and 364(c)(3) of the Bankruptcy Code, a valid and perfected first lien, subject only to (i) Prior Claims (as defined below) and (ii) validly filed mechanics liens for pre-petition services, on all present and after-acquired intangible, personal and real property of the Debtor of any nature whatsoever, including, without limitation, all cash contained in any account maintained by the Debtor, all causes of action existing as of the Filing Date and the proceeds thereof, all causes of action arising under the Bankruptcy Code, excluding avoidance actions under Bankruptcy Code §§ 544 through 553 inclusive, and proceeds thereof, and all real property, the title to which is held by the Debtor, or possession of which is held by the Debtor pursuant to leasehold interest (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral").  As used herein, the term "Prior Claims" shall mean (i) the pre-petition liens and security interests of the Lenders and (ii) any non-avoidable valid, enforceable and perfected liens and security interests in favor of any person or entity on or in the assets of the Debtor, as pre-petition debtor, which existed on the Filing Date and are not subject

to § 552(a) of the Bankruptcy Code, but only to the extent such liens and security interests are superior in priority to the liens and security interests of the Lenders, after giving effect to any existing subordination or intercreditor arrangements. Other than the first priority liens and security interests in favor of the Lenders pursuant to the DIP Loan Documents and this Agreement, the Prior Claims and the claims of First Insurance Funding Corp., as described more fully in the Motion filed herein on April 7, 2004, no other claims, liens or security interests whether prior to or pari passu with the claims, liens or security interests of the Lenders shall attach to the DIP Collateral in this or any superceding or subsequent chapter 11 or chapter 7 case (collectively, the "Successor Case") without the express prior written consent of the Lenders. The Lenders at their option may release at any time from their liens and security interests any assets determined by the Lenders to have a risk of environmental liabilities which the Lenders in their sole discretion deem unacceptable. Any security interest or lien upon the DIP Collateral which is avoided or otherwise preserved for the benefit of the Debtor's estate under § 551 or any other provision of the Bankruptcy Code shall be subordinate to the security interests in and liens of the Lenders upon the DIP Collateral.

10. **Limitations on Post-Petition Liens and Cross-Collateralization.** The post-petition liens and security interests granted in the DIP Collateral under the DIP Loan Documents and this Agreement shall secure the Pre-Petition Indebtedness only to the extent the value of the Pre-Petition Collateral, plus all net proceeds of sales or collections of Pre-Petition Collateral applied to the Pre-Petition Indebtedness as of any post-petition date of determination, is less than the value of the Pre-Petition Collateral as of the Filing Date (whether such decline in value is attributable to physical deterioration, consumption, use, shrinkage, decline in market value or otherwise). The Lenders shall retain all of the rights available to them pursuant to § 507(b) of the Bankruptcy Code.

11. **Perfection of New Liens.** All liens and security interests on or in the DIP Collateral granted to the Lenders by this Agreement and the DIP Loan Documents shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection. The Lenders may (in their discretion) but shall not be required to, file a certified copy of this Agreement in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property and such filing or recording shall be accepted and shall constitute further evidence of perfection of the Lenders' interests in the DIP Collateral.

12. **Modification of Automatic Stay; Other Remedies.**

(a)    Except as set forth in subparagraph (b) of this paragraph, which governs any action by the Lenders to foreclose on their liens on any DIP Collateral or to exercise any other default-related remedies (other than those specifically referenced in the next sentence), the automatic stay pursuant to § 362 of the Bankruptcy Code is hereby modified as described more fully below. The Lenders are hereby granted leave to (i) file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral, (ii) to the extent permitted by § 506(b) of the Bankruptcy Code, charge and collect any interest, fees, costs, and expenses and other amounts accruing at

any time under the DIP Loan Documents or this Agreement as provided herein or therein, (iii) to give the Debtor any notice provided for in any of the DIP Loan Documents or this Agreement, and (iv) upon the occurrence of the Termination Date, and without application or motion to, or order from the Court or any other court, (A) terminate the Pre-Petition Credit Agreement and the Post-Petition Financing under this Agreement and the other DIP Loan Documents, (B) declare all Indebtedness immediately due and payable, (C) revoke the Debtor's right, if any, under the Interim Cash Collateral Order (or, if entered, the Final Cash Collateral Order), this Agreement and/or the other DIP Loan Documents to use Cash Collateral (provided, however, that the Debtor may use the Base Operating Funds (as defined below) to pay expenses arising or occurring after the occurrence of the Termination Date until entry of the Stay Relief Order (defined below)) and (D) cease making loans or other extensions of credit under the DIP Loan Documents or this Agreement.

                (b)      Upon the occurrence of the Termination Date, the Lenders shall be entitled (i) to file an emergency motion for relief from the automatic stay for the purpose of foreclosing or otherwise enforcing their liens on any or all of the DIP Collateral and/or to exercise any other default-related remedies under the DIP Loan Documents, this Agreement or applicable law, and (ii) to obtain an expedited hearing on such motion upon four (4) days' notice to counsel for the Debtor, counsel for any official committee of unsecured creditors (the "Committee"), counsel for AFI Lending and the U.S. Trustee. The Lenders shall be entitled to such relief from the automatic stay upon a showing that a Termination Date has occurred and is continuing; provided, however, that if the Debtor pays the DIP Indebtedness in full and the Debtor proves that notwithstanding the occurrence of a Termination Date, the Lenders are and will continue to be adequately protected through August 31, 2004, the Debtor shall be entitled to seek an order of the Court to continue to use Cash Collateral limited to the Borrowing Base through August 31, 2004. Upon the entry of an order granting the Lenders relief from the automatic stay (the "Stay Relief Order") to enforce their liens or to exercise any other default-related remedies, (i) the Lenders may exercise any remedies available to the Lenders under this Agreement, the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents or applicable law, including to foreclose on the Pre-Petition Collateral and the DIP Collateral, (ii) provided that the Lenders in their sole discretion have made available to Debtor (through additional post-petition Loans or by consenting to Debtor's use of Cash Collateral) sufficient funds to pay the costs thereof, the Debtor shall cooperate with the Lenders in connection with any enforcement action by the Lenders by, among other things, (A) providing access to its premises to representatives of the Lenders, (B) providing the Lenders access to its books and records, (C) performing all other obligations set forth in the Pre-Petition Credit Agreement, the Pre-Petition Loan Documents, this Agreement and/or the other DIP Loan Documents, and (D) taking reasonable steps to safeguard and protect the Pre-Petition Collateral and the DIP Collateral until the Lenders can make adequate provision to protect and safeguard the Pre-Petition Collateral and the DIP Collateral, and the Debtor shall not otherwise interfere or encourage others to interfere with the Lenders' enforcement of their rights. In addition, after the entry of the Stay Relief Order, and provided that the Lenders in their sole discretion have made available to the Debtor (through additional post-petition loans or by consenting to the Debtor's use of Cash Collateral) sufficient funds to pay the costs thereof, the Debtor shall, at the request of the Lenders, use commercially reasonable efforts to sell or otherwise dispose of the DIP Collateral on terms and conditions acceptable to the Lenders and shall turn over the proceeds of such sale(s) or other disposition(s) to the Lenders for application to the Indebtedness in

accordance with and subject to the limitations set forth in, the provisions hereof and the DIP Loan Documents.

13.    Priority Claims.  Subject to the Carve-Out described in paragraph 14 below, the DIP Indebtedness shall have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Chapter 11 Case or any Successor Case), and shall, to the extent permitted by the Bankruptcy Code, at all times be senior to the rights of the Debtor, any successor trustee or estate representative in this Chapter 11 Case or any Successor Case.

