*CK# 1092    150*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | CHAPTER 11 |
| AUBURN FOUNDRY, INC. | ) | BK CASE NO. 04-10427 |
| | ) | |
| Debtor. | ) | |

## MOTION FOR RELIEF FROM AUTOMATIC STAY

Edwin P. Rosebrock ("Rosebrock"), by counsel, requests that the Bankruptcy Court enter

an Order granting him relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) to enable

Rosebrock to exercise his rights under the applicable non-bankruptcy law with respect to the

contractual and other issues raised in Cause No. 1:03-CV-337 in the United States District Court

for the Northern District of Indiana Fort Wayne Division.  In support of its motion, Rosebrock

states as follows:

1.      On or about September 5, 2003, Rosebrock filed his Amended Verified

Complaint in Cause No. 1:03CV3337 in the United States District Court for the Northern District

of Indiana Fort Wayne Division naming Auburn Foundry, Inc.; Glass, Molders, Pottery, Plastics

& Allied Workers Union, Local 322; and Matthew McCarty, President of Local 322, as

Defendants.  (See copy attached hereto as Exhibit A.)

2.      On or about February 8, 2004, Auburn Foundry, Inc., ("Auburn Foundry") filed a

voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy

Code"), commencing BK Case No. 04-10427.

3.      On February 18, 2004, Auburn Foundry filed a Notice of Bankruptcy with the

United States District Court Northern District of Indiana Fort Wayne Division in Cause No.

1:03-CV-337.  (See copy attached hereto as Exhibit B.)

4.      On February 19, 2004, Judge William C. Lee issued an order to mark Cause No. 1:03-CV-337 closed due to the Automatic Stay imposed by the Bankruptcy Court in Cause No. BK Case No. 04-10427.  (See copy attached hereto as Exhibit C.)

5.      This Court has jurisdiction to hear and decide this Motion for Relief pursuant to 28 U.S.C. §§ 157 and 1334.

6.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).

7.      Since February 8, 2004, Auburn Foundry has continued to operate its business and manage its affairs as a debtor in possession.

8.      On or about March 25, 2004, Rosebrock filed his claim in this case for damages arising out of his claims in Cause No. 1:03-CV-337.

9.      On or about November 10, 2004, Rosebrock filed his amended claim in this case for damages arising out of his claims in Cause No. 1:03-CV-337.

10.      Rosebrock's claims in Cause No. 1:03-CV-337 arise from the contractual obligations of a Collective Bargaining Agreement between Auburn Foundry and Local 322 of the Glass, Molders, Pottery, Plastics & Allied Workers Union and an arbitration award issued on March 5, 2003.

11.      Rosebrock has suffered, and continues to suffer, immediate and irreparable injury by virtue of being restrained from exercising his contractual rights and his rights under applicable non-bankruptcy law with respect to the damages claimed in Cause No. 1:03-CV-337.

12.      But for the automatic stay, Rosebrock would be able to pursue his claims against the three defendants named in Cause No. 1:03-CV-337.

WHEREFORE, Rosebrock respectfully requests that the Bankruptcy Court terminate the automatic stay against Rosebrock pursuant to 11 U.S.C. §362(d)(1) of the Bankruptcy Code so that Rosebrock may pursue any and all rights and remedies available to him under applicable

non-bankruptcy law with respect to Cause No. 1:03-CV-337 in order to liquidate the claims for administration under the plan of reorganization and grant to Rosebrock such other and further relief as the Court deems just and proper in the premises.

Respectfully submitted,

EILBACHER FLETCHER, LLP

Patrick L. Proctor, #17509-02
803 South Calhoun Street, 4th Floor
Fort Wayne, IN  46802
Telephone:  260-425-9777
Fax:  260-424-9177
*Attorney for Edwin P. Rosebrock*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing was served by first class U.S. mail, postage prepaid, on the _10TH_ day of November, 2004, upon the following:

> John R. Burns
> BAKER & DANIELS
> 111 East Wayne Street, Suite 800
> Fort Wayne, IN  46802

> Nancy Gargula
> Ellen Triebold
> One Michigan Square, 5th Floor
> 100 East Wayne Street
> South Bend, IN  46601

> Henry Efroymson
> ICE MILLER
> One American Square
> P.O. Box 82001
> Indianpaolis, IN  46282

Patrick L. Proctor

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

FILED

03 SEP -5 PM 3:50

STEPHEN R. LUDWIG, CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

EDWIN P. ROSEBROCK, and )
MARY K. ROSEBROCK, )
)
    Plaintiffs, )
)
    v. )
)
AUBURN FOUNDRY, INC., and )
GLASS, MOLDERS, POTTERY, PLASTICS )
& ALLIED WORKERS UNION, LOCAL 322, )
and MATTHEW McCARTY, President of )
Local 322, )
)
    Defendants. )

Cause No.    1:03CV337

## AMENDED VERIFIED COMPLAINT

The Plaintiffs, Edwin P. Rosebrock ("Eddie Rosebrock") and Mary K. Rosebrock, ("Mary Rosebrock"), (hereinafter collectively referred to as "the Plaintiffs"), state their causes of action against the Defendants, Auburn Foundry, Inc. ("the Company"), Glass, Molders, Pottery, Plastics & Allied Workers Union, Local 322 ("the Union"), and Matthew McCarty ("McCarty"), (hereinafter collectively referred to as "the Defendants") as follows:

### I.  Introduction

1.  The Plaintiffs bring this civil action seeking declaratory, injunctive, compensatory and other relief to redress violations of their civil and statutory rights arising from the Defendant's acts, practices and conduct in respect to the Plaintiffs' employment with the Company and membership with the Union.

