## **Exhibit A**

Agreement

# **EXHIBIT B**

Interim DIP Order

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

|  |  |  |
|---|---|---|
| In the Matter of: | ) | Case No. 04-10427 |
| | ) | |
| Auburn Foundry, Inc., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## INTERIM ORDER APPROVING JOINT MOTION PURSUANT TO RULE 4001(C) TO APPROVE AGREEMENT CONCERNING SENIOR DIP FINANCING

Upon the Joint Motion of Auburn Foundry, Inc. ("Auburn" or the "Debtor") and

the Senior Lenders to Approve Agreement Concerning Senior DIP Financing (the "DIP

Motion"), for a preliminary order and final order (a) authorizing the Debtor to obtain post-

petition financing pursuant to section 364 of title 11 of the United States Code (the "Bankruptcy

Code") and Rules 2002 and 4001(c) of the Federal Rules of Bankruptcy Procedures upon the

terms and conditions set forth in this Order and the Agreement attached as Exhibit A hereto and

incorporated herein by reference (the "Agreement")[1] and (b) scheduling a hearing (the "Final

Hearing") to consider entry of a final order (the "Final Order") with respect thereto; due and

sufficient notice of the Motion and the preliminary hearing thereon (the "Preliminary Hearing")

having been given under the circumstances; the Preliminary Hearing on the Motion having been

held on April 19, 2004; and upon the entire record made at the Preliminary Hearing; and the

Court having found good and sufficient cause appearing therefor;

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Agreement.

The Court hereby makes the following FINDINGS:

A.    On February 8, 2004 (the "Filing Date"), the Debtor filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is continuing in possession of its property, and operating and managing its business, as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

B.    This Court has jurisdiction over this Chapter 11 Case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of the Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.    The Debtor is unable to obtain unsecured credit on terms more favorable than those described herein.

D.    The Debtor, AFI Lending and the Lenders have agreed that as of the Filing Date, the Debtor was liable to the Lenders in the aggregate principal amount of approximately $23,312,638.40 in respect of loans made by the Lenders to the Debtor pursuant to the Pre-Petition Credit Agreement (plus attorneys' fees, costs and interest accrued and unpaid thereon, to the extent allowed) (the "Pre-Petition Indebtedness"). The Pre-Petition Indebtedness includes $10,901,915.66 of Revolving Loans (including undrawn Letters of Credit) and $12,410,722.74 of Term Loans. The Pre-Petition Indebtedness consisting of Revolving Loans (including all undrawn Letters of Credit) plus attorneys' fees, costs and interest accrued and unpaid thereon, to the extent allowed, is referred to herein as the "Pre-Petition Revolver Indebtedness."

E.    Notice of the Preliminary Hearing and the relief requested in the Motion has been given to (i) the Office of the United States Trustee, (ii) the official committee of unsecured creditors (the "Committee"), (iii) known holders of pre-petition liens against the Debtor's property, and (iv) other parties in interest who have filed requests for notice in this

2

FWIMAN1 332976v1

Chapter 11 Case with the Court. This Preliminary Hearing is being held pursuant to the provisions of Bankruptcy Rule 4001(c)(2).

F.      Based on the record presented to this Court by the Debtor, it appears (and the Debtor and the Lenders have stipulated) that the Post-Petition Financing has been negotiated in good faith and at arm's-length between the Debtor and the Lenders, and any credit extended and loans made to the Debtor pursuant to this Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, Bankruptcy Code § 364(e).

G.      Based on the record before this Court, it appears (and the Debtor and the Lenders have stipulated) that the terms of this Order, including, without limitation, the terms of the Post-Petition Financing, are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.

H.      The Debtor has requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(c). The permission granted herein to enter into post-petition financing is necessary to avoid immediate and irreparable harm to the Debtor. This Court concludes that entry of this Order is in the best interests of the Debtor's estate and creditors as its implementation will, among other things, allow for the flow of supplies and services to the Debtor necessary to sustain the operation of the Debtor's existing business.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.      Motion Granted. The Motion is granted, subject to the terms and conditions set forth in this Order and the Agreement.

2.      Agreement Approved. The Agreement is hereby approved in all respects.

3.    <u>Authorization</u>.  Upon the terms and conditions set forth in the Agreement, the Debtor is expressly authorized and empowered to borrow money, and enter into and perform its obligations under the Agreement and the other DIP Loan Documents.

4.    <u>Security for DIP Indebtedness</u>.  The Lenders are hereby granted as security for the repayment of all DIP Indebtedness, pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code, a valid and perfected lien and security interest in the DIP Collateral with the priority set forth in paragraph 9 of the Agreement.  Other than the liens and security interests in favor of the Lenders pursuant to the Agreement, the DIP Loan Documents and this Order, the Prior Claims and the claims of First Insurance Funding Corp., as described more fully in the Motion filed herein on April 7, 2004, no other claims, liens or security interests prior to or <u>pari passu</u> with the claims, liens or security interests of the Lenders shall attach to the DIP Collateral in this or any superceding or subsequent chapter 11 or chapter 7 case (collectively, the "<u>Successor Case</u>") without the express prior written consent of the Lenders.

