IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

IN THE MATTER OF:                          )
                                           )
AUBURN FOUNDRY, INC.                       )          Chapter 11
                                           )
                        Debtor.            )          BK Case No. 04-10427


### AMENDED AND SUPPLEMENTED DISCLOSURE STATEMENT TO ACCOMPANY PLAN OF REORGANIZATION DATED JANUARY 20, 2005


**BAKER & DANIELS**
John R Burns (#3016-02)
Stephen A. Claffey (#3233-98)
Mark A. Werling (#20426-02)
111 East Wayne Street, Suite 800
Fort Wayne, Indiana 46802
Telephone:  (260) 424-8000
Facsimile:  (260) 460-1700

ATTORNEYS FOR THE DEBTOR,
AUBURN FOUNDRY, INC.

## IMPORTANT NOTICE

This Disclosure Statement has been submitted by Auburn Foundry, Inc. (the "Debtor" or "AFI") in connection with a Plan of Reorganization dated January 20, 2005.

This Disclosure Statement and its related documents are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes to accept the Plan. No representations have been authorized by the Bankruptcy Court concerning the Debtor, its business operations or the value of its assets, except as explicitly set forth in this Disclosure Statement.

Please refer to the Plan (or, where indicated, certain motions filed with the Bankruptcy Court) for definitions of the capitalized terms used in this Disclosure Statement.

The Debtor reserves the right to file an amended Plan and Disclosure Statement from time to time. The Debtor urges you to read this Disclosure Statement carefully for a discussion of voting instructions, recovery information, classification of claims, the history of the Debtor and the Reorganization Case, the Debtor's businesses, properties and results of operations, historical and projected financial results and a summary and analysis of the Plan.

11 U.S.C. § 1125(b) PROHIBITS SOLICITATION OF AN ACCEPTANCE OR REJECTION OF A PLAN OF REORGANIZATION UNLESS A COPY OF THE PLAN OF REORGANIZATION OR A SUMMARY THEREOF IS ACCOMPANIED OR PRECEDED BY A COPY OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT, AND, THEREFORE, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED AS, AN AUTHORIZED SOLICITATION PURSUANT TO 11 U.S.C. § 1125 AND RULE 3017 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  NO SUCH SOLICITATION WILL BE MADE EXCEPT AS AUTHORIZED PURSUANT TO SUCH LAW AND RULES.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE STATEMENTS OR INFORMATION CONTAINED HEREIN.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

IN THE MATTER OF:                          )
                                           )
AUBURN FOUNDRY, INC.                       )          Chapter 11
                                           )
                 Debtor.                   )          BK Case No. 04-10427


I.      **OVERVIEW OF THE DISCLOSURE STATEMENT[1]**

### INTRODUCTION

On February 8, 2004 (the "Petition Date"), Auburn Foundry, Inc. (the "Debtor"), filed a voluntary petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Capitalized terms not otherwise defined herein will have the same meanings as are ascribed to such terms in the Plan.

The Plan provides for the sale of substantially all of the Debtor's assets through two separate sale procedures.  First, New AFI, a newly formed entity, will purchase all of the Debtor's assets except (i) the manufacturing facility and certain equipment located at Plant 1, (ii) the Landfills, and (iii) Avoidance Action Recoveries and the proceeds of Insurance Claim – Kemper, which claim has been filed by the Debtor.  Principally, New AFI will acquire Plant 2, the office building and attached parking lot at Plant 1, the Residential Real Estate, and the Wetlands.  In addition, the Debtor will sell, at a public auction, the manufacturing facility and certain equipment located at Plant 1.  Plant 1 and Plant 2 are described more fully in Article III(B)(3) of this Disclosure Statement.

New AFI's purchase price will be the sum of (i) the Allowed Secured Claims of the Senior Lenders and Allowed Miscellaneous Secured Claims, (ii) the amount necessary to satisfy the claims of the Senior DIP Lender and Junior DIP Lender in full; (iii) all allowed Administrative Expense Claims (other than expenses pertaining to Retained Property) and Priority Claims unpaid as of the Effective Date; (iv) all allowed Claims for Underfunded Pension Liabilities, Accrued Vacation Pay, Accrued Personal Day Pay, and Pension Excise Taxes unpaid as of the Effective Date; and (v) a total of $1,750,000 to the divided, Pro Rata, among holders of Allowed Unsecured Claims, which sum shall be distributed, over time, pursuant to the terms of the Plan.  IDEM, which also holds an unsecured Claim, will receive the rights under a trust agreement that will be funded by the proceeds from a $1,021,000 letter of credit, proceeds from the Insurance Claim – Kemper, and any Net Proceeds from the disposition of the Landfills.

---

[1]    Capitalized terms used and not defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan.

The Debtor has received an offer of a guaranteed bid for the sale of the manufacturing facility at Plant 1 and related equipment from a Guaranteed Bidder, an entity which may then conduct the Plant 1 Auction for these assets.  Under an Auction Agreement, the negotiation of which is yet to be finalized, the Guaranteed Bidder is expected to offer a guaranteed price to the Debtor for such assets.  Any amount greater than the guaranteed price at the time of the possible auction will be divided between the Debtor and the Guaranteed Bidder.  As an alternative the Guaranteed Bidder has offered to purchase outright these assets.  The Guaranteed Bidder will have no common ownership or management with the Debtor. The Debtor is reviewing these alternatives and will finalize an Auction Agreement that will be part of the supplementary documents filed with the Plan.

Upon the Effective Date, the Subordinated Lenders, as holders of both Secured Claims and Unsecured Claims, will subordinate their distribution rights, $8,530,530.34 secured and $502,245.37 unsecured, to Unsecured Creditors, including IDEM.  Accordingly, the Subordinated Lenders, each of whom is a shareholder of the Debtor, will receive no distributions from the Estate on account of their Subordinated Debt.

All of the Debtor's marketable assets will be sold through the sale mechanisms described herein, and all Net Proceeds therefrom shall be distributed to Creditors under the Plan.

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit A)
- The Debtor's Projected Financial Information (Exhibit B)
- The Debtor's Liquidation Analysis (Exhibit C)
- The Debtor's Most Recent Audited Financial Statements and Monthly Operating Reports (Exhibit D)
- New AFI's Banking Covenants for Payments to Officers and Directors (Exhibit E)
- Exhibits to Plan and Disclosure Statement Supplement:  Fairness Opinion, Plant 1 Equipment, and Debtor's Real Estate (Exhibit F)

The projections contained in Exhibit B represent the Debtor's forecasts for New AFI upon emergence.

Any interested party desiring further information should contact:

BAKER & DANIELS
111 E. Wayne Street, Suite 800
Fort Wayne, Indiana 46802
Telephone: 260-424-8000
Facsimile:  260-460-1700
Attn:  John R Burns, III
Email:  john.burns@bakerd.com
Attn:  Mark A. Werling
Email:  mark.werling@bakerd.com

## II.    SUMMARY AND OVERVIEW OF THE PLAN

Taken together, the New AFI Sale and the Plant 1 Auction are the primary means of funding the Plan.

The following table briefly summarizes the classifications and treatment of Claims and Equity Interests under the Plan.  Estimated Amounts are based, in part, on the Debtor's Schedules and, in part, on the Debtor's subsequent estimates of such Claims.  These estimates are subject to further revision by the Debtor at any time subsequent to the filing of the Disclosure Statement.

| Class | Designation | Estimated Amount | Estimated Recovery |
|-------|-------------|------------------|--------------------|
| Class 1 | Priority Tax Claims | $  1,438,374.00 | 100% |
| Class 2 | Priority Non-Tax Claims | $      127,317.32 | 100% |
| Class 3 | Allowed Secured Claims | $26,961,000 in Senior Lender debt.<br><br>$8,530,530 in Subordinated Debt. | 100% of Allowed Claims for Senior Lender Debt.<br><br>0%, pursuant to a consensual subordination on the Effective Date of distribution rights to holders of Allowed Class 5 and Class 6 Claims. |
| Class 4 | Miscellaneous Secured Claims | $      169,623.16 | 100% |
| Class 5 | General Unsecured Claims | $14,830,552.00.  This does not include $502,245 in General Unsecured Claims of Subordinated Lenders, whose distribution | Pro Rata Share of $1,750,000, in total, to be distributed, over time, pursuant to the Plan. |

| | | rights will be subordinated on the Effective Date to holders of Class 5 and Class 6 Claims. | |
|---|---|---|---|
| Class 6 | IDEM Claims | Approximately $5,000,000 | $1,021,000 from a letter of credit furnished by the Debtor that will be funded into a trust and disbursements made subject to the trust agreement and an assignment of proceeds from Insurance Claim – Kemper.  IDEM will also receive any Net Proceeds from the disposition of the Landfills. |
| Class 7 | Common Stock Interests | N/A | N/A |

The management of New AFI will be identical to the Debtor's management. Management salaries at New AFI will be substantially similar to salaries currently paid by the Debtor.  All of the members of New AFI's sole member, AFI Lending Group, LLC (other than the Senior Lenders, by virtue of a unit granted to them under the New Credit Facility are shareholders of the Debtor.

## III.    GENERAL INFORMATION

### A.    Overview of Chapter 11

Chapter 11 is the primary business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business and affairs for itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to distributions of the value of a debtor's assets.