14.    Carve-Out.

(a)    Subject to the remaining provisions of this paragraph, the Lenders' liens on and security interests in the DIP Collateral and their administrative claims under § 364(c)(1) and 502(b) of the Bankruptcy Code, respectively, shall be subject only to (i) the payment of any unpaid fees payable pursuant to 28 U.S.C. § 1930, and (ii) the payment of provisionally or finally allowed and unpaid fees and disbursements incurred by the Debtor's professionals pursuant to § 327 of the Bankruptcy Code (collectively, the "Debtor Professionals") and the professionals retained by any Committee pursuant to § 1103(a) of the Bankruptcy Code (collectively, the "Committee Professionals") in amounts not to exceed the amounts set forth for the Debtor Professionals and the Committee Professionals, respectively, in the Approved Budget, less all post-petition amounts paid to the Debtor Professionals (excluding payments from the pre-petition retainer) and any Committee Professionals (the amounts specified in clauses (i) and (ii) including the limitations therein, collectively, the "Carve-Out"). Any fees provisionally allowed shall be disgorged and not subject to the Carve-Out if not finally allowed.

(b)    Notwithstanding anything to the contrary in this Agreement or the DIP Loan Documents, no proceeds of Indebtedness or Cash Collateral (including any pre-petition retainer funded by the Lenders pursuant to the Pre-Petition Loan Documents) nor any Pre-Petition Collateral or DIP Collateral (or proceeds thereof) from the date hereof forward may be used to pay, any and all claims for services rendered by any of the Debtor Professionals or the Committee Professionals in connection with the assertion of or joinder in any claim, counterclaim, action or proceeding, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief:  (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Indebtedness or the liens and security interests of the Lenders in the Pre-Petition Collateral or the DIP Collateral; provided, however, that the foregoing limitations shall not apply to claims for services rendered by the Committee Professionals in connection with the investigation of the validity, extent, priority, avoidability or enforceability of the Pre-Petition Indebtedness or the Lenders' pre-petition liens and security interests on the Pre-Petition Collateral. Provided further, that nothing herein shall be construed to limit or control the Debtor Professionals or Committee Professionals in the exercise of their professional responsibilities to their clients, or to limit the claims or defenses they may assert. The Lenders shall retain their rights as a party in interest to object to any claims of any of the Debtor Professionals and the Committee Professionals.

FWDMAN1 332977v1

15.    Cash Collection Procedures.  From and after the date hereof, all collections and proceeds of any DIP Collateral or Pre-Petition Collateral or services provided by the Debtor and all other cash or cash equivalents as to which the Lenders have a validly perfected security interest which shall at any time come into the possession or control of the Debtor, or to which the Debtor shall become entitled at any time shall be deposited in the same bank accounts into which the collections and proceeds of the Pre-Petition Collateral were deposited under the Pre-Petition Credit Agreement (or in such other accounts as are designated by the Lenders from time to time), and such collections and proceeds upon such deposit shall be applied, to the extent permitted by this Agreement, against the Pre-Petition Indebtedness and the DIP Indebtedness as provided in this Agreement; provided, however, that prior to the occurrence of a Termination Date, only collections and proceeds in excess of $500,000 (the "Base Operating Funds") shall be applied to the Pre-Petition Indebtedness and the DIP Indebtedness, and after the occurrence of a Termination Date and prior to the entry of a Stay Relief Order, any Base Operating Funds on hand as of the occurrence of a Termination Date shall not be applied to the Pre-Petition Indebtedness or the DIP Indebtedness.

16.    Budget.  Attached as Exhibit D hereto and incorporated herein by reference is a budget (which has been approved by the Lenders) setting forth by line item all projected cash receipts and cash disbursements for the time period from April 9, 2004 through September 3, 2004 ("Initial Approved Budget"). The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) to which the Lenders and the Debtor agree in their respective sole discretion (each such additional budget, a "Supplemental Approved Budget"). The aggregate of all items approved by the Lenders in the Initial Approved Budget and any and all Supplemental Approved Budgets (acceptable to the Lenders in their discretion) shall constitute an "Approved Budget." The Lenders shall have no obligation with respect to the Debtor's use of the proceeds of the Post-Petition Financing, the DIP Collateral or Cash Collateral, and shall not be obligated to ensure or monitor the Debtor's compliance with any Approved Budget or to pay (directly or indirectly from their DIP Collateral) any expenses incurred or authorized to be incurred pursuant to the Approved Budget. Funds borrowed under this Agreement and Cash Collateral used under this Agreement shall be used by the Debtor in accordance with this Agreement, but the Debtor shall not be required to comply with the Approved Budget on a line item basis, but rather on an aggregate basis. The Lenders' consent to any Approved Budget shall not be construed as a consent to the use of any Cash Collateral or a commitment to continue to provide Post-Petition Financing after the occurrence of the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended. To induce the Lenders to permit the Debtor to use Cash Collateral and borrow additional funds, the Debtor has agreed that as long as any Indebtedness is outstanding, the Debtor shall not seek, assert, argue for, encourage or support the use of Cash Collateral of the Lenders by the Debtor except as expressly permitted and consented to by the Lenders pursuant to the terms of this Agreement; provided, however, that upon the occurrence of a material unforeseen change in the Debtor's circumstances, the Debtor may seek to use the Cash Collateral of the Lenders (subject to proving the Lenders are adequately protected) on such terms as will not cause the Lenders to suffer a material adverse effect of their rights or interests hereunder or the Lenders' collateral position as of the Filing Date less any permanent reduction of Pre-Petition Indebtedness after the Filing Date (provided, however, that the inability of the Debtor to comply with the Borrowing Base alone shall not constitute a material unforeseen change).

9

17.    Financial Covenants. The Debtor shall comply with the following financial covenants measured at the end of each week commencing with the first full week after the date hereof:

(a)    The aggregate cost of scrap for any four-week period shall not be more than 40.25% of sales of inventory for such four-week period or the Debtor shall have maintained margined dollars (sales less scrap costs) reasonably comparable to those in the Approved Budget as demonstrated by margin reports that Debtor must provide to Lenders together with any reports showing that the Debtor is not in compliance with the scrap cost covenant percentage.

(b)    The pounds of inventory sold by the Debtor (i) during any two-week period, shall be at least 75% of the amount set forth in the Approved Budget for such three-week period, (ii) during any three-week period, shall be at least 80% of the amount set forth in the Approved Budget for such three-week period, and (iii) for any four-week period, shall be at least 85% of the amount set forth in the Approved Budget for such four-week period.

(c)    The "salary payroll" expenses shall be less than 110% of the amount set forth in the Approved Budget for any four-week period.

Within two (2) Business Days after each weekly period, the Debtor shall provide the Lenders and counsel to the Committee with a certificate as to compliance or non-compliance with each of the foregoing covenants together with supporting documentation including actual figures.

18.    Other Covenants. The Debtor shall timely comply with all of the covenants set forth in this Agreement and the other DIP Loan Documents. In addition, the Debtor shall comply with the following covenants:

(a)    No later than April 26, 2004, the Debtor shall provide the Lenders with a draft plan of reorganization (the "Plan") and the accompanying disclosure statement (the "Disclosure Statement") for such Plan.

(b)    No later than May 10, 2004, the Debtor shall file with the Court (1) the Plan and the Disclosure Statement, and (2) a motion to approve the Disclosure Statement.

(c)    If and when the Debtor determines it is prudent to replace the existing Three Phase Substation Transformer, the Debtor shall use its best efforts taking into account manufacturing schedules to immediately purchase and install in Plant 2 a rebuilt 18,000 KVA Three Phase Substation Transformer, with primary voltage 67000 Delta (350 KV BIL) and secondary voltage 13090Y/7560 (110 KV BIL).