EXHIBIT _A_

2.  This complaint raises two claims: (1) a hybrid action under §301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §185(a); and (2) a claim under §101 of the Labor Management Reporting and disclosures Act ("LMRDA"), 29 U.S.C. §411.

## II.    Jurisdiction

3.  The Company is an "employer" within the meaning of the LMRA, 29 U.S.C. §152(2); and within the meaning of the LMRDA, 29 U.S.C. §402(e).

4.  The Union is a "labor organization" within the meaning of the LMRA, 29 U.S.C. §152(5); and within the meaning of the LMRDA, 29 U.S.C. §402(i).

5.  McCarty, at all times relevant to this complaint, is an "officer" of the Union as defined by the LMRDA 29 U.S.C. §402(n).

6.  The Plaintiffs are employees of the Company within the meaning of the LMRA, 29 U.S.C. §152(3); and within the meaning of the LMRDA, 29 U.S.C. §402(f).

7.  At all times relevant to this complaint, the Plaintiffs have been members in good standing of the Union as defined by the LMRDA, 29 U.S.C. §402(o).

8.  This Court has jurisdiction over this action pursuant to 29 U.S.C. §301; 29 U.S.C. 412; 28 U.S.C. §1331(a) and 28 U.S.C. §1337.

9.  This Court is the proper venue for this action since the Defendants are residents of DeKalb County, Indiana; since all of the events giving rise to this cause of action occurred in DeKalb County, Indiana; and since the Plaintiff's claims concern the interpretation of a labor contract negotiated, executed and performed in DeKalb County, Indiana and/or the enforcement of an arbitration award entered in DeKalb County or Allen County, Indiana.

## III.    Facts Giving Rise to the Plaintiffs' Claims

10. The Union is the exclusive bargaining representative of the Company's production and maintenance employees at the Company's facilities located in DeKalb County, Indiana.

11. At all times relevant to this lawsuit, the Company and the Union have been parties to a Collective Bargaining Agreement ("CBA") governing the terms and conditions of employment of the bargaining unit employees.

12. The Plaintiff, Eddie Rosebrock became employed by the Company at its facility located in DeKalb County, Indiana on July 31, 1995.

13. The Plaintiff, Mary Rosebrock became employed by the Company at its facility located in DeKalb County, Indiana on June 1, 1999.

14. On April 23, 2002, the Company discharged Eddie Rosebrock from employment.

15. Eddie Rosebrock filed a grievance regarding this termination through the Union pursuant to the grievance procedure set forth in Article VII of the CBA.

16. The Union and the Company took this grievance to arbitration before Arbitrator Harvey A. Nathan ("the Arbitrator") on January 14, 2003.

17. The Plaintiff Mary Rosebrock attended the arbitration held on January 14, 2003 regarding Eddie Rosebrock's termination upon the request of the Union.

18. The Union told Mary Rosebrock that she might be called as a witness during the arbitration and requested her to attend the arbitration.

19. The Company granted Mary Rosebrock an excused, unpaid, leave of absence on that day for the purpose of attending the arbitration.

20. Pursuant to the Union's rules and bylaws, union members that miss work in order to serve as witnesses at arbitration hearings are entitled to be paid their lost wages by the Union.

21. The Union did not pay Mary Rosebrock her lost wages for her time off work on January 14, 2003. Rather, the Union applied that money towards back union dues that the Union claimed that Eddie Rosebrock owed for the period of time that he was terminated from the Company.

22. On March 5, 2003, the Arbitrator entered an order finding that the Company did not have just cause to discharge Eddie Rosebrock and ordered the Company to reinstate him to his former position with seniority "and to make him whole for all wages and benefits lost."

23. The Arbitrator retained jurisdiction of the case for a period of sixty (60) days in order to resolve any issues arising out of the remedy set forth in the award. (See Arbitrator's Award attached hereto as Exhibit "A").

24. The Company reinstated Eddie Rosebrock's employment, but did not make him whole for all wages and benefits lost.

25. Eddie Rosebrock complained to both the Company and the Union about the Company's refusal to make him whole following his reinstatement, but both Defendants ignored the Plaintiff's complaints.

26. Eddie Rosebrock asked the Union to contact the Arbitrator to activate his jurisdiction to resolve the remedy dispute, but the Union refused to contact the Arbitrator regarding this issue.

27. Eddie Rosebrock attempted to contact the Arbitrator himself to address his remedy issues, but the Arbitrator informed him that he would have to go through his Union.

28. The Arbitrator's self-retained jurisdiction over this issue terminated on or about May 5, 2003 and the Union never contacted the Arbitrator regarding the Plaintiff's remedy issues.

29. The Union also never argued for Eddie Rosebrock or represented him before the Company regarding his remedy issues.

30. Eddie Rosebrock requested the Union to file a new grievance on his behalf regarding his remedy issue, but the Union refused to file a new grievance on his behalf.