5.    <u>Perfection of New Liens</u>.  All liens and security interests on or in the DIP Collateral granted to the Lenders by the Agreement and the DIP Loan Documents shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection.  The Lenders may (in their discretion) but shall not be required to, file a certified copy of the Agreement in any filing or recording office in any county or other jurisdiction in which the Debtor has real or personal property and such filing or recording shall be accepted and shall constitute further evidence of perfection of the Lenders' interests in the DIP Collateral.

4

6.    <u>Modification of Automatic Stay</u>.  The automatic stay pursuant to § 362 of the Bankruptcy Code is hereby modified on the limited basis described in paragraph 12 of the Agreement.  Upon the occurrence of a Termination Date, the Lenders shall be entitled to, among other things, (i) immediately cease making loans or extensions of credit, (ii) file an emergency motion for relief from the automatic stay for the purpose of foreclosing or otherwise enforcing their liens on any or all of the DIP Collateral and/or to exercise any other default-related remedies under the Agreement, the DIP Loan Documents, this Order or applicable law, and (iii) to obtain an expedited hearing on such motion upon four (4) days' notice to counsel for the Debtor, counsel for any Committee, counsel for AFI Lending and the U.S. Trustee.  The Lenders shall be entitled to such relief from the automatic stay upon a showing that a Termination Date has occurred and is continuing; provided, however, that if the Debtor pays the DIP Indebtedness in full and the Debtor proves that notwithstanding the occurrence of a Termination Date, the Lenders are and will continue to be adequately protected through August 31, 2004, the Debtor shall be entitled to seek an order of the Court to continue to use Cash Collateral limited to the Borrowing Base through August 31, 2004.

7.    <u>Priority Claims</u>.  Subject to the Carve-Out described in paragraph 14 of the Agreement, the DIP Indebtedness shall have the highest administrative priority under § 364(c)(1) of the Bankruptcy Code, shall have priority over all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, §§ 105, 326, 330, 331, 503(b), 507(a), 507(b) or 726 or any other provision of the Bankruptcy Code or otherwise (whether incurred in the Chapter 11 Case or any Successor Case), and shall, to the extent permitted by the Bankruptcy Code, at all times be senior to the rights of the Debtor, any successor trustee or estate representative in this Chapter 11 Case or any Successor Case.

8.      Subordinated DIP. All advances by AFI Lending to the Debtor on and

after the Filing Date (the "Subordinated DIP") shall be subject and subordinate to the DIP

Indebtedness and the amount (up to $1,050,000), if any, by which the value of the Lenders' Pre-

Petition Collateral, including, without limitation, Cash Collateral, has been reduced, charged, or

is subject to future reduction or charge, by the incurrence of any allowable and unpaid

administrative expenses, surcharges (arising under § 506(c) of the Bankruptcy Code or

otherwise), liens, wage claims, taxes (including, without limitation, real estate taxes) or other

items or amounts arising on or after the Filing Date (the "Priming Diminution") and the amount

(up to $1,300,000 less the Priming Diminution), if any, by which the Pre-Petition Collateral

consisting of cash, the collectible amount of accounts receivable and inventory has not been

replaced by DIP Collateral consisting of cash, the collectible amount of accounts receivable and

inventory (the "Collateral Diminution"), and, once advanced, shall not be repaid in whole or in

part by the Debtor until the DIP Indebtedness has been indefeasibly paid in full, the Priming

Diminution and the Collateral Diminution have been determined by the Court in a final, non-

appealable order (the "Subordinated DIP Repayment Date"). On the Subordinated DIP

Repayment Date, the Debtor shall repay to AFI Lending only the amount by which the

Subordinated DIP exceeds the Priming Diminution and the Collateral Diminution (after taking

into account payment of the Subordinated DIP). The remainder of the Subordinated DIP shall

only be repaid by the Debtor after indefeasible payment in full of all of the Indebtedness.

9.      Binding on Successors. The provisions of this Order and the Agreement

shall be binding upon and inure to the benefit of the Lenders, the Debtor, and their respective

successors and assigns (including any trustee or other estate representative appointed as a

representative of the Debtor's estate or of any estate in any Successor Case). Except as

6

otherwise explicitly set forth in this Order or the Agreement, no third parties are intended to be or shall be deemed to be third party beneficiaries of this Order, the Agreement or the DIP Loan Documents.

10.    Effect of Dismissal or Conversion.  If the Chapter 11 Case is dismissed, converted, otherwise superseded, the Lenders' rights and remedies under this Order, the Agreement and the DIP Loan Documents shall be and remain in full force and effect as if such Chapter 11 Case had not been dismissed, converted, superseded.  Furthermore, notwithstanding any such dismissal, conversion, supercission, all of the terms and conditions of this Order and the Agreement, including, without limitation, the liens and the priorities granted hereunder and thereunder, shall remain in full force and effect, to the extent permitted by applicable law.

11.    Lenders' Relationship with Debtor.  In making decisions to advance any Loans or other extensions of credit to the Debtor, in administering any Loans or other extensions of credit, or in taking any other actions reasonably related to this Order or the Indebtedness or the DIP Loan Documents (including, without limitation, the exercise of their approval rights with respect to any budget), the Lenders shall have no liability to any third party and shall not be deemed to be in control of the operations of the Debtor or to be acting as a "controlling person," "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar Federal or state statute), and the Lenders' relationship with the Debtor shall not constitute or be deemed to constitute a joint venture or partnership of any kind between the Lenders and the Debtor.