The commencement of a chapter 11 case creates a bankruptcy estate that is comprised of all of the legal and equitable interests of a debtor as of the commencement date of the chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and affairs and remain in possession of its property as a "debtor-in-possession".

The consummation of a plan of reorganization is the fundamental objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for restructuring a debtor's business and satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of a plan, and substitutes the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. The Debtor is submitting this Disclosure Statement to holders of claims against and equity interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

**B.    Description and History of Business**

1.    The Debtor's Pre-Petition History

AFI is one of the largest independent gray and ductile iron foundry operations in North America. It supplies over 160,000 tons of cast iron and ductile parts annually to large original equipment manufacturers ("OEMs") in the automotive, RV, heavy truck, air compressor and home appliance markets. With revenue of over $120 million in 2002, AFI ranked number two in sales compared to its nearest geographic competitors. The Fink family has controlled AFI since the Company's founding in 1911, with four family members currently controlling 80% of the Debtor's stock.

AFI  manufactured in two facilities within two miles of each other in Auburn, Indiana, with a combined production capacity of over 160,000 tons. The Debtor's parts weigh less than 50 pounds per unit. Typical products include brake, transmission and air conditioning components for consumer product companies. AFI's quality and delivery performance have fostered many long-term customer relationships. In 2002, approximately 69% of the Debtor's revenue was generated from customers served for more than ten years.

Historically a gray iron-only operation, AFI has entered the growing ductile iron market. While similar in appearance and production methodology, ductile iron is a more profitable, higher demand product than gray iron because of its greater tensile strength and elongation attributes. These strength and elongation attributes result from mixing magnesium into the primary ferrous alloy to produce a microscopic spherical graphite shape in the iron matrix.

The changes that occurred in 2003 were the initial steps in a two-year process of returning the company to acceptable profitability levels. For the prior five years, the Debtor

suffered continuing losses, which reached a climax in 2003 with a loss expected to exceed $14 million.

The initial change was the determination that the Debtor needed to offer ductile iron as part of its product mix.  AFI had been equipped such that for little capital investment, less than $250,000, its plants would be able to produce ductile products.  Ductile products, due to their position in the market place and the control standards necessary for production, carry an average 30% higher selling price.

The Debtor then began marketing its ductile capability to new and existing customers.  An excellent opportunity was developed, and AFI was favored with a contract from a very large Tier II automotive supplier.  In order to meet the needs of this supplier, AFI had to be certified as a ductile producer by one of the automotive companies.  In late summer, Chrysler Automotive did an inspection, and AFI was certified.   Industry standards would indicate that it is highly unusual for a company to be certified so quickly and on first inspection.  In addition, the Debtor asked for and was certified under ISO 9000 standards for ductile production.

The second change to occur in 2003 consisted of taking the cupola melt system off line and moving to strictly electric melt capability.  The major driver for this decision was the capital outlay that would be necessary for meeting environmental requirements associated with cupola melting.

After consistently delivering annual EBITDA in excess of $10.0 million during most of the 1990s, the combination of increased global competition, a labor strike, and a weak economy negatively affected operating performance prior to the Chapter 11 filing.  Volumes and pricing became weak, scrap costs increased dramatically by virtue of foreign demand, and foreign competition was fierce.  Many foundries failed, and are failing, in this extremely challenging environment.

2.     Properties

AFI has two facilities in which it had produced gray and ductile iron.

**Plant 1**

Plant 1, which is the older and less profitable of the two facilities, is located in the City of Auburn, Indiana.  AFI recently closed Plant 1 to facilitate a successful reorganization.  Prior to that time, AFI used Plant 1 to meet its production needs for both gray and ductile iron.  Under the revised Plan, AFI (and, subsequent to confirmation, New AFI) will meet those needs exclusively through its newer facility at Plant 2.

**Plant 2**

Built in 1995, and located near Interstate 69 outside the City of Auburn, Indiana, Plant 2 is one of the newest, most efficient, low-cost foundries in the nation.  It houses state-of-the-art casting equipment and automated systems.  Plant 2 generates product recovery yields (measure of how many good pounds are produced for a given amount of input material) nearly

15% higher than the industry.  In management's opinion, the plant's efficiency, from a labor standpoint, is unmatched in the industry.  For example, while Plant 1 required 10.0 manhours to produce one ton of good product, Plant 2 requires only 4.0 manhours.

**Other Property**

AFI also owns real property identified in the Plan as the Residential Real Estate, the Wetlands, and the Landfills, none of which are part of Plant 1 or Plant 2.  Legal descriptions for each are included on Exhibit E.

3.    <u>Present Condition of the Debtor and its Properties</u>.

The initial plan, which was filed with the Court on July 12, 2004, provided for a sale of two manufacturing plants to New AFI.  The Debtor withdrew that plan and subsequently closed Plant 1.  The Debtor determined, during the Chapter 11 Case, that it was sustaining monthly operating losses of approximately $1,300,000 at Plant 1, yet earning approximately $600,000 per month at Plant 2.  The Debtor concluded that neither it nor New AFI could operate both plants profitably subsequent to confirmation.

Under its revised Plan, the Debtor will sell Plant 2 and related assets to New AFI, which intends to operate the plant as a going concern, and sell Plant 1 and related assets.  New AFI's projected future earnings at Plant 2 will fund certain distributions under the Plan.

4.    <u>Current Executive Officers:</u>

Dennis Maude
David K. Weber
Thomas Woehlke

5.    <u>Officers, Directors, and Shareholders</u>

The Debtor's officers and directors, and each shareholder who owns or holds more than 5% of the voting securities, as listed in the Statement of Financial Affairs, is as follows:

| Name and Address | Title | Nature and Percentage of Stock Ownership |
|---|---|---|
| David D. Hunter | Director | |
| Dennis Maude | Chief Financial Officer | |
| David K. Weber | Vice President - Technology | |
| Thomas Woehlke | President | |
| William E. Fink | Director | 20.3% of Stock |
| David B. Fink | Director | 20.3% of Stock |
| John A. Fink | Director | 20.3% of Stock |
| Janet F. Borden | Stockholder | 17.7% of Stock |
| Tim Borden | Director | |

Tim and Janet Borden are husband and wife.

6.     Negotiations with New AFI, Senior Lenders, and Unsecured Creditors Committee

New AFI, through its counsel, negotiated its purchase price with the Debtor's management at arms length and in good faith, and did so in conjunction with discussions among the Senior Lenders and the Creditors' Committee.  The Debtor believes New AFI's offer represents the highest and best price available in the market.

To ensure the fairness of the New AFI Sale, the Debtor filed a motion with the Court to engage Western Reserve Partners, LLC ("WRP") to perform an independent opinion concerning such sale.  The Debtor selected WRP after considering several alternatives and advising the Senior Lenders and the Unsecured Creditors' Committee.  The Debtor will disclose WRP's fairness opinion in a supplemental filing within three business days of receipt thereof.

AFI discloses that it has reached an agreement with the Committee pursuant to which the Committee will express its intention to support the Plan.  The financial terms of that agreement provide, in principal part, that:

1)  Holders of Allowed General Unsecured Claims shall receive a total of $1,750,000, including an initial payment of $375,000, in accordance with AFI's Projected Financial Information.

2)  For purposes of computing Excess Cash Flow under the Plan, the amount of capital expenditures by New AFI shall be limited to $1,100,000 in 2005, $1,750,000 in 2006 and $1,850,000 in 2007.

3)  Payments to shareholders, officers and directors shall be limited to amounts permitted by applicable banking covenants set forth in Exhibit E.

4)  The retainer held by Baker & Daniels shall be applied to Court approved professional fees or other administrative or priority expenses, but shall not be part of the assets purchased by New AFI or any approved purchaser of Property Subject to Auction.

5)  "Cure" payments on leased equipment, if any, on Property Subject to Auction that is sold will be paid by the buyer, not by Debtor.

6)  Debtor and the Committee will establish a liquidating trust for residual estate matters, and/or agreement for the appointment of a plan monitor with standing to enforce plan compliance, in a form mutually agreeable to Debtor and the Committee, including terms and source of compensation for the trustee and/or plan monitor satisfactory to the Committee, with Committee counsel Henry A. Efroymson serving as initial trustee and/or plan monitor, as the case may be, or such other person as the Court may designate with the Committee's written consent.

## IV.    PREPETITION SECURED DEBT

The Debtor's assets are secured by liens and mortgages in favor of the Senior Lenders, Bank of America, National Association, and GMAC Commercial Finance, LLC, successor by merger to GMAC Business Credit, LLC.  The Senior Lenders will have Allowed Secured Claims of approximately $23,312,638.  The Debtor's assets are also secured by liens and mortgages in favor of certain Subordinated Lenders.  The claims of the Subordinated Lenders' have an aggregate value of approximately $8,530,530 in Secured Claims and $502,245 in Unsecured Claims, all of which are subordinated on the Effective Date solely with respect to distribution rights on terms set forth in the Plan.  Miscellaneous Secured Claims consist principally, if not exclusively, of certain financing leases scheduled as Secured Claims on the Debtor's Schedules and identified separately as such on Exhibit D.

## V.    SUMMARY OF VOTING PROCESS

### A.    Who May Vote to Accept or Reject the Plan.

Generally, holders of allowed claims or equity interests that are "impaired" under a plan are permitted to vote on the plan. A claim is defined by the Bankruptcy Code and the Plan to include a right to payment from a debtor; an equity interest represents an ownership stake in a debtor. In order to vote, a creditor must first have an allowed claim. Votes on the Plan will only be solicited from those Holders of Allowed Claims whose Claims are impaired and which will receive property or rights under the Plan. As explained more fully below, to be entitled to vote, a Claim must be both "Allowed" and "Impaired."