(d)    On or prior to the date hereof, (a) the order approving the Subordinated DIP shall be amended to increase the amount AFI Lending is committed to lend upon the request of the Debtor from $850,000 to $1,300,000, and (b) $1,050,000 shall be funded in cash to the Debtor.

() The Debtor shall use its best efforts (and work in good faith in cooperation with BBK) to obtain accommodation agreements in form and substance substantially similar to Exhibit C hereto with each of its five largest customers.

19. Application of Collateral Proceeds. All proceeds of Pre-Petition Collateral and DIP Collateral consisting of inventory or accounts receivable sold in the ordinary course of business shall be applied (a) first, to the DIP Indebtedness (in such order as determined by the Lenders in their sole discretion) until paid in full, and (b) second, to the Pre-Petition Revolver Indebtedness (in such order as determined by the Lenders in their sole discretion), but may, subject to the terms hereof, be re-borrowed. All other proceeds of Pre-Petition Collateral and, to the extent permitted under paragraph 10 of this Agreement, all other proceeds of DIP Collateral, shall be applied (a) first, to the Pre-Petition Indebtedness (in such order as determined by the Lenders in their sole discretion) until paid in full, and (b) second, to the DIP Indebtedness (in such order as determined by the Lenders in their sole discretion). Proceeds of Pre-Petition Collateral and DIP Collateral consisting of accounts receivable or inventory sold outside the ordinary course of business shall be applied as a permanent reduction of the Commitment. The Debtor shall not have the right to direct the manner of application of any payments to the Lenders or any other receipts by the Lenders of proceeds of any of the Pre-Petition Collateral or DIP Collateral other than in the manner set forth in this paragraph and the Pre-Petition Credit Agreement.

20. Subordinated DIP. All advances by AFI Lending to the Debtor on and after the Filing Date up to $1,300,000 (the "Subordinated DIP") shall be subject and subordinate to the DIP Indebtedness and the amount (up to $1,050,000), if any, by which the value of the Lenders' Pre-Petition Collateral, including, without limitation, Cash Collateral, has been reduced, charged, or is subject to future reduction or charge, by the incurrence of any allowable and unpaid administrative expenses, surcharges (arising under § 506(c) of the Bankruptcy Code or otherwise), liens, wage claims, taxes (including, without limitation, real estate taxes) or other items or amounts arising on or after the Filing Date (the "Priming Diminution") and the amount (up to $1,300,000 less the Priming Diminution), if any, by which the Pre-Petition Collateral consisting of cash, the collectible amount of accounts receivable and inventory has not been replaced by DIP Collateral consisting of cash, the collectible amount of accounts receivable and inventory (the "Collateral Diminution"), and, once advanced, shall not be repaid in whole or in part by the Debtor until the DIP Indebtedness has been indefeasibly paid in full, the Priming Diminution and the Collateral Diminution have been determined by the Court in a final, non-appealable order (the "Subordinated DIP Repayment Date"). On the Subordinated DIP Repayment Date, the Debtor shall repay to AFI Lending only the amount by which the Subordinated DIP exceeds the Priming Diminution and the Collateral Diminution (after taking into account payment of the Subordinated DIP). The remainder of the Subordinated DIP shall only be repaid by the Debtor after indefeasible payment in full of all of the Indebtedness.

21. No Rollup or Effect on Cramdown. Nothing set forth in this Agreement or the DIP Loan Documents shall require or entitle the Pre-Petition Revolver Indebtedness or any other Pre-Petition Indebtedness to be rolled into or become DIP Indebtedness or to receive treatment under a plan of reorganization superior to that required under §1129 of the Bankruptcy Code.

22.    <u>Books and Records</u>. The Debtor shall permit the Lenders and any authorized representatives designated by the Lenders (including, without limitation, their auditors, appraisers and financial advisors), upon reasonable notice, to visit and inspect any of the properties of the Debtor, including the Debtor's respective financial and accounting records, and to make copies and take extracts therefrom, and to discuss the Debtor's affairs, finances and business with such Debtor's officers and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably requested. Without limiting the generality of the foregoing, the Debtor shall promptly provide to the Lenders and the Lenders' designated representatives any information or data reasonably necessary to monitor the Debtor's compliance with the covenants in the DIP Loan Documents and this Agreement and to perform appraisals or other valuation analyses of any property of the Debtor; provided, however, that notwithstanding anything to the contrary, any material deviation from prior reporting standards or requests shall not be imposed unless they are reasonable under the circumstances. Nothing herein shall constitute a waiver or relinquishment by Debtor of the Attorney-Client Privilege or Attorney Work-Product Doctrine.

23.    <u>Reservation of Rights; No Waiver</u>. Neither Lenders nor Debtor waives, and expressly reserves, any and all claims, defenses, rights and remedies they have pursuant to any or all of the DIP Loan Documents, the Bankruptcy Code and/or other applicable law against the other and any officer, director, employee, agent or other representative of the other. In addition, the rights, claims and obligations of the Debtor and the rights, claims, liens, security interests, obligations and priorities of the Lenders arising under this Agreement are in addition to, and are not intended as a waiver or substitution for, the rights, obligations, claims, liens, security interests and priorities granted under the Pre-Petition Loan Documents to the extent, if any, that such rights and obligations survive the filing by the Debtor of its Chapter 11 bankruptcy petition.

24.    <u>Agreement Binding on Successors</u>. The provisions of this Agreement shall be binding upon and inure to the benefit of the Lenders, the Debtor, and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of the Debtor's estate or of any estate in any Successor Case). Except as otherwise explicitly set forth in this Agreement, no third parties are intended to be or shall be deemed to be third party beneficiaries of this Agreement or the DIP Loan Documents.

25.    <u>Effect of Dismissal or Conversion</u>. If the Chapter 11 Case is dismissed, converted, otherwise superseded, the Lenders' rights and remedies under this Agreement and the DIP Loan Documents shall be and remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, superseded. Furthermore, notwithstanding any such dismissal, conversion, supercession, all of the terms and conditions of this Agreement, including, without limitation, the liens and the priorities granted hereunder, shall remain in full force and effect, to the extent permitted by applicable law.

26.    <u>The Lenders' Relationship with Debtor</u>. In making decisions to advance any Loans or other extensions of credit to the Debtor, in administering any Loans or other extensions of credit, or in taking any other actions reasonably related to this Agreement or the Indebtedness or the DIP Loan Documents (including, without limitation, the exercise of their approval rights with respect to any budget), the Lenders shall have no liability to any third party

FWIMAN1 332977v1

and shall not be deemed to be in control of the operations of the Debtor or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), and the Lenders' relationship with the Debtor shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the Lenders and the Debtor.

27.    <u>Effect of Modification</u>.  Except as permitted hereby, the Debtor shall not, without the Lenders' prior written consent, seek to modify, vacate or amend this Agreement, the Interim Cash Collateral Order (or, if entered, the Final Cash Collateral Order), the Interim DIP Order (or, if entered, the Final DIP Order) or any DIP Loan Documents.  If any of the provisions of this Agreement are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacatur shall not affect the validity of any Indebtedness outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such Indebtedness.

28.    <u>No Marshalling</u>.  The Lenders shall not be under any obligation to marshall any assets in favor of the Debtor or any other party or against or in payment of any or all of the Indebtedness.

IN WITNESS WHEREOF, the parties hereto have hereupon set their hands as of the date first above written.