31. Prior to his termination, Eddie Rosebrock regularly worked voluntary overtime performing "furnace watch" duties due to his seniority on the second shift within the Company's Melt Department.

4

32. Article XI, Section 11.2 c), of the CBA states in part that "[f]urnace watch overtime will be voluntary, based on seniority and ability from within the Melt Department and within a shift. (A true and accurate copy of Article XI, Section 11.2 c) of the CBA is attached hereto as Exhibit "B").

33. Following his reinstatement to his position the Company has regularly denied Eddie Rosebrock furnace watch overtime work by allowing more senior employees from other shifts to bump into second shift for the overtime work.

34. Prior to Eddie Rosebrock's reinstatement to employment, the company never allowed employee's within the Melt Department to bump into other shifts for furnace watch overtime work.

35. The Company's current practice of allowing other employees from other shifts to bump Eddie Rosebrock from furnace watch overtime violates the CBA.

36. Eddie Rosebrock attempted to file a grievance through the Union pursuant to the grievance procedure in the CBA, but the Union refused to file a grievance on the Plaintiff's behalf.

37. Since his reinstatement, Eddie Rosebrock has paid union dues by allowing such dues to be withheld from his paycheck on a monthly basis.

38. On August 18, 2003, the Plaintiffs were both denied access to a union body meeting by the Union, allegedly because Eddie Rosebrock had not fully paid his back union dues.

39. This allegation is a lie, since Eddie Rosebrock is, and has been current on his union dues.

40. Mary Rosebrock has also, at all times, remained current on her union dues, and was denied access to the union meeting simply because of her association with the Plaintiff Eddie Rosebrock.

41. The Plaintiffs requested minutes of the August 18, 2003 Union meeting, but the Union denied the Plaintiffs copies of the meeting minutes.


## IV.  Count I

### §301 Claim Against the Company

42. The Company has failed to comply with the Arbitrator's award issued on March 5, 2003 by refusing to make the Plaintiff Eddie Rosebrock whole in terms of lost wages and benefits following his reinstatement to employment.

43. The Company has breached the Collective Bargaining Agreement by failing to comply with the Arbitrator's Award.

44. The Company has breached the Collective Bargaining Agreement by denying Eddie Rosebrock overtime work to which he is entitled under the terms of the CBA.

45. The Company's breach of contract has resulted in contractual economic damages to the Plaintiff Eddie Rosebrock in the form of lost wages, lost overtime work, and lost employee benefits.


## V.  Count II

### Breach of Duty of Fair Representation Claim Against the Union

46. The Union breached its duty of fair representation owed to Plaintiff Eddie Rosebrock by refusing to reinstate the Arbitrator to resolve the remedy dispute stemming from the Arbitrator's award.

47. The Union breached its duty of fair representation owed to Plaintiff Eddie Rosebrock by refusing to file a new grievance on his behalf concerning the Company's failure to

make Eddie Rosebrock whole following his reinstatement to employment pursuant to the Arbitrator's Award.

48. The Union breached its duty of fair representation owed to the Plaintiff by refusing to file a grievance on his behalf concerning the Company's violation of Article XI, Section 11.2 c), of the CBA, when it refused to grant Eddie Rosebrock overtime hours to which he was entitled.

49. The Union breached its duty of fair representation owed to Mary Rosebrock when it refused to reimburse her for time missed from work for purposes of serving as a witness at her husband's arbitration.

50. The Union breached its duty of fair representation owed to both Plaintiffs when it refused to allow the Plaintiffs to attend a regular union body meeting and failed to provide the Plaintiffs a copy of the minutes of the meeting or to provide the Plaintiffs information regarding the subjects discussed at the meeting.

51. The Union's conduct toward the Plaintiffs has been arbitrary, discriminatory, hostile and in bad faith.

52. The Plaintiffs have suffered damages in the form of lost wages, lost employee benefits, costs and attorney fees in bringing a legal action to force their contract rights, and emotional distress damages.


## VI. Count III

## Violation of the Plaintiffs' LMRDA Rights by the Union and by McCarty

53. McCarty's actions on behalf of the Union violated the Plaintiffs rights secured by Title I of the LMRDA, including their right to free speech, their right to attend union meetings, their right to associate with other union members, there right to speak out at union meeting

regarding issues being considered by the Union, and their right to file grievances to enforce their rights under the CBA.

54.    McCarty and the Union have also discriminated against other bargaining unit members do to their free speech and association rights, and have denied other bargaining unit members rights secured them under the CBA with the Company.

55.    McCarty and the Union have acted with malice or reckless or wanton indifference to the Plaintiffs' rights and to the rights of other bargaining unit members.

56.    The Plaintiffs have suffered damages in the form of lost wages, lost employee benefits, costs and attorney fees, and emotional distress damages.


## VII. <u>REMEDIES</u>

57.    The Plaintiff Eddie Rosebrock seeks enforcement of the Arbitrator's award against the Company including reimbursement of all lost wages, including lost overtime hours, and lost employee benefits for the period that he was discharged, plus interest,  pursuant to §301 of the LMRA.

58.    The Plaintiff Eddie Rosebrock seeks damages against the Company in the form of his lost wages, plus interest, due to lost overtime hours in the furnace watch position stemming from the Company ongoing violation of the CBA pursuant to §301 of the LMRA.