7

12.     Effect of Modification.  Except as permitted hereby, the Debtor shall not, without the Lenders' prior written consent, seek to modify, vacate or amend this Order, the Agreement or any DIP Loan Documents.  If any of the provisions of this Order or the Agreement are hereafter modified, vacated or stayed by subsequent order of this or any other Court, such stay, modification or vacatur shall not affect the validity of any Indebtedness outstanding immediately prior to the effective time of such stay, modification or vacation, or the validity and enforceability of any lien, priority, right, privilege or benefit authorized hereby with respect to any such Indebtedness.

13.     Safe Harbor.  The Court has considered and determined the matters addressed herein pursuant to its powers under the Bankruptcy Code, including the power to authorize the Debtor to obtain credit on the terms and conditions upon which the Debtor and the Lenders have agreed.  Thus, each of such terms and conditions constitutes a part of the authorization under § 364 of the Bankruptcy Code, and is, therefore, subject to the protections contained in § 364(e) of the Bankruptcy Code.

14.     Subsequent Hearing; Procedure for Objections and Entry of Final Order. The Motion is set for a Final Hearing before this Court at ___ _.m. on _____, 2004 (such date or such later date to which the Final Hearing is adjourned or continued with the Lenders' prior consent, the "Final Hearing Date"), at which time any party in interest may present any timely filed objections to the entry of a Final Order.  The Debtor shall promptly serve a notice of entry of this Order and the Final Hearing, together with a copy of this Order, by regular mail upon (i) the parties identified in finding paragraph E hereof, and (ii) any other party which theretofore has filed in the Chapter 11 Case a request for special notice with this Court and served such request upon Debtor's counsel.  The notice of the entry of this Order and the Final

8

Hearing shall state that objections to the entry of a Final Order on the Motion shall be in writing and shall be filed with the United States Bankruptcy Clerk for the Northern District of Indiana no later than _____, 2004, which objections shall be served so that the same are received on or before 4:00 p.m. (Eastern time) of such date by (i) John Burns, Baker & Daniels, 111 East Wayne Street, Suite 800, Fort Wayne, Indiana 46802, counsel to the Debtor, (ii) Josef Athanas, Latham & Watkins LLP, 5800 Sears Tower, 233 South Wacker Drive, Chicago, Illinois 60606, counsel to the Lenders and (iii) the United States Trustee. Any objections by creditors or other parties in interest to any of the provisions of this Order shall be deemed waived unless filed and served in accordance with this paragraph. This Order shall expire upon the earlier of the entry of a Final Order or three (3) Business Days after the Final Hearing Date (the "Expiration Date").

15.    No Marshalling. The Lenders shall not be under any obligation to marshal any assets in favor of the Debtor or any other party or against or in payment of any or all of the Indebtedness.

16.    Effect of Failure of Final Order to be Entered. If a Final Order substantially identical to this Order is not entered or a Final Cash Collateral Order substantially identical to the Interim Cash Collateral Order entered contemporaneously herewith is not entered on or prior to the Expiration Date, all DIP Indebtedness shall be immediately due and payable, the Lenders' consent to the use of Cash Collateral shall terminate and the Agreement shall terminate. The Lenders shall be entitled to the benefits of the Agreement for the period prior to the Expiration Date, but on and after the Expiration Date, the parties shall no longer be bound by the Agreement and the Debtor shall be free to seek the use of Cash Collateral from the Court (and the Lenders shall be free to object thereto).

FWIMAN1 332976v1

17.    <u>Objections Overruled or Withdrawn</u>.  All objections to the entry of this Order have been withdrawn or overruled.

18.    <u>Controlling Effect</u>.  To the extent any provisions in this Order or the Agreement conflict with any provisions of the Motion, any Pre-Petition Loan Documents, any DIP Loan Documents, any prior cash collateral order or any prior debtor-in-possession financing order, the provisions of this Order and the Agreement shall control.

19.    <u>Order Effective</u>.  This Order shall be effective as of the date of signature by the Court.

IT IS SO ORDERED.

DATED this _____ day of April, 2004.

_____
UNITED STATES BANKRUPTCY JUDGE

10

## Exhibit A

Agreement

## EXHIBIT C

Form of Accommodation Agreement

shipments, misshipments, improper invoices, mispricing, duplicate payments, billing errors, premium freight (to the extent necessary to avoid product interruption charges and not caused by GM) or professional fees and costs incurred by GM related to Auburn Foundry;

2.      the Pre-Petition Setoff; and

3.      payments made by GM to Auburn Foundry's vendors or the cost of raw materials or other inventory GM supplies or causes to be supplied to Auburn Foundry (provided that GM may only assert setoffs for such payments against accounts payable arising more than 3 business days after the Senior Lenders' receipt of written notice from GM advising that payments have been made to Auburn Foundry's vendors or inventory supplied and the amount of such payments or the cost of such inventory).

d.      Except for the Pre-Petition Setoff, Allowed Setoffs specifically include any consequential or special damages, provided, however, under no circumstances shall Allowed Setoffs exceed ten percent (10%) of its aggregate accounts payable to Auburn Foundry, provided further, that once Allowed Setoffs are asserted against a particular invoice(s) or account(s) receivable, no further Allowed Setoffs may be taken against such invoice(s) or account(s) receivable. For further clarification, with respect to vendor payments made by GM, if GM has made such payments to Auburn Foundry's vendors because Auburn Foundry's vendors refuse to ship to Auburn Foundry, GM must give the Senior Lenders written notice of or claimed setoff and such setoff can only be asserted against accounts payable arising more than 3 business days after Senior Lenders' receipt of such written notice. Any Allowed Setoffs that cannot be used by GM because of the 10% limitation provided for above may be carried forward and used against future accounts (but in all cases subject to the foregoing 10% limitation of the aggregate amount of GM's post-petition payables to Auburn Foundry).