### B.    Summary of Voting Requirements.

In order for the Plan to be confirmed, the Plan must be accepted by at least one noninsider, impaired Class of Claims. A class of claims is deemed to have accepted a plan when allowed votes representing at least two-thirds (2/3) in amount and a majority in number of the claims of the class actually voting cast votes in favor of a plan. A class of equity interests has accepted a plan when votes representing at least two-thirds (2/3) in amount of the outstanding equity interests of the class actually voting cast votes in favor of a plan. The Debtor is soliciting votes from holders of Allowed Claims in the following Classes which are impaired under the Plan:

| Class | Description |
|-------|-------------|
| Class 3 | Secured Claims |
| Class 4 | Miscellaneous Secured Claims |
| Class 5 | General Unsecured Claims |
| Class 6 | IDEM Claims |

The Debtor will have the right to supplement this Disclosure Statement as to additional impaired Classes, if any.

**A VOTE FOR ACCEPTANCE OF THE DEBTOR'S PLAN BY THOSE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE IS MOST IMPORTANT.  THE DEBTOR ASSERTS THAT THE TREATMENT OF CREDITORS UNDER THE DEBTOR'S PLAN IS THE BEST ALTERNATIVE FOR CREDITORS AND THE DEBTOR RECOMMENDS THAT THE HOLDERS OF ALLOWED CLAIMS VOTE IN FAVOR OF THE DEBTOR'S PLAN.**

## VI.    SIGNIFICANT EVENTS DURING THE REORGANIZATION CASE

### A.    First Day Orders

On or shortly after the Petition Date, the Debtor filed numerous motions and applications requesting expedited orders that were generally routine in nature, but necessary to allow the Debtor to operate in the normal course during its transition into chapter 11.  The First Day Orders may be categorized as follows:

#### 1.    Extension of Time to File Schedules

The Debtor filed a Motion to extend the deadline to file its Schedules and Statement of Financial Affairs on February 23, 2004 due to the substantial size, scope and complexity of the Debtor's operations and the extent of material required to be compiled to complete the schedules and statements. The Court extended the time to March 12, 2004 and the Debtor proceeded to file its Schedules and Statement of Financial Affairs.

#### 2.    Cash Management System

The Debtor requested the authority to operate its cash management system substantially in the same manner in which it was handled prepetition. The Debtor utilizes cash management procedures in the ordinary course of its businesses designed to permit the efficient collection, investment and application of funds. Such procedures incorporate various lockbox accounts, concentration accounts, payroll accounts, and accounts payable through a system that is fully described in the motion. The Court approved the Debtor's existing cash management systems and use of existing bank accounts and business forms.

#### 3.    Prepetition Obligations

The Debtor filed a motion requesting the authority or discretion to pay certain prepetition wage obligations.  The Court authorized the Debtor to pay prepetition compensation, prepetition business expenses, deductions, withholdings and benefits that accrued but remained unpaid as of the Petition Date, to or for the benefit of employees, independent contractors, up to the statutory maximums provided in sections 507(a)(3) and 507(a)(4) of the Bankruptcy Code.

    4.      <u>Workers' Compensation Program</u>

AFI self-insures its workers' compensation obligations in accordance with Indiana law.  The Bankruptcy Court authorized AFI to continue its workers' compensation program, and pay all costs associated therewith.

    5.      <u>Use of Cash Collateral and Debtor-in-Possession Financing</u>

On the Petition Date, the Debtor filed a Motion for Interim Order Authorizing the Use of Cash Collateral and Granting Adequate Protection. With the consent of the Senior Lenders, the Debtor obtained Court approval to utilize cash collateral on an interim basis, in accordance with an approved budget.  In consideration of the consent by the Senior Lenders to the Debtor's use of cash collateral, the Debtor granted the Senior Lenders adequate protection, including, but not limited to, replacement liens in after-acquired property.

**B.**      **The Official Committee of Unsecured Creditors**

On or about February 12, 2004, the United States Trustee filed its Notice of Appointment of Creditors' Committee and appointed five (5) members to serve on a single Creditors' Committee and to represent the interests of all general unsecured creditors of the Debtor.  The United States Trustee filed an amended Notice on February 19, 2004.

**C.**      **Professionals of the Debtor**

The Debtor obtained Court authority to retain Baker & Daniels as its bankruptcy counsel.  It also obtained authority to employ Mellon Consultants as actuarial consultants and to employ Ernst & Young as its accounting consultants.  Most recently, the Debtor obtained Court approval to retain Rothberg Logan & Warsco as "conflicts counsel" to assist with Avoidance Actions.

**D.**      **Compliance with Bankruptcy Code, Bankruptcy Rules, Local Court Rules and U.S. Trustee Deadlines**

On March 13, 2004, the Debtor filed its Statement of Financial Affairs, Schedules of Assets and Liabilities, and lists of Equity Security Holders, each as amended from time to time.  On March 19, 2004, the United States Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code.  To the best of the Debtor's knowledge, information and belief, the Debtor has complied with all other applicable requirements of the Bankruptcy Code and Bankruptcy Rules, as well as local Bankruptcy Court rules and deadlines of the Office of the United States Trustee.  The Debtor is current in its filing of Monthly Operating Reports.

**E.**      **Discussions with Lenders, Committees and Unions; Pensions and Benefits**

Throughout its case, the Debtor has conducted numerous meetings and conversations with all major constituencies including, without limitation, the Senior Lenders, the Creditors' Committee, the PBGC, and the Union.  The Debtor has kept these parties

informed of the status of the development of the Plan. Under the current circumstances, the Debtor believes that the Plan maximizes the value of the Debtor's estate.

Earlier this year, the Debtor held additional discussions with the Union regarding consensual modifications to the Collective Bargaining Agreement and the Pension Plans. The Debtor hoped to achieve cost savings of approximately $1,100,000 under its prior plan of operating both Plant 1 and Plant 2. On August 21, 2004, the Union considered and ratified these modifications. They include, but are not limited to, changes to retiree medical and medical insurance benefits; limiting personal days available per quarter; and reducing scheduled increases to hourly wages. In addition, the Union agreed to a freeze (but not termination) of the Pension Plans, with the Debtor agreeing to participate in the Union's multiemployer pension plan, provided that the Debtor's financial obligation in connection with such participation does not exceed $.45 per hour per Union employee, plus reasonable initial costs incurred by the Debtor for professional services associated with the Debtor's joining the plan as a new participating employer. In the event the Debtor's financial obligation related to its participation in the multiemployer plan would necessarily exceed these parameters, the Debtor and the Union have agreed that the Debtor will seek the approval of the Union to make an equivalent contribution on behalf of Union members through an employer contribution to the defined contribution plan in which Union members currently participate rather than joining the Union multiemployer pension plan. The Plan provides for the assumption by New AFI of Underfunded Pension Liabilities and Pension Excise Tax Claims, which shall be paid upon the earlier of (i) the scheduled due date and (ii) the date agreed upon by the IRS and/or PBGC in response to any request for a waiver of minimum funding contribution requirements. The Plan also provides for the assumption by New AFI, and payment over a four month period, of Accrued Vacation Pay and Accrued Personal Day Pay which arise under the Collective Bargaining Agreement. The Debtor has complied with § 1113 of the Code in negotiating consensual modifications to the Collective Bargaining Agreement.

On September 15, 2004, the Debtor submitted a written request to the Internal Revenue Service for a waiver of minimum funding contribution requirements in connection with its hourly employee Pension Plan. If granted, this request will not relieve the Debtor (or New AFI) of such payment obligations, but instead would facilitate the fulfillment of such payments, with interest, over a period agreed upon by the IRS and/or PBGC. The Debtor expects to make a similar request of the Internal Revenue Service with respect to its salaried employee Pension Plan.

The Debtor also has certain unfunded, unsecured, non-qualified pension plans for its current and former executives, including the Benefits Restoration Plan dated January 1, 1994, the 1995 Long Term Incentive Plan dated November 30, 1998, and the 1995 Long-Term Incentive Plan dated December 1, 1994. None of these plans arise under a collective bargaining agreement within the meaning of § 1113 of the Code or provide for Retiree Benefits pursuant to § 1114 of the Code. Each is expressly rejected under the Plan.