**AUBURN FOUNDRY, INC.**

By: _____

Its: _____

**BANK OF AMERICA, NATIONAL ASSOCIATION**

By: _____

Its: _____

**GMAC COMMERCIAL FINANCE,
LLC, SUCCESSOR BY MERGER TO
GMAC BUSINESS CREDIT LLC**

By: _____

Its: _____

**FI LENDING GROUP, LLC**

By: _____

Its: _____

IN WITNESS WHEREOF, the parties hereto have hereupon set their hands as of the date first above written.

AUBURN FOUNDRY, INC.

By: _Thomas Whitehill_

Its: _President_

BANK OF AMERICA, NATIONAL ASSOCIATION

By: _____

Its: _____

GMAC COMMERCIAL FINANCE, LLC, SUCCESSOR BY MERGER TO GMAC BUSINESS CREDIT LLC

By: _____

Its: _____

AFI LENDING GROUP, LLC

By: _____

Its: _____

CHI\564002.9

14

IN WITNESS WHEREOF, the parties hereto have hereupon set their hands as of the date first above written.

AUBURN FOUNDRY, INC.

By: _____

Its: _Chairman of the Bonad of Directors_

BANK OF AMERICA, NATIONAL ASSOCIATION

By: _____

Its: _____

GMAC COMMERCIAL FINANCE, LLC, SUCCESSOR BY MERGER TO GMAC BUSINESS CREDIT LLC

By: _____

Its: _____

AFI LENDING GROUP, LLC

By: _____

Its: _____

14

IN WITNESS WHEREOFF, the parties hereto have hereupon set their hands on the date first above written.

**AUBURN FOUNDRY, INC.**

By: _____

Its: _____

**BANK OF AMERICA, NATIONAL ASSOCIATION**

By: _____

Its: _____

**GMAC COMMERCIAL FINANCE, LLC, SUCCESSOR BY MERGER TO GMAC BUSINESS CREDIT LLC**

By: _____

Its: _SENIOR    VICE    PRESIDENT_

**AFI LENDING GROUP, LLC**

By: _____

Its: _____

IN WITNESS WHEREOF, the parties hereto have hereupon set their hands as of the date first above written.

AUBURN FOUNDRY, INC.

By: _____

Its: _____

BANK OF AMERICA, NATIONAL ASSOCIATION

By: _____

Its: _S.V.P. / Portfolio Manager_

GMAC COMMERCIAL FINANCE, LLC, SUCCESSOR BY MERGER TO GMAC BUSINESS CREDIT LLC

By: _____

Its: _____

AFI LENDING GROUP, LLC

By: _____

Its: _____

CH664002.8

14

## **EXHIBIT A**

Interim Cash Collateral Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

|  |  |
|---|---|
| In the Matter of: | Case No. 04-10427 |
| Auburn Foundry, Inc., | Chapter 11 |
| Debtor. | |

## INTERIM ORDER APPROVING JOINT MOTION PURSUANT TO RULE 4001(B) TO APPROVE AGREEMENT CONCERNING USE OF CASH COLLATERAL

Upon the Joint Motion of Auburn Foundry, Inc. ("Auburn" or the "Debtor") and

the Senior Lenders to Approve Agreement Concerning Use of Cash Collateral (the "Cash

Collateral Motion"), for a preliminary order and final order (a) authorizing use of cash collateral

pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules

2002 and 4001 of the Federal Rules of Bankruptcy Procedures upon the terms and conditions set

forth in this Order and the Agreement attached as Exhibit A hereto and incorporated herein by

reference (the "Agreement")[1] and (b) scheduling a hearing (the "Final Hearing") to consider

entry of a final order (the "Final Order") with respect thereto; due and sufficient notice of the

Motion and the preliminary hearing thereon (the "Preliminary Hearing") having been given

under the circumstances; the Preliminary Hearing on the Motion having been held on April 19,

2004; and upon the entire record made at the Preliminary Hearing; and the Court having found

good and sufficient cause appearing therefor;

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Agreement.

The Court hereby makes the following FINDINGS:

A.      On February 8, 2004 (the "Filing Date"), the Debtor filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is continuing in possession of its property, and operating and managing its business, as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.      This Court has jurisdiction over this Chapter 11 Case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.      Notice of the Preliminary Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) the official committee of unsecured creditors (the "Committee"), (iii) known holders of pre-petition liens against the Debtor's property, and (iv) other parties in interest who have filed requests for notice in this Chapter 11 Case with the Court. This Preliminary Hearing is being held pursuant to the provisions of Bankruptcy Rule 4001(b)(2).

D.      The Debtor, AFI Lending and the Lenders have agreed that as of the Filing Date, the Debtor was liable to the Lenders in the aggregate principal amount of approximately $23,312,638.40 in respect of loans made by the Lenders to the Debtor pursuant to the Pre-Petition Credit Agreement (plus attorneys' fees, costs and interest accrued and unpaid thereon, to the extent allowed) (the "Pre-Petition Indebtedness"). The Pre-Petition Indebtedness includes $10,901,915.66 of Revolving Loans (including undrawn Letters of Credit) and $12,410,722.74 of Term Loans. The Pre-Petition Indebtedness consisting of Revolving Loans (including all undrawn Letters of Credit) plus attorneys' fees, costs and interest accrued and unpaid thereon, to the extent allowed, is referred to herein as the "Pre-Petition Revolver Indebtedness."

2

E.     The Debtor has requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b).  The permission granted herein to use Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtor.  This Court concludes that entry of this Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for the flow of supplies and services to the Debtor necessary to sustain the operation of the Debtor's existing business.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.     <u>Motion Granted</u>.  The Motion is granted, subject to the terms and conditions set forth in this Order and the Agreement.

2.     <u>Agreement Approved</u>.  The Agreement is hereby approved in all respects.

3.     <u>Authorization</u>.  Upon the terms and conditions set forth in the Agreement, the Debtor is expressly authorized and empowered to use Cash Collateral, and enter into and perform its obligations under the Agreement and the other DIP Loan Documents.

4.     <u>Replacement Liens</u>.  The Lenders are hereby granted as security for the repayment of all amounts of the Lenders' Cash Collateral used by the Debtor, pursuant to § 363 of the Bankruptcy Code, a valid and perfected lien and security interest in the DIP Collateral with the priority set forth in paragraph 9 of the Agreement.  Other than the liens and security interests in favor of the Lenders pursuant to the Agreement, the DIP Loan Documents and this Order, the Prior Claims and the claims of First Insurance Funding Corp., as described more fully in the Motion filed herein on April 7, 2004, no other claims, liens or security interests prior to or pari passu with the claims, liens or security interests of the Lenders shall attach to the DIP

Collateral in this or any superceding or subsequent chapter 11 or chapter 7 case (collectively, the "Successor Case") without the express prior written consent of the Lenders.

5.      <u>Limitations on Post-Petition Liens and Cross Collateralization</u>. The post-petition liens and security interests granted in the DIP Collateral shall secure the Pre-Petition Indebtedness only to the limited extent set forth in paragraph 10 of the Agreement. The Lenders shall retain all of the rights available to them pursuant to § 507(b) of the Bankruptcy Code.

6.      <u>Modification of Automatic Stay</u>. The automatic stay pursuant to § 362 of the Bankruptcy Code is hereby modified on the limited basis described in paragraph 12 of the Agreement. Upon the occurrence of a Termination Date, the Lenders shall be entitled to, among other things, (i) revoke the Debtor's right, if any, under this Order, the Agreement and the DIP Loan Documents to use Cash Collateral (provided, however, that the Debtor may use the Base Operating Funds to pay expenses arising or occurring after the occurrence of a Termination Date until entry of the Stay Relief Order (as defined below)), (ii) file an emergency motion for relief from the automatic stay for the purpose of foreclosing or otherwise enforcing their liens on any or all of the DIP Collateral and/or to exercise any other default-related remedies under the Agreement, the DIP Loan Documents, this Order or applicable law, and (iii) to obtain an expedited hearing on such motion upon four (4) days' notice to counsel for the Debtor, counsel for any Committee, counsel for AFI Lending, and the U.S. Trustee. The Lenders shall be entitled to such relief from the automatic stay (a "Stay Relief Order") upon a showing that a Termination Date has occurred and is continuing; provided, however, that if the Debtor pays the DIP Indebtedness in full and the Debtor proves that notwithstanding the occurrence of a Termination Date, the Lenders are and will continue to be adequately protected through August

31, 2004, the Debtor shall be entitled to seek an order of the Court to continue to use Cash Collateral limited to the Borrowing Base through August 31, 2004.