59.    The Plaintiff Eddie Rosebrock seeks declaratory and injunctive relief against the Company to prevent any further violations of the Arbitrator's Award or the CBA and to prevent any further unlawful retaliation.

60.    The Plaintiffs mutually seek damages against the Union in the form of lost wages plus interest, lost employee benefits plus interest, lost overtime hours plus interest, emotional

distress damages, and the costs and attorney fees incurred for bringing this action due to the Union's breach of its duty of fair representation.

61. The Plaintiffs mutually seek declaratory and injunctive relief against the Union to prevent any further violations of the Union's duty of fair representation or further unlawful retaliation against the Plaintiffs.

62. The Plaintiffs seek all lost economic damages, emotional distress damages, punitive damages, and costs and attorney fees against the Union due to the Union's violation of the Plaintiffs' rights secured by Title I of the LMRDA.

## VIII.    Prayer For Relief

**Wherefore,** the Plaintiffs, Edwin P. Rosebrock and Mary K. Rosebrock hereby respectfully request that the Court enter a judgment in their favor and against the Defendant, Auburn Foundry, Inc., on the Plaintiff's §301 claim, against the Defendant Glass, Molders, Pottery, Plastics & Allied Workers Union, Local 322, on the Plaintiffs' breach of duty of fair representation claim, and against both the Union and the Defendant Matthew McCarty on the Plaintiffs' LMRDA claim, and award the Plaintiffs all damages requested for each claim including lost wages, employee benefits, emotional distress damages, punitive damages, costs and attorney fees as appropriate.   In the alternative, the Plaintiff requests the Court to grant any other relief that the Court deems just and appropriate in the premises.

## IX.    Request for Jury Trial

**COME NOW** the Plaintiffs, by Counsel, and request that this matter be tried to a Jury.

## VERIFICATION

We affirm under the penalties of perjury that the facts stated above are true and correct.

Edwin P. Rosebrock

Mary K. Rosebrock


**Respectfully Submitted:**

Patrick L. Proctor #17509-02
130 West Main Street, Suite 25
Fort Wayne, IN  46802
Tel: (260) 422-3705
**Attorney for the Plaintiff**

10

Before

Harvey A. Nathan

Arbitrator

<table>
<tr><td>

In the Matter of the Arbitration

between

AUBURN FOUNDRY, INC.
(Auburn, Indiana)
                        Employer,

and

GLASS, MOLDERS, POTTERY,
PLASTICS & ALLIED WORKERS
INT'L UNION LOCAL 322
                        Union.

</td><td>

AAA Case No.

52 300 00431 02


Grievance No.  332-02-58 P2

Edwin Rosebrock

</td></tr>
</table>

<u>Hearing Held</u>:           January 14, 2003

<u>Briefs Exchanged</u>:    February 21, 2003

<u>For the Employer:</u>    Baker & Daniels
                                 By: Martha M. Kinder,
                                 Attorneys

<u>For the Union:</u>        Rick Vitatoe,
                                 International Representative


# A R B I T R A T I O N      A W A R D



EXHIBIT

A

## I. The Issues

The parties could not agree on the statement of the issue. The grievant, Edwin Rosebrock, was discharged on April 23, 2002 for violation of Work Rules 8 and 17. The Employer suggests that the issue is whether the grievant violated these rules. The Union proposes that the issue be framed in terms of whether the grievant was discharged for just cause.

The parties' Agreement, dated November 22, 1999, defines the bases for the loss of seniority and all rights of employment. Among the reasons listed in Section 8.3 of the Agreement is a discharge "for just cause." The rules themselves, also part of the Agreement, do not mandate any particular type of discipline for their violation, although the rules allegedly violated by the grievant "subject" him to discharge. The word "subject" in this context means "may" be discharged. Thus, an employee subject to discharge means that he may be discharged. Whether or not discharge is actually appropriate, however, is to be gauged by the contractual standard for such actions. The standard in this Agreement is one of "just cause," which the arbitrator has authority to review.[1]

---

[1] Section 4.1 of the Agreement provides that the Company reserves to itself, subject only to specific restrictions contained in the Agreement, the right to "discharge for proper cause." In the context of Section 8.3, proper cause is "just cause," the term of art used in labor relations as developed by arbitration law over many decades. That discharge for a violation of a Group One Work Rule is not automatic is confirmed by the language of Section 4.4 which refers to discipline less than discharge.

2

The arbitrator has authority pursuant to section 7.5 of the Agreement to interpret the meaning and application of the "just cause" standard based upon the facts as he finds them.  If the arbitrator finds that there was not just cause to discharge the grievant then he may determine that some other lesser penalty is appropriate and he may also craft the appropriate remedy to provide restitution for a grievant wrongly discharged.[2]    Based upon this analysis the issues in this case are as follows:

    1. Did the Company have just cause to discharge the grievant, Edwin Rosebrock, on April 23, 2002?

    2. If not, what is the appropriate remedy?

## II. Applicable Contract Provisions

The applicable provisions of the Articles of Agreement are as follows:

ARTICLE IV     Management Responsibility

Section 4.1  Management Rights The Union recognizes the Company as retaining sole right to manage its business subject only to restrictions governing the exercise of these rights as are expressly provided in the Agreement.  Such rights include, but are not limited to, the right to *** suspend, discharge for proper cause, or otherwise discipline employees; ***

---

    [2]  Accordingly, the Company's argument, as expressed at the hearing and its brief, that the "undisputed penalty" for a breach of group one rules is discharge and the only thing for the arbitrator to decide is whether the rules were violated, is simply wrong.  The Company's evidence and the language of the Agreement itself provide otherwise.