e.    Subject to the agreements which are intended for the sole benefit of Senior Lenders, GM reserves and does not waive any rights and interests it may have, but for this Agreement, including the right to assert affirmative claims against Auburn Foundry, the right to assert setoffs for defensive purposes (than to defend against claims for payment of accounts) and the right to cancel or terminate purchase orders or other contracts in accordance with their respective terms and conditions.

f.    In consideration of GM's agreement set forth at sub-section (c) above, each of the Senior Lenders and Auburn Foundry agree that to the extent at any time insufficient financing exists to fund all of the raw material and other related requirements for Auburn Foundry's production for its customers, the available financing will be used first to fund those expenses associated with production for GM under the post-petition contract referenced at section II below and other customers who have signed agreements substantially similar to this agreement.

## II.    POST-PETITION CONTRACT

a.    GM and Auburn Foundry will enter into a post-petition contract, incorporating the terms and conditions set forth in the existing contracts between GM and Auburn Foundry except as modified in this Section II(a) only, whereby Auburn Foundry will supply the same parts post-petition that it is supplying pre-petition during the term of the post-petition contract. Subject to confirming that the increase in raw scrap price equals or exceeds twenty percent (20%) and that the increase is necessary to allow Auburn Foundry to break even regarding the GM production, pricing of the post-petition contract parts will be twenty percent (20%) higher than existing contract prices for such parts through the term of this contract (the "April 1 Contract Price"). In the event the published Chicago market price for #1 bushling for the first full week of a given

3

month between May and July, 2004 as reported in the *Iron Age Scrap Bulletin* increases by ten

percent (10%) or more above the Iron Age Scrap Bulletin price for the first week of April, 2004

(the "Reference Price"), then Auburn Foundry will be entitled to an additional two percent (2%)

price increase above the April 1 Contract Price for the remaining term of the post-petition

contract. For clarity, at no time during the period April 1, 2004 through August 1, 2004, shall

the purchase price exceed the April 1 Contract Price, plus 2%. For the period after August 1,

2004 through December 23, 2004, Auburn Foundry shall be entitled to an increase of 4% above

the April 1 Contract Price, if the published Chicago market price for #1 bushling for the first full

week in any given month between September and December, 2004 as reported in the *Iron Age*

*Scrap Bulletin* increases by 16% or more above the Reference Price prior to the termination of

the agreement on December 23, 2004. For clarity, at no time during the period August 1, 2004

through December 23, 2004 shall the purchase price exceed the April 1, Contract price, plus 4%.

Any adjustment in accordance with the above shall be effective on the fifteenth (15th) day of the

month in which the respective percentage increase is terminated. Notwithstanding the foregoing,

if GM should propose a scrap purchase program to Auburn Foundry that provides it an

equivalent economic benefit to the alternative set forth in this Section II(a), the Auburn Foundry

agrees to evaluate, in good faith, any such proposals by GM.

      b.    The term of the post-petition contract shall be April 1, 2004 through

December 23, 2004.

      c.    Auburn Foundry will build inventory banks upon GM's request subject to

capacity constraints, availability of financing and ramp-up requirements. Commencing in the

first full week of April, 2004, Auburn Foundry will meet GM increases in product release

requests in excess of present levels by more than fifteen percent (15%) if firm release requests

4

are given to Auburn Foundry by GM four weeks in advance of actual requirements.  If GM increases its release requests by more than twenty percent (20%) over present levels, such increases shall be by separate purchase orders and such purchase orders shall be payable thirty (30) days after GM's receipt of such parts.  GM will make an advance payment of $50,000.00 on amounts otherwise payable to Auburn Foundry in May, 2004 on or about the date of the set-off described in I(b) and shall make an advance payment of $50,000.00 on amounts otherwise payable to Auburn Foundry in June, 2004 on or about May 2, 2004.

      d.      If there is equipment owned by Auburn Foundry that is dedicated solely to the production of GM product and not otherwise useable by Auburn Foundry, Auburn Foundry will grant GM the first opportunity to purchase that equipment at a mutually agreeable price before selling such equipment to others; provided, however, that Auburn Foundry shall not sell any such equipment without either (1) the prior written consent of the Agent, or (2) an order of the Bankruptcy Court of the Northern District of Indiana after notice and a hearing at which the Agent shall have the right to object.

      e.      Provide GM and its representatives access to information and Auburn Foundry's operations at reasonable times and upon reasonable notice so as not to unduly interfere with Auburn Foundry's operations.  In order to receive non-public information, GM will sign a Confidentiality Agreement if requested by Auburn Foundry, and Auburn Foundry reserves the right not to disclose proprietary information, or information that it deems confidential to its business operations.

      f.      Auburn Foundry will cooperate with GM's reasonable resourcing consistent with the provisions of this agreement in the event of a default by Auburn Foundry under the post-

5

petition contract with GM (if any such contract is entered into) after expiration of any notice or cure periods in such contract, if any, or upon expiration of such contract.

     g.     Upon payment in full of all post-petition invoices owed to Auburn Foundry without setoffs or defenses, other than Allowed Setoffs, or entry of an order by the Bankruptcy Court for the Northern District of Indiana that Auburn Foundry does not have a possessory lien on the GM owned tooling, GM shall have the right to possession of the GM owned tooling.