The following table prepared by the Debtor's court-appointed pension actuary illustrates the Debtor's estimates for pension contributions:

| Plan Year: | Contribution Required: | Assumed Waiver Amount: | Date due for deposits into Trust: | |
|---|---|---|---|---|
| June 30, 2002 – June 29, 2003 | $245,630 | $0 | March 1, 2005 | $245,630 |
| June 30, 2003 – June 29, 2004 (5 year amortization payment of waiver is $272,279) | $1,072,954 | $1,072,954 | N/A | $0 |
| June 30, 2004 – June 29, 2005 (5 year amortization payment of waiver is $313,969) | $1,509,517 | $1,237,238 | October 14, 2004<br>January 14, 2005<br>April 14, 2005<br>July 14, 2005<br>March 14, 2006 | $56,463<br>$56,463<br>$56,463<br>$56,463<br>$46,427 |
| June 30, 2005 – June 29, 2006 | $1,252,766 | $0 | October 14, 2005<br>January 14, 2006<br>April 14, 2006<br>July 14, 2006<br>March 14, 2007 | $261,097<br>$261,097<br>$261,097<br>$261,097<br>$208,378 |

AFI discloses that the Union filed a claim on June 17, 2004 on behalf of AFI's bargaining unit employees in the following amounts:

| 2004 Vacation | $1,045,690.20 |
|---|---|
| 2004 Personal Days | $ 159,647.60 |
| Contractual Grievances | $  88,756.56 |

The Union and AFI reached an agreement reflected in an amendment to the existing Collective Bargaining Agreement with respect to the assumption by New AFI of the obligation to pay the contractual 2004 vacation and 2004 personal days pursuant to an agreed-upon schedule. Further discussions recently occurred on this issue and AFI expects an additional amendment to be ratified prior to confirmation further extending such payments. The earlier agreement is referred to in Article VII(A)(3) of the Disclosure Statement. AFI has agreed to revise part 2.04 of the Plan to state clearly that New AFI will assume the modified Collective Bargaining Agreement, and the obligation to pay the amount necessary to satisfy the Union's one outstanding grievance respecting a tool allowance, which New AFI will pay in accordance with the modified Collective Bargaining Agreement once the Plan has been confirmed. The amount and payment date for that distribution is set forth in AFI's Projected Financial Information.

**F.    Final Orders Permitting Use of Cash Collateral, Senior DIP Financing, and Junior DIP Financing**

On May 12 and 13, 2004, the Court entered Final Orders regarding use of cash collateral, Senior DIP Financing, and Junior DIP Financing.  Taken together, these orders granted the Debtor permission to use cash collateral through and including August 31, 2003. They also provide the Debtor with sufficient DIP financing to fund its operations, consistent with its budget, during the Plan confirmation process.

**G.    Filing of Initial Plan**

On July 12, 2004, the Debtor filed a Plan providing for a sale of both plants and certain other assets to New AFI in exchange for the assumption of certain indebtedness.  That plan has been withdrawn.  The Debtor's new Plan is premised upon the closing of Plant 1, the less profitable of its two locations, and a separate sale for each of its manufacturing facilities.

**H.    Pending Motions to Approve Cash Use Agreement and Extend Senior and Junior DIP Financing**

After the expiration of the Final Cash Use Order on August 31, 2004, the Debtor and the Senior Lenders entered into a series of consensual cash use extensions culminating in the filing of a joint cash use motion on October 22, 2004.  The Debtor also filed contemporaneous motions to continue and extend its present Senior and Junior DIP Financing.  The Debtor has secured a $3,300,000 commitment from its Junior DIP Lender.  Each of these motions were granted on January 4, 2005.  The Senior Lenders recently consented to additional cash use through March 31, 2004.  The Debtor and the Senior Lenders anticipate entering into further cash use agreements for such periods as are necessary to consummate the Plan.

**VII.    PLAN OF REORGANIZATION**

THE FOLLOWING DISCUSSION OF THE PLAN CONSTITUTES A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS OF THE PLAN ITSELF. YOU SHOULD READ THE PLAN BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. CHANGES MAY BE MADE TO THE PLAN. ANY SUCH CHANGES MADE TO THE PLAN WILL BE DESCRIBED AT THE PLAN CONFIRMATION HEARING.

As contemplated in the Solicitation, Classes 3, 4, 5, and 6 are entitled to vote pursuant to the Plan.

**A.    Unclassified Allowed Claims and Their Treatment**

1.    Administrative Expense Claims

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees, in writing, to a less favorable treatment or has been paid by the Debtor prior to the Effective Date, and except as specifically set forth in the Plan

to the contrary, each holder of an Allowed Administrative Expense Claim shall receive, in full and complete settlement, discharge and satisfaction of its Allowed Administrative Expense Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable.  With respect to Administrative Expense Claims of the Debtor's vendors, such vendors shall be entitled to payment pursuant to agreed-upon trade terms.  Purchase Orders from post-petition vendors shall presumptively establish agreed-upon trade terms for purposes of the Plan.

The Debtor estimates that it will have approximately $500,000 in Allowed Administrative Expense Claims.  The Debtor also estimates that approximately $1,750,000 of post-petition employee obligations will be due and payable by the Reorganized Debtor (or New AFI, if it assumes such obligations).

2.    Claims for Underfunded Pension Liabilities and Pension Excise Taxes

The New AFI Sale is premised upon the assumption of Allowed Claims for Underfunded Pension Liabilities by New AFI, regardless of whether such Claims are administrative in nature, entitled to payment on a priority basis under § 507 of the Code, or allowable as Unsecured Claims.  New AFI shall pay such Claims in full.  If the IRS and/or PBGC grant one or more waivers of minimum funding contribution requirements, New AFI shall make the first payment to which such waiver applies on the first day of the first month after the Effective Date (or, if a waiver is granted after the Effective Date, such date as may be agreed upon by the IRS and/or PBGC), and shall continue making payments quarterly thereafter, with interest, pursuant to IRS procedures and regulations.

New AFI will also assume, and pay in full, Allowed Pension Excise Tax Claims. New AFI may, at its option, pay such Claims (i) on the Effective Date or (ii) in quarterly installments over a six year period, with interest at a fixed annual rate of 6.5% and the first payment due on the first day of the first month after the Effective Date.

Claims for Underfunded Pension Liabilities are not impaired under the Plan because they will be paid in full, upon the earlier of (i) their scheduled due dates and (ii) the payment date or dates to which the IRS and/or PBGC give their consent based on waivers of minimum funding contribution requirements.

3.    Claims Arising Under the Collective Bargaining Agreement

The New AFI Sale is premised upon the assumption by New AFI of Allowed Claims for Accrued Vacation Pay and Accrued Personal Day Pay, regardless of whether such Claims are otherwise administrative in nature, entitled to payment on a priority basis under § 507 of the Bankruptcy Code, or allowed as General Unsecured Claims.  New AFI shall pay such Claims, in full, through four (4) monthly Cash payments commencing the fifteenth (15th) day of the first full month after the Effective Date in an aggregate amount equal to such Allowed Claims.  If the Debtor does not have an agreement with the Union in place on the Effective Date to modify the Collective Bargaining Agreement (in accordance with the agreement of August 21, 2004, described more fully in the Disclosure Statement), then New AFI shall pay, in Cash, on the fifteenth (15th) day of the first full month after the Effective Date, so much of the Accrued

Vacation Pay and Accrued Personal Day Pay as is entitled to payment as a Priority Claim. In such event, any remaining balance of Accrued Vacation Pay and Accrued Personal Day Pay shall be paid included as a Class 5 General Unsecured Claim.

Claims for Accrued Vacation Pay and Accrued Personal Day Pay are not impaired under the Plan because, such Claims shall be paid in full in accordance with terms to which the Union has given its consent.

The Debtor estimates that it has approximately $988,227 in Allowed Claims for Accrued Vacation Pay and $109,096 in Allowed Claims for Accrued Personal Day Pay.

4.    Pension Plans

The Debtor intends, and the Plan contemplates, that New AFI will assume the Pension Plans, as first modified and restructured under the Plan. Thereafter, New AFI will be the contributing sponsor of the Debtor's Pension Plans. Each of the Pension Plans is a defined benefit pension plan insured by the Pension Benefit Guaranty Corporation ("PBGC") under Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1301-1461, *et seq*. The Pension Plans are subject to minimum funding requirements of ERISA and § 412 of the Internal Revenue Code. It is the position of the PBGC that no provision of the Plan, the Confirmation Order, or § 1141 of the Code will discharge, release, or relieve the Debtor or any other party, in any capacity, from any liability with respect to the Pension Plans under any law, governmental policy, or regulatory provision. In addition, it is the position of the PBGC that neither the PBGC nor the Pension Plans shall be enjoined from enforcing such liability as a result of the Plan's provisions for satisfaction, release and discharge of claims. The Debtor does not concur with the PBGC's positions, although it makes provision for the satisfaction of Underfunded Pension Liabilities in the Plan. The Plan does not release PBGC's pension related claims, if any, against persons other than the Debtor, Reorganized Debtor, or New AFI.

It is the position of the PBGC that the Pension Plans are underfunded on a termination basis in an amount it estimates to be $5,912,300 for the Salaried Plan and $6,981,100 for the Retirement Income Plan. An underfunded pension plan can terminate only in either a distress termination or PBGC-initiated termination under Title IV of ERISA. Should the Pension Plans terminate, it is the position of the PBGC that it will assert claims for the underfunding, for any unpaid minimum funding contributions owed the Pension Plan, and for any unpaid premiums owed the PBGC. The Debtor does not concur with the PGBC's positions. The Pension Plans will not terminate, however, if the Plan is confirmed. If the Pension Plans terminate, the PBGC's contingent termination claims could become Allowed Claims against the Estate.