7.    <u>Limitation on Right to Seek Further Use of Cash Collateral</u>.  To induce the Lenders to permit the Debtor to use Cash Collateral and borrow additional funds, the Debtor has agreed that as long as any Indebtedness is outstanding, the Debtor shall not seek, assert, argue for, encourage or support the use of Cash Collateral of the Lenders by the Debtor except as expressly permitted and consented to by the Lenders pursuant to the terms of this Agreement; provided, however, that upon the occurrence of a material unforeseen change in the Debtor's circumstances, the Debtor may seek to use the Cash Collateral of the Lenders (subject to proving the Lenders are adequately protected) on such terms as will not cause the Lenders to suffer a material adverse effect of their rights or interests hereunder or the Lenders' collateral position as of the Filing Date less any permanent reduction of Pre-Petition Indebtedness after the Filing Date (provided, however, that the inability of the Debtor to comply with the Borrowing Base alone shall not constitute a material unforeseen change).

8.    <u>Perfection of New Liens</u>.  All liens and security interests on or in the DIP Collateral granted to the Lenders by this Agreement and the DIP Loan Documents shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection. The Lenders may (in their discretion) but shall not be required to, file a certified copy of this Agreement in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property and such filing or recording shall

be accepted and shall constitute further evidence of perfection of the Lenders' interests in the DIP Collateral.

        9.     Binding on Successors.  The provisions of this Order and the Agreement shall be binding upon and inure to the benefit of the Lenders, the Debtor, and their respective successors and assigns (including any trustee or other estate representative appointed as a representative of the Debtor's estate or of any estate in any Successor Case).  Except as otherwise explicitly set forth in this Order or the Agreement, no third parties are intended to be or shall be deemed to be third party beneficiaries of this Order, the Agreement or the DIP Loan Documents.

        10.    Effect of Dismissal or Conversion.  If the Chapter 11 Case is dismissed, converted, otherwise superseded, the Lenders' rights and remedies under this Order, the Agreement and the DIP Loan Documents shall be and remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, superseded.  Furthermore, notwithstanding any such dismissal, conversion, supercission, all of the terms and conditions of this Order and the Agreement, including, without limitation, the liens and the priorities granted hereunder and thereunder, shall remain in full force and effect, to the extent permitted by applicable law.

        11.    Effect of Modification.  Except as permitted hereby, the Debtor shall not, without the Lenders' prior written consent, seek to modify, vacate or amend this Order, the Agreement or any DIP Loan Documents.  If any of the provisions of this Order or the Agreement are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacatur shall not affect the validity of any Indebtedness outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and

6

enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such Indebtedness.

12.    Subsequent Hearing; Procedure for Objections and Entry of Final Order. The Motion is set for a Final Hearing before this Court at ___ _.m. on _____, 2004 (such date or such later date to which the Final Hearing is adjourned or continued with the Lenders' prior consent, the "Final Hearing Date"), at which time any party in interest may present any timely filed objections to the entry of a Final Order. The Debtor shall promptly serve a notice of entry of this Order and the Final Hearing, together with a copy of this Order, by regular mail upon (i) the parties identified in finding paragraph C hereof, and (ii) any other party which theretofore has filed in the Chapter 11 Case a request for special notice with this Court and served such request upon Debtor's counsel. The notice of the entry of this Order and the Final Hearing shall state that objections to the entry of a Final Order on the Motion shall be in writing and shall be filed with the United States Bankruptcy Clerk for the Northern District of Indiana no later than _____, 2004, which objections shall be served so that the same are received on or before 4:00 p.m. (Eastern time) of such date by (i) John Burns, Baker & Daniels, 111 East Wayne Street, Suite 800, Fort Wayne, Indiana 46802, counsel to the Debtor, (ii) Josef Athanas, Latham & Watkins LLP, 5800 Sears Tower, 233 South Wacker Drive, Chicago, Illinois 60606, counsel to the Lenders and (iii) the United States Trustee. Any objections by creditors or other parties in interest to any of the provisions of this Order shall be deemed waived unless filed and served in accordance with this paragraph. This Order shall expire upon the earlier of a Final Order or three (3) Business Days after the Final Hearing Date (the "Expiration Date").

13.    Effect of Failure of Final Order to be Entered. If a Final Order substantially identical to this Order is not entered or a Final DIP Order substantially identical to

the Interim DIP Order entered contemporaneously herewith is not entered on or prior to the Expiration Date, all DIP Indebtedness shall be immediately due and payable, the Lenders' consent to the use of Cash Collateral shall terminate and the Agreement shall terminate. The Lenders shall be entitled to the benefits of the Agreement for the period prior to the Expiration Date, but on and after the Expiration Date, the parties shall no longer be bound by the Agreement and the Debtor shall be free to seek the use of Cash Collateral from the Court (and the Lenders shall be free to object thereto).

14.    Objection Overruled or Withdrawn.  All objections to the entry of this Order have been withdrawn or overruled.

15.    Controlling Effect.  To the extent any provisions in this Order or the Agreement conflict with any provisions of the Motion, any Pre-Petition Loan Documents, any DIP Loan Documents, any prior debtor-in-possession financing order or any prior cash collateral order, the provisions of this Order and the Agreement shall control.

16.    Order Effective.  This Order shall be effective as of the date of signature by the Court.

IT IS SO ORDERED.

DATED this _____ day of April, 2004.

_____
UNITED STATES BANKRUPTCY JUDGE

## **Exhibit A**

Agreement

# EXHIBIT B

Interim DIP Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

|  |  |  |
|---|---|---|
| In the Matter of: | ) | Case No. 04-10427 |
|  | ) |  |
| Auburn Foundry, Inc., | ) | Chapter 11 |
|  | ) |  |
| Debtor. | ) |  |

## INTERIM ORDER APPROVING JOINT MOTION PURSUANT TO RULE 4001(C) TO APPROVE AGREEMENT CONCERNING SENIOR DIP FINANCING

Upon the Joint Motion of Auburn Foundry, Inc. ("Auburn" or the "Debtor") and the Senior Lenders to Approve Agreement Concerning Senior DIP Financing (the "DIP Motion"), for a preliminary order and final order (a) authorizing the Debtor to obtain post-petition financing pursuant to section 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 4001(c) of the Federal Rules of Bankruptcy Procedures upon the terms and conditions set forth in this Order and the Agreement attached as Exhibit A hereto and incorporated herein by reference (the "Agreement")[1] and (b) scheduling a hearing (the "Final Hearing") to consider entry of a final order (the "Final Order") with respect thereto; due and sufficient notice of the Motion and the preliminary hearing thereon (the "Preliminary Hearing") having been given under the circumstances; the Preliminary Hearing on the Motion having been held on April 19, 2004; and upon the entire record made at the Preliminary Hearing; and the Court having found good and sufficient cause appearing therefor;

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Agreement.