3

Section 4.4 Unpaid Suspension During Investigation Any employee charged with violation of a group one work rule may be suspended without pay while the Company conducts an investigation.  If the employee is found not in violation of a Group One work rule, or an ensuing discipline is less than the period of suspension, the employee will be paid the amount of back pay the employee lost by virtue of the suspension being for a period for which there should not have been a suspension, ***.

## ARTICLE VII    Grievance Procedure

Section 7.5 Step Four    ***
b) The decision of the arbitrator shall be final and binding on all parties. The arbitrator shall have no authority to add to, delete from, or in any way modify the terms of this Agreement, or any supplemental agreement thereto. ***

## ARTICLE VIII    SENIORITY

Sec. 8.3 Loss of Seniority.  Seniority and all rights of employment shall terminate when an employee:
    ***
    b) Is discharged for just cause and is not reinstated.

## EXHIBIT VI   EMPLOYEE CONDUCT

***

Group One Rules    Subject to Immediate Discharge
***

8.  Use or threat of physical violence against any employee or other person on Company property.

17.  Any act or threat against another employee or the Company.

## III. The Facts

The Company operates two facilities in Auburn, Indiana, where it produces gray iron castings.  The grievant was classified as an "Operator Relief" in the Melt Department. In April, 2002, the grievant was having severe domestic problems.  His step son had been incarcerated in Ohio and his wife, who held the grievant responsible for her son's woes, had left him and was

4

threatening divorce. Additionally, the grievant believed that his wife was having an affair with a supervisor at the plant. It is undenied that at the dates and times at issue in this case the grievant was very distraught and agitated.

On April 18, 2002, Patty Parrish, an administrative assistant in Employee Relations, got a message to call the grievant. Although Parrish testified that she only knew Rosebrock as a co-worker, she had spoken with him in the past about his personal problems. Parrish returned the call and they began again to talk about the grievant's problems. During this conversation, Parrish testified, Rosebrock said that his wife told him that she was having an affair with a manager at the plant that he would like to kill that manager.[3] According to Parrish, Rosebrock also said that he had purchased a gun but that he did not have possession of it, and that was good thing. Parrish testified that the grievant never said that if he got possession of the gun he intended to use it against the suspected manager or that he intended to bring the gun to the plant. After this call, Parrish notified Robert Tuffley, Melt Department Manager, of the conversation.

Rosebrock testified that on April 18th he had returned home from work and found a note from his wife that she was leaving him and was filing for

---

[3] According to Parrish, Rosebrock did not name the manager. A careful review of Rosebrock's testimony indicates that his wife never identified the manager but that Rosebrock suspected a particular individual.

divorce. April 18th was also his tenth wedding anniversary. He testified that he telephoned Parrish because she was in Human Resources and he thought it was appropriate for him to call her and discuss his problems. He testified that he just needed someone to talk to and what he said was not intended to be a threat.

Rosebrock went to work on April 19th, a Friday, but left early because he was distraught and could not concentrate. He told his supervisor, Don Bradbury, what was going on and Bradbury told the grievant to call him. That evening Tuffley called Rosebrock. In addition to being the manager of the department in which Rosebrock worked, Tuffley was a good friend of his. Tuffley asked the grievant what was going on, and the grievant told Tuffley of his problems. Tuffley asked Rosebrock if he had a gun. Rosebrock answered that he and his wife were in the process of purchasing one but that neither of them had it. Tuffley asked him if he was planning to do anything to the man he suspected of having the affair with his wife. Rosebrock answered that he felt as if he could do something but that he would not.

Rosebrock telephoned Tuffley at home the next day. He talked about his problems and Tuffley mostly listened. Rosebrock also mentioned that he had seen his pastor.

On the following day Rosebrock telephoned Tuffley again. According to both Tuffley and Rosebrock, the grievant was very distraught and was crying. According to Tuffley, Rosebrock named the person at the plant who he thought

6

was having the affair with his wife. He told Tuffley that if he ever got this person in position on the melt deck he would kill him.[4] Tuffley testified that he said to the grievant that he knew the Rosebrock was having a hard time but there were people available to help him.[5]    Rosebrock testified that although he was depressed and crying he did not mention committing suicide and was not intoxicated. According to Rosebrock, Tuffley told him that he would talk to Tussey about getting help for the grievant and getting him some time off.    Tuffley testified that he took what Rosebrock said 'seriously, although it was not easy to understand him during the conversation.

---

[4] On cross examination the emphasis of Tuffley's testimony was different. First he and Rosebrock talked about suicide and Tuffley urged that this would not accomplish anything. Then when Rosebrock was less distraught he said that he would kill the other man (instead of killing himself). Then Tuffley told Rosebrock that he needed help and that he would talk to Kevin Tussey, Human Resources Director, about getting him some help.