## III.    TOOLING ACKNOWLEDGMENT

a.    Auburn Foundry acknowledges and agrees that, exclusive of Auburn Owned Tooling (as defined below), all tooling, dies, test and assembly fixtures, jigs, gauges, patterns, casting patterns, cavities, molds, and documentation, including engineering specifications and test reports, together with any accessions, attachments, parts, accessories, substitutions, replacements, and appurtenances thereto used by Auburn Foundry in connection with its manufacture of the component parts for GM (collectively "GM Tooling") are owned by GM and are being held by Auburn Foundry or, to the extent Auburn Foundry has transferred GM's Tooling to third parties, by such third parties, as bailees at will.  For purposes of this Agreement, the term "Auburn Owned Tooling" means all tooling, dies, tests and assembly fixtures, jigs, gauges, patters, casting patterns, cavities, molds, and documentation, including engineering specifications and test reports, together with any accessions, attachments, parts, accessories, substitutions, replacements and appurtenances thereto, for which GM has not made full payment of the applicable purchase order price or which is not subject to a purchase order.  Each item of Auburn Owned Tooling will become and be considered GM Tooling under the terms of this Agreement once it has been paid for in full in accordance with the terms of the applicable purchase order related thereto, without setoff or recoupment by GM.  Additionally, GM Tooling does not include any tooling manufactured by Auburn Foundry on or after the date of the execution of this agreement under a purchase order for GM unless and until such tooling has been fully paid for by GM without setoff or recoupment.

b.    On or before May 31, 2004, Auburn Foundry will supply to GM and the Agent a list of Auburn Owned Tooling.  Any tooling utilized to manufacture component parts for GM not included on the list of Auburn Owned Tooling shall be deemed GM Tooling unless the Agent

7

objects in writing within ten (10) days thereafter. Auburn Foundry will cooperate with GM in determining which of Auburn Foundry's tooling is Auburn Owned Tooling or GM Tooling. If a party objects to the tooling list, GM and the Agent shall each select an independent accountant (whose fees and costs shall be paid by the respective party) who shall determine the status of any tooling in dispute. If the two independent accountants cannot agree, the dispute will be referred to binding arbitration with all costs and expenses shared equally. Should either the Agent or GM fail to appoint an accountant within ten (10) days after a timely objection by either party, the status of any disputed tooling shall be determined by the independent accountant selected by GM or the Agent, as the case may be, acting alone.

c.    No person or entity other than GM has any right, title or interest in GM Tooling. Upon payment in full of all post-petition invoices owed to Auburn Foundry without setoffs or defenses, other than Allowed Setoffs, or entry of an order by the Bankruptcy Court for the Northern District of Indiana that Auburn Foundry does not have a possessory lien on the GM Tooling, GM shall have the right to possession of the GM Tooling.

## IV.    PAYMENT OF PRE-PETITION PAYABLE

a.    In anticipation of execution of this agreement, GM wire transferred $402,011.00 in payment for pre-petition products sold by Auburn Foundry to GM.

b.    On or before March 15, 2004, GM and Auburn Foundry will file a joint motion seeking court approval of the terms of this agreement, including approving the Pre-Petition Setoff by GM under §533 of the Bankruptcy Code in the amount of $150,000.00 in favor of GM. The Pre-Petition Setoff, when approved by the Bankruptcy Court, shall be immediately effective

as payment in part of the rejection damages that will be incurred by GM based upon the differential between the existing contract price of the post-petition contract price.

## V.    THIRD PARTY BENEFICIARIES

The Agent and the Senior Lenders are intended third party beneficiaries of this agreement and this agreement cannot be amended without the express written consent of all parties hereto.

General Motors Corporation

By:_____

Its:_____

Auburn Foundry, Inc., Debtor-In-Possession

By:_____

Its:_____

9

# EXHIBIT D

Budget

**Asbury Foundry, Inc.**
**Cash Flow and Collateral Forecast**
**Annual Borrowing April 9th and forecast through August 2004 = ($000's)**

c. Estimated amount of prepetition vacation days. Total yearly payment of $3,000 equals $23 per on item 3.75 months on prepetition remainder to post-petion

## SEVENTH AMENDMENT

This Seventh Amendment (this "Amendment") is dated as of October 7, 2004 and is made by and among Auburn Foundry, Inc. ("Auburn" or the "Debtor"), Bank of America, N.A. ("BofA"), GMAC Commercial Finance, LLC successor by merger to GMAC Business Credit LLC ("GMAC" and, together with BofA, the "Lenders") and AFI Lending Group, LLC ("AFI Lending").