5.    Professional Fee Claims

All Persons acting as professionals of the Debtor seeking an award by the Bankruptcy Court of a Professional Fee Claim, after the application of retainers and carve-out payments, if any, or of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 503(b)(2), 503(b)(3),

503(b)(4) or 503(b)(5) of the Bankruptcy Code: (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within forty five (45) days after the Confirmation Date; and (b) if granted, such an award by the Bankruptcy Court, shall, unless first paid in full by the Debtor, be assumed by New AFI and paid in full in such amounts as are allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Professional Fee Claim becomes an Allowed Professional Fee Claim, or as soon thereafter as practicable, (ii) upon such other terms as may be mutually agreed upon between such holder of the Allowed Professional Fee Claim and the Debtor, or, on and after the Effective Date, New AFI, or (iii) in accordance with any administrative procedures order entered by the Bankruptcy Court.  All Professional Fee Claims for services rendered by professionals of the Debtor in connection with the Bankruptcy Case and the Plan after the Confirmation Date shall be assumed and paid by New AFI upon receipt of an invoice therefor, or on such other terms and conditions as New AFI may agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.  New AFI shall accede to the rights of the Debtor in and to any retainer paid by the Debtor to its Professionals.

6.    Senior DIP Lender's Claims

Unless otherwise agreed by the Senior DIP Lender, in writing, the Debtor's obligations under or evidenced by the Senior DIP Financing, will be paid in full on the Effective Date.

7.    Junior DIP Lender's Claims

Unless otherwise agreed by the Junior DIP Lender, in writing, the Debtor's obligations under or evidenced by the Junior DIP Financing, including the "Commitment Fee," as that term is defined in the Final Junior DIP Financing Order, and the "DIP Lender's attorney's fees," as that term is defined in the Final Junior DIP Financing Order, will be paid in full on the Effective Date.  The difference between AFI Lending Group's $3,300,000 commitment and the outstanding balance of the Junior DIP Financing shall be computed and funded on the Effective Date and converted concurrently to a membership interest in New AFI.  The balance due shall also be converted to a membership interest in New AFI.

8.    U.S. Trustee

Pursuant to 28 U.S.C. §1930(a)(6), a reorganized debtor is obligated to continue paying statutory quarterly fees to the United States Trustee post-confirmation of a plan of reorganization until the case is closed, dismissed or converted. The Reorganized Debtor (or New AFI, if it assumes such responsibility with the consent of the United States Trustee) will be responsible for making such statutory quarterly payments and submitting appropriate financial reports to the United States Trustee until the Reorganization Case is closed.

**B.      Classification and Treatment of Allowed Claims and Interests**

A summary of the classification and treatment of Allowed Claims and Allowed Interests under the Plan is set forth below.

1.      Class 1:  Priority Tax Claims

Distributions:  Except to the extent that a holder of an Allowed Class 1 Claim has been paid by the Debtor prior to the Effective Date or agrees, in writing, to a different treatment, each holder of an Allowed Class 1 Claim as of the Record Date shall receive, as payment in full, at the sole option of New AFI, (a) Cash in an amount equal to such Allowed Class 1 Claim on the later of the Effective Date and the date such Claim becomes an Allowed Class 1 Claim, or as soon thereafter as is practicable, (b) equal quarterly Cash payments in an aggregate amount equal to such Allowed Class 1 Claim, together with interest at a fixed annual rate equal to 6.5% through the sixth anniversary date of the Effective Date, or (c) upon such other terms determined by the Bankruptcy Court to provide the holder of such Allowed Class 1 Claim deferred Cash payments having a value, as of the Effective Date, equal to such Allowed Class 1 Claim.

The Debtor estimates that its Priority Tax Claims are approximately $1,438,374.

**Class 1 is unimpaired under the Plan.  Each holder of an Allowed Class 1 Claim is conclusively presumed to have accepted the Plan and, consequently, is not entitled to vote to accept or reject the Plan.**

2.      Priority Non-Tax Claims

Distributions:  Except to the extent that a holder of an Allowed Class 2 Claim has been paid by the Debtor prior to the Effective Date or agrees, in writing, to a different treatment, each holder of an Allowed Class 2 Claim as of the Record Date shall receive, as payment in full, Cash in an amount equal to such Allowed Class 2 Claim on the later of the Effective Date and the date such claim becomes an Allowed Class 2 Claim, or as soon thereafter as practicable, or such other treatment that will not impair the holder of such Allowed Class 2 Claim in accordance with Section 1124 of the Bankruptcy Code.

The Debtor estimates that its Priority Non-Tax Claims are approximately $127,317.

**Class 2 is unimpaired under the Plan.  Each holder of an Allowed Class 2 Claim is conclusively presumed to have accepted the Plan and, consequently, is not entitled to vote to accept or reject the Plan.**

3.      Class 3:  Allowed Secured Claims

Class 3A:  Senior Lender Secured Claims.

Distributions:  The Allowed Class 3A Claims of the Senior Lenders shall consist of the Secured Revolver Debt, the Secured Term Debt, and all accrued and unpaid interest thereon and fees, costs, and charges incurred by the Senior Lenders in connection therewith, in an amount estimated to be $26,961,000 in the aggregate but subject to final determination as of the Effective Date.  Except to the extent that a holder of an Allowed Class 3A Claim has been paid by the Debtor prior to the Effective Date or agrees, in writing, to a different treatment, each holder of an Allowed Class 3A Claim as of the Record Date shall receive the treatment set forth in Article VII hereof on the Effective Date.

Retention of Liens:  Each holder of an Allowed Class 3A Claim shall, to the extent provided in Article VII of the Plan, retain the Liens (or replacement Liens) securing its Allowed Class 3 Claim as of the Effective Date until full and final satisfaction of such Allowed Class 3 Claim is made as provided herein, and upon such full and final satisfaction, such Liens shall, except to the extent provided in Article VII hereof, be deemed null and void, and shall be unenforceable for all purposes (all without further act or action).

**Class 3A is impaired under the Plan.  Holders of Allowed Class 3A Claims are entitled to vote to accept or reject the Plan.**

Class 3B:  Subordinated Secured Claims.

Distributions:  The Allowed Class 3B Claims of the Subordinated Lenders shall be $8,530,530.34 in the aggregate.  Notwithstanding any provision hereof to the contrary, the Allowed Class 3B Claims shall, upon the Effective Date, be subordinate with respect to distributions to the Allowed Claims in Class 4, 5 and 6.  Accordingly, the holders of Allowed Class 3B Claims shall receive no distribution on account of their Allowed Claims.

Retention of Liens:  Each holder of an Allowed Class 3B Claim shall retain the Liens (or replacement Liens) securing its Allowed Class 3B Claim until the Effective Date.  Upon the Effective Date, all such Liens shall be null and void, and shall be unenforceable for all purposes (without further act or action).

**Class 3B is impaired under the Plan.  Holders of Allowed Class 3B Claims are entitled to vote to accept or reject the Plan.**

4.    Miscellaneous Secured Claims

Distributions:  Except to the extent that a holder of a Miscellaneous Secured Claim has been paid by the Debtor prior to the Effective Date or agrees, in writing, to a different treatment (including, without limitation, by consenting to the payment terms applicable to its indebtedness contained in an Asset Purchase Agreement), each holder of an Allowed Miscellaneous Secured Claim as of the Record Date shall receive payment in full of its Allowed Class 4 Claim in accordance with the term set forth in Article VII of the Plan.

The Debtor estimates that its Miscellaneous Secured Claims are approximately $169,623.

Retention of Liens:  Each holder of an Allowed Class 4 Claim shall retain the Liens securing its Allowed Class 4 Claim as of the Effective Date until full and final payment of such Allowed Class 4 Claim is made as provided herein, and upon such full and final payment, such Liens shall be unenforceable for all purposes (all without further act or action).

**Class 4 is impaired under the Plan.  Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.**

5.    Class 5:  General Unsecured Claims

Distributions:  Except to the extent that a holder of a General Unsecured Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each holder of an Allowed General Unsecured Claim as of the Record Date, other than General Unsecured Claims otherwise treated in accordance with the Plan, shall receive payment, in full and complete settlement, discharge and satisfaction of such Allowed Class 5 Claims, in accordance with the terms set forth in Article VII of the Plan.

The Debtor's Schedules list General Unsecured Claims having an aggregate value of $14,830,552.  The Plan provides that holders of such Claims shall be entitled to a Pro Rata share of a $1,750,000 sum, with such distributions being made, over time, in accordance with Article VII of the Plan.

**Class 5 is impaired under the Plan.  Holders of Allowed Class 5 Claims are entitled to vote to accept or reject the Plan.**

6.    Class 6:  IDEM Claims

Distributions:  Except to the extent that IDEM, as the holder of an Allowed IDEM Claim, has been paid post-petition or agrees to a different treatment, IDEM shall receive payment, in full and complete settlement, discharge and satisfaction of such Allowed Class 6 Claims, in accordance with the terms set forth in Article VII of the Plan.  Any such post-petition payments shall be credited against payments due under the Plan.  If the Landfills or components thereof are liquidated at any time subsequent to the Effective Date, all Net Proceeds therefrom shall be distributed to IDEM, on account of its Allowed Class 6 Claim, as soon as practicable after any such sale.

The Debtor estimates that IDEM Claims, including Claims scheduled as contingent, will become Allowed Claims of approximately $5,000,000.  The Plan provides that IDEM will receive, on account of its Allowed IDEM Claim, the rights under a trust agreement for a trust fund in the amount of $1,021,000 from a letter of credit furnished by the Debtor and an assignment of proceeds from the Debtor's Insurance Claim – Kemper.