The Court hereby makes the following FINDINGS:

A.    On February 8, 2004 (the "Filing Date"), the Debtor filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is continuing in possession of its property, and operating and managing its business, as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.    This Court has jurisdiction over this Chapter 11 Case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.    The Debtor is unable to obtain unsecured credit on terms more favorable than those described herein.

D.    The Debtor, AFI Lending and the Lenders have agreed that as of the Filing Date, the Debtor was liable to the Lenders in the aggregate principal amount of approximately $23,312,638.40 in respect of loans made by the Lenders to the Debtor pursuant to the Pre-Petition Credit Agreement (plus attorneys' fees, costs and interest accrued and unpaid thereon, to the extent allowed) (the "Pre-Petition Indebtedness"). The Pre-Petition Indebtedness includes $10,901,915.66 of Revolving Loans (including undrawn Letters of Credit) and $12,410,722.74 of Term Loans. The Pre-Petition Indebtedness consisting of Revolving Loans (including all undrawn Letters of Credit) plus attorneys' fees, costs and interest accrued and unpaid thereon, to the extent allowed, is referred to herein as the "Pre-Petition Revolver Indebtedness."

E.    Notice of the Preliminary Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) the official committee of unsecured creditors (the "Committee"), (iii) known holders of pre-petition liens against the Debtor's property, and (iv) other parties in interest who have filed requests for notice in this

Chapter 11 Case with the Court. This Preliminary Hearing is being held pursuant to the provisions of Bankruptcy Rule 4001(c)(2).

      F.      Based on the record presented to this Court by the Debtor, it appears (and the Debtor and the Lenders have stipulated) that the Post-Petition Financing has been negotiated in good faith and at arm's-length between the Debtor and the Lenders, and any credit extended and loans made to the Debtor pursuant to this Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, Bankruptcy Code § 364(e).

      G.      Based on the record before this Court, it appears (and the Debtor and the Lenders have stipulated) that the terms of this Order, including, without limitation, the terms of the Post-Petition Financing, are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.

      H.      The Debtor has requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(c). The permission granted herein to enter into post-petition financing is necessary to avoid immediate and irreparable harm to the Debtor. This Court concludes that entry of this Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for the flow of supplies and services to the Debtor necessary to sustain the operation of the Debtor's existing business.

      Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

      **IT IS HEREBY ORDERED** that:

      1.      <u>Motion Granted</u>. The Motion is granted, subject to the terms and conditions set forth in this Order and the Agreement.

      2.      <u>Agreement Approved</u>. The Agreement is hereby approved in all respects.

3.    <u>Authorization</u>.  Upon the terms and conditions set forth in the Agreement, the Debtor is expressly authorized and empowered to borrow money, and enter into and perform its obligations under the Agreement and the other DIP Loan Documents.

4.    <u>Security for DIP Indebtedness</u>.  The Lenders are hereby granted as security for the repayment of all DIP Indebtedness, pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code, a valid and perfected lien and security interest in the DIP Collateral with the priority set forth in paragraph 9 of the Agreement.  Other than the liens and security interests in favor of the Lenders pursuant to the Agreement, the DIP Loan Documents and this Order, the Prior Claims and the claims of First Insurance Funding Corp., as described more fully in the Motion filed herein on April 7, 2004, no other claims, liens or security interests prior to or <u>pari passu</u> with the claims, liens or security interests of the Lenders shall attach to the DIP Collateral in this or any superceding or subsequent chapter 11 or chapter 7 case (collectively, the "<u>Successor Case</u>") without the express prior written consent of the Lenders.

5.    <u>Perfection of New Liens</u>.  All liens and security interests on or in the DIP Collateral granted to the Lenders by the Agreement and the DIP Loan Documents shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection.  The Lenders may (in their discretion) but shall not be required to, file a certified copy of the Agreement in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property and such filing or recording shall be accepted and shall constitute further evidence of perfection of the Lenders' interests in the DIP Collateral.

6.      Modification of Automatic Stay.  The automatic stay pursuant to § 362 of the Bankruptcy Code is hereby modified on the limited basis described in paragraph 12 of the Agreement.  Upon the occurrence of a Termination Date, the Lenders shall be entitled to, among other things, (i) immediately cease making loans or extensions of credit, (ii) file an emergency motion for relief from the automatic stay for the purpose of foreclosing or otherwise enforcing their liens on any or all of the DIP Collateral and/or to exercise any other default-related remedies under the Agreement, the DIP Loan Documents, this Order or applicable law, and (iii) to obtain an expedited hearing on such motion upon four (4) days' notice to counsel for the Debtor, counsel for any Committee, counsel for AFI Lending and the U.S. Trustee.  The Lenders shall be entitled to such relief from the automatic stay upon a showing that a Termination Date has occurred and is continuing; provided, however, that if the Debtor pays the DIP Indebtedness in full and the Debtor proves that notwithstanding the occurrence of a Termination Date, the Lenders are and will continue to be adequately protected through August 31, 2004, the Debtor shall be entitled to seek an order of the Court to continue to use Cash Collateral limited to the Borrowing Base through August 31, 2004.

7.      Priority Claims.  Subject to the Carve-Out described in paragraph 14 of the Agreement, the DIP Indebtedness shall have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Chapter 11 Case or any Successor Case), and shall, to the extent permitted by the Bankruptcy Code, at all times be senior to the rights of the Debtor, any successor trustee or estate representative in this Chapter 11 Case or any Successor Case.

8.    Subordinated DIP. All advances by AFI Lending to the Debtor on and

after the Filing Date (the "Subordinated DIP") shall be subject and subordinate to the DIP

Indebtedness and the amount (up to $1,050,000), if any, by which the value of the Lenders' Pre-

Petition Collateral, including, without limitation, Cash Collateral, has been reduced, charged, or

is subject to future reduction or charge, by the incurrence of any allowable and unpaid

administrative expenses, surcharges (arising under § 506(c) of the Bankruptcy Code or

otherwise), liens, wage claims, taxes (including, without limitation, real estate taxes) or other

items or amounts arising on or after the Filing Date (the "Priming Diminution") and the amount

(up to $1,300,000 less the Priming Diminution), if any, by which the Pre-Petition Collateral

consisting of cash, the collectible amount of accounts receivable and inventory has not been

replaced by DIP Collateral consisting of cash, the collectible amount of accounts receivable and

inventory (the "Collateral Diminution"), and, once advanced, shall not be repaid in whole or in

part by the Debtor until the DIP Indebtedness has been indefeasibly paid in full, the Priming

Diminution and the Collateral Diminution have been determined by the Court in a final, non-

appealable order (the "Subordinated DIP Repayment Date"). On the Subordinated DIP

Repayment Date, the Debtor shall repay to AFI Lending only the amount by which the

Subordinated DIP exceeds the Priming Diminution and the Collateral Diminution (after taking

into account payment of the Subordinated DIP). The remainder of the Subordinated DIP shall

only be repaid by the Debtor after indefeasible payment in full of all of the Indebtedness.

9.    Binding on Successors. The provisions of this Order and the Agreement

shall be binding upon and inure to the benefit of the Lenders, the Debtor, and their respective

successors and assigns (including any trustee or other estate representative appointed as a

representative of the Debtor's estate or of any estate in any Successor Case). Except as

6

otherwise explicitly set forth in this Order or the Agreement, no third parties are intended to be or shall be deemed to be third party beneficiaries of this Order, the Agreement or the DIP Loan Documents.

          10.    Effect of Dismissal or Conversion. If the Chapter 11 Case is dismissed, converted, otherwise superseded, the Lenders' rights and remedies under this Order, the Agreement and the DIP Loan Documents shall be and remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, superseded. Furthermore, notwithstanding any such dismissal, conversion, supercission, all of the terms and conditions of this Order and the Agreement, including, without limitation, the liens and the priorities granted hereunder and thereunder, shall remain in full force and effect, to the extent permitted by applicable law.