[5] After this phone call Tuffley wrote a memorandum about the conversation. The memorandum, admitted into evidence, is more detailed than Tuffley's testimony. In the memo Tuffley states that Rosebrock was intoxicated and that before he said anything about killing the other man up on the melt deck he told Tuffley that he was going to commit suicide. In the memo Tuffley wrote that he told Rosebrock to calm down and that surely Rosebrock did not mean the statements he had made. Rosebrock, according to Tuffley, stated that he would "kill him." Tuffley responded that this was no way to solve a problem and that there were people out there who could help him. Tuffley's memo then concludes with the statement that he told Rosebrock that he would speak to Kevin Tussey, Human Resources Director, and then get back to Rosebrock. Rosebrock then "calmed down and became distraught again."

7

On April 23, 2002, the grievant was working when he was summoned to the office. He was accused of threatening to kill another employee and was told that he was being terminated. According to Tussey, the grievant did not deny the allegations. He just shook his head. Tussey testified that in the past employees have been discharged for making threats. Tussey was not sure whether anyone had ever been discharged for making threats while not on Company premises.

After the discharge, Rosebrock called Tuffley and asked him how it came about that he was discharged. Tuffley responded that he did not mean for it to happen that way. Rosebrock testified that he felt that Tuffley had betrayed a confidence. Rosebrock testified that he told Tuffley that he would not risk his job and do anything so stupid as threaten or harm another employee.

Steve Parrish, Union Treasurer, represented Rosebrock at the termination meeting. Parrish protested the discharge and said that the grievant should be sent to the EAP to get help. Parrish testified that at least one Company representative, Jeff Perkins, agreed.

## IV. Positions of the Parties

A. The Company

The Company argues that it is universally understood that violence has no acceptable role in the workplace. When an employer learns of a threat to employees it must take action. No provocation can justify a violent response

from one employee to another. Thus, the Company argues, even if the grievant believed in good faith that another employee was having an illicit affair with his wife, there was no basis to threaten that other employee's life.

The Company argues that the argument that the grievant would never have carried out the threat is speculative and without merit. When a threat of this nature is made, the Company argues, it cannot be expected to wait until the grievant acts on his impulse. The risk is too great. According to the Company, it is the threat itself which is disruptive and must be addressed. Employees have to know that the making of the threat in and of itself is the misconduct, and not the likelihood that the threat would be carried out. Moreover, the company contends, no one can ever know whether the grievant would have carried out the threat. What is known is that he could have caused great harm on the melt deck or with the gun he spoke of to Patty Parrish.[6] With that knowledge the Company was well within its rights in discharging the grievant. Indeed, the Company points out, the Company does not need to rely on a formal rule in discharging the grievant because the nature of the threat was so serious.

The Company argues that the undisputed penalty for a violation of the Group One Rules is immediate termination. Consequently, the only issue for the arbitrator is whether or not the threats were made. In this case, the

---

[6] The melt deck is at or near the furnace where iron is melted in the manufacturing process. The melt deck is 30 feet above the plant floor.

Company argues, the testimony from Tuffley and Parrish was clearly presented and there is no basis to discredit them. The testimony of the grievant, on the other hand, was self-serving although he did acknowledge that when confronted by Tussey he never denied that he made the threats. There is no basis for mitigation, the Company asserts. There is no defense to the outrageous threats the grievant made against another person employed at the plant.

### B. The Union

The Union argues that Rosebrock never made a threat. He spoke with Patty Parrish because he had personal problems and needed some time off from work. He spoke with Bob Tuffley because they were old friends and he needed to confide his troubles with an old and trusted friend. The Union asks the arbitrator to credit Rosebrock's testimony over that of Parrish and Tuffley. It argues that these two Company representatives misunderstood Rosebrock, who was admittedly very distraught, and took what he said out of context. The Union argues that Tuffley should not be believed because he admittedly deceived the grievant and took a confidential conversation and turned it against the grievant. The Union also points out that the testimony of Union representative Steve Parrish establishes that the Company was not against sending the grievant to the EAP and encouraged him to do so even though it was also discharging him at the same time.

The Union also argues that there is no evidence that Rosebrock took any

10

action against the person he believed was having an affair with his wife.  In fact, the Union contends, Rosebrock specifically told Tuffley that he wouldn't do anything stupid which might jeopardize his job.

## V. <u>Analysis and Conclusions</u>

The Company is certainly correct when it argues that threatening another employee with bodily harm is serious misconduct.  Whether or not the employee takes steps to act on his threat or even has the means to act on it, is, as the Company suggests, somewhat irrelevant.  It is the threat itself which is intimidating and disruptive, and the Company has an obligation to protect its personnel, its property and its environment from threats.  As the Company points out, it need not wait until steps are taken to act on the threat.  Simply stated, the risks are too great.