## W I T N E S S E T H :

WHEREAS, the Debtor, the Lenders and AFI Lending entered into that certain Agreement for Long-Term Cash Use and Senior Debtor-In-Possession Financing, dated as of April 19, 2004 (as the same may have heretofore been or may hereafter be further amended, modified, supplemented, extended, renewed, restated or replaced, the "Cash Use Agreement");

WHEREAS, on May 12, 2004, the Bankruptcy Court for the Northern District of Indiana (the "Court") entered the (i) Final Order Approving Joint Motion Pursuant to Rule 4001(B) to Approve Agreement Concerning Use of Cash Collateral (the "Final Cash Collateral Order") and (ii) Final Order Approving Joint Motion Pursuant to Rule 4001(C) to Approve Agreement Concerning Senior DIP Financing;

WHEREAS, pursuant to Section 18 of the Cash Use Agreement, no later than May 20, 2004, the Debtor was required to file with the Court (i) the Plan and Disclosure Statement and (ii) a motion to approve the Disclosure Statement (the "Filing Date Requirements");

WHEREAS, pursuant to Section 8 of the Cash Use Agreement, the Lenders' willingness to make loans under the Cash Use Agreement and the Lenders' consent to the Debtor's use of cash collateral immediately and automatically terminates and all DIP Indebtedness is immediately due and payable in cash upon the earliest to occur of certain specified events (the "Termination Date");

WHEREAS, on or about May 25, 2004, the Debtor and the Lenders executed a Waiver and Amendment whereby they amended the Cash Use Agreement to extend the Filing Date Requirements to June 8, 2004;

WHEREAS, on or about June 8, 2004, the Debtor and the Lenders executed a Second Waiver and Amendment whereby they amended the Cash Use Agreement to extend the Filing Date Requirements to July 7, 2004;

WHEREAS, on or about July 8, 2004, the Debtor and the Lenders executed a Third Waiver and Amendment whereby they amended the Cash Use Agreement, effective as of July 7, 2004, to extend the Filing Date requirements to July 12, 2004;

WHEREAS, on or about August 31, 2004, the Debtor and the Lenders executed a Fourth Amendment (the "Fourth Amendment") whereby they amended the Cash Use Agreement, effective as of August 31, 2004, to extend the Termination Date to September 15, 2004;

WHEREAS, on or about September 15, 2004, the Debtor and the Lenders executed a Fifth Waiver and Amendment whereby they amended the Cash Use Agreement, effective as of September 15, 2004, to extend the Termination Date to September 30, 2004;

WHEREAS, on or about September 30, 2004, the Debtor and the Lenders executed a Sixth Waiver and Amendment whereby they amended the Cash Use Agreement, effective as of September 30, 2004, to extend the Termination Date to October 7, 2004;

WHEREAS, Section 16 of the Cash Use Agreement states that the Initial Approved Budget, as defined therein, for the period from April 9, 2004 through September 3, 2004 may be modified or supplemented from time to time by additional budgets to which the Lenders and the Debtor agree;

WHEREAS, Section 27 of the Cash Use Agreement permits the Debtor and the Lenders to seek to modify or amend, *inter alia*, the Cash Use Agreement and the Final Cash Collateral Order.

WHEREAS, the Debtor, the Lenders and AFI Lending have agreed to further amend the Cash Use Agreement, in each case subject to the terms and conditions specified herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the parties hereto agree, covenant and warrant as follows:

**SECTION 1.  Definitions.**  All capitalized terms used herein (including the recitals hereto) shall have the respective meanings assigned thereto in the Cash Use Agreement unless otherwise defined herein.

**SECTION 2.  No Waivers; Reservation of Rights.**

(a)    The Lenders have not waived, nor by this Amendment are waiving, or have any intention of waiving, any violations of the Cash Use Agreement which may be continuing on the date hereof or any violations which may occur after the date hereof.

(b)    The Lenders and the Debtor reserve the right, in their sole respective discretion, to exercise any or all of their respective rights and remedies under the Cash Use Agreement as a result of any violation of the Cash Use Agreement which may be continuing on the date hereof or any violation of the Cash Use Agreement which may occur after the date hereof, and the Lenders and the Debtor have not waived any of such rights or remedies, and nothing in this Amendment, and no delay on their part in exercising any such rights or remedies, should be construed as a waiver of any such rights or remedies.

**SECTION 3.  Amendment to Cash Use Agreement.**  The Cash Use Agreement is hereby amended as follows:

Section 8(i) of the Cash Use Agreement is hereby amended and restated by deleting "October 7, 2004" and replacing it with "November 5, 2004." Provided, however, that such section

shall be further amended by deleting "November 5, 2004" and replacing it with "December 31, 2004" at such time as the Debtor, Lenders and AFI Lending shall in writing agree that Debtor has submitted, and Lenders and AFI Lending have each approved in their sole and absolute discretion, a budget and financial projections for Debtor's operations through December 31, 2005.

Section 12(b) of the Cash Use Agreement is hereby amended and restated by deleting "October 7, 2004" each of the two times it appears therein and replacing it with November 5, 2004." Provided, however, that such section shall be further amended by deleting "November 5, 2004" and replacing it with "December 31, 2004" at such time as the Debtor, Lenders and AFI Lending shall in writing agree that Debtor has submitted, and Lenders and AFI Lending have each approved in their sole and absolute discretion, a budget and financial projections for Debtor's operations through December 31, 2005.

Section 18 (a) and (b) shall be amended by substituting the dates "November 5, 2004" and "November 15, 2004", respectively, as the dates by which Debtor shall tender a draft Amended Disclosure Statement and Plan of Reorganization to Lenders and thereafter file Debtor's Amended Disclosure Statement and Plan of Reorganization.