AFI acknowledges that its operations are subject to a variety of federal and state environmental statutes and regulations.  Under these environmental laws, IDEM asserts that AFI has actual and potential liabilities.  IDEM alleges various violations of the Resource Conservation and Recovery Act, the Clean Water Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Clean Air Act, Indiana's equivalent acts

of the aforementioned and/or similar federal or state environmental laws. Under certain circumstances, these laws provide for civil penalties and remediation of contamination resulting from discharges and releases into the environment. AFI has been notified by IDEM of various alleged violations and its statutory obligations that might arise from such alleged violations. AFI has responded to or is in the process of responding to IDEM's allegations and notices.

Further, AFI discloses that IDEM has asserted claims equal to approximately $22,000,000 in the aggregate, based on eleven Proofs of Claim filed and incorporated herein. IDEM and AFI were engaged in discussions concerning alleged violations pre-petition and continued such discussions post-petition. Although AFI estimates that IDEM's claims will be allowable in an amount approximately equal to $5,000,000, IDEM presently does not agree with AFI's conclusion. Pursuant to the Plan of Reorganization, IDEM's recovery (based on IDEM's status as the sole member of its class) is limited to exercise of its rights to a $1 million Letter of Credit presently in IDEM's possession, plus its potential recovery of the insurance claim to be assigned to it under the Plan.

**Class 6 is impaired under the Plan. Holders of Allowed Class 6 Claims are entitled to vote to accept or reject the Plan.**

7.    Class 7:  Common Stock Interests

Distributions.  This Class shall retain its Common Stock and all rights therein subject to the provisions of the Plan, but shall not receive or retain any property or distributions under the Plan on account of such Equity Interests.

The Net Proceeds of any non-cash assets retained by the Reorganized Debtor shall be distributed to Class 5 Unsecured Creditors under the Plan. Consequently, the Common Stock will have no market value.

**Holders of Allowed Class 7 Interests are deemed to reject the Plan. Consequently, holders of Allowed Class 7 Interests are not entitled to vote to accept or reject the Plan.**

C.    **Conditions to Confirmation of the Plan**

Confirmation of the Plan is subject to a number of conditions, including, but not limited to, approval of the Plan by the Bankruptcy Court pursuant to Bankruptcy Code Section 1129. In particular, confirmation of the Plan is conditioned in part upon:

1.    Conditions to Confirmation.

(a)    The Bankruptcy Court shall have entered a Final Order approving this Disclosure Statement with respect to the Plan;

(b)    The Confirmation Order shall have been entered.

2.      <u>Conditions to Effectiveness of the Plan</u>.  The following are conditions precedent to the occurrence of the Effective Date, and will remain in effect on the Effective Date, unless (except as otherwise provided) waived in writing by the Debtor and the Senior Lenders:

(a)      <u>Confirmation Order.</u> The Confirmation Order shall have been entered by the Bankruptcy Court, more than ten (10) days shall have elapsed since the Confirmation Date, no stay of the Confirmation Order shall be in effect and the Confirmation Order shall not have been reversed, modified or vacated.

(b)      <u>Plan Implementation</u>.  All actions, documents, and agreements necessary to implement the Plan and the New AFI Sale have been effected or executed, including, without limitation, the execution, delivery and/or filing of the Plan Supplement and the funding of all commitments pursuant to which New AFI will fulfill its obligations to the Senior Lenders under the Plan, including, without limitation, capital call commitments and funding commitments under the New Credit Facility.

(c)      <u>Substitution of Parties.</u>  The Reorganized Debtor shall be substituted for the Debtor in all adversary proceedings and contested matters pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere.

**D.      General Provisions**

1.      <u>Retention of Jurisdiction.</u>

Notwithstanding confirmation of this Plan, the Bankruptcy Court will retain jurisdiction for the following purposes:

(a)      <u>In General</u>.  The Bankruptcy Court will retain jurisdiction to determine the allowance and payment of any Claim(s) upon any objection(s) thereto (or other appropriate proceedings) by the Debtor or any other party-in interest entitled to proceed in that manner as well as all other matters related to distributions under the Plan. As part of such retained jurisdiction, the Bankruptcy Court will continue to determine the allowance of Administrative Claims and any request(s) for payment(s) thereof. Additionally, the Bankruptcy Court will retain jurisdiction to determine the allowance, legality and payment of all Claims asserted by the IRS pursuant to Section 505 of the Bankruptcy Code or otherwise and in order to resolve any issues regarding United States Trustee quarterly fees.

(b)      <u>Sale Hearings.</u> The Bankruptcy Court will retain jurisdiction to hear and determine all matters in connection with the sale of the Debtor's assets.

(c)      <u>Plan Disputes and Enforcement.</u> The Bankruptcy Court will retain jurisdiction to determine any dispute(s) which may arise regarding the interpretation of any provision of the Plan and to enforce any provisions of this Plan and any and all documents relating to the Plan.

(d)     <u>Further Orders.</u> The Bankruptcy Court will retain jurisdiction to facilitate the performance of the Plan by entering any further necessary or appropriate order(s) regarding enforcement of the Plan and any provisions thereof. In addition, the Bankruptcy Court will retain jurisdiction to facilitate or implement the discharge of any Claim, or any portion thereof, pursuant to the Plan.

(e)     <u>Other Actions.</u>  Except as otherwise specifically provided in the Plan, the Bankruptcy Court will retain jurisdiction to adjudicate all causes of action retained by the Debtor or Reorganized Debtor. This provision will not restrict the rights of the Reorganized Debtor to proceed in any other court of competent jurisdiction; and it will not be construed to require the Reorganized Debtor to proceed in any other such court if the court also has proper jurisdiction.

(f)     <u>Final Decree.</u> The Bankruptcy Court will retain jurisdiction to enter an appropriate final decree in the Reorganization Case.

(g)     <u>Appeals.</u> In the event of an appeal of the Confirmation Order or any other type of review or challenge to the Confirmation Order, and provided that no stay of the effectiveness of the Confirmation Order has been entered, the Bankruptcy Court will retain jurisdiction to implement and enforce the Confirmation Order and this Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding the Plan or the performance thereof as may be necessary or appropriate to effectuate the reorganization.

(h)     <u>Executory Contracts.</u> The Bankruptcy Court will retain jurisdiction to determine any and all matters regarding Executory Contracts, including, but not limited to, assumptions or rejections thereof, and any and all Claims arising from such Executory Contracts, including, but not limited to, rejection damages claims.

2.     <u>General Provisions.</u>

(a)     <u>Additional Assurances.</u>  The Reorganized Debtor will execute such other and further documents as are necessary to implement any of the provisions of the Plan.

(b)     <u>Extension of Payment Dates.</u> If any payment date falls due on a day other than a Business Day, then such payment date will be extended to the next Business Day.

(c)     <u>Interest on Claims.</u> Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

(d)     ***<u>Exculpation and Limitation of Liability.</u>  None of the Debtor, the Reorganized Debtor, New AFI, the Senior DIP Lender, the Junior DIP Lender, the Creditors' Committee, or any of their respective members, shareholders, officers, directors, employees, advisors, Professionals or agents shall have or incur any liability to any holder of a Claim or***

*Equity Interest for any action or omission in connection with, related to, or arising out of the Reorganization Case, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct and gross negligence, and, in all respects, the Debtor, the Reorganized Debtor, the Purchaser or Purchasers, New AFI, the Senior DIP Lender, the Junior DIP Lender, and the Creditors' Committee, and each of their respective members, shareholders, officers, directors, employees, advisors, Professionals and agents will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided, however, that nothing in this section shall be deemed a release of any non-debtor from liability, if any, under Title I of the Employee Retirement Income Security Act of 1974, as amended.*

*(e)    <u>Release of Claims.</u>  On the Effective Date, the Debtor and the Reorganized Debtor will automatically release and will be deemed to release any and all claims (including any claims arising out of any alleged fiduciary or other duty) that they have or may have against (i) the Senior Lenders, arising or based upon any actions, conduct, or omissions occurring prior to the Effective Date, or based upon their status as a pre- or post-petition lender of the Debtor and (ii) any of their officers and directors who held such positions after the Petition Date in their capacities as such, arising or based upon any actions, conduct or omissions occurring prior to the Effective Date, or based on their status as officers and directors, excluding willful misconduct and gross negligence. The Confirmation Order shall constitute an order approving the compromise, settlement and release of any and all such claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. To the full extent permitted by applicable Law, each holder of a Claim (whether or not Allowed) against or Equity Interest in the Debtor shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover and shall be deemed to release any Claim against (i) the Senior Lenders and (ii) such officers and directors occurring prior to the Effective Date, excluding, however, willful misconduct and gross negligence.*

(f)    <u>Captions</u>. Section captions used in the Plan are for convenience only, and will not affect the construction of the Plan.

(g)    <u>Disclosure Statement.</u> Holders of Claims and Equity Interests and all other interested parties are referred to this Disclosure Statement, which accompanies the Plan in conjunction with the solicitation of acceptances of the Plan.

(h)    <u>Successors and Assigns</u>. The rights and obligations of any holder of a Claim or Equity Interest referred to in the Plan will be binding upon, and will inure to the benefit of, the successors, assigns, heirs, devisees, executors, and personal representatives of such holder.

(i)    <u>Governing Law.</u>  Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable to the Debtor, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Indiana, without giving effect to the principles of conflicts of law thereof.

(j)    Revocation.  If the Plan is revoked or withdrawn prior to Confirmation, if Confirmation does not occur, if the Effective Date does not occur in accordance with the Plan or if the Reorganized Debtor does not make the required payments on, or as soon as reasonably practical after the Effective Date (unless waived by the recipient thereof), then the Plan (and the previously entered Confirmation Order) shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any other Person.