          11.    Lenders' Relationship with Debtor. In making decisions to advance any Loans or other extensions of credit to the Debtor, in administering any Loans or other extensions of credit, or in taking any other actions reasonably related to this Order or the Indebtedness or the DIP Loan Documents (including, without limitation, the exercise of their approval rights with respect to any budget), the Lenders shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtor or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), and the Lenders' relationship with the Debtor shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the Lenders and the Debtor.

7

12.    <u>Effect of Modification</u>. Except as permitted hereby, the Debtor shall not, without the Lenders' prior written consent, seek to modify, vacate or amend this Order, the Agreement or any DIP Loan Documents. If any of the provisions of this Order or the Agreement are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacatur shall not affect the validity of any Indebtedness outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such Indebtedness.

13.    <u>Safe Harbor</u>. The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtor to obtain credit on the terms and conditions upon which the Debtor and the Lenders have agreed. Thus, each of such terms and conditions constitutes a part of the authorization under § 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in § 364(e) of the Bankruptcy Code.

14.    <u>Subsequent Hearing; Procedure for Objections and Entry of Final Order</u>. The Motion is set for a Final Hearing before this Court at ___ _.m. on _____, 2004 (such date or such later date to which the Final Hearing is adjourned or continued with the Lenders' prior consent, the "<u>Final Hearing Date</u>"), at which time any party in interest may present any timely filed objections to the entry of a Final Order. The Debtor shall promptly serve a notice of entry of this Order and the Final Hearing, together with a copy of this Order, by regular mail upon (i) the parties identified in finding paragraph E hereof, and (ii) any other party which theretofore has filed in the Chapter 11 Case a request for special notice with this Court and served such request upon Debtor's counsel. The notice of the entry of this Order and the Final

8

Hearing shall state that objections to the entry of a Final Order on the Motion shall be in writing and shall be filed with the United States Bankruptcy Clerk for the Northern District of Indiana no later than _____, 2004, which objections shall be served so that the same are received on or before 4:00 p.m. (Eastern time) of such date by (i) John Burns, Baker & Daniels, 111 East Wayne Street, Suite 800, Fort Wayne, Indiana 46802, counsel to the Debtor, (ii) Josef Athanas, Latham & Watkins LLP, 5800 Sears Tower, 233 South Wacker Drive, Chicago, Illinois 60606, counsel to the Lenders and (iii) the United States Trustee. Any objections by creditors or other parties in interest to any of the provisions of this Order shall be deemed waived unless filed and served in accordance with this paragraph. This Order shall expire upon the earlier of the entry of a Final Order or three (3) Business Days after the Final Hearing Date (the "Expiration Date").

15.    No Marshalling. The Lenders shall not be under any obligation to marshal any assets in favor of the Debtor or any other party or against or in payment of any or all of the Indebtedness.

16.    Effect of Failure of Final Order to be Entered. If a Final Order substantially identical to this Order is not entered or a Final Cash Collateral Order substantially identical to the Interim Cash Collateral Order entered contemporaneously herewith is not entered on or prior to the Expiration Date, all DIP Indebtedness shall be immediately due and payable, the Lenders' consent to the use of Cash Collateral shall terminate and the Agreement shall terminate. The Lenders shall be entitled to the benefits of the Agreement for the period prior to the Expiration Date, but on and after the Expiration Date, the parties shall no longer be bound by the Agreement and the Debtor shall be free to seek the use of Cash Collateral from the Court (and the Lenders shall be free to object thereto).

17.    <u>Objections Overruled or Withdrawn</u>.  All objections to the entry of this Order have been withdrawn or overruled.

18.    <u>Controlling Effect</u>.  To the extent any provisions in this Order or the Agreement conflict with any provisions of the Motion, any Pre-Petition Loan Documents, any DIP Loan Documents, any prior cash collateral order or any prior debtor-in-possession financing order, the provisions of this Order and the Agreement shall control.

19.    <u>Order Effective</u>.  This Order shall be effective as of the date of signature by the Court.

IT IS SO ORDERED.

DATED this _____ day of April, 2004.


_____
UNITED STATES BANKRUPTCY JUDGE

10

# Exhibit A

Agreement

## EXHIBIT C

Form of Accommodation Agreement

shipments, misshipments, improper invoices, mispricing, duplicate payments, billing errors, premium freight (to the extent necessary to avoid product interruption charges and not caused by GM) or professional fees and costs incurred by GM related to Auburn Foundry;

2.      the Pre-Petition Setoff; and

3.      payments made by GM to Auburn Foundry's vendors or the cost of raw materials or other inventory GM supplies or causes to be supplied to Auburn Foundry (provided that GM may only assert setoffs for such payments against accounts payable arising more than 3 business days after the Senior Lenders' receipt of written notice from GM advising that payments have been made to Auburn Foundry's vendors or inventory supplied and the amount of such payments or the cost of such inventory).

d.      Except for the Pre-Petition Setoff, Allowed Setoffs specifically include any

consequential or special damages, provided, however, under no circumstances shall Allowed

Setoffs exceed ten percent (10%) of its aggregate accounts payable to Auburn Foundry, provided

further, that once Allowed Setoffs are asserted against a particular invoice(s) or account(s)

receivable, no further Allowed Setoffs may be taken against such invoice(s) or account(s)

receivable. For further clarification, with respect to vendor payments made by GM, if GM has

made such payments to Auburn Foundry's vendors because Auburn Foundry's vendors refuse to

ship to Auburn Foundry, GM must give the Senior Lenders written notice of or claimed setoff

and such setoff can only be asserted against accounts payable arising more than 3 business days

after Senior Lenders' receipt of such written notice. Any Allowed Setoffs that cannot be used by

GM because of the 10% limitation provided for above may be carried forward and used against

future accounts (but in all cases subject to the foregoing 10% limitation of the aggregate amount

of GM's post-petition payables to Auburn Foundry).

e.     Subject to the agreements which are intended for the sole benefit of Senior

Lenders, GM reserves and does not waive any rights and interests it may have, but for this

Agreement, including the right to assert affirmative claims against Auburn Foundry, the right to

assert setoffs for defensive purposes (than to defend against claims for payment of accounts) and

the right to cancel or terminate purchase orders or other contracts in accordance with their

respective terms and conditions.

f.     In consideration of GM's agreement set forth at sub-section (c) above, each of the

Senior Lenders and Auburn Foundry agree that to the extent at any time insufficient financing

exists to fund all of the raw material and other related requirements for Auburn Foundry's

production for its customers, the available financing will be used first to fund those expenses

associated with production for GM under the post-petition contract referenced at section II below

and other customers who have signed agreements substantially similar to this agreement.

## II.     POST-PETITION CONTRACT

a.     GM and Auburn Foundry will enter into a post-petition contract, incorporating the

terms and conditions set forth in the existing contracts between GM and Auburn Foundry except

as modified in this Section II(a) only, whereby Auburn Foundry will supply the same parts post-

petition that it is supplying pre-petition during the term of the post-petition contract. Subject to

confirming that the increase in raw scrap price equals or exceeds twenty percent (20%) and that

the increase is necessary to allow Auburn Foundry to break even regarding the GM production,

pricing of the post-petition contract parts will be twenty percent (20%) higher than existing

contract prices for such parts through the term of this contract (the "April 1 Contract Price"). In

the event the published Chicago market price for #1 bushling for the first full week of a given

month between May and July, 2004 as reported in the *Iron Age Scrap Bulletin* increases by ten

percent (10%) or more above the Iron Age Scrap Bulletin price for the first week of April, 2004

(the "Reference Price"), then Auburn Foundry will be entitled to an additional two percent (2%)

price increase above the April 1 Contract Price for the remaining term of the post-petition

contract. For clarity, at no time during the period April 1, 2004 through August 1, 2004, shall

the purchase price exceed the April 1 Contract Price, plus 2%. For the period after August 1,

2004 through December 23, 2004, Auburn Foundry shall be entitled to an increase of 4% above

the April 1 Contract Price, if the published Chicago market price for #1 bushling for the first full

week in any given month between September and December, 2004 as reported in the *Iron Age*

*Scrap Bulletin* increases by 16% or more above the Reference Price prior to the termination of

the agreement on December 23, 2004. For clarity, at no time during the period August 1, 2004

through December 23, 2004 shall the purchase price exceed the April 1, Contract price, plus 4%.