Basically, the arbitrator agrees with the general principles articulated by the Company.   Threats of bodily harm are simply unacceptable.   The disagreement in this case focuses more on the facts than on workplace precepts.  First, as expressed earlier in this award, neither the Agreement nor the rules themselves require discharge for a violation of Group One rules. Section 4.4 of the Agreement, in addressing the Company's right to suspend an employee pending investigation of an alleged Group One rule violation, states that the suspended employee will be paid lost earnings if it is determined that he was "not in violation of a Group One work rule **or an**

11

**ensuing discipline is less than the period of suspension."** (Emphasis added)  Thus, the Agreement contemplates that an employee may violate a Group One rule and may be disciplined for a period of time which is less than the investigation itself took.  If the parties intended that all violations of Group One rules mandated discharge the highlighted language (above) would not be in the contract. An employee <u>may be</u> discharged for a violation of these rules, hence the use of the words "subject to immediate discharge," but it is not required in each and every case.  In fact, the Company's exhibit listing past occasions when employees violated Rule 8 shows that many of these employees received a suspension for their misconduct.  Each case must be judged on its individual merits and the "just cause" standard or equitable treatment must be applied.  Every "threat" does not justify discharge.  Context is critical.

If the Company acted in the belief that the Agreement permitted it to discharge the grievant for any violation of Group One rules, regardless of the circumstances, then it acted in error and in violation of the Agreement. Yet, this appears to be the Company's position.  Both at the hearing and its brief, the Company argued strenuously that the <u>only</u> issue before the arbitrator is whether the rules were violated.  If there was a violation, the Company maintains, it could discharge the grievant.  There is nothing else for the arbitrator to decide.  But this is not what the Agreement says and there is no restriction on the arbitrator's jurisdiction in deciding a discharge case.  On the

12

arbitrator is without authority to add to, delete or modify the contract. If the arbitrator were to ignore the plain language of Section of 4.4, referencing discipline less than discharge for a violation of Group One rules, he would be doing just that. The arbitrator cannot ignore some of the language of Section 4.4, and neither can the Company.

The arbitrator must conclude, based upon the Company's position taken throughout this case, that it discharged Edwin Rosebrock because it found a violation of Rules 8 and 17 and that it did not even need to <u>consider </u>the use of progressive discipline. If that was the Company's perspective, and the record so indicates, then it discharged the grievant in violation of the Agreement. It was required to consider discipline less than discharge. The record appears that this was never contemplated. This being so, the arbitrator has no choice but to reinstate the grievant. It is not for the arbitrator to speculate what the discipline might have been had the Company acted properly and considered discipline less than discharge, as Agreement the contemplates.

But there is another basis to set aside the discharge because it was in violation of the Agreement. The Company was incorrect in its conclusion that there was a threat of such seriousness that discharge was for just cause. As stated above, context is critical. This is not a case where there was a confrontation or where the alleged threats were made on Company property. The grievant never approached the supervisor he suspected of dallying with

13

his wife, although he had the opportunity between April 18th and the 23rd, when he was discharged. Nor did he ever make any questionable statements at issue while he was on Company premises. On the contrary, when the grievant felt distressed he asked for received permission to go home. His conversation with Patty Parrish was in the context of asking for time _away_ from the plant. The grievant's actions show a pattern of avoiding a confrontation, not seeking one out.

In this case, the grievant did what worked for him, which was to seek out friends and discuss his problems. As Rosebrock testified, it helped him a lot to talk about his anger and his grief. At various times the grievant was told to seek out professional help. Indeed, it is undenied that even at his discharge meeting it was suggested that he seek help from the Employee Assistance Program. Everyone recognized that the grievant was deeply troubled. Yet, the Company's response was not to require that he take time off and seek counseling, but rather that his employment be severed. It would seem, parenthetically, that discharge would do nothing to alleviate the risk. If the grievant had been inclined to cause bodily harm, discharging him, as opposed to calling the police, might have exacerbated the risk. While he certainly had to be removed from the plant on a temporary basis, leaving him without a job and this juncture seems almost counter-intuitive. He should have been given the opportunity he needed to get well as with any other illness. The discharge was without just cause.

14

# A W A R D

1. The Company did not have just cause to discharge the grievant, Edwin Rosebrock, on April 23, 2002.

2. The Company shall reinstate Rosebrock to his position as an Operator Relief in the Melt Department with full seniority and make him whole for all wages and benefits lost.

3. The Arbitrator retains jurisdiction of this case for a period of sixty (60) days in order to resolve any issues arising out of the remedy herein.

Respectfully submitted,

HARVEY A. NATHAN

March 5, 2003

15



COLLECTIVE BARGAINING
AGREEMENT

between

AUBURN FOUNDRY, INC.
Auburn, Indiana

and

GLASS, MOLDERS, POTTERY,
PLASTICS & ALLIED WORKERS
INTERNATIONAL UNION
AFL-CIO, CLC
(GMP INTERNATIONAL UNION)

Local 322

May 3, 2003 through May 3, 2006

**EXHIBIT**

tabbies

B

employee signs up for overtime and overtime becomes available, the Company will notify the employee that overtime is available and that overtime assignment is being offered. The employee can refuse the overtime being offered. However, if the employee accepts the overtime, the employee must report for the overtime which is awarded to the employee, unless it is cancelled by the Company in advance of the reporting time.

h)   <u>WEEKEND OVERTIME.</u> For voluntary weekend overtime, the Company will determine the number of hours to be worked and then will post sheets for all weekend overtime hours required. Employees wishing to volunteer for non-mandatory weekend overtime must be qualified to perform the weekend overtime work and must sign the overtime sheet. If an employee signs up for weekend overtime, the employee must report for the overtime which is awarded to the employee, unless it is cancelled by the Company in advance of the reporting time. Employees will not be paid for weekend overtime scheduling errors that could have been brought to their supervisor's attention prior to the end of the employee's last shift preceding the scheduled weekend overtime.