Section 18(d) shall be amended by deleting "1,300,000" and replacing it with "$1,800,000." Provided, however, that such section shall be further amended by deleting "$1,800,000" and replacing it with "$3,300,000" at such time as the Debtor, Lenders and AFI Lending shall in writing agree that Debtor has submitted, and Lenders and AFI Lending have each approved in their sole and absolute discretion, a budget and financial projections for Debtor's operations through December 31, 2005.

Section 20 of the Cash Use Agreement is hereby amended and restated in its entirety by inserting the following provision:

> 20. <u>Subordinated DIP</u>. All advances by AFI Lending to the Debtor on and after the Filing Date up to $1,800,000 (the "<u>Subordinated DIP</u>") shall be subject and subordinate to the DIP Indebtedness and the amount (up to $1,050,000), if any, by which the value of the Lenders' Pre-Petition Collateral, including, without limitation, Cash Collateral, has been reduced, charged, or is subject to future reduction or charge, by the incurrence of any allowable and unpaid administrative expenses, surcharges (arising under § 506(c) of the Bankruptcy Code or otherwise), liens, wage claims, taxes (including, without limitation, real estate taxes) or other items or amounts arising on or after the Filing Date (the "<u>Priming Diminution</u>") and the amount (up to $1,800,000 less the Priming Diminution), if any, by which the Pre-Petition Collateral consisting of cash, the collectible amount of accounts receivable and inventory has not been replaced by DIP Collateral consisting of cash, the collectible amount of accounts receivable and inventory (the "<u>Collateral Diminution</u>"), and, once advanced, shall not be repaid in whole or in part by the Debtor until the DIP

Indebtedness has been indefeasibly paid in full, and the Priming Diminution and the Collateral Diminution have been determined by the Court in a final, non-appealable order (the "Subordinated DIP Repayment Date"). Upon the extension of the Termination Date to December 31, 2004, each reference in this Section to "$1,800,000" shall automatically, and without further written amendment, be changed to "$3,300,000." On the Subordinated DIP Repayment Date, the Debtor shall repay to AFI Lending only the amount by which the Subordinated DIP outstanding at such time exceeds the Priming Diminution and the Collateral Diminution. The remainder of the Subordinated DIP shall only be repaid by the Debtor after indefeasible payment in full of all of the Indebtedness. For example, if, after the increase in the amount of the Subordinated DIP to $3,300,000, the amount of the Subordinated DIP was $2,000,000 and the Priming Diminution and the Collateral Diminution were determined to be $500,000 and $700,000, respectively, then on the Subordinated DIP Repayment Date, AFI Lending would receive payment on the Subordinated DIP of $800,000. The balance of the Subordinated DIP in the amount of $1,200,000 would remain outstanding until full indefeasible payment to the Lenders of the Indebtedness.

**SECTION 4. Additional Agreements.**

The Lenders and the Debtor agree that the budget attached as Exhibit A hereto (the "Budget") shall constitute an agreed-upon supplement to the Initial Approved Budget for the period ending November 5, 2004 within the meaning of Section 16 of the Cash Use Agreement. Upon the further amendment of the Termination Date from "November 5, 2004" to "December 31, 2004," the budget and financial projections provided by Debtor for its operations through December 31, 2005 shall constitute an agreed-upon supplement to the Initial Approved Budget for the period ending December 31, 2004 within the meaning of Section 16 of the Cash Use Agreement.

Any loan advances hereafter made to Debtor by AFI Lending in excess of the $1,300,000 presently advanced shall be credited against any obligation of AFI Lending to make a capital contribution to New AFI upon the Effective Date of a confirmed Plan of Reorganization, if such obligation hereafter exists by agreement with Lenders, or otherwise.

**SECTION 5. Conditions to Effectiveness of This Amendment.** This Amendment shall become effective upon full execution of this Amendment and delivery by each party to this Amendment to each other party to this Amendment a copy of this Amendment executed by such party.

**SECTION 6. Provisions of General Application.**

(a)    **Effect of this Amendment.** Except as expressly set forth herein, no other changes or modifications to the Cash Use Agreement are intended or implied and in all other

-4-

respects the Cash Use Agreement is hereby specifically ratified, restated and confirmed by all parties hereto as of the date hereof.  To the extent of conflict between the terms of this Amendment and the Cash Use Agreement, the terms of this Amendment shall control.  The Cash Use Agreement and this Amendment shall be read and construed as one agreement.

     (b)    **Binding Effect.**  This Amendment shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

     (c)    **Survival of Representations and Warranties.**  All representations and warranties made in this Amendment shall survive the execution and delivery of this Amendment.

     (d)    **Severability.**  Any provision of this Amendment held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Amendment.

     (e)    **Reviewed by Attorneys.**  The Debtor and the Lenders represent and warrant to each other and AFI Lending that they (i) understand fully the terms of this Amendment and the consequences of the execution and delivery of this Amendment, (ii) have been afforded an opportunity to have this Amendment reviewed by, and to discuss this Amendment with such attorneys and other persons they may wish, and (iii) have entered into this Amendment and executed and delivered all documents in connection herewith of their own free will and accord and without threat, duress or other coercion of any kind by any person.

     (f)    **Counterparts.**  This Amendment may be executed in any number of counterparts, but all of such counterparts shall together constitute but one and the same agreement.

     (g)    **Headings**.  Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purposes.

IN WITNESS WHEREOF, this Amendment has been duly executed as of the day and year first above written.