(k)    Reservation of Rights.  The filing of the Plan, any statement or provision contained therein or in this Disclosure Statement or the taking of any action by the Debtor with respect to the Plan is not an admission or a waiver of any rights prior to the Effective Date, except as specifically set forth in the Plan with respect to the period of time prior to the Effective Date.

(l)    Fractional Dollars. Notwithstanding any other provision of the Plan, no payments of or on account of fractions of dollars will be made to any holder of an Allowed Claim. When any payment of or on account of a fraction of a dollar to any holder of a Claim would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest whole number (up or down).  The Debtor shall not be required to make any distribution or issue any check that would be in an amount less than five dollars ($5.00) on account of any Claim.

(m)    Unclaimed Property.  Any Property held for distribution in accordance with the Plan by the Debtor which is unclaimed or undistributed on the first anniversary of the Effective Date (except to the extent it is a Disputed Claim or Disputed Interest) shall be distributed in accordance with the Plan.

(n)    Payment Option.  At the option of the Debtor except as otherwise required or provided in the Plan or by any applicable agreement, any Cash payment to be made pursuant to the Plan may be made by check on a United States Bank mailed by first class mail or by wire transfer.

(o)    Amendments.  The authority of the Debtor and any other party to an agreement or instrument to agree to modifications, supplements or amendments thereto shall be as provided in such agreement or instrument, but may not be inconsistent with the Plan.

(p)    Post-Confirmation Reportings. Until the entry of the Final Decree, the Debtor shall comply with the post-confirmation reporting requirements. Additionally, the Debtor shall file post-confirmation monthly operating reports.

## VIII.  FINANCIAL PROJECTIONS

The Debtor's financial projections are attached as Exhibit B hereto.

## IX.     SELECTED HISTORICAL FINANCIAL INFORMATION

Attached to the Disclosure Statement is a copy of the audited financial statements for the prepetition Debtor for the years ending December 31, 2001 and 2002, and the Debtor's monthly operating reports since the commencement of the Chapter 11 case.  This data includes historical and current financial information such as balance sheets, income statements, profit and loss statements, and cash flow statements.

The historical financial information is not necessarily indicative of the future results of operations of the Reorganized Debtor or any Purchaser.

## X.      CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

Under the Internal Revenue Code of 1986, as amended (the "Tax Code"), there are certain federal income tax consequences associated with the Plan. The following is only a summary discussion of certain significant consequences. This Disclosure Statement does not constitute and is not intended to constitute either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only. This summary is based upon laws, regulations, rulings and decisions now in effect and upon proposed regulations of the Internal Revenue Service ("Service"), all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision.  Under present law, there is substantial uncertainty surrounding many of the tax consequences discussed below. Uncertainty is created, in part, by the changes made by the Bankruptcy Tax Act of 1980, the Tax Reform Act of 1984, the Tax Reform Act of 1986, the Revenue Reconciliation Act of 1990, and the Taxpayer Relief Act of 1997, certain provisions of which call for the promulgation of regulations ("Regulations") by the United States Department of the Treasury ("Treasury Department") which have not yet been promulgated or have not yet become final. As a result, many alternative tax consequences are possible. In addition, there are differences in the nature of the claims of Creditors, their methods of tax accounting and prior actions taken by Creditors with respect to their Claims. Further, this summary does not discuss all aspects of federal taxation that may be relevant to a particular Creditor affected by special considerations not discussed below. For example, certain types of Creditors (including non-resident aliens, foreign corporations, broker-dealers, financial institutions, life insurance companies and tax exempt organizations) may be subject to special rules not discussed below. In addition to the federal income tax consequences discussed below, the transactions contemplated herein may have significant state, local and foreign tax consequences which are not discussed herein. Neither a ruling from the Service nor an opinion of counsel has been requested with respect to the federal income tax consequences of the Plan.

ACCORDINGLY, CREDITORS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THEIR CLAIMS. THE DEBTOR AND ITS COUNSEL ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF

THE PLAN AS TO ANY CREDITOR NOR IS THE DEBTOR OR ITS
COUNSEL RENDERING ANY FORM OF LEGAL OPINION AS TO
SUCH TAX CONSEQUENCES.

The Debtor is a Subchapter S corporation. The Debtor estimates that any taxable
gain occasioned by the New AFI Sale and the Plant 1 Auction will be taxable, if at all, to its
shareholders rather than the corporation. Accordingly, based on the Debtor's present knowledge
and information, the Debtor believes the sales contemplated by the Plan will not result in the
imposition of additional tax upon the Estate.

## XI.    ALTERNATIVES TO THE PLAN

The Debtor believes that the Plan maximizes the value of its Estate and
provides creditors the greatest possible value and return that can be realized on their Allowed
Claims. The Debtor recommends that you vote to accept the Plan. The Plan, however, can be
confirmed even if it is not accepted by every impaired class of Allowed Claims or Allowed
Interests, so long as the Plan meets the "cram-down" standards set forth in section 1129(b)
of the Bankruptcy Code.

### A.    Other Plans of Reorganization

In the event the Plan is not confirmed, alternatives to confirmation of the
Plan include the submission of an alternative plan or plans of reorganization by AFI or by
another party-in-interest, the sale of AFI's assets or the liquidation of AFI. The Debtor believes
that the confirmation of any plan of reorganization proposed by another party-in-interest would
involve costly and time-consuming procedures, including, *inter alia,* the possibility of
protracted and costly litigation.

### B.    Liquidation Under Chapter 7 of the Bankruptcy Code

The Bankruptcy Code requires that each holder of an impaired Claim or Interest
either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the
Effective Date, that is not less than the value such holder would receive or retain if AFI were
liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. The first step in
meeting this test is to determine the dollar amount that would be generated from the liquidation
of the Debtor's assets in the context of a chapter 7 case. Such amount is reduced by the amount
of any claims secured by the Debtor's assets. Unpaid chapter 11 administrative expenses, and
the costs and expenses of the liquidation and additional administrative expenses that will result
from the termination of the Debtor's businesses and the use of chapter 7 for the purposes of
liquidation must also be paid. Any remaining net cash would be allocated to creditors and
shareholders of the Debtor in strict priority in accordance with section 726 of the
Bankruptcy Code.

In connection with the Disclosure Statement, AFI prepared a liquidation
analysis ("Liquidation Analysis"). Section 1129(a)(7) of the Bankruptcy Code requires that, as to
each holder of an impaired claim or interest, such claim or interest (i) has accepted the plan of

reorganization ("POR"); or (ii) will receive or retain under the POR, on account of such claim or interest, property of a value as of the Effective Date of the POR that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

This Liquidation Analysis indicates the value that may be obtained by a chapter 7 trustee for the benefit of Classes of Claims and Interests upon the disposition of assets of the Debtor's bankruptcy estate pursuant to a chapter 7 liquidation as an alternative to the operation of a going concern business and payments in accordance with the POR. Accordingly, the values of assets discussed in this Liquidation Analysis may differ from values referenced in the Plan.

This Liquidation Analysis is based upon significant estimates and assumptions that, although developed in AFI's reasoned business judgment, are, by their nature, subject to economic and competitive contingencies and uncertainties that are largely beyond the control of AFI. The Liquidation Analysis is also AFI's best determination of the manner in which assets of its bankruptcy estate are most appropriately liquidated, and a chapter 7 trustee may not make the same liquidation determinations, and accordingly, such determinations are subject to change. Thus, there can be no guaranty or assurance that the values reflected in this Liquidation Analysis would be realized if AFI were, in fact, to undergo a chapter 7 liquidation.

The following is a list of key uncertainties that exist with respect to the Liquidation Analysis, and key assumptions made in conjunction therewith:

1.    This Liquidation Analysis assumes that AFI's assets would not be shut down immediately, but instead would be shut down in a safe and reasonable manner, although it is not contemplated that the chapter 7 trustee would undertake limited operations for the purpose of utilizing raw materials or completing work-in-process.

2.    During the liquidation period, corporate operations would cease with almost all positions phased out as soon as practicable. Certain limited corporate personnel, such as certain of those in the financial and management information systems areas, would be retained by the chapter 7 trustee for the liquidation period in order to support the completion of an orderly liquidation.

3.    Following corporate winddown and likely disposition of leases and certain related property, plant and equipment of AFI, it is assumed that the chapter 7 trustee would liquidate all remaining miscellaneous assets in an orderly manner.

4.    The winddown costs during the liquidation period are good faith best estimates by AFI, and any deviation from this timeframe could materially affect winddown costs, claims proceeds from the liquidation of assets, and ultimately, the recovery to creditors.

5.      There is a general risk in any liquidation of unanticipated events that could have a substantial impact on both projected receipts of proceeds from assets and disbursements to creditors. These events include, but are not limited to, changes in raw materials costs, changes in general economic conditions and changes in the market value of AFI's primary assets.

6.      Other than as specifically addressed in this Liquidation Analysis, the issues of potential recoveries from Avoidance Actions and a bankruptcy claims reconciliation have not been addressed.

7.      The book values of assets for this Liquidation Analysis are estimated book values as of December 31, 2003. Accounts receivable are assumed to be collected on a best efforts basis, utilizing finished inventory in the possession of AFI relating to account debtors as leverage to collect accounts receivable. Finished goods will be sold and shipped to customers as soon as possible, and remaining inventory will be secured in a manner to prevent damage, and liquidated in an organized and timely manner. All sales of inventory are on an "as-is-where-is" basis, and accordingly, the amount of scrap inventory could increase.

8.      Property, plant and equipment includes the manufacturing assets of AFI, including all real property associated therewith.

9.      Costs associated with liquidation represent costs and expenses relating to asset preservation, idling expenses, environmental expenses, payroll and other various corporate functions during the winddown and liquidation period and chapter 7 professional fees incurred, including but not limited to those associated with the appointment of a chapter 7 trustee.

Estimate of Costs. The Debtor's costs of liquidation would include any obligations and unpaid expenses incurred by the Debtor during the Reorganization Case and the liquidation process, such as trade obligations, income taxes on gains resulting from the sale of assets, compensation for attorneys, financial advisors, accountants and other professionals and costs and expenses of members of any statutory committee of unsecured creditors appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code.  Furthermore, additional claims would arise by reason of the breach or rejection of obligations incurred and executory contracts or unexpired leases entered into by the Debtor both prior to and during the pendency of the Reorganization Case. It is possible that a conversion to a chapter 7 case could result in wind-down expenses being greater or less than the estimated amount. Such expenses are dependent, in substantial part, on the length of time of liquidation.

Unencumbered Assets. The Senior Lenders have first priority Liens on substantially all of the Debtor's assets.  As indicated below, the Debtor is presently pursuing potential preference actions.  A non-exclusive summary of such potential claims, based on

payments made by the Debtor within 90 days of the Petition Date, is attached to the Plan as Exhibit A and incorporated therein by reference.

The Debtor has identified fifteen (15) potential preferences which it is presently pursuing through formal demand letters. The aggregate relief sought by the Debtor is approximately $1,482,765. The Debtor is presently completing its analysis of invoice and payment data in conjunction with its preparation of adversary complaints. The Debtor reserves the right to pursue additional potential preferences based on its ongoing analysis.

Distribution of Net Proceeds Under Absolute Priority Rule. Under the absolute priority rule, no junior creditor can receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. Unpaid and chapter 11 administrative expense claims would be paid before any distribution to prepetition priority and unsecured creditors.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, including the limited unencumbered assets of the Debtor, the Debtor has determined that confirmation of the Plan will provide each holder of an Allowed Claim or Allowed Interest with a recovery that is not less than it would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

The Debtor also believes that the value of any distributions from the liquidation proceeds to each class of Allowed Claims in a chapter 7 case would be the same or significantly less than the value of distributions under the Plan. In this regard, it is also possible that the distribution of proceeds of liquidation could be delayed for an extended period after the completion of such liquidation in order to resolve claims and prepare for distributions. In the event that litigation were necessary to resolve claims asserted in the chapter 7 cases, the delay could be further prolonged and administrative expenses further increased.

The liquidation analysis is an estimate of proceeds that may be generated as a result of hypothetical liquidations of the Debtor. Underlying the liquidation analysis are a number of assumptions and estimates that are inherently subject to significant economic, competitive and operational uncertainties and contingencies beyond the control of the Debtor or a chapter 7 trustee. Additionally, various liquidation decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtor's assets will result in an accurate estimate of the proceeds that would be realized were the Debtor to undergo actual liquidation. The actual amount of claims against the chapter 7 Estate could vary significantly from the Debtor's estimates depending upon the claims asserted during the pendency of the chapter 7 case. This analysis does not include liabilities that may result from litigation, certain new tax assessments or other potential claims, and does not include the value of potential recoveries from avoidance actions.

## XII.  CONFIRMATION REQUIREMENTS

### A.  The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing before a plan of reorganization may be confirmed. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the claim or number and type of shares of equity security interests held by the objector. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and certain other parties when and as set forth in the attached notice of confirmation hearing.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. At the hearing on the confirmation of the Plan, the Bankruptcy Court will confirm the Plan only if the requirements of the Bankruptcy Code, particularly those set forth in section 1129 of the Bankruptcy Code, have been satisfied.

### B.  Acceptances Necessary to Confirm the Plan

At the Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the requisite amount and number of Allowed Claims and Allowed Interests in each impaired class. Under the Bankruptcy Code, a class of creditors or equity security holders is impaired if its legal, equitable or contractual rights are altered by a proposed plan of reorganization. If a class is not impaired, each creditor or equity security holder in such unimpaired class is conclusively presumed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 1, 2, and 7 are not entitled to vote on the Plan. Classes 3, 4, 5, and 6 are impaired under the Plan and holders of Allowed Claims or Allowed Interests in such classes are entitled to vote for or against the Plan by completing and returning ballots mailed to them with this Disclosure Statement in the manner set forth in the ballots.

An impaired class of creditors and each holder of a claim in such class will be deemed to have accepted the Plan if the holders of at least two-thirds in amount and more than one-half of those in number of the Allowed Claims in such impaired class for which complete and timely ballots have been received have voted for acceptance of the Plan. An impaired class of equity securities and each holder of an interest in such class will be deemed to have accepted a plan if the plan has been accepted by at least two-thirds in amount of the interests in such class who actually vote on the Plan.

### C.  Best Interests of Creditors

To satisfy one of the requirements for confirmation of the Plan, the Debtor must establish and the Bankruptcy Court must find that, with respect to each class of Allowed Claims and Allowed Interests under the Plan, each holder of the Allowed Claim or Allowed Interests in that class either has accepted the Plan or will receive or retain under the Plan on account of such

Allowed Claim or Allowed Interest property of a value that is at least the amount that such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. The Section above regarding the liquidation analysis contains the Debtor's analysis of the likely results of chapter 7 liquidation of the Debtor. The Bankruptcy Court must compare the value of the distributions that would be made to each class in chapter 7 liquidation cases to the values of distributions to each class under the Plan to determine if the Plan is in the best interest of each class of Allowed Claims and Allowed Interest. THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF THE HOLDERS OF ALL ALLOWED CLAIMS AND PROVIDES VALUE TO ALL OF THEM IN EXCESS OF THE AMOUNTS OR IN THE SAME AMOUNTS THAT THEY WOULD RECEIVE IN CHAPTER 7 CASES OF THE DEBTOR.

### D.    Feasibility

As a condition to confirmation of the plan, the Bankruptcy Code requires the Bankruptcy Court to determine that confirmation is not likely to be followed by liquidation of the Reorganized Debtor or the need for further financial reorganization of the Reorganized Debtor. For purposes of determining whether the Plan meets this "feasibility" standard, the Debtor has analyzed the projected ability of the Reorganized Debtor (or a Purchaser which acquires its operational assets) to meet its obligations under the Plan and of the Reorganized Debtor (or a Purchase which assumes certain debts of the Debtor) to continue its operations. As part of this analysis, AFI prepared Financial Projections which are attached hereto as Exhibit B.

The Debtor believes that the results set forth in the Financial Projections are reasonable and attainable.  The Debtor has consistently operated within the confines of its cash use budgets since the outset of the Chapter 11 case, and consistently met or exceeded its projections for sales, operations, and earnings.  The Financial Projections for New AFI demonstrate an ability to continue such achievements subsequent to Plan confirmation.

Substantial effort has been made to ensure that the Financial Projections and assumptions on which they are based are reasonable. The Debtor cautions, however, that no representations can be made by the Debtor with respect to the accuracy of the Financial Projections or the Reorganized Debtor's ability to achieve the projected results. Many of the assumptions on which the Financial Projections are based are subject to major uncertainties. Some assumptions inevitably will not materialize and unanticipated events may affect the actual financial results. Therefore, the actual results achieved will vary from the projected results and the variations may be material. THE DEBTOR, HOWEVER, BELIEVES THAT THE PLAN IS FEASIBLE AND THE DEBTOR URGES THE HOLDERS OF ALL ALLOWED CLAIMS VOTING ON THE PLAN TO VOTE TO ACCEPT THE PLAN.

### E.    Confirmation of the Plan

In the event the Bankruptcy Court determines that all of the requirements for the confirmation of the Plan are satisfied, the Bankruptcy Court will issue the Confirmation Order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

## XIII.   <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

HOLDERS OF IMPAIRED CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THOSE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

BAKER & DANIELS

By:  /s/ John R Burns
     John R Burns (#3016-02)
     Stephen A. Claffey (#3233-98)
     Mark A. Werling (#20426-02)
     111 East Wayne Street, Suite 800
     Fort Wayne, Indiana 46802
     john.burns@bakerd.com
     stephen.claffey@bakerd.com
     mark.werling@bakerd.com
     Telephone:  (260) 424-8000
     Facsimile:  (260) 460-1700

ATTORNEYS FOR THE DEBTOR,
AUBURN FOUNDRY, INC.

**EXHIBIT A**

"PLAN OF REORGANIZATION"

**EXHIBIT B**

"PROJECTED FINANCIAL INFORMATION"

**EXHIBIT C**

"LIQUIDATION ANALYSIS"

**EXHIBIT D**

"DEBTOR'S MOST RECENT AUDITED FINANCIAL STATEMENTS
AND MONTHLY OPERATING REPORTS"

**EXHIBIT E**

"NEW AFI'S BANKING COVENANTS FOR
PAYMENTS TO OFFICERS AND DIRECTORS"

## EXHIBIT F

"EXHIBITS TO PLAN AND DISCLOSURE STATEMENT SUPPLEMENT"