Any adjustment in accordance with the above shall be effective on the fifteenth (15th) day of the

month in which the respective percentage increase is terminated. Notwithstanding the foregoing,

if GM should propose a scrap purchase program to Auburn Foundry that provides it an

equivalent economic benefit to the alternative set forth in this Section II(a), the Auburn Foundry

agrees to evaluate, in good faith, any such proposals by GM.

      b.    The term of the post-petition contract shall be April 1, 2004 through

December 23, 2004.

      c.    Auburn Foundry will build inventory banks upon GM's request subject to

capacity constraints, availability of financing and ramp-up requirements. Commencing in the

first full week of April, 2004, Auburn Foundry will meet GM increases in product release

requests in excess of present levels by more than fifteen percent (15%) if firm release requests

4

are given to Auburn Foundry by GM four weeks in advance of actual requirements. If GM increases its release requests by more than twenty percent (20%) over present levels, such increases shall be by separate purchase orders and such purchase orders shall be payable thirty (30) days after GM's receipt of such parts. GM will make an advance payment of $50,000.00 on amounts otherwise payable to Auburn Foundry in May, 2004 on or about the date of the set-off described in I(b) and shall make an advance payment of $50,000.00 on amounts otherwise payable to Auburn Foundry in June, 2004 on or about May 2, 2004.

       d.     If there is equipment owned by Auburn Foundry that is dedicated solely to the production of GM product and not otherwise useable by Auburn Foundry, Auburn Foundry will grant GM the first opportunity to purchase that equipment at a mutually agreeable price before selling such equipment to others; provided, however, that Auburn Foundry shall not sell any such equipment without either (1) the prior written consent of the Agent, or (2) an order of the Bankruptcy Court of the Northern District of Indiana after notice and a hearing at which the Agent shall have the right to object.

       e.     Provide GM and its representatives access to information and Auburn Foundry's operations at reasonable times and upon reasonable notice so as not to unduly interfere with Auburn Foundry's operations. In order to receive non-public information, GM will sign a Confidentiality Agreement if requested by Auburn Foundry, and Auburn Foundry reserves the right not to disclose proprietary information, or information that it deems confidential to its business operations.

       f.     Auburn Foundry will cooperate with GM's reasonable resourcing consistent with the provisions of this agreement in the event of a default by Auburn Foundry under the post-

5

petition contract with GM (if any such contract is entered into) after expiration of any notice or cure periods in such contract, if any, or upon expiration of such contract.

       g.      Upon payment in full of all post-petition invoices owed to Auburn Foundry without setoffs or defenses, other than Allowed Setoffs, or entry of an order by the Bankruptcy Court for the Northern District of Indiana that Auburn Foundry does not have a possessory lien on the GM owned tooling, GM shall have the right to possession of the GM owned tooling.

### III.    TOOLING ACKNOWLEDGMENT

a.      Auburn Foundry acknowledges and agrees that, exclusive of Auburn Owned Tooling (as defined below), all tooling, dies, test and assembly fixtures, jigs, gauges, patterns, casting patterns, cavities, molds, and documentation, including engineering specifications and test reports, together with any accessions, attachments, parts, accessories, substitutions, replacements, and appurtenances thereto used by Auburn Foundry in connection with its manufacture of the component parts for GM (collectively "GM Tooling") are owned by GM and are being held by Auburn Foundry or, to the extent Auburn Foundry has transferred GM's Tooling to third parties, by such third parties, as bailees at will.  For purposes of this Agreement, the term "Auburn Owned Tooling" means all tooling, dies, tests and assembly fixtures, jigs, gauges, patters, casting patterns, cavities, molds, and documentation, including engineering specifications and test reports, together with any accessions, attachments, parts, accessories, substitutions, replacements and appurtenances thereto, for which GM has not made full payment of the applicable purchase order price or which is not subject to a purchase order.  Each item of Auburn Owned Tooling will become and be considered GM Tooling under the terms of this Agreement once it has been paid for in full in accordance with the terms of the applicable purchase order related thereto, without setoff or recoupment by GM.  Additionally, GM Tooling does not include any tooling manufactured by Auburn Foundry on or after the date of the execution of this agreement under a purchase order for GM unless and until such tooling has been fully paid for by GM without setoff or recoupment.

b.      On or before May 31, 2004, Auburn Foundry will supply to GM and the Agent a list of Auburn Owned Tooling.  Any tooling utilized to manufacture component parts for GM not included on the list of Auburn Owned Tooling shall be deemed GM Tooling unless the Agent

7

objects in writing within ten (10) days thereafter. Auburn Foundry will cooperate with GM in

determining which of Auburn Foundry's tooling is Auburn Owned Tooling or GM Tooling. If a

party objects to the tooling list, GM and the Agent shall each select an independent accountant

(whose fees and costs shall be paid by the respective party) who shall determine the status of any

tooling in dispute. If the two independent accountants cannot agree, the dispute will be referred

to binding arbitration with all costs and expenses shared equally. Should either the Agent or GM

fail to appoint an accountant within ten (10) days after a timely objection by either party, the

status of any disputed tooling shall be determined by the independent accountant selected by GM

or the Agent, as the case may be, acting alone.

       c.     No person or entity other than GM has any right, title or interest in GM Tooling.

Upon payment in full of all post-petition invoices owed to Auburn Foundry without setoffs or

defenses, other than Allowed Setoffs, or entry of an order by the Bankruptcy Court for the

Northern District of Indiana that Auburn Foundry does not have a possessory lien on the GM

Tooling, GM shall have the right to possession of the GM Tooling.

## IV.   PAYMENT OF PRE-PETITION PAYABLE

       a.     In anticipation of execution of this agreement, GM wire transferred $402,011.00

in payment for pre-petition products sold by Auburn Foundry to GM.

       b.     On or before March 15, 2004, GM and Auburn Foundry will file a joint motion

seeking court approval of the terms of this agreement, including approving the Pre-Petition

Setoff by GM under §533 of the Bankruptcy Code in the amount of $150,000.00 in favor of GM.

The Pre-Petition Setoff, when approved by the Bankruptcy Court, shall be immediately effective

as payment in part of the rejection damages that will be incurred by GM based upon the differential between the existing contract price of the post-petition contract price.

## V.    THIRD PARTY BENEFICIARIES

The Agent and the Senior Lenders are intended third party beneficiaries of this agreement and this agreement cannot be amended without the express written consent of all parties hereto.

General Motors Corporation

By:_____

Its:_____

Auburn Foundry, Inc., Debtor-In-Possession

By:_____

Its:_____

**EXHIBIT D**

Budget

Auburn Foundry, Inc.
Cash Flow and Collateral Forecast
Actual through April 9th and forecast through August 2004 - $000's

c. Estimated amount of prepetition vacation days. Total yearly payment of $1,000 equals $83 per month times 3.75 months are prepetition reminder is post petition