i)   All hours worked from Friday, 10:00 p.m. to Saturday, 10:00 p.m. shall be paid at time and one-half. All hours worked from Saturday, 10:00 p.m. to Sunday, 10:00 p.m. shall be paid at double time. The above excludes normal shift starting and ending times that fall between these hours. **Except as otherwise provided in 11.2c) and the weekend maintenance schedule, there shall not be any mandatory overtime scheduled on a Sunday.**

— 28 —

) Except as otherwise provided in 11.2c) and the week-
end maintenance schedule, there shall not    any
mandatory overtime scheduled during a holiday
weekend. Holiday weekend shall be defined as a
weekend where a holiday listed in Exhibit IV falls on
a Friday or a Monday.

**SECTION 11.3  Wage Classifications.** The wage classifi-
cation schedule of the Company, which is attached hereto,
marked Exhibit I, is recognized by both parties as the wage
agreement between the parties, and is a part of this Agreement.

**SECTION 11.4  Report in Pay.** Any employee reporting
for work having been called to report, or who comes to work
on his regular shift without having been notified not to report,
and no work is available, shall receive two (2) hours pay for
so reporting. However, for acts of God or causes beyond the
control of the Company, such as no power, there shall be no
obligation to pay reporting employees.

a) The Company does reserve the right to furnish other work
for the two hour period to be paid for at the regular rate
of pay.

b) When an employee reports to work and work is not
available through causes beyond the control of the Com-
pany, and the employee is asked to "standby" pending the
resumption of work, the employee shall be paid his regular
hourly rate beginning with his regular scheduled starting
time for that day.

c) The Company shall have discharged its responsibility to
the employee of "notification not to report" by calling the
number on record in the office files. The Company shall

— 29 —

In witness whereof, the parties hereto have executed this
Agreement this 3rd day of May, 2003.

Auburn Foundry, Inc.

_David K. Weber_

_David W. Tussey_

_Lori A. Wenino_

Local 322
Glass, Molders, Pottery, Plastics & Allied Workers
International Union AFL-CIO, CLC

_Rick Vitatoe_                          _Darby Patton, Jr._

_Matt McCarty_                          _Cindy Rogers_

_Ted Bowser_                            _Steve Parrish_

— 54 —

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

EDWIN P. ROSEBROCK and ) 
MARY K. ROSEBROCK, )
                            )
        Plaintiffs, )
                            )
    v. )     CIVIL NO. 1:03-CV-0337
                            )
AUBURN FOUNDRY, INC., et al., )
                            )
        Defendants. )
                            )

## <u>NOTICE OF BANKRUPTCY</u>

Defendant, Auburn Foundry, Inc. ("Auburn Foundry") files this notice of

bankruptcy to inform the Court and all parties that on February 8, 2004, Auburn Foundry filed a

voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the

United States Bankruptcy Court for the Northern District of Indiana, Fort Wayne Division,

commencing a Chapter 11 case known as *In re Auburn Foundry, Inc.,* Case No. 04-10427-reg.

Pursuant to 11 U.S.C. § 362(a), the continuation in this action of any claims against Auburn

Foundry that were or could have been commenced prior to the Chapter 11 bankruptcy petition

date, is automatically stayed.

        BAKER & DANIELS

        By:   s/ Martha M. Lemert
             Martha M. Lemert, Atty. #20961-02
             111 East Wayne Street, Suite 800
             Fort Wayne, Indiana 46802
             Telephone: (260) 420-8000
             Facsimile: (260) 460-1700
        ATTORNEYS FOR DEFENDANT, AUBURN
        FOUNDRY, INC.

EXHIBIT ___ ß ___

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Notice of Bankruptcy has been served electronically or by first-class U.S. mail, postage prepaid, this 18th day of February, 2004 upon the following parties:

> Patrick L. Proctor
> Attorney at Law
> 130 West Main Street Suite 25
> Fort Wayne, IN  468602
> ATTORNEY FOR PLAINTIFFS
>
> Mimi C. Satter
> SATTER & ANDREWS, L.P.
> 217 South Salina Street, 6th Floor
> Syracuse, NY  13202
> ATTORNEYS FOR DEFENDANT GMP

_____ s/ Martha M. Lemert _____

FWIMAN1 324672v1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

Edwin P. Rosebrock et al

v.                                           Civil No. 1:03-cv-337

Auburn Foundry, Inc.

## **ORDER**

The court has been advised that this action cannot proceed to trial and disposition for the following reason:

Automatic Stay imposed due to Bankruptcy Filing of Auburn Foundry

Therefore, it is ordered that the clerk of the court mark this action closed for statistical purposes and,

It is further ordered that the court shall retain jurisdiction and that this case shall be restored to the trial docket upon motion of a party if circumstances change, so that it may proceed to final disposition; this order shall not prejudice the rights of the parties to this litigation.

Enter: February 19, 2004.

 S/William C. Lee, Judge
William C. Lee, Judge
United States District Court

EXHIBIT __ C __