FWIMAN1 357824v1
CH\719474.2

AUBURN FOUNDRY, INC.

By: _____

Its: _____

BANK OF AMERICA, N. A.

By: _____

Its: _____

GMAC COMMERCIAL FINANCE LLC,
SUCCESSOR BY MERGER TO GMAC
BUSINESS CREDIT LLC

By: _____

Its: _____

AFI LENDING GROUP, LLC

By: _____

Its: _____

-6-

**AUBURN FOUNDRY, INC.**

By: _____

Its: _____

**BANK OF AMERICA, N. A.**

By: _____

Its: _____

**GMAC COMMERCIAL FINANCE LLC,
SUCCESSOR BY MERGER TO GMAC
BUSINESS CREDIT LLC**

By: _____

Its: _____

**AFI LENDING GROUP, LLC**

By: _____

Its: _____

FWIMANI 357824v1
CH\719474.2

**AUBURN FOUNDRY, INC.**

By: _____

Its: _____

**BANK OF AMERICA, N. A.**

By: _____

Its: _____

**GMAC COMMERCIAL FINANCE LLC,
SUCCESSOR BY MERGER TO GMAC
BUSINESS CREDIT LLC**

By: _____

Its: _____ SENIOR    VICE PRESIDENT

**AFI LENDING GROUP, LLC**

By: _____

Its: _____

-6-

**AUBURN FOUNDRY, INC.**

By: _____

Its: _____

**BANK OF AMERICA, N. A.**

By: _____

Its: _____

**GMAC COMMERCIAL FINANCE LLC,
SUCCESSOR BY MERGER TO GMAC
BUSINESS CREDIT LLC**

By: _____

Its: _____

**AFI LENDING GROUP, LLC**

By: _____

Its: _MANAGING member_

FWGMANL 357824v1
CH7194742

Cash Flow Analysis Jan thru Feb
Auburn Foundry Inc
Weekly Cash Flow

| Week ending dates | 10/8/2004 | 10/15/2004 | 10/22/2004 | 10/29/2004 | 11/5/2004 |
|---|---|---|---|---|---|
| **Sales for week** | | | | | |
| Pounds | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 |
| Dollars | $1,728 | $1,728 | $1,728 | $1,728 | $1,728 |
| Collections | $1,350 | $1,350 | $1,350 | $1,400 | $2,600 |
| Non A/R | 5 | 5 | 5 | 5 | 5 |
| Total payroll, taxes, and benefits | 580 | 465 | 580 | 390 | 580 |
| Total purchase of materials | 959 | 978 | 986 | 990 | 959 |
| Utilities | 150 | 150 | 270 | 150 | 150 |
| Bank Fee/Interest | 6 | 10 | | | 6 |
| Total payments | 1,695 | 1,603 | 1,836 | 1,530 | 1,695 |
| Cash Flow from Operations | ($340) | ($248) | ($481) | ($125) | $910 |
| **Professional/Bankruptcy Costs** | | | | | |
| Debtor Counsel | | 75 | | 0 | |
| Debtor Financial Advisor | | | | 0 | |
| Other | | | | 0 | |
| Creditor Committee | 35 | | | 0 | 10 |
| US Trustee | | | | 10 | |
| Draw on letter of credit | 1,021 | | | | |
| Renew Liability Insurance | 50 | | | | 50 |
| Total Professional/Bankruptcy Costs | $1,106 | $75 | $0 | $10 | $60 |
| Total cash inflow ( outflow ) | ($1,446) | ($323) | ($481) | ($135) | $850 |
| Cumulative Cash Flow | ($1,430) | ($1,753) | ($2,234) | ($2,369) | ($1,519) |
| **Borrowing Base** | | | | | |
| Acc't Rec - beg | $9,669 | $10,047 | $10,425 | $10,803 | $11,131 |
| Plus Sales | $1,728 | $1,728 | $1,728 | $1,728 | $1,728 |
| Less Cash Receipts | ($1,350) | ($1,350) | ($1,350) | ($1,400) | ($2,600) |
| Acc't Rec - end | 10,047 | 10,425 | 10,803 | 11,131 | 10,259 |
| Less Ineligibles | (2,155) | (2,155) | (2,155) | (2,155) | (2,155) |
| Eligible Rec | 7,892 | 8,270 | 8,648 | 8,976 | 8,104 |
| Available from A/R - 85% | 6,708 | 7,030 | 7,351 | 7,630 | 6,888 |
| Available from Inv | 1,456 | 1,456 | 1,456 | 1,456 | 1,456 |
| Overadvance | 1,325 | 1,325 | 1,325 | 1,325 | 1,325 |
| Total borrowing base | 9,489 | 9,811 | 10,132 | 10,411 | 9,669 |
| **Line of Credit** | | | | | |
| Beg Bal | 7,482 | 8,928 | 9,251 | 9,732 | 9,867 |
| Less Cash Receipts | ($1,355) | ($1,355) | ($1,355) | ($1,405) | ($2,605) |
| Plus borrowings | $2,801 | $1,678 | $1,836 | $1,540 | $1,755 |
| | 8,928 | 9,251 | 9,732 | 9,867 | 9,017 |
| Plus Letter of Credit | 0 | | | | |
| Total Line of Credit | 8,928 | 9,251 | 9,732 | 9,867 | 9,017 |
| Availability | 561 | 560 | 400 | 544 | 